# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANEL GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:24-cv-00090-JAM |
| v. | ) | |
| | ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., | ) | |
| a/k/a WORLD WRESTLING ENTERTAINMENT, | ) | |
| LLC; VINCENT K. MCMAHON; and JOHN | ) | |
| LAURINAITIS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT VINCENT K. McMAHON'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO COMPEL ARBITRATION

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

James A. Budinetz (ct16068)
McElroy, Deutsch, Mulvaney &
  Carpenter, LLP
One State Street, 14th Floor
Hartford, CT  06103
Telephone: (860) 522-5175
Facsimile:  (860) 522-2796
jbudinetz@mdmc-law.com

*Attorneys for Defendant*
*Vincent K. McMahon*

**KASOWITZ BENSON TORRES LLP**

Jessica T. Rosenberg
  (*admission pro hac vice pending*)
Jonathan L. Shapiro
  (*admission pro hac vice pending*)
1633 Broadway
New York, NY  10019
Telephone: (212) 506-1700
Facsimile   (212) 506-1800
JRosenberg@kasowitz.com
JShapiro@kasowitz.com

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ..................................................................................................................... 1

    A.   The Plaintiff ................................................................................................. 4

    B.   The Parties' Negotiation and Entry into the Agreement ..................................... 5

          1.   The Agreement's Negotiation and Monetary Terms ................................. 5

          2.   The Agreement's Release of Claims ........................................................ 7

          3.   The Agreement's Arbitration Provision ................................................... 8

          4.   The Agreement's Confidentiality and Severability Provisions .................. 9

          5.   Plaintiff's Acknowledgement That She Knowingly
             and Voluntarily Entered into the Agreement ......................................... 10

    C.   Plaintiff Commences This Action in Violation of the Agreement. ................... 10

ARGUMENT ......................................................................................................................... 10

    I.   SECTION X OF THE AGREEMENT IS A VALID AND ENFORCEABLE
       AGREEMENT TO ARBITRATE ...................................................................... 12

          A.   Plaintiff Knowingly and Voluntarily Signed the Agreement Containing
             the Arbitration Provision ..................................................................... 12

          B.   Plaintiff's Challenge to the Enforceability of the Agreement as a Whole
             (Rather than the Arbitration Provision) Should Be Decided by the Arbitrator
             and Not This Court ............................................................................. 14

    II.   PLAINTIFF'S CLAIMS FALL WITHIN THE SCOPE OF THE ARBITRATION
        AGREEMENT ............................................................................................... 17

    III.  THERE IS NO CONGRESSIONAL INTENT TO RENDER ANY CLAIMS
         ASSERTED IN THE COMPLAINT NON-ARBITRABLE ............................... 18

    IV.  THIS COURT SHOULD STAY THE ACTION PENDING ARBITRATION ............... 20

CONCLUSION ...................................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aminoff & Co. LLC v. Parcel Pro, Inc.*,
No. 21-cv-10377, 2022 WL 987665 (S.D.N.Y. Apr. 1, 2022) ...............................................11

*Arrigo v. Blue Fish Commodities, Inc.*,
408 F. App'x 480 (2d Cir. 2011) ...................................................................................15, 16

*AT & T Techs., Inc. v. Comm's Workers*,
475 U.S. 643 (1986)........................................................................................................11, 12

*In re Belton v. GE Cap. Retail Bank*,
961 F.3d 612 (2d Cir. 2020)..................................................................................................18

*Carter v. Reilly*,
Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S,
2023 WL 8889473 (Conn. Super. Ct. Dec. 20, 2023) ...................................................... 13-14

*Castillo v. Altice USA, Inc.*,
No. 1:23-cv-05040, 2023 WL 6690674 (S.D.N.Y. Oct. 12, 2023)........................................20

*Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*,
943 F.2d 220 (2d Cir. 1991)..................................................................................................20

*Contec Corp. v. Remote Sol.*, Co.,
398 F.3d 205 (2d Cir. 2005)..................................................................................................18

*Cuseo v. Aquent, Inc.*,
No. CV040568982, 2005 WL 532257 (Conn. Super. Ct. Jan. 31, 2005) ..............................17

*D'Antuono v. Serv. Road Corp.*,
789 F. Supp. 2d 308, 323 (D. Conn. 2011) ...........................................................................13

*Daly v. Citigroup Inc.*,
939 F.3d 415 (2d Cir. 2019)..................................................................................................11

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985)........................................................................................................10, 17

*Delo v. Paul Taylor Dance Found., Inc.*,
No. 22-cv-9416, 2023 WL 4883337 (S.D.N.Y. Aug. 1, 2023).............................................20

*Denney v. BDO Seidman, L.L.P.*,
412 F.3d 58 (2d Cir. 2005)....................................................................................................18

ii

*Dighello v. Busconi*,
   673 F. Supp. 85 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir. 1988) ...................................14

*DiMartino v. Hartford*,
   636 F. Supp. 1241 (D. Conn. 1986)...................................................................16

*Doe v. Steele*,
   No. 20-cv-1818, 2021 WL 927363 (S.D. Cal. Mar. 11, 2021)...............................................20

*Empire State Ethanol and Energy, LLC v. BBI Int'l*,
   No. 08-cv-623, 2009 WL 1813205 (N.D.N.Y. June 25, 2009) ............................................21

*Epic Sys. Corp., v. Lewis*,
   584 U.S. 497 (2018).........................................................................................11

*Fink v. Golenbock*,
   238 Conn. 183 (1996) ......................................................................................17

*Grabe v. Hokin*,
   341 Conn. 360 (2021) ......................................................................................19

*Green Tree Fin. Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000)...........................................................................................11

*Katsoris v. WME IMG, LLC*,
   237 F. Supp. 3d 92 (S.D.N.Y. 2017)..................................................................21

*Katz v. Cellco P'ship*,
   794 F.3d 341 (2d Cir. 2015)..............................................................................21

*Kuryla v. Coady*,
   No. AANCV126009961,
   2013 WL 1494223 (Conn. Super. Ct. Mar. 22, 2013) ..........................................18

*Lamkin v. Morinda Props. Weight Parcel, LLC*,
   440 F. App'x 604 (10th Cir. 2011) ...................................................................12

*Levine v. Massey*,
   232 Conn. 272 (1995) ......................................................................................13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)........................................................................................11, 17

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)..............................................................................12

*Oldroyd v. Elmira Sav. Bank, FSB*,
   134 F.3d 72 (2d Cir. 1998)................................................................................11

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
  No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019),
  *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020)...............................20

*Patushi v. Global Lending Services LLC*,
  No. 23-cv-00946, 2024 WL 1281553 (D. Conn. Mar. 26, 2024) (Meyer, J.) .................12, 13

*Pingel v. Gen. Elec. Co.*,
  No. 14-cv-00632, 2014 WL 7334588 (D. Conn. Dec. 19, 2014) ...........................................15

*Porcelli v. JetSmarter, Inc.*, No. 19-cv-2537,
  2019 WL 2371896 (S.D.N.Y. June 5, 2019) ........................................................................11

*Ramasamy v. Essar Glob. Ltd.*,
  825 F. Supp. 2d 466 (S.D.N.Y. 2011).....................................................................................12

*Rent-A-Ctr., W., Inc. v. Jackson*,
  561 U.S. 63 (2010)...........................................................................................14, 15, 16

*Shearson/American Express, Inc. v. McMahon*,
  482 U.S. 220 (1987).................................................................................................................18

*Success Sys., Inc. v. CRS, Inc.*,
  No. 21-cv-1391, 2023 WL 2742344 (D. Conn. Mar. 31, 2023) ..............................................13

*Ursini v. Goldman*,
  118 Conn. 554 (1934) ..............................................................................................................13

*White v. Kampner*,
  229 Conn. 465 (1994) ..............................................................................................................18

*Young v. Data Switch Corp.*,
  231 Conn. 95 (1994) ................................................................................................................16

*Zendon v. Grandison Mgmt., Inc.*, No. 18-cv-4545,
  2018 WL 6427636 (E.D.N.Y. Dec. 7, 2018) .........................................................................20

**Statutes**

Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act,
  9 U.S.C. § 401 *et seq.*...............................................................................................................19

Federal Arbitration Act,
  9 U.S.C. § 1 *et. seq.*..........................................................................................................10, 21

Speak Out Act,
  42 U.S.C. § 19401 *et seq.*.......................................................................................................19

Trafficking Victims Protection Act,
    18 U.S.C. § 1591 *et seq.*..........................................................................................................20

Defendant Vincent K. McMahon respectfully submits this memorandum of law in support of his motion to compel arbitration of Plaintiff Janel Grant's Complaint filed on January 25, 2024, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4.

## PRELIMINARY STATEMENT

By publicly filing her salacious, false and defamatory Complaint, Plaintiff has brazenly and intentionally violated a binding contract to arbitrate. The Complaint's outrageous claims of sexual abuse and coercion are pure fiction—plainly intended to garner publicity—and are flatly contradicted by Plaintiff's own contemporaneous statements. Contrary to Plaintiff's false allegations, Plaintiff and Defendant (collectively, the "Parties") engaged in a consensual relationship during which Defendant never coerced Plaintiff into doing anything and never mistreated her in any way. In fact, in a love letter Plaintiff wrote to Defendant shortly before the Parties ended their relationship, Plaintiff described Defendant as "[m]y best friend, my love and my everything," praising him for being the "wonderful, tender, vulnerable, heart-on-your-sleeve soul you really are." It is incredulous that Plaintiff, a then 42-year-old woman who claims on her resume to have a law degree from Pace University, would have written these words to Defendant months *after* all the events in the Complaint of alleged abuse, coercion, and "sex-trafficking" took place.

At the time the Parties met in 2019, Plaintiff was not "dealing with profound grief [from her parents' deaths] and struggling financially" as described in her Complaint and she had not been "devoting years to around-the-clock caregiving" of her parents. (*See* Compl. ¶ 3.) Those statements are complete falsehoods. Based on a foreclosure action against Plaintiff and her parents, Plaintiff's father passed away on April 18, 2017—two years before Plaintiff met Defendant – and his marital status was recorded as "widowed" confirming Plaintiff's mother had

passed earlier. *MTGLQ Investors, L.P. v. Grant*, Index No. 53017/2017, Dkt No. 132 at 1 (N.Y. Sup. Ct., Westchester Cnty., Mar. 12, 2021).

Court records further show that contrary to her claim of "around-the-clock caregiving," Plaintiff's father lived in a senior care home in Stamford, Connecticut before he passed away— not with her—and the Grants' neighbor would bring Plaintiff's mother dinner and "help around the house" before she passed. *Id.* Dkt. No. 31 ("Affidavit of Due Diligence") at 3. In fact, contrary to her story of around-the-clock devotion in the Complaint, the foreclosure action on her parents' home reveals that Plaintiff was adamant that she did not want to be associated with "any of this" and failed to respond to requests regarding the foreclosure action. Affidavit of Due Diligence at 3. Indeed, Plaintiff was so absent in her parents' lives that it took substantial time and significant effort for the creditor in the action to locate her and identify her as her parents' next-of-kin. *See generally id.*

In addition to falsehoods about her own background, Plaintiff's Complaint is further riddled with fabrications and omissions about her relationship with Defendant. During the Parties' consensual relationship, Plaintiff and Defendant knew that the other was also involved in other romantic relationships. Plaintiff was living in Park Tower, a luxury multi-million-dollar building in Stamford, Connecticut with her long-time fiancé, attorney, Brian Goncalves ("Goncalves"). Since August 2022, Goncalves has served as Senior Vice President and Chief Privacy Officer of TelevisaUnivision, and Goncalves previously held positions with Mastercard and Hewlett-Packard. Plaintiff and Goncalves lived in the same luxury building as Defendant—just four floors below—when the Parties began their affair in 2019. Plaintiff would often visit Defendant at his condominium at all hours, including at 2:30 a.m., to pursue their affair and then return back to her condominium with Goncalves the same night. It is nonsensical that the disturbing alleged acts in

the Complaint including violence, coerced sex, and forcing Plaintiff to be defecated on were taking place before Plaintiff returned to her lawyer fiancé four floors below without incident.  Defendant was never contacted by Goncalves (who was on the Board of the luxury building), anyone at the building, the police, any friends of Plaintiff, or any lawyer or advocate for Plaintiff at any time about the fictitious, extensive, years-long abusive behavior alleged in the Complaint.

After three years and having decided to return to their partners, in January 2022, Plaintiff and Defendant agreed to end their consensual affair and separate from each other, with Plaintiff leaving the company where they worked, World Wrestling Entertainment, Inc. ("WWE"). Plaintiff and Defendant entered into a binding contract to memorialize that agreement, entitled Confidential Settlement Agreement, General Release and Covenant Not to Sue (Ex. 1, the "Agreement" or "Agmt.").[1]  Plaintiff initially wanted to include a term in the contract mandating that Defendant could not move out of their shared building but Defendant refused to include that term and did move out.  Plaintiff's contention that that contract, between Defendant and WWE, on the one hand, and Plaintiff, on the other, is not enforceable is utterly meritless—but that is an issue for the arbitrator.  In fact, because the Parties wished to "preserve the confidential and private nature" of any disputes under the Agreement, they specifically provided in the Agreement that disputes would be resolved through arbitration.  Plaintiff was represented by a lawyer who negotiated the Agreement for her before she executed it.

When Defendant learned that Plaintiff, despite her promises, had violated the Agreement by wrongfully disclosing both the existence of the Agreement and their relationship, he exercised his contractual right to withhold payment otherwise owed under the Agreement.  In response,

---

[1] Exhibit 1, which is attached to the Declaration of Vincent K. McMahon ("McMahon Decl.") submitted herewith, is the fully executed Agreement.  Exhibit 1 is otherwise identical to Exhibit A to the Complaint (Dkt. No. 1-1), which is signed only by Plaintiff.

Plaintiff sought to harm him.  She intentionally violated the enforceable contract with her salacious, false and defamatory public filing.  However, the FAA and binding United States Supreme Court precedent—and Plaintiff's own agreement—require that if Plaintiff wishes to proceed with her fictitious claims, she must do so in arbitration, not in this Court, and that this action be stayed pending arbitration.

As this is a pre-answer motion, Defendant does not specifically address the substantive merits of Plaintiff's counts asserted against him.  For the avoidance of doubt, however, Defendant vehemently and categorically denies all allegations of wrongdoing in the Complaint, including Plaintiff's outrageous claims that Defendant coerced Plaintiff into unwanted sexual acts, sexually assaulted and/or battered her, trafficked her, and defecated on her.  Those are false statements intended for publicity.  When the Complaint's allegations are adjudicated in the proper forum (arbitration), witnesses are called to testify under oath, and all communications between the Parties (including those authored by Plaintiff which she intentionally did not share in her Complaint) are produced, the allegations and claims will be disproven and Plaintiff will be exposed for the liar she is.  Meanwhile, for the foregoing reasons and as set forth further below, Defendant's motion should be granted.

## **BACKGROUND**

### A.    **The Plaintiff**

Plaintiff is 43 years old; she was born in 1980 to her parents, Jane Grant and Anthony Grant, and grew up in Mount Kisco, New York.  From approximately 1999 to 2002, Plaintiff lived in Los Angeles, California, pursuing a career in acting.  In 2001, Plaintiff bid in an auction to be

featured in the film *Who Wants to be a Movie Star?* as one of the actors with five lines and under.[2] Subsequently in 2006, Plaintiff was featured in the film *The Theory of Everything* as a hospital receptionist.[3] Plaintiff also spent the majority of her childhood and adult life as an equestrian rider and owning horses. According to another lawsuit filed by Plaintiff against several defendants for alleged injury sustained by Plaintiff's horse, Plaintiff had moved back to the East Coast by 2012, and was actively involved in the equestrian community around the same time. *See generally Grant v. Meagher*, No. 1:13-cv-03636, Dkt. No. 1 ¶¶ 14–18 (S.D.N.Y.). When they met, Plaintiff told Defendant she had received a law degree but never took the bar exam. Based on her representation, Defendant assisted Plaintiff to set up meetings with WWE's Human Resources to apply for a position in the legal department as a legal administrator-coordinator.

**B.   The Parties' Negotiation and Entry into the Agreement**

**1.   The Agreement's Negotiation and Monetary Terms**

The Parties' consensual relationship—during which Plaintiff was engaged to Goncalves and resided with him in a luxury apartment—lasted a little less than three years, and ended in or about January 2022. (*See* McMahon Decl. ¶ 2.) On December 24, 2021—shortly before the Parties' relationship ended, and as was reported in the New York Post—Grant "penned a lengthy email to McMahon . . . in which she called him 'my best friend, my love and my everything.'"[4] They then negotiated an agreement under which Plaintiff would receive monetary compensation in exchange for and in consideration of various mutual promises and covenants.

---

[2] *See "Who Wants to be a Movie Star?" Gives "Big Break" to Unknowns from Across the Country; Principal Photography Begins Today*, BUSINESS WIRE (Jan. 16, 2001).

[3] *See The Theory of Everything*, IMDB (last viewed Apr. 22, 2024), https://www.imdb.com/title/tt0318126/?ref_=nm_ ov_bio_lk.

[4] *See* Shannon Thaler, *Vince McMahon accuser Janel Grant wrote 'love letter' to ex-WWE CEO after alleged sex abuse — but claims she was coerced*, NEW YORK POST (Apr. 1, 2024, 11:59 a.m. ET).

Plaintiff negotiated on her own behalf in the first instance.  Defendant initially intended the monetary consideration to Plaintiff under the Agreement to be in the range of $1,000,000 to $1,500,000.  (*Id.* ¶ 3; Compl. ¶ 210.)  Plaintiff negotiated the monetary provision in the Agreement by telling Defendant that "his initial offer of $1,000,000 was not enough to compensate for the lost earning potential and the fact that she would be unable to continue the promised career trajectory of Vice President, as well as failing to last as a Director for a full year."  (Compl. ¶ 210.)  She negotiated the monetary consideration to the final amount of $3,000,000.  (*Id.*; McMahon Decl. ¶ 3; *see also* Agmt. § V.)  As another example, Plaintiff also demanded that the $3,000,000 was to be paid as a lump sum.  (*See* Compl. ¶ 211.)  A compromise was ultimately reached such that, as the Agreement states, the first $1,000,000 was to be paid upon the execution of the Agreement and the rest was to be paid in four installments:

V.   MONETARY CONSIDERATIONS TO GRANT

A.   Upon execution of this Agreement by the parties, McMahon will pay the sum of One Million Dollars ($1,000,000.00) to Grant within ten (10) days of execution of this Agreement.

B.   Provided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years, McMahon will pay the following sums to Grant within ten (10) days of the dates listed below:

February 1, 2023 - $500,000.00
February 1, 2024 - $500,000.00
February 1, 2025 - $500,000.00
February 1, 2026 - $500,000.00

In the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement, McMahon shall have no obligation to make any payments set forth above which would otherwise become due on the dates indicated, and all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon in accordance with the terms of this Agreement.

(Agmt. § V.)

As Plaintiff admits in her Complaint, the Parties each retained counsel who were involved in the drafting, editing, and negotiation of the Agreement.  (*See* Compl. ¶ 261.)  Indeed, in the course of negotiating the Agreement, Plaintiff's counsel (Jonathan M. Shapiro of Aeton Law Partners LLP (*see* Agmt. § VII(A))), in an effort to reinforce the strength of the arbitration clause (discussed in detail below), proposed that the following language be inserted:  "In the event of a claim of breach under this Agreement by any party that results in arbitration or any legal proceeding, the prevailing party, as determined by the tribunal or Court, shall recover from the non-party(ies) all of its resulting costs and attorneys fees."  (McMahon Decl. ¶ 5.)  Although the finalized Agreement did not incorporate that proposed language verbatim, the arbitration provision states that the prevailing party in the arbitration "shall be entitled to recover from the non-prevailing party all of its attorney's fees and costs."  (Agmt. § X.)

### 2.     The Agreement's Release of Claims

In the Agreement, signed by all Parties on January 28, 2022, the Parties mutually agreed to release any claims they may have against one another.  Specifically, Plaintiff agreed, among other things, to release Defendant of all claims she ever had "as a result of, or in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel . . . ."  (*Id.* § II(A).)

The Agreement states further:  "BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES."  (*Id.* § II(B).)  Still further, the Agreement states that "Grant agrees that she will not cause, and has not caused, to be filed any legal action,

administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." (*Id*. § II(C).) And, "Grant covenants and agrees that she will forever forebear from pursing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand to claims against McMahon and/or WWE." (*Id*. § II(D).) Finally, under the Agreement, "Grant agrees that she shall not institute or be a party to any lawsuits, either individually or as a class representative or member against McMahon and/or WWE as to any matters up to the date of execution of this Agreement," and that "Grant knowingly and intentionally waives any right to any additional recovery that might be sought on her behalf by any other person, entity, or local, state or federal government or agency thereof." (*Id*. § II(E).) It is difficult to conceive of a more clear and unequivocal release and covenant not to sue.

Defendant and WWE similarly agreed "to release and forever discharge Grant . . . from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature . . . whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant." (*Id.* § II(F).)

### 3.     The Agreement's Arbitration Provision

The Agreement also contains a broad arbitration clause, which requires that the Parties must first attempt to resolve "any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach contains an arbitration clause" informally. (*Id.* § X.) If that attempt is unsuccessful, the arbitration clause mandates that "the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding

arbitration under the Federal Arbitration Act . . . ." (*Id.*)  Specifically, Section X of the Agreement

states:

> In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach, the parties agree to first attempt to resolve such disputes informally and prior to taking any formal legal action to resolve such disputes. In the event any such dispute cannot be resolved informally, all parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.  The parties agree to discuss the venue for any such arbitration proceeding if and when such a dispute arises which cannot be informally resolved; but in the event the parties cannot agree on a venue then the exclusive venue for any arbitration proceeding shall be in Stamford, Connecticut.  The prevailing party, as determined by the arbitration tribunal, shall be entitled to recover from the non-prevailing party all of its attorney's fees and costs.

(*Id.*)

### 4.    The Agreement's Confidentiality and Severability Provisions

Among other terms, the Agreement also contains a provision pursuant to which Plaintiff

agreed to keep the Agreement, and information about Defendant, confidential.  (*Id.* § I.)  It also

contained a clear severability provision:  "In the event that any provision of this Agreement is held

to be void or unenforceable by an arbitration panel or court reviewing an arbitration decision, the

remaining provisions shall nevertheless be binding provided, however, if any of the confidentiality

obligations of this Agreement are ever contended to be unenforceable by Grant, or are found to be

unenforceable by any tribunal, Grant agrees that she shall return all monies paid pursuant to this

Agreement to McMahon."  (*Id.* § IX.)[5]

---

[5] In this lawsuit, Grant is (erroneously) contending that the confidentiality provision *is* unenforceable.  Defendant therefore reserves his right to, at the appropriate time and in the appropriate forum, demand (among other things) that Plaintiff return the monetary compensation of $1,000,000, which Defendant has already paid Plaintiff under the Agreement.

     **5.**     **Plaintiff's Acknowledgement That She Knowingly and Voluntarily Entered into the Agreement**

The Agreement made clear that by signing her name, Plaintiff "represents that she is able to read the language and to understand the meaning and effect of this Agreement," that "she has read and understands this Agreement and the effect of it," and that "her attorney . . . has explained it to her." (*Id.* § VII(A).)  She also unequivocally acknowledged that "among the rights she is **knowingly and voluntarily** waiving by executing this Agreement is the right to bring or pursue any claims or causes of action against McMahon and/or WWE." (*Id.* § VII(B) (emphasis added).)

     **C.**     **Plaintiff Commences This Action in Violation of the Agreement.**

Defendant paid Plaintiff the first payment specified in Section V(A) of the Agreement in the amount of $1,000,000; however, because Plaintiff failed to comply with her confidentiality obligations (which she breached by disclosing her relationship with Defendant), Defendant did not pay her the first of the four $500,000 installments specified in Section V(B).  Then, rather than sue Defendant for breach of contract in arbitration, in complete disregard of the clear terms of the Agreement and her obligations thereunder, Plaintiff initiated the instant action on January 25, 2024, alleging various causes of action against Defendant, WWE, and defendant John Laurinaitis ("Laurinaitis," the former Head of Talent Relations and General Manager of WWE) (Compl. ¶ 37). The allegations in the Complaint are replete with falsehoods, misstatements, and irresponsible mischaracterizations of the Parties' relationship.

## <u>ARGUMENT</u>

The FAA "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .'" *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2).  The act reflects "a liberal federal policy favoring

arbitration agreements." *Epic Sys. Corp., v. Lewis*, 584 U.S. 497, 505–06 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("*Moses*")); *see also Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution.").

The question of whether the dispute is to be arbitrated, *i.e.*, the "question of arbitrability," is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Techs., Inc. v. Comm's Workers*, 475 U.S. 643, 649 (1986). In determining whether to compel arbitration, a court must determine "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." *Porcelli v. JetSmarter, Inc.*, No. 19-cv-2537, 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)); *see also Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019).

The party moving to compel arbitration "bears the initial burden of showing that an arbitration agreement exists by a preponderance of the evidence." *Aminoff & Co. LLC v. Parcel Pro, Inc.*, No. 21-cv-10377, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses*, 460 U.S. at 24–25. "[A]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

*AT & T Techs., Inc.*, 475 U.S. at 650 (quotation omitted); *see also Patushi v. Global Lending Services LLC*, No. 23-cv-00946, 2024 WL 1281553, at *1 (D. Conn. Mar. 26, 2024) (Meyer, J.) (noting FAA "requires enforcement of agreements to arbitrate and embodies a national policy favoring arbitration") (internal quotation marks omitted).

"In deciding motions to compel, courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (internal quotation marks and citation omitted). That standard "requires a court to consider all relevant, admissible evidence submitted by the parties and contained in pleadings, . . . affidavits[ ] . . . [and] draw all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks and citations omitted).

As detailed below, pursuant to the FAA, Plaintiff should be compelled to arbitrate her claims asserted in the Complaint as required by Section X of the Agreement.[6]

## I. SECTION X OF THE AGREEMENT IS A VALID AND ENFORCEABLE AGREEMENT TO ARBITRATE

### A. Plaintiff Knowingly and Voluntarily Signed the Agreement Containing the Arbitration Provision

"The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia*, 834 F.3d at 229. Here, the Agreement states that it "was made in and shall be governed by and construed under the laws of the State of Connecticut . . . ." (Agmt. § XI.) Under Connecticut law, the arbitration provision contained in Section X is valid, enforceable and irrevocable.

---

[6] If this Motion is denied (and it should not be), Defendant reserves his right to move to dismiss the Complaint under Rule 12 of the Federal Rules of Civil Procedure based on Plaintiff's release of claims in Section II of the Agreement. *See Ramasamy v. Essar Glob. Ltd.*, 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011) ("A motion to dismiss or stay in favor of arbitration is not a Rule 12 motion or a responsive pleading . . . ."). As courts have recognized, the very point of an agreement to arbitrate is to reserve merits arguments for the arbitrator, so a defendant is not required to answer or file a Rule 12 motion while a motion to compel arbitration is pending. *See Lamkin v. Morinda Props. Weight Parcel, LLC*, 440 F. App'x 604, 607–08 (10th Cir. 2011).

"In Connecticut, the fact that a party signed a written agreement is usually conclusive evidence of contract formation." *D'Antuono v. Serv. Road Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011); *see also Success Sys., Inc. v. CRS, Inc.*, No. 21-cv-1391, 2023 WL 2742344, at *10 (D. Conn. Mar. 31, 2023) (noting under Connecticut law that "the presence of a written agreement is generally strong evidence of a contractual relationship"). Indeed, this Court recently noted that, under Connecticut law, "[w]hen an agreement is reduced to writing and signed by all parties, the agreement itself is substantial evidence that a meeting of the minds has occurred." *Patushi*, 2024 WL 1281553, at *2 (quoting *Tedesco v. Agolli*, 182 Conn. App. 291, 308 (2018)). It has long been the law in Connecticut that "where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interest, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so . . . ." *Ursini v. Goldman*, 118 Conn. 554, 562 (1934); *see also Levine v. Massey*, 232 Conn. 272, 279 (1995) (holding the circumstances surrounding the making of a contract, purposes which the parties sought to accomplish, and their motives "cannot prove an intent contrary to the plan meaning of the language used" in the contract).

Not only did the Parties sign the Agreement, they were represented by counsel when the Agreement was formed. (*See* Compl. ¶¶ 209–11; Agmt. § VII(A).) Plaintiff also unequivocally represented that: (1) she entered into the Agreement "**knowingly and voluntarily**" (Agmt. § VII(B)), (2) she understood the Agreement and its effect (*id.* § VII(A)), and (3) her lawyer explained the terms of the Agreement to her (*id.*). Indeed, Plaintiff negotiated the Agreement to her advantage. (McMahon Decl. ¶ 3; Compl. ¶ 210.)

Plaintiff is thus bound by the arbitration agreement, which is valid and enforceable. *See Carter v. Reilly*, Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S, 2023 WL 8889473, at

*7 (Conn. Super. Ct. Dec. 20, 2023) (finding that the written agreement at issue was "a valid and enforceable contract between the parties" because, among other things, "counsel for both parties were involved in the review and execution of this agreement"); *Dighello v. Busconi*, 673 F. Supp. 85, 88 (D. Conn. 1987) (enforcing an arbitration agreement between individuals), *aff'd*, 849 F.2d 1467 (2d Cir. 1988).

**B.    Plaintiff's Challenge to the Enforceability of the Agreement as a Whole (Rather than the Arbitration Provision) Should Be Decided by the Arbitrator and Not This Court**

Plaintiff's challenge to the enforceability of the Agreement as a whole, rather than the arbitration provision in Section X itself, has no bearing on Defendant's motion compel this action to arbitration because the issue should be decided by an arbitrator.

The United States Supreme Court addressed this very issue in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010).  There, the Supreme Court explained:  "There are two types of validity challenges under § 2:  One type challenges specifically the validity of the agreement to arbitrate, and [t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."  *Id.* at 70 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)) (internal quotation marks omitted).  However, "only the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable."  *Id.*  This is because "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."  *Id.* at 71.  And Section 2 of the FFA "states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained."  *Id.* at 70 (emphasis in original).

14

To further clarify when a challenge qualifies as one that is directed specifically at the validity of the agreement to arbitrate, the Court explained that:

> In some cases the claimed basis of invalidity for the contract as a whole will be much easier to establish than the same basis as applied only to the severable agreement to arbitrate.  Thus, in an employment contract many elements of alleged unconscionability applicable to the entire contract (outrageously low wages, for example) would not affect the agreement to arbitrate alone.  But even where that is not the case—as in *Prima Paint* itself, **where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene**.

*Id.* at 71 (emphasis added).  In other words, "if a party challenges specifically the enforceability of the particular [arbitration] agreement, the district court considers the challenge, but if a party challenges the enforceability of the agreement as a whole, the challenge is for the arbitrator."  *Id.* at 63 (syllabus).

Following the Supreme Court's decision in *Rent-A-Center*, courts have routinely declined to consider challenges that were not directed specifically to the arbitration clause.  *See Arrigo v. Blue Fish Commodities, Inc*., 408 F. App'x 480, 482 (2d Cir. 2011) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.") (quoting *Buckeye*, 546 U.S. at 445–46 and citing *Rent-A-Ctr.*, 561 U.S. at 70–71); *Pingel v. Gen. Elec. Co*., No. 14-cv-00632, 2014 WL 7334588, at *5 (D. Conn. Dec. 19, 2014) (finding that the plaintiff's challenge based on unconscionability "is a challenge to the contract generally, and the same exact losing argument made" in *Rent-A-Center*).

Here, the Complaint asserts that the Speak Out Act bars the nondisclosure clause and the nondisparagement clause in the Agreement, and that, because these clauses are "the core term[s] of the [Agreement]," the entire Agreement "itself[] is judicially unenforceable."  (Compl. ¶¶ 276–

77.)  Further, the Complaint seeks a declaratory judgment that the Agreement is void based on grounds attacking either the Agreement as a whole, or provisions *other than* the arbitration agreement.   For example, the Complaint asserts that "the [Agreement,] including the confidentiality provision, is impermissibly broad," that "Ms. Grant entered into the contract under duress and undue influence," that "the [Agreement] is a contract of adhesion," that "the [Agreement] is substantively unconscionable," and that the "[Agreement] is void as against public policy."  (Compl. ¶¶ 280–84.)  *None* of these challenges makes any specific reference to the arbitration clause.  Nor does the Complaint otherwise allege any factual basis to challenge the arbitration clause itself—because there is none.

Quite the contrary, drafts of the Agreement indicated that the Parties negotiated the arbitration clause at arms-length with help of counsel.  (McMahon Decl. ¶¶ 4–5; *see* Compl. ¶ 261.)  Because Plaintiff's challenges to the Agreement are exactly the type that either are directed to the Agreement as a whole, or are "on the ground that the illegality of one of the contract's provisions renders the whole contract invalid," the issues of contract validity must be considered by the arbitrator.[7]  *See Rent-A-Ctr.*, 561 U.S. at 70; *Arrigo*, 408 F. App'x at 482.

---

[7] Defendant will establish in arbitration that each argument Plaintiff raises to invalidate the Agreement fails under applicable law.  As a brief example, contrary to Plaintiff's assertion that she entered the contract under duress or coercion, courts in Connecticut have repeatedly held that "if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or avoid it," that party, because of his or her ratification of the contract, cannot assert duress or undue influence as a matter of law.  *Young v. Data Switch Corp*., 231 Conn. 95, 103 (1994) (collecting cases).  Indeed, courts in Connecticut have found that even two months were too long to raise duress and undue influence argument.  *See DiMartino v. Hartford*, 636 F. Supp. 1241, 1252 (D. Conn. 1986).  The Agreement was executed on January 28, 2022, and the Complaint was filed almost two years later on January 25, 2024.  In the interim, as the Complaint admits, Plaintiff received and accepted the initial payment of $1,000,000 upon the execution of the Agreement.  (Compl. ¶ 263.)  Plaintiff's clear ratification of the Agreement and her willing and voluntary acceptance of its benefits, which lasted years until recently, refute her allegations of duress and undue influence as a matter of law.  *See Young*, 231 Conn. at 103.

## II.   PLAINTIFF'S CLAIMS FALL WITHIN THE SCOPE OF THE ARBITRATION AGREEMENT

In accord with a strong policy favoring arbitration, federal courts read arbitration clauses as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses*, 460 U.S. at 24–25.  Indeed, the FAA "leaves no place for the exercise of discretion by a district court but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Byrd*, 470 U.S. at 213.

Here, all claims alleged in the Complaint are within the scope of the arbitration clause, which broadly provides that the Parties must arbitrate "any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach."  (Agmt § X.)

Courts have repeatedly enforced arbitration clauses with similar, broad language.  In *Fink v. Golenbock*, 238 Conn. 183 (1996), for example, the Supreme Court of Connecticut held that an arbitration clause mandating that "[a]ny disputes arising under the employment agreement between [the parties] shall be submitted to the American Arbitration Association" was "all-embracing, all-encompassing and broad."  *Id.* at 196.  Indeed, the arbitration agreement in *Fink* was found to be "broad and unrestricted" such that it encompasses tort claims, as well as statutory claims.  *Id.*; *see also Cuseo v. Aquent, Inc.*, No. CV040568982, 2005 WL 532257, at *2 (Conn. Super. Ct. Jan. 31, 2005) ("The inclusion of such broad language," such as "[a]ny claim or controversy arising out of or relating to this [a]greement…," "generally includes all claims, including tort claims.").  The broad arbitration clause in the Parties' Agreement similarly encompasses Plaintiff's contract claims (Counts I and II), statutory claims (Counts III and IV), and tort claims (Counts V to IX).

Further, under Connecticut law, like federal law, "arbitration must be compelled unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation

that covers the asserted dispute.  Doubts should be resolved in favor of coverage." *White v. Kampner*, 229 Conn. 465, 473 (1994) (quoting *Bd. of Educ. v. Frey*, 174 Conn. 578, 582 (1978)). It cannot be said with such "positive assurance" that the arbitration clause cannot be construed to encompass the asserted claims in this case.  Far from it.  Indeed, by challenging the enforceability of the Agreement, Plaintiff has initiated a dispute on the "construction, interpretation, application, performance or breach" of the Agreement, which renders the entire dispute a proper issue for arbitration.  (*See* Agmt § (X).)[8]

## III.   THERE IS NO CONGRESSIONAL INTENT TO RENDER ANY CLAIMS ASSERTED IN THE COMPLAINT NON-ARBITRABLE

While the FAA requires courts to strictly enforce arbitration agreements, that mandate may be overridden by contrary congressional intent.  *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  Such an intent may be deduced from "the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227 (internal quotation marks, modifications, and citations omitted); *see also In re Belton v. GE Cap. Retail Bank*, 961 F.3d 612, 615 (2d Cir. 2020).  Here, Plaintiff asserts two sets of claims

---

[8] Plaintiff must be compelled to arbitrate her claims asserted against WWE because, like Defendant, WWE is a party to the Agreement, and all reasons asserted herein in support of Defendant's motion to compel arbitration applies equally to the WWE.  (Agmt. at 1, § X ("In the event any such dispute cannot be resolved informally, **all parties hereto** agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association . . . .") (emphasis added).)  And although Laurinaitis is not a signatory to the Agreement, Plaintiff should also be compelled to arbitrate her claims against him.  "Connecticut state courts have looked to federal law to determine the circumstances under which nonsignatories may be bound to arbitration agreements."  *Kuryla v. Coady*, No. AANCV126009961, 2013 WL 1494223, at *9 (Conn. Super. Ct. Mar. 22, 2013) (collecting cases).  The Second Circuit has recognized that "signatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."  *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (internal quotation marks and modifications omitted).  By signing the Agreement, Plaintiff agreed to release all claims against Laurinaitis in his personal capacity and official capacity.  (*See* Agmt. § II(A).)  Plaintiff's allegations and claims against Laurinaitis are closely intertwined with her allegations and claims against Defendant and WWE, and Plaintiff thus must be compelled to arbitrate her claims against Laurinaitis.  *See Denney*, 412 F.3d at 70; *Contec Corp. v. Remote Sol.*, Co., 398 F.3d 205, 209 (2d Cir. 2005).

based on federal statutes, and neither implicates a congressional intent that Plaintiff's claims are not arbitrable.

*First*, in Count I, Plaintiff seeks to void the Agreement based on the Speak Out Act, which renders *predispute* nondisclosure clauses or nondisparagement clauses unenforceable in disputes involving sexual assault and sexual harassment claims.  *See* 42 U.S.C. § 19403.  According to Plaintiff, because the nondisclosure clause and nondisparagement clause in the Agreement are "the core term[s]" of the Agreement, and are allegedly invalidated by the Speak Out Act, the Agreement itself is "judicially un-enforceable."  (Compl. ¶ 277.)[9]  The Speak Out Act does not prohibit the arbitration of any claims asserted in this case.  Based on the text of the statute, Congress intended to limit the application of the Speak Out Act to only nondisclosure clauses and nondisparagement clauses in predispute agreements.  *See* 42 U.S.C. § 19403 ("**no nondisclosure clause** or **nondisparagement clause** agreed to **before the dispute arises** shall be judicially enforceable . . . .") (emphases added).  Nothing in the text of the statute, the legislative history, or the underlying purpose of the Act suggests a Congressional intent to also render a related ***arbitration clause*** unenforceable.  The Speak Out Act is thus not a reason to find that Plaintiff's claims should not be compelled to arbitration.[10]

---

[9] Contrary to Plaintiff's assertion that the nondisclosure and nondisparagement clauses are "core term[s]" of the Agreement such that the invalidity of which would render the entire Agreement meaningless, the Agreement contains other material provisions, such as the release provisions and the payment provision.  (*See* Agmt. §§ II & V.)  Indeed, the Complaint itself admits as much by alleging that "McMahon has breached **a core term** of the NDA.  He paid $1,000,000, but failed to make any further payments . . . ."  (*See* Compl. ¶ 263 (emphasis added).)  In any event, the Agreement contains a severability clause, which states that if "any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding . . . ."  (Agmt. § IX.)  Assuming *arguendo* that the nondisclosure and nondisparagement clauses are unenforceable under the Speak Out Act—which they are not—the remaining provisions in the Agreement are nonetheless severable and enforceable.  *See Grabe v. Hokin*, 341 Conn. 360, 385 (2021) ("[T]he prenuptial agreement contained a severability clause that expressly contemplated that, if one or more of its terms were found to be invalid, the rest of the agreement would survive").

[10] Plaintiff may attempt to argue in opposition that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "EFAA")—which was enacted on March 3, 2022, and renders unenforceable a "predispute arbitration agreement" with respect to sexual assault or harassment disputes, 9 U.S.C. § 402(a)—constitutes contrary

*Second*, Counts III and IV of the Complaint assert claims based on the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 *et seq.*, which similarly imposes no prohibition on arbitration. The TVPA and its legislative history are silent the on the issue of arbitration, and no inherent conflict exists between arbitration and the TVPA's underlying purpose, which is to "combat severe forms of worker exploitation that do not amount to actual involuntary servitude." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24, 2019) (internal quotation marks and citation omitted), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020). Indeed, courts around the country have repeatedly compelled arbitration of TVPA claims. *See, e.g.*, *Zendon v. Grandison Mgmt., Inc.*, No. 18-cv-4545, 2018 WL 6427636, at *3 (E.D.N.Y. Dec. 7, 2018) (finding that the parties' arbitration agreement encompassed all claims at issue, including those under the TVPA); *Doe v. Steele*, No. 20-cv-1818, 2021 WL 927363, at *9 (S.D. Cal. Mar. 11, 2021) (finding that the plaintiff's TVPA claims "sound in tort" and compelling arbitration of claims asserted under the TVPA). Accordingly, there is no contrary congressional intent to render any of Plaintiff's claims non-arbitrable.

## IV.     THIS COURT SHOULD STAY THE ACTION PENDING ARBITRATION

Courts have the inherent power to grant a discretionary stay of a proceeding pending arbitration. *See Citrus Mktg. Bd. of Israel v. J. Lauritzen A/S*, 943 F.2d 220, 225 (2d Cir. 1991). In determining whether such stay is justified, a court must consider: "1) whether there are common

---

congressional intent. However, the EFAA is inapplicable to this action because the EFAA does not apply retroactively, *see Delo v. Paul Taylor Dance Found., Inc.*, No. 22-cv-9416, 2023 WL 4883337, at *4 (S.D.N.Y. Aug. 1, 2023) ("The EFAA applies to claims that accrued on or after March 3, 2022, the date of its enactment—it does not apply retroactively."), and the Agreement is not a "predispute arbitration agreement" because it was entered into on January 28, 2022, *after* the alleged misconduct by Defendant which forms the basis of Plaintiff's claims. *See Castillo v. Altice USA, Inc.*, No. 1:23-cv-05040, 2023 WL 6690674, at *3 (S.D.N.Y. Oct. 12, 2023) ("'[T]he use of dispute in this context clearly refers to the discriminatory conduct underlying the Complaint, requiring the arbitration agreement to be entered into prior to the dispute—the discriminatory conduct.'") (quoting *Barnes v. Festival Fun Parks, LLC*, No. 3:22-cv-165, 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023)).

issues between the arbitration and the litigation; 2) whether those issues are likely to be resolved in arbitration; 3) whether the failure to grant a stay will prejudice the defendant; and 4) whether the stay will prejudice the plaintiff." *Empire State Ethanol and Energy, LLC v. BBI Int'l*, No. 08-cv-623, 2009 WL 1813205, at *1 (N.D.N.Y. June 25, 2009) (citing *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71 (2d Cir. 1997) and *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991)). In addition, "[t]he [c]ourt must consider factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017). To this end, "[a] discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Id.* at 110–11 ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). "In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Id.* at 111.

Because all claims alleged in the Complaint fall within the scope of the arbitration clause, the Court should stay the action under Section 3 of the FAA. *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) (holding that a stay of proceedings is "necessary after all claims have been referred to arbitration and a stay requested"); 9 U.S.C. § 3. Even if the Court were to find that not all claims are arbitrable (and it should not), a stay pending the resolution of the arbitration is nevertheless justified. *See Katz*, 937 F.2d at 750 ("It is appropriate, as an exercise of the district court's inherent powers, to grant a stay 'where the pending proceeding is an arbitration in which issues involved in the case may be determined.'").

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests that the Court grant his motion and compel arbitration of all claims asserted in the Complaint and stay the litigation pending arbitration.

Date: April 23, 2024                                 Respectfully submitted,

**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**

By:     /s/ James A. Budinetz
        James A. Budinetz (ct16068)
        One State Street, 14th Floor
        Hartford, CT  06103
        Telephone: (860) 522-5175
        Facsimile:  (860) 522-2796
        jbudinetz@mdmc-law.com

**KASOWITZ BENSON TORRES LLP**
Jessica T. Rosenberg
(*admission pro hac vice pending*)
Jonathan L. Shapiro
(*admission pro hac vice pending*)
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
JRosenberg@kasowitz.com
JShapiro@kasowitz.com

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on April 23, 2024 a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ James A. Budinetz (ct16068)