# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANEL GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:24-cv-00090-JAM |
| v. | ) | |
| | ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., | ) | |
| a/k/a WORLD WRESTLING ENTERTAINMENT, | ) | |
| LLC; VINCENT K. MCMAHON; and JOHN | ) | |
| LAURINAITIS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT VINCENT K. McMAHON'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO COMPEL ARBITRATION

**McCARTER & ENGLISH, LLP**

James A. Budinetz (ct16068)
McCarter & English, LLP
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6765
Facsimile: (860) 724-3397
jbudinetz@mccarter.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Jessica T. Rosenberg
  (admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
jrosenberg@akingump.com

*Attorneys for Defendant*
*Vincent K. McMahon*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND ........................................................................................................ 3

   **A.**  **The Parties** .................................................................................................. 3

   **B.**  **The Settlement Agreement** ........................................................................ 3

      1.  The Settlement Agreement's Negotiation and Monetary Terms ................................... 3

      2.  The Settlement Agreement's Release of Claims .......................................................... 5

      3.  The Settlement Agreement's Arbitration Provision ...................................................... 6

      4.  The Settlement Agreement's Confidentiality and Severability Provisions ................... 7

      5.  Plaintiff's Acknowledgement That She Knowingly and Voluntarily Entered into the Settlement Agreement .................................................................... 8

   **C.**  **Plaintiff Commences This Action in Violation of the Settlement Agreement** ............. 8

ARGUMENT ............................................................................................................. 8

   **I.**  **THE PARTIES ENTERED INTO A VALID AND ENFORCEABLE AGREEMENT TO ARBITRATE** ........................................................................ 11

   **II.**  **THE SETTLEMENT AGREEMENT DELEGATES BOTH THRESHOLD AND SUBSTANTIVE ISSUES TO THE ARBITRATOR** .......................................... 12

      A.  The Settlement Agreement Delegates the Threshold Issue of Arbitrability to the Arbitrator ......................................................................... 13

         *1.*  *The Settlement Agreement Uses Broad Language and Incorporates Specific Rules to Delegate Arbitrability to the Arbitrator* ................... 14

         *2.*  *Plaintiff's Challenge to the Enforceability of the Settlement Agreement Does Not Change the Analysis* ......................................... 16

      B.  The Settlement Agreement Delegates Plaintiff's Substantive Claims to the Arbitrator .................................................................. 19

   **III.**  **THERE IS NO CONGRESSIONAL INTENT TO RENDER ANY CLAIMS ASSERTED IN THE COMPLAINT NON-ARBITRABLE** ................................. 21

   **IV.**  **THIS COURT SHOULD STAY THE ACTION PENDING ARBITRATION** .... 25

CONCLUSION .......................................................................................................... 26

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
307 F.3d 24 (2d Cir. 2002)..........................................................................................9

*Arrigo v. Blue Fish Commodities, Inc.*,
408 F. App'x 480 (2d Cir. 2011) .............................................................................18, 19

*Barnes v. Festival Fun Parks, LLC*,
No. 22-cv-165, 2023 WL 4209745 (W.D. Pa. June 27, 2023) ...............................................24

*Bd. of Educ. v. Frey*,
392 A.2d 466 (Conn. 1978) .......................................................................................13

*Bell v. Cendant Corp.*,
293 F.3d 563 (2d Cir. 2002).....................................................................................14, 15

*Buckeye Check Cashing, Inc. v. Cardegna*,
546 U.S. 440 (2006)..............................................................................................17, 18

*Carter v. Reilly*,
Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S, 2023 WL 8889473
(Conn. Super. Ct. Dec. 20, 2023)...............................................................................12

*Castillo v. Altice USA, Inc.*,
698 F. Supp. 3d 652 (S.D.N.Y. 2023)........................................................................23, 24

*Connecticut Co. v. Division 425*,
164 A.2d 413 (Conn. 1960) ......................................................................................12

*Considine v. Brookdale Senior Living, Inc.*,
124 F. Supp. 3d 83 (D. Conn. 2015)........................................................................9, 15, 16

*Contec Corp. v. Remote Sol., Co.*,
398 F.3d 205 (2d Cir. 2005).....................................................................................15, 21

*Cunningham v. CVS Health Corp.*,
No. 23-cv-1328, 2024 WL 2867303 (S.D.N.Y. June 4, 2024) ...............................................23

*Cuseo v. Aquent, Inc.*,
No. CV040568982, 2005 WL 532257 (Conn. Super. Ct. Jan. 31, 2005) ...............................20

*D'Antuono v. Serv. Road Corp.*,
789 F. Supp. 2d 308 (D. Conn. 2011).........................................................................11

*Daly v. Citigroup Inc.*,
   939 F.3d 415 (2d Cir. 2019).........................................................................9, 10, 13

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985).............................................................................................9, 13

*Denney v. BDO Seidman, L.L.P.*,
   412 F.3d 58 (2d Cir. 2005)...........................................................................................21

*Dighello v. Busconi*,
   673 F. Supp. 85 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir. 1988) ..................12

*Emcon Corp. v. Pegnataro*,
   562 A.2d 521 (Conn. 1989) ........................................................................................14

*Epic Sys. Corp., v. Lewis*,
   584 U.S. 497 (2018)........................................................................................................9

*Fink v. Golenbock*,
   680 A.2d 1243 (Conn. 1996) ......................................................................................20

*First Options of Chi., Inc. v. Kaplan*,
   514 U.S. 938 (1995).............................................................................................13, 23

*Gengaro v. City of New Haven*,
   984 A.2d 1133 (Conn. App. 2009) .............................................................................19

*Grabe v. Hokin*,
   267 A.3d 145 (Conn. 2021) ........................................................................................22

*Green Tree Fin. Corp.-Alabama v. Randolph*,
   531 U.S. 79 (2000).......................................................................................................10

*Guyden v. Aetna, Inc.*,
   544 F.3d 376 (2d Cir. 2008).................................................................................9, 21

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
   586 U.S. 63 (2019)...............................................................................10, 13, 14, 16

*Katsoris v. WME IMG, LLC*,
   237 F. Supp. 3d 92 (S.D.N.Y. 2017)..........................................................................25

*Kuryla v. Coady*,
   No. AANCV126009961, 2013 WL 1494223 (Conn. Super. Ct. Mar. 22, 2013) ..................21

*Lamkin v. Morinda Props. Weight Parcel, LLC*,
   440 F. App'x 604 (10th Cir. 2011) .............................................................................11

*Levine v. Massey*,
    654 A.2d 737 (Conn. 1995) ............................................................................................11

*Maity v. Tata Consultancy Servs., Ltd.*,
    No. 19-cv-19861, 2021 WL 6135939 (D.N.J. Dec. 29, 2021)................................................23

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...............................................................................................9, 10, 12

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)........................................................................................10, 11

*Oldroyd v. Elmira Sav. Bank, FSB*,
    134 F.3d 72 (2d Cir. 1998).............................................................................................9

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
    No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019), *aff'd in part,
    appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020) ..........................................23

*Patushi v. Global Lending Servs. LLC*,
    No. 23-cv-946, 2024 WL 1281553 (D. Conn. Mar. 26, 2024) ...............................9, 10, 11, 12

*Pingel v. Gen. Elec. Co.*,
    No. 14-cv-632 (CSH), 2014 WL 7334588 (D. Conn. Dec. 19, 2014)....................................18

*Porcelli v. JetSmarter, Inc.*,
    No. 19-cv-2537, 2019 WL 2371896 (S.D.N.Y. June 5, 2019) ................................................9

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)..............................................................................................17, 18

*Ramasamy v. Essar Glob. Ltd.*,
    825 F. Supp. 2d 466 (S.D.N.Y. 2011)................................................................................11

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010).................................................................................13, 17, 18, 19, 22

*Riggs v. Akamai Techs.*,
    No. 23-cv-6463, 2024 WL 3347032 (S.D.N.Y. July 8, 2024)................................................25

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003)..........................................................................................15

*Shearson/American Express, Inc. v. McMahon*,
    482 U.S. 220 (1987).................................................................................................21

*Smith v. Spizzirri*,
    601 U.S. 472 (2024).................................................................................................25

*Tedesco v. Agolli*,
   189 A.3d 672 (Conn. App. 2018) ........................................................11

*Walters v. Starbucks Corp.*,
   623 F. Supp. 3d 333 (S.D.N.Y. 2022)...................................................24

*White v. Kampner*,
   641 A.2d 1381 (Conn. 1994) ...............................................................13

*Young v. Data Switch Corp.*,
   646 A.2d 852 (Conn. 1994) .................................................................19

*Zendon v. Grandison Mgmt., Inc.*,
   No. 18-cv-4545, 2018 WL 6427636 (E.D.N.Y. Dec. 7, 2018)................23

## STATUTES

9 U.S.C. § 2 ............................................................................9, 11, 17

9 U.S.C. § 3 .............................................................................1, 13, 25

9 U.S.C. § 4 ...............................................................................1, 13

9 U.S.C. § 401(1) ............................................................................24

9 U.S.C. § 402(a) ............................................................................23

18 U.S.C. § 1591 et seq. ..................................................................22

42 U.S.C. § 19403 ...........................................................................22

42 U.S.C. § 19403(a) .......................................................................21

Pub. L. No. 117-90, § 3, 136 Stat. 26 (2022)...................................23

## OTHER AUTHORITIES

AAA Commercial Arbitration Rules and Procedures R-7(a) ......................16

AAA Employment Arbitration Rules and Procedures R-6(a) ......................16

Federal Rules of Civil Procedure, Rule 12 ............................................11

House Judiciary Committee Report on EFAA, H.R. Rep. No. 117-234 (2022)...........................25

Defendant Vincent K. McMahon respectfully submits this memorandum of law in support of his Motion to Compel Arbitration of Plaintiff Janel Grant's Complaint filed on January 25, 2024, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4.

## PRELIMINARY STATEMENT

In January 2022, Plaintiff, Defendant McMahon, and Defendant World Wrestling Entertainment, Inc. ("WWE") entered a contract that requires "any dispute arising under or out of" that agreement to be arbitrated:

> [A]ll parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.

(Exhibit 1 to the Declaration of Vincent K. McMahon ("McMahon Decl.") ("Confidential Settlement Agreement, General Release and Covenant Not to Sue" (the "Settlement Agreement" or "Agmt.")), § X.)[1]  Despite the clear and unambiguous arbitration clause, in January 2024, Plaintiff publicly filed this lawsuit in federal court in direct violation of her agreement to arbitrate.

The Settlement Agreement mandates arbitration.  It delegates not only Plaintiff's substantive claims to arbitration, it also delegates the threshold issue of the arbitrability of those claims to the arbitrator.  Thus, this case must be immediately stayed and sent to arbitration.  The FAA, binding United States Supreme Court precedent, and Plaintiff's own agreement require that if Plaintiff wishes to proceed with her fictitious and released claims, she must do so in arbitration, not in this Court.

---

[1] Exhibit 1 is the fully executed Settlement Agreement.  Exhibit 1 is otherwise identical to Exhibit A to the Complaint (Dkt. No. 1-1), which is signed only by Plaintiff.

The Settlement Agreement was drafted when Plaintiff and Defendant McMahon, who had engaged in a consensual, intimate relationship for approximately three years, sought to memorialize the end of that relationship.  In January 2022, Plaintiff and Defendant McMahon, each represented by counsel, negotiated and executed the Settlement Agreement, with Defendant McMahon signing on his own behalf and, in his capacity as Chairman, on behalf of WWE.  That agreement, which explicitly sought "to avoid any damage caused by public disclosure of private matters known to Grant and McMahon," included, among other provisions, terms for Plaintiff's departure from the company where they both worked (WWE), the payment of $3 million to Plaintiff, mutual releases, and a comprehensive agreement to arbitrate any and all disputes.

Pursuant to the Settlement Agreement, Defendant McMahon made an initial payment of $1 million to Plaintiff.  When Defendant McMahon later learned that Plaintiff, despite her representations and warranties, had breached the Settlement Agreement by wrongfully disclosing both the existence of the Settlement Agreement and their relationship, he exercised his contractual right to withhold further payment otherwise owed under the Settlement Agreement.  In response, Plaintiff sought to besmirch him.  She intentionally violated the Settlement Agreement's arbitration provision and filed a false and defamatory public lawsuit.

Plaintiff's disregard for the Settlement Agreement's binding arbitration provision is a breach of the Settlement Agreement.  And her position that the entire contract between Defendants McMahon and WWE, on the one hand, and Plaintiff, on the other, is not enforceable is utterly meritless.  But these are all issues for the arbitrator.

As this is a pre-answer motion, Defendant McMahon does not specifically address the legal sufficiency or substantive merits of Plaintiff's counts asserted against him.  For the avoidance of doubt, however, Defendant McMahon vehemently and categorically denies all allegations of

wrongdoing in the Complaint, including Plaintiff's outrageous false claims intended for publicity. When the Complaint's allegations are adjudicated in the proper forum (arbitration), witnesses are called to testify under oath, and all communications between the parties are produced (including those authored by Plaintiff, many of which were intentionally omitted from the Complaint), the allegations and claims will be disproven.[2]  Meanwhile, for the foregoing reasons and as set forth further below, Defendant McMahon's Motion to Compel Arbitration should be granted.

## **BACKGROUND**

### A.  The Parties

Defendant McMahon engaged in a friendship and consensual, intimate relationship with Plaintiff, who is 44 years old.  Plaintiff told Defendant McMahon she needed a job, and he facilitated meetings between Plaintiff and WWE's Human Resources department to discuss a position in the legal department as a legal administrator-coordinator.  (McMahon Decl. ¶ 3.)

### B.  The Settlement Agreement

#### 1.  The Settlement Agreement's Negotiation and Monetary Terms

The consensual relationship between Plaintiff and Defendant McMahon lasted just under three years and ended in or about January 2022.  (McMahon Decl. ¶ 2.)  At that time, Plaintiff and Defendant McMahon negotiated an agreement resolving several issues, including Plaintiff's resignation from the WWE and how to safeguard the private and confidential nature of their relationship.  Under the Settlement Agreement, Plaintiff agreed to receive monetary compensation

---

[2] On June 11, 2024, the Court stayed this action for six months and denied all pending motions without prejudice to renew within two weeks of the stay being lifted.  (Dkt. No. 68.)  In Defendant McMahon's previously filed memorandum of law in support of his motion to compel arbitration, (Dkt. No. 30), Defendant McMahon advanced certain facts to combat a limited number of the countless fabrications and omissions that riddle Plaintiff's Complaint. Plaintiff moved to strike certain of those statements.  (Dkt. No. 31.)  In an effort to avoid unnecessary litigation, Defendant McMahon has not included those statements herein, but fully intends to prove their veracity at the appropriate juncture in arbitration.

in exchange for and in consideration of various mutual promises and covenants, including a mutual release of all claims.

Initially, Plaintiff negotiated on her own behalf. When she learned that Defendant McMahon was offering monetary consideration in the range of $1,000,000, she negotiated to increase that sum significantly. (*Id.* ¶ 3; Compl. ¶ 210.) Plaintiff insisted that Defendant McMahon's "initial offer of $1,000,000 was not enough to compensate for the lost earning potential and the fact that she would be unable to continue the promised career trajectory of Vice President, as well as failing to last as a Director for a full year." (Compl. ¶ 210.) She persuaded Defendant McMahon to increase the monetary consideration to $3,000,000—triple the amount of his opening offer. (*Id.*; McMahon Decl. ¶ 3; *see also* Agmt. § V.)

As Plaintiff admits in her Complaint, the parties each retained counsel who were involved in the drafting, editing, and negotiation of the Settlement Agreement. (*See, e.g.*, Compl. ¶¶ 209-12.) Indeed, in the course of negotiating the Settlement Agreement and in an effort to reinforce the strength of the arbitration clause (discussed in detail below), Plaintiff's counsel (Jonathan M. Shapiro of Aeton Law Partners LLP (*see* Agmt. § VII(A))), proposed language that ultimately resulted in an arbitration provision that entitles the prevailing party in the arbitration "to recover from the non-prevailing party all of its attorney's fees and costs." (Agmt. § X.)

With respect to monetary consideration, the parties ultimately agreed to the following terms.

V.    <u>MONETARY CONSIDERATIONS TO GRANT</u>

A.    Upon execution of this Agreement by the parties, McMahon will pay the sum of One Million Dollars ($1,000,000.00) to Grant within ten (10) days of execution of this Agreement.

B.    Provided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years, McMahon will pay

the following sums to Grant within ten (10) days of the dates listed below:

> February 1, 2023 - $500,000.00
> February 1, 2024 - $500,000.00
> February 1, 2025 - $500,000.00
> February 1, 2026 - $500,000.00

> In the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement, McMahon shall have no obligation to make any payments set forth above which would otherwise become due on the dates indicated, and all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon in accordance with the terms of this Agreement.

(Agmt. § V.)

## 2. The Settlement Agreement's Release of Claims

In the Settlement Agreement, signed by all parties on January 28, 2022, the parties mutually agreed to release any claims they may have against one another. Specifically, Plaintiff agreed, among other things, to release Defendants of all claims she ever had "as a result of, or in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel . . . ." (*Id.* § II(A).) The Settlement Agreement states further:

- "BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES." (*Id.* § II(B).)

- "Grant agrees that she will not cause, and has not caused, to be filed any legal action, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." (*Id.* § II(C).)

- "Grant covenants and agrees that she will forever forebear from pursing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand to claims against McMahon and/or WWE." (*Id*. § II(D).)

- "Grant agrees that she shall not institute or be a party to any lawsuits, either individually or as a class representative or member against McMahon and/or WWE as to any matters up to the date of execution of this Agreement." (*Id*. § II(E).)

- "Grant knowingly and intentionally waives any rights to any additional recovery that might be sought on her behalf by any other person, entity, or local, state or federal government or agency thereof." (*Id.*)

It is difficult to conceive of a more clear and unequivocal release and covenant not to sue.

Defendant and WWE similarly agreed to "release and forever discharge Grant . . . from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant." (*Id.* § II(F).)

### 3. The Settlement Agreement's Arbitration Provision

The Settlement Agreement contains a broad arbitration clause, which requires the parties to first attempt to resolve informally "any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach." (*Id.* § X.) If that attempt is unsuccessful, the arbitration clause mandates that "the sole and exclusive legal method to resolve

any and all disputes and/or controversies is to commence binding arbitration under the Federal

Arbitration Act." (*Id.*) Specifically, Section X of the Settlement Agreement states:

> **In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach**, the parties agree to first attempt to resolve such disputes informally and prior to taking any formal legal action to resolve such disputes. In the event any such dispute cannot be resolved informally, all parties hereto agree that **the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration** under the Federal Arbitration Act **pursuant to the procedures of the American Arbitration Association** and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.

(*Id.* (emphases added).)

### 4. The Settlement Agreement's Confidentiality and Severability Provisions

The Settlement Agreement also contains confidentiality provisions pursuant to which

Plaintiff "agree[d], represent[ed], and warrant[ed]" to keep the Settlement Agreement, its terms,

and information about Defendant McMahon and their relationship confidential. (*Id.* § I(A).)

The Settlement Agreement also contains a clear severability provision: "In the event that

any provision of this Agreement is held to be void or unenforceable by any arbitration panel or

court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding

provided, however, if any of the confidentiality obligations of this Agreement are ever contended

to be unenforceable by Grant, or are found to be unenforceable by any tribunal, Grant agrees that

she shall return all monies paid pursuant to this Agreement to McMahon." (*Id.* § IX(A).)[3]

---

[3] In this lawsuit, Plaintiff erroneously contends that the confidentiality provision is unenforceable. Defendant McMahon therefore reserves his right, at the appropriate time and in the appropriate forum, to demand (among other things) that Plaintiff return the monetary compensation of $1,000,000 that Defendant McMahon has already paid Plaintiff under the Settlement Agreement.

### 5. Plaintiff's Acknowledgement That She Knowingly and Voluntarily Entered into the Settlement Agreement

The Settlement Agreement clearly states that by signing her name, Plaintiff "represents that she is able to read the language and to understand the meaning and effect of this Agreement," that "she has read and understands this Agreement and the effect of it," and that "her attorney . . . has explained it to her." (*Id.* § VII(A).)  She also unequivocally acknowledged that "among the rights she is **knowingly and voluntarily** waiving by executing this Agreement is the right to bring or pursue any claims or causes of action against McMahon and/or WWE." (*Id.* § VII(B) (emphasis added).)

### C. Plaintiff Commences This Action in Violation of the Settlement Agreement

In violation of the clear terms of the Settlement Agreement and Plaintiff's obligations thereunder, Plaintiff commenced the instant action on January 25, 2024.  Initiating litigation—in open court, rather than the negotiated and contracted for forum (and without "first attempt[ing] to resolve such dispute[] informally" (*id.* § X))—is a material breach of several provisions of the Settlement Agreement, including those addressing confidentiality, releases, and arbitration.  While it will be impossible to fully remedy the wrong of publicizing Plaintiff's salacious and false allegations, Defendant McMahon will pursue appropriate remedies at the proper juncture.  For the time being, the Court must remedy the improper forum selected by Plaintiff, and compel arbitration.

## ARGUMENT

The parties, represented by counsel, negotiated and included a broad arbitration clause in the Settlement Agreement.  Critically, that clause by its terms requires the parties not only to arbitrate the merits of any claims that fall within the scope of the Settlement Agreement, but also the threshold issue of the arbitrability of those claims.  Under a wealth of settled precedent, this

Court must honor the parties' contract and compel arbitration over Plaintiff's claims, all of which arise under or out of the Settlement Agreement.

The FAA "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable'" absent specified grounds. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). Indeed, the FAA "requires enforcement of agreements to arbitrate and embodies a national policy favoring arbitration." *Patushi v. Global Lending Servs. LLC*, No. 23-cv-946, 2024 WL 1281553, at *1 (D. Conn. Mar. 26, 2024) (Meyer, J.) (internal quotation marks omitted); *see also Epic Sys. Corp., v. Lewis*, 584 U.S. 497, 505-06 (2018) (noting that the FAA reflects "a liberal federal policy favoring arbitration agreements" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) ("*Moses*"))); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution."), *abrogated on other grounds by Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015).

In determining whether to compel arbitration, a court must typically determine "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." *Porcelli v. JetSmarter, Inc.*, No. 19-cv-2537, 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)).[4] However, once a court determines that "a valid arbitration agreement exists"

---

[4] Courts in this District and Circuit sometimes refer instead to a two- or three-part test, though they analyze the same considerations. *See, e.g.*, *Considine v. Brookdale Senior Living, Inc.*, 124 F. Supp. 3d 83, 88 (D. Conn. 2015) ("In applying the FAA, the Court must examine '(1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002))); *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019)

(i.e., step one), if it subsequently determines that "the agreement delegates the arbitrability issue" (i.e., steps two and three) to an arbitrator, then the court "may not decide the arbitrability issue" itself and must instead compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019); *see also* Argument II.A, *infra*. In other words, the court must allow the arbitrator to determine whether plaintiff's claims are subject to arbitration.

If, on the other hand, the court concludes that the question of whether a plaintiff's claims are subject to arbitration has *not* been delegated to the arbitrator, then "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses*, 460 U.S. at 24-25. Notably, courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Daly*, 939 F.3d at 421 (citation omitted).

In deciding motions to compel arbitration, courts apply "a standard similar to that applicable for a motion for summary judgment." *Patushi*, 2024 WL 1281553, at *1 (quoting *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 229 (2d Cir. 2016)). That standard requires a court to "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, together with affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* (quoting *Nicosia*, 834 F.3d at 229) (cleaned up).

As detailed below, the parties mutually agreed to arbitrate all claims asserted in the Complaint—as well as the arbitrability of those claims—and there is no basis for Plaintiff to

---

("In reviewing a motion to compel arbitration, we must therefore determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; and, (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable.") (cleaned up).

circumvent that agreement. Thus, pursuant to the FAA and in accordance with Section X of the Settlement Agreement, Plaintiff should be compelled to honor her agreement to arbitrate the claims asserted in the Complaint.[5]

## I. THE PARTIES ENTERED INTO A VALID AND ENFORCEABLE AGREEMENT TO ARBITRATE

The parties freely and voluntarily entered into an agreement to arbitrate, satisfying the first factor of the Court's analysis. "The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles." *Nicosia*, 834 F.3d at 229; *Patushi*, 2024 WL 1281553, at *2. Under Connecticut law—the operative law under the Settlement Agreement (*see* Agmt. § XI)—"the fact that a party signed a written agreement is usually conclusive evidence of contract formation." *D'Antuono v. Serv. Road Corp*., 789 F. Supp. 2d 308, 323 (D. Conn. 2011). Indeed, this Court recently noted that, under Connecticut law, "[w]hen an agreement is reduced to writing and signed by all parties, the agreement itself is substantial evidence that a meeting of the minds has occurred." *Patushi*, 2024 WL 1281553, at *2 (quoting *Tedesco v. Agolli*, 189 A.3d 672, 683 (Conn. App. 2018)). It has long been the law in Connecticut that "where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so." *D'Antuono*, 789 F. Supp. 2d at 323 (citation omitted); *see also Levine v. Massey*, 654 A.2d 737, 741 (Conn. 1995) ("The circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary

---

[5] If this Motion is denied (and it should not be), Defendant McMahon reserves his right to move to dismiss the Complaint under Rule 12 of the Federal Rules of Civil Procedure based on, among other things, Plaintiff's release of claims in Section II of the Settlement Agreement. *See Ramasamy v. Essar Glob. Ltd*., 825 F. Supp. 2d 466, 467 n.1 (S.D.N.Y. 2011) ("A motion to dismiss or stay in favor of arbitration is not a Rule 12 motion or a responsive pleading . . . ."). As courts have recognized, the very point of an agreement to arbitrate is to reserve merits arguments for the arbitrator. *See, e.g.*, *Lamkin v. Morinda Props. Weight Parcel, LLC*, 440 F. App'x 604, 607-08 (10th Cir. 2011).

to the plain meaning of the language used." (citing *Connecticut Co. v. Division 425*, 164 A.2d 413, 417-18 (Conn. 1960))).

Not only did the parties sign the Settlement Agreement—including the agreement to arbitrate—each was represented by counsel when it was negotiated and memorialized. (*See* Compl. ¶¶ 209-14; Agmt. § VII(A).) Plaintiff also unequivocally represented that: (1) she entered into the Settlement Agreement "knowingly and voluntarily" (Agmt. § VII(B)); (2) she understood the Settlement Agreement and its effect (*id*. § VII(A)); and (3) her lawyer had explained the terms of the Settlement Agreement to her (*id.*). Indeed, Plaintiff negotiated the Settlement Agreement to her advantage by tripling Defendant McMahon's opening offer. (McMahon Decl. ¶ 3; Compl. ¶ 210.)

Thus, the parties entered into an agreement to arbitrate—an agreement that is valid and enforceable, and to which Plaintiff must be bound. *See, e.g.*, *Carter v. Reilly*, Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S, 2023 WL 8889473, at *7 (Conn. Super. Ct. Dec. 20, 2023) (compelling arbitration where the "language of the written agreement illustrate[d] that" the agreement at issue was "a valid and enforceable contract between the parties," and where "counsel for both parties were involved in the review and execution of [the] agreement"); *Patushi*, 2024 WL 1281553, at *2-3 (granting motion to compel arbitration of all claims); *see also, e.g.*, *Dighello v. Busconi*, 673 F. Supp. 85, 88 (D. Conn. 1987) (enforcing arbitration agreement between individuals), *aff'd*, 849 F.2d 1467 (2d Cir. 1988).

## II.    THE SETTLEMENT AGREEMENT DELEGATES BOTH THRESHOLD AND SUBSTANTIVE ISSUES TO THE ARBITRATOR

Given the strong public policy favoring arbitration, federal courts read arbitration clauses as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25. Indeed, the FAA "leaves no place for

the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Byrd*, 470 U.S. at 218 (citing 9 U.S.C. §§ 3, 4); *see also White v. Kampner*, 641 A.2d 1381, 1384-85 (Conn. 1994) ("An order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (quoting *Bd. of Educ. v. Frey*, 392 A.2d 466, 468 (Conn. 1978))); *Daly*, 939 F.3d at 421 (similar).

Here, there is little doubt that the Settlement Agreement's arbitration clause delegates the threshold question of arbitrability to the arbitrator. This Court thus need not (and indeed cannot) consider whether the Agreement delegates Plaintiff's substantive claims to arbitration. But, in any case, as demonstrated below, the arbitration clause clearly encompasses Plaintiff's substantive claims as well.

### A.    The Settlement Agreement Delegates the Threshold Issue of Arbitrability to the Arbitrator

The Supreme Court has held "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Henry Schein*, 586 U.S. at 67-68 (citations omitted). To do so, the parties' agreement must "delegate threshold arbitrability questions to the arbitrator . . . by 'clear and unmistakable' evidence." *Id.* at 69 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010)). Such "clear and unmistakable" evidence exists here.

    1.   *The Settlement Agreement Uses Broad Language and Incorporates Specific Rules to Delegate Arbitrability to the Arbitrator*

In their binding Settlement Agreement, the parties agreed to submit to arbitration not only the merits of any dispute but also the very question of arbitrability—"that is, whether their arbitration agreement applies to the particular dispute." *Henry Schein*, 586 U.S. at 65. The Settlement Agreement delegates issues of arbitrability to the arbitrator by 1) including broad language referring "any and all disputes and/or controversies" to arbitration, and 2) explicitly incorporating "the procedures of the American Arbitration Association" (the "AAA"). (Agmt. § X.) Under Second Circuit precedent, *either* the use of broad language *or* the incorporation of arbitration rules conclusively demonstrates the parties' intention to have the gateway question of arbitrability decided by an arbitrator, not a court. The employment of both here leaves no doubt as to the parties' intent.

    i.   <u>The Arbitration Provision Employs Broad Terms to Identify Its Scope</u>

"[A]n intent to refer the matter [of arbitrability] to the arbitrator may be indicated by . . . the use of broad terms to describe the scope of arbitration, such as 'all questions in dispute and all claims arising out of' the contract or 'any dispute that cannot be adjudicated.'" *Bell v. Cendant Corp.*, 293 F.3d 563, 568 (2d Cir. 2002) (internal quotation marks and citation omitted); *see also Emcon Corp. v. Pegnataro*, 562 A.2d 521, 523-24 (Conn. 1989) (holding that questions of arbitrability had been delegated to the arbitrator where the agreement's "broad and all encompassing language" read as follows: "In the event of any dispute between the parties hereto as to the interpretation or application of the Agreement, such dispute shall be determined or settled by arbitration.").

Here, the parties repeatedly used "broad terms to describe the scope of arbitration." *Bell*, 293 F.3d at 568. Specifically, they agreed that "the *sole and exclusive* legal method to resolve ***any***

**and all disputes and/or controversies** is to commence binding arbitration." (Agmt. § X; *see also id.* (referring to "**any dispute** arising under or out of this Agreement, its construction, interpretation, application, performance, or breach") (emphases added).) That language alone is "sufficient to send the issue of arbitrability to the arbitrator." *Bell*, 293 F.3d at 569.

That understanding is reinforced by other provisions of the Settlement Agreement. The Agreement's severability provision, for instance, makes clear that the parties expected disputes over "*any* provision of th[e] Agreement" to be first resolved "by an[] arbitration panel" and only then by a "court reviewing an arbitration decision." (Agmt. § IX(A) (emphasis added).) Moreover, the Settlement Agreement makes clear that an express objective of the agreement to arbitrate was to utilize "sealed proceedings which preserve the confidential and private nature of this Agreement." (Agmt. § X.) Litigating arbitrability in a public forum is fundamentally incompatible with the parties' stated desire that the Agreement remain private and confidential.

ii.   The Arbitration Provision Explicitly Incorporates Rules That Empower the Arbitrator

"[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 122 (2d Cir. 2003)) (discussing AAA Commercial Arbitration Rules). Courts in the Second Circuit have thus consistently found that the parties' incorporation of these AAA rules constitutes "clear and unmistakable evidence" of their intent to delegate the issue of arbitrability to the arbitrator. *See, e.g.*, *Contec*, 398 F.3d at 208; *Considine*, 124 F. Supp. 3d at 90-91.

Like the parties in *Contec*, the parties here agreed that the sole method to resolve all disputes was to "commence binding arbitration under the Federal Arbitration Act pursuant to the

15

procedures of the American Arbitration Association."  (Agmt. § X.)  Rule 7(a) of the AAA Commercial Arbitration Rules and Procedures and Rule 6(a) of the AAA Employment Arbitration Rules and Procedures provide that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[6]  In addition to the Settlement Agreement's broad description of the scope of arbitration, its incorporation of the AAA's procedures provides unmistakable proof of the parties' intent.  *See Considine*, 124 F. Supp. 3d at 90 ("Moreover, even if the plain language of the contract were not dispositive on this point, the parties also incorporate a set of rules into their agreement, which delegate the authority to decide arbitrability to the arbitrator.").

The parties' intent to delegate questions of arbitrability is "clear and unmistakable" from their Settlement Agreement.  *See Henry Schein*, 586 U.S. at 69.  The Court thus need not—and indeed, cannot—proceed to the question of whether Plaintiff's claims fall within the scope of the Settlement Agreement.  *See id.* at 68 (holding that "a court possesses no power to decide the arbitrability issue" when the parties' contract delegates that question to the arbitrator, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

> ### 2. *Plaintiff's Challenge to the Enforceability of the Settlement Agreement Does Not Change the Analysis*

Plaintiff's challenge to the enforceability of the Settlement Agreement as a whole, rather than the specific arbitration provision in Section X, does not allow her to avoid the arbitration clause.  While such a challenge raises an issue of enforceability, under binding United States Supreme Court precedent, that issue still must be decided by an arbitrator.

---

[6]    *See*    https://www.adr.org/sites/default/files/CommercialRules_Web_1.pdf    (AAA    Commercial    Rules); https://www.adr.org/sites/default/files/EmploymentRules_Web_3.pdf (AAA Employment Rules).

In *Rent-A-Center*, the Supreme Court addressed this very situation, reversing the Ninth Circuit's conclusion that, despite a contract's delegation to arbitration, a challenge to the contract "as a whole" as "unconscionable" should be decided by the district court. 561 U.S. at 70-75. The Supreme Court held, to the contrary, that "any challenge to the validity of the Agreement as a whole [is] for the arbitrator" to decide. *Id.* at 66-67; *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) ("[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.").

As the Supreme Court explained in *Rent-A-Center*: "There are two types of validity challenges under § 2 [of the FAA]: 'One type challenges specifically the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole, either on a ground that directly affects the entire agreement (*e.g.*, the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid.'" 561 U.S. at 70 (quoting *Buckeye*, 546 U.S. at 444). "[O]nly the first type of challenge is relevant to a court's determination whether the arbitration agreement at issue is enforceable." *Id. (*citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)). That is because "as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract." *Id.* at 70-71 (quoting *Buckeye*, 546 U.S. at 445). And Section 2 of the FAA "states that a 'written provision' 'to settle by arbitration a controversy' is 'valid, irrevocable, and enforceable' *without mention* of the validity of the contract in which it is contained." *Id.* at 70. "Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Id.*

The Court then explained that "where the alleged fraud that induced the whole contract *equally induced* the agreement to arbitrate which was part of that contract," the challenge is to the

validity of the agreement as a whole and not suitable for judicial intervention. *Rent-A-Center*, 561 U.S. at 71 (emphasis added). In other words, when a party challenges a contract, "but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract" and "[t]he challenge should therefore be considered by an arbitrator, not a court." *Buckeye*, 546 U.S. at 446; *see also Prima Paint*, 388 U.S. at 403-04 (holding that courts may address attacks on "the arbitration clause itself" but not on "the contract generally").

Based on this long-established line of Supreme Court precedent, courts in this Circuit have routinely declined to consider challenges directed at the contract as a whole, where the contract includes an arbitration delegation. *See Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482 (2d Cir. 2011) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." (quoting *Buckeye*, 546 U.S. at 445-46)); *see also Pingel v. Gen. Elec. Co*., No. 14-cv-632 (CSH), 2014 WL 7334588, at *5 (D. Conn. Dec. 19, 2014) (finding that the plaintiff's challenge based on unconscionability "is a challenge to the contract generally, and the same exact losing argument made" in *Rent-A-Center*).

In this case, Plaintiff lobs a litany of baseless attacks against the Settlement Agreement—none of which applies to the arbitration clause specifically. For instance, the Complaint alleges that the "NDA [i.e., Settlement Agreement] *itself*[] is judicially unenforceable" under the Speak Out Act. (Compl. ¶ 277 (emphasis added).) That claim does not even mention the Settlement Agreement's arbitration delegation, instead highlighting its nondisclosure and the nondisparagement clauses, which the Complaint describes as "the core term[s] of the [Settlement Agreement]." (*Id.* ¶¶ 275-77 (emphasis added).)

The Complaint's request for a declaratory judgment that the Settlement Agreement is void under the common law likewise attacks either the Settlement Agreement as a whole or provisions

*other than* the arbitration agreement.  For example, the Complaint asserts that "the [Settlement Agreement,] including the confidentiality provision, is impermissibly broad," that "Ms. Grant entered into the contract under duress and undue influence," that "the [Settlement Agreement] is a contract of adhesion," that "the [Settlement Agreement] is substantively unconscionable," and that the "[Settlement Agreement] is void as against public policy."  (Compl. ¶¶ 280-84.)  Notably, *none* of these challenges specifically reference the arbitration clause.  Likewise, the Complaint fails to allege—nor could it—any factual basis whatsoever to challenge the arbitration clause itself.

Quite the contrary, drafts of the Settlement Agreement indicated that the parties negotiated the arbitration clause at arms' length with help of counsel.  (McMahon Decl. ¶¶ 4-5; *see* Compl. ¶ 261.)  Because Plaintiff's challenges to the Settlement Agreement are exactly the type that either are directed to the Settlement Agreement as a whole, or are "on the ground that the illegality of one of the contract's provisions renders the whole contract invalid," the issues of contract validity must be considered by the arbitrator.[7]  *Rent-A-Center*, 561 U.S. at 70; *Arrigo*, 408 F. App'x at 482.

### B.    The Settlement Agreement Delegates Plaintiff's Substantive Claims to the Arbitrator

The Court need not decide whether Plaintiff's claims fall within the scope of the arbitration agreement because the parties have delegated that arbitrability determination to the arbitrator.  *See*

---

[7] Defendant McMahon will establish in arbitration that each argument Plaintiff raises to invalidate the Settlement Agreement fails under applicable law.  As a brief example, contrary to Plaintiff's assertion that she entered the contract under duress or undue influence, (Compl. ¶ 281), courts in Connecticut have repeatedly held that "if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or avoid it," that party, because of his or her ratification of the contract, cannot assert duress or undue influence as a matter of law.  *Young v. Data Switch Corp.*, 646 A.2d 852, 856-57 (Conn. 1994); *Gengaro v. City of New Haven*, 984 A.2d 1133, 1139-40 (Conn. App. 2009) (applying same rule to argument based on undue influence).  Here, the Settlement Agreement was executed on January 28, 2022, the Complaint was filed almost two years later on January 25, 2024, and in the interim, as the Complaint admits, Plaintiff received and accepted the initial payment of $1,000,000 upon the execution of the Settlement Agreement.  (Compl. ¶ 263.)  Plaintiff's clear ratification of the Settlement Agreement and her willing and voluntary acceptance of its benefits refute her allegations of duress and undue influence as a matter of law.  *See Young*, 646 A.2d at 856-57.

Argument II.A, *supra*.  But if the Court does consider the issue, it should conclude that Plaintiff's claims fall squarely within the scope of the arbitration agreement.

There can be little doubt that Plaintiff's claims are covered by the arbitration clause. Section X mandates that the parties arbitrate "*any* dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach."  (Agmt § X (emphasis added).)  Courts have found that comparable provisions are "all-embracing, all-encompassing and broad" such that they encompass tort claims, as well as statutory claims.  *Fink v. Golenbock*, 680 A.2d 1243, 1252 (Conn. 1996) (citing similar cases); *see also Cuseo v. Aquent, Inc.*, No. CV040568982, 2005 WL 532257, at *2 (Conn. Super. Ct. Jan. 31, 2005) ("The inclusion of such broad language within arbitration clauses," such as "[a]ny claim or controversy arising out of or relating to this [a]greement," "generally includes all claims, including tort claims.").

By challenging the enforceability of the Settlement Agreement, Plaintiff has initiated a dispute on the "construction, interpretation, application, performance or breach" of the Settlement Agreement, rendering the entire dispute appropriate for arbitration.  (Agmt § X).  Moreover, all of Plaintiff's other claims concern the very disputes and issues that the Settlement Agreement was explicitly designed to address: her "relationship with McMahon, WWE, or any employees . . . of WWE" and her "employment with WWE."  (*Id.* §§ I.A, Recitals.)  Thus, all of Plaintiff's claims, whether contractual (Counts I and II), statutory (Counts III and IV), or tort (Counts V to IX), "aris[e] under or out of [the Settlement Agreement], its construction, interpretation, application, performance or breach."[8]  (*Id.* § X.)

---

[8] Plaintiff must be compelled to arbitrate her claims asserted against WWE because, like Defendant McMahon, WWE is a party to the Settlement Agreement.  (*See* Agmt. at 1.)  All reasons provided herein in support of Defendant McMahon's motion to compel arbitration apply equally to the WWE.  (Agmt. § X ("In the event any such dispute cannot be resolved informally, *all parties hereto* agree that the *sole and exclusive* legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the

## III.    THERE IS NO CONGRESSIONAL INTENT TO RENDER ANY CLAIMS ASSERTED IN THE COMPLAINT NON-ARBITRABLE

Congress did not intend for any of the claims in the Complaint to be non-arbitrable, thereby satisfying the third factor of the Court's analysis.

"When statutory claims are involved, a party can prevent enforcement of the arbitration agreement *only* by showing that 'Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.'"  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)) (emphasis added).  Such an intent may be deduced from "the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes."  *Shearson/American Express*, 482 U.S. at 227 (cleaned up); *see also Guyden*, 544 F.3d at 382 (same).  Here, no federal statute renders any of Plaintiff's claims non-arbitrable.

In Count I, Plaintiff seeks to void the Settlement Agreement based on the Speak Out Act, a federal statute that has no bearing on the arbitrability of claims.  The Speak Out Act dictates that, in the context of sexual harassment and/or sexual assault disputes, "no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable."  42 U.S.C. § 19403(a).  By its own terms, the Speak Out Act affects only the enforceability of

procedures of the American Arbitration Association . . . .") (emphasis added).)  And, although Defendant Laurinaitis is not a signatory to the Settlement Agreement, Plaintiff should also be compelled to arbitrate her claims against him.  "Connecticut courts have looked to federal law to determine the circumstances under which nonsignatories may be bound to arbitration agreements."  *Kuryla v. Coady*, No. AANCV126009961, 2013 WL 1494223, at *9 (Conn. Super. Ct. Mar. 22, 2013) (collecting cases).  The Second Circuit has recognized that "signatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where a careful review of the relationship among the parties, the contracts they signed, and the issues that had arisen among them discloses that the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."  *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (internal quotation marks and modifications omitted); *see also Contec*, 398 F.3d at 209.  By signing the Settlement Agreement, Plaintiff agreed to release all claims against Defendant Laurinaitis, a WWE employee, in his personal capacity and official capacity.  (*See* Agmt. § II(A).)  Plaintiff's allegations and claims against Defendant Laurinaitis are closely intertwined with her allegations and claims against Defendants McMahon and WWE, and Plaintiff thus must be compelled to arbitrate her claims against Defendant Laurinaitis.

particular types of clauses—nondisclosure and nondisparagement clauses—none of which are arbitration clauses. Moreover, the Act does not specify the forum in which enforceability should be determined; it in no way suggests that an arbitrator cannot adjudicate enforceability of the Settlement Agreement. Nothing in the statute's text or legislative history suggests otherwise. Thus, the Speak Out Act plainly does not impact the arbitrability of Plaintiff's claims.

To the extent Plaintiff seeks to argue that the nondisclosure and nondisparagement clauses in the parties' Settlement Agreement are "core term[s]" that are invalidated by the Speak Out Act, thereby rendering the entire Settlement Agreement "judicially unenforceable," (*see* Compl. ¶ 277), that argument is one for the arbitrator, and it does not impact the arbitration clause in any event. *See* Argument II.A.2, *supra*; *Rent-A-Center*, 561 U.S. at 71 (holding that arbitration clauses are severable).[9]

Counts III and IV of the Complaint assert claims based on the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591 et seq., which similarly imposes no prohibition on arbitration. The TVPA and its legislative history are silent on the issue of arbitration, and no inherent conflict exists between arbitration and the TVPA's underlying purpose, which is to "combat severe forms of worker exploitation that do not amount to actual involuntary servitude."

---

[9] Plaintiff's claim based on the Speak Out Act is also ill-conceived as a matter of law and fact, as will be shown in arbitration. As a threshold matter, the nondisparagement and nondisclosure clauses in the Settlement Agreement were agreed to at the termination of the relationship between Plaintiff and Defendant McMahon on January 28, 2022, not "before the dispute ar[ose]," as is required by the Speak Out Act. 42 U.S.C. § 19403. And, contrary to Plaintiff's assertion that those clauses are "the core term[s]" of the Settlement Agreement such that their invalidity would render the entire Settlement Agreement meaningless, the Settlement Agreement contains numerous other material provisions, such as the release provisions and the payment provision. (*See* Agmt. §§ II, V.) Indeed, the Complaint itself admits as much by alleging that "McMahon has breached **a core term** of the NDA. He paid $1,000,000, but failed to make any further payments . . . ." (Compl. ¶ 263 (emphasis added).) In any event, the Settlement Agreement contains a severability clause, which states that if "any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding . . . ." (Agmt. § IX.) Assuming *arguendo* that the nondisclosure and nondisparagement clauses are unenforceable under the Speak Out Act—which they are not—the remaining provisions in the Settlement Agreement are nonetheless severable and enforceable. *See Grabe v. Hokin*, 267 A.3d 145, 161 (Conn. 2021) ("[T]he prenuptial agreement contained a severability clause that expressly contemplated that, if one or more of its terms were found to be invalid, the rest of the agreement would survive.").

*Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at \*17 (E.D.N.Y. Sept. 24, 2019) (internal quotation marks and citation omitted), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020).  Indeed, courts have repeatedly compelled arbitration of TVPA claims.  *See, e.g., Zendon v. Grandison Mgmt., Inc.*, No. 18-cv-4545, 2018 WL 6427636, at \*3 (E.D.N.Y. Dec. 7, 2018) (finding that the parties' arbitration agreement encompassed all claims at issue, including those under the TVPA); *Maity v. Tata Consultancy Servs., Ltd.*, No. 19-cv-19861, 2021 WL 6135939, at \*7 (D.N.J. Dec. 29, 2021) (compelling arbitration of complaint that alleged violation of the TVPA).  Accordingly, there is no contrary congressional intent to render any of Plaintiff's claims non-arbitrable.

Finally, Plaintiff may attempt to argue that her claims are non-arbitrable pursuant to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "EFAA"), a statute not mentioned in the Complaint.  The EFAA dictates that in cases involving a sexual assault dispute or sexual harassment dispute, "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute."  9 U.S.C. § 402(a).  Plaintiff cannot benefit from the EFAA for at least two equally fatal reasons.  *First*, the EFAA was enacted on March 3, 2022, and does not apply retroactively—it applies only "with respect to any dispute or claim that arises or accrues on or after the date of enactment of [the EFAA]."  Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022); *Castillo v. Altice USA, Inc.*, 698 F. Supp. 3d 652, 655-56 (S.D.N.Y. 2023); *Cunningham v. CVS Health Corp.*, No. 23-cv-1328, 2024 WL 2867303, at \*11 (S.D.N.Y. June 4, 2024).  As courts in the Second Circuit have held, "a dispute arises when the conduct which constitutes the alleged sexual assault or sexual harassment occurs," and "a claim accrues when the plaintiff has a complete and present cause of action."  *Castillo*, 698 F. Supp. 3d at 656-57 (quoting

*Barnes v. Festival Fun Parks, LLC*, No. 22-cv-165, 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023)); *Walters v. Starbucks Corp.*, 623 F. Supp. 3d 333, 337 (S.D.N.Y. 2022).  Accordingly, as a threshold matter, the EFAA is inapplicable to this case because the allegations of Defendant McMahon's purported misconduct, i.e., when the "dispute or claim[s] . . . ar[ose] or accrue[d]," predate March 3, 2022 – the EFAA's effective date.  *See Walters*, 623 F. Supp. 3d at 337 ("Walters's claims in this lawsuit are not covered by [the EFAA] because each claim arose or accrued before March 3, 2022.  Each of Walters's claims accrued at the time she experienced discrimination, harassment, or retaliation, and at the latest by December of 2021, when she left her job.").[10]

*Second*, even absent this threshold bar, the EFAA is inapplicable because the parties' arbitration provision is not a "predispute arbitration agreement."  The EFAA can invalidate only a "predispute arbitration agreement," defined by the EFAA as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement."  9 U.S.C. § 401(1).  A "dispute . . . clearly refers to the discriminatory conduct underlying the Complaint," and therefore the EFAA "require[s] the arbitration agreement to be entered into prior to . . . the discriminatory conduct."  *Castillo*, 698 F. Supp. 3d at 657 (citations and internal quotation marks omitted).  The very nature of the parties' agreement here—entitled "Confidential *Settlement* Agreement, General Release and Covenant Not to Sue" (emphasis added)—and their mutual release of all claims up to and including "the date of execution of th[e] Agreement," evince that the Settlement Agreement addressed and settled a dispute that had already arisen at the time of execution.  This stands in stark contrast to non-negotiated, boilerplate arbitration agreements frequently entered into by

---

[10] The sparse allegations in the Complaint that postdate March 3, 2022 allege no actionable misconduct, and therefore do not alter this analysis.  (*See* Compl. ¶¶ 228-29 (alleging that Plaintiff communicated with WWE Superstar via text on two occasions after March 3, 2022); *id.* ¶¶ 230-31 (narrative paragraphs detailing alleged peripheral events following the public revelation of the relationship between Plaintiff and Defendant McMahon).)

employees in the normal course of employment, which are the type of "predispute arbitration agreements" targeted by the EFAA.  *See, e.g.*, *Riggs v. Akamai Techs.*, No. 23-cv-6463, 2024 WL 3347032, at *3 (S.D.N.Y. July 8, 2024) (denying motion to compel arbitration based on EFAA where parties agreed that plaintiff "signed a valid and relevant arbitration agreement when she began her employment"); *see also* House Judiciary Committee Report on EFAA, H.R. Rep. No. 117-234, at 3-4 (2022) (addressing "forced arbitration clauses" that are "[o]ften buried deep within the fine print of employment and consumer contracts").

**IV.    THIS COURT SHOULD STAY THE ACTION PENDING ARBITRATION**

Because this "lawsuit involves an arbitrable dispute," the Court must stay the case.  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  Section 3 of the FAA provides that "when any issue in a suit is subject to arbitration, the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'"  *Id.* at 476 (quoting 9 U.S.C. § 3).  As the Supreme Court recently made clear, "the word 'shall' 'creates an obligation impervious to judicial discretion," such that "[w]hen § 3 says that a court 'shall . . . stay' the proceeding, the court must do so."  *Id.* (citations omitted).  Therefore, the Court should stay the case pending the completion of arbitration.

Even if the Court were to find that not all claims are arbitrable (which it should not), the case should still be stayed.  *See Smith*, 601 U.S. at 476 (explaining that a stay is mandatory "when *any issue in a suit* is subject to arbitration") (emphasis added).  Indeed, a stay "is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims," as would be the case here if the Court ultimately compelled arbitration of only certain claims.  *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110-11 (S.D.N.Y. 2017) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law

25

with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants.") (citation omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant McMahon respectfully requests that the Court grant his motion and compel arbitration of all claims asserted in the Complaint and stay the litigation pending arbitration.

Date: December 23, 2024                             Respectfully submitted,

**AKIN GUMP STRAUSS HAUER & FELD LLP**

By:     */s/ Jessica T. Rosenberg*

Jessica T. Rosenberg
  (admitted *pro hac vice*)
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
jrosenberg@akingump.com

**McCARTER & ENGLISH, LLP**
James A. Budinetz (ct16068)
CityPlace I, 185 Asylum Street
Hartford, CT  06103
Telephone: (860) 275-6765
Facsimile: (860) 724-3397
jbudinetz@mccarter.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 23, 2024 a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's CM/ECF system.


*/s/ Jessica T. Rosenberg*