# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANEL GRANT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:24-cv-00090-SFR |
| v. | ) | |
| | ) | |
| WORLD WRESTLING ENTERTAINMENT, INC., | ) | |
| a/k/a WORLD WRESTLING ENTERTAINMENT, | ) | |
| LLC; and VINCENT K. MCMAHON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT VINCENT K. McMAHON'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTION TO COMPEL ARBITRATION

**McCARTER & ENGLISH, LLP**

James A. Budinetz (ct16068)
Snigdha Mamillapalli (ct31142)
McCarter & English, LLP
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6765
Facsimile: (860) 724-3397
jbudinetz@mccarter.com
smamillapalli@mccarter.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**

Jessica T. Rosenberg
  (admitted *pro hac vice*)
Ilana Roberts
  (admitted *pro hac vice*)
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
jrosenberg@akingump.com
iroberts@akingump.com

*Attorneys for Defendant*
*Vincent K. McMahon*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................. 3

I.   The Parties ...................................................................................................... 3

II.  The Settlement Agreement ............................................................................ 3

     A.   The Settlement Agreement's Negotiation and Monetary Terms ............................. 3

     B.   The Settlement Agreement's Release of Claims ...................................................... 5

     C.   The Settlement Agreement's Arbitration Provision ............................................... 6

     D.   The Settlement Agreement's Confidentiality and Severability Provisions ............ 7

     E.   Plaintiff's Acknowledgement That She Knowingly and Voluntarily Entered
          into the Settlement Agreement .................................................................................. 8

III. Plaintiff Commences This Action in Violation of the Settlement Agreement ................. 8

LEGAL STANDARD ......................................................................................................... 8

ARGUMENT ..................................................................................................................... 10

I.   The Parties Entered into a Valid and Enforceable Agreement to Arbitrate .................... 10

     A.   The Parties, Both Represented by Counsel, Knowingly and Voluntarily
          Signed a Formal Written Arbitration Agreement with Clear Terms .................. 10

     B.   Plaintiff's Challenges to the Enforceability of the Settlement Agreement as a
          Whole Do Not Impact the Enforceability of the Arbitration Clause ................... 12

II.  The Settlement Agreement Delegates Both Threshold and Substantive Issues to the
     Arbitrator ........................................................................................................... 16

     A.   The Settlement Agreement Delegates the Threshold Issue of Arbitrability to
          the Arbitrator ..................................................................................................... 17

     B.   The Settlement Agreement Delegates Plaintiff's Substantive Claims to the
          Arbitrator ........................................................................................................... 19

III. There Is No Congressional Intent to Render Any Claims Asserted in the Complaint
     Non-Arbitrable ................................................................................................... 20

IV.  This Court Should Stay the Action Pending Arbitration .................................. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
    307 F.3d 24 (2d Cir. 2002)................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................15

*Barnes v. Festival Fun Parks, LLC*,
    No. 22-cv-165, 2023 WL 4209745 (W.D. Pa. June 27, 2023) ................................24

*Bell v. Cendant Corp.*,
    293 F.3d 563 (2d Cir. 2002)............................................................................18

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006)..........................................................................12, 13, 14

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
    117 F.3d 655 (2d Cir. 1997)........................................................13, 14, 15

*Carter v. Reilly*,
    Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S, 2023 WL 8889473
    (Conn. Super. Ct. Dec. 20, 2023)....................................................................11

*Castillo v. Altice USA, Inc.*,
    698 F. Supp. 3d 652 (S.D.N.Y. 2023)........................................................23, 24

*Conn. Co. v. Division 425*,
    164 A.2d 413 (Conn. 1960) ............................................................................11

*Considine v. Brookdale Senior Living, Inc.*,
    124 F. Supp. 3d 83 (D. Conn. 2015)..........................................................9, 19

*Contec Corp. v. Remote Sol. Co.*,
    398 F.3d 205 (2d Cir. 2005)......................................................................18, 19

*Cunningham v. CVS Health Corp.*,
    No. 23-cv-1328, 2024 WL 2867303 (S.D.N.Y. June 4, 2024) ................................24

*Cuseo v. Aquent, Inc.*,
    No. CV040568982, 2005 WL 532257 (Conn. Super. Ct. Jan. 31, 2005) ................20

*D'Antuono v. Serv. Road Corp.*,
    789 F. Supp. 2d 308 (D. Conn. 2011)..........................................................10, 11

*Daly v. Citigroup Inc.*,
    939 F.3d 415 (2d Cir. 2019)...................................................................................17

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985)......................................................................................8, 17

*Dighello v. Busconi*,
    673 F. Supp. 85 (D. Conn. 1987), *aff'd*, 849 F.2d 1467 (2d Cir. 1988) .................................11

*Emcon Corp. v. Pegnataro*,
    562 A.2d 521 (Conn. 1989) ...................................................................................18

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)...........................................................................................9

*Ferrie v. DirecTV, LLC*,
    No. 15-cv-409 (JCH), 2016 WL 183474 (D. Conn. Jan. 12, 2016).......................................16

*Fink v. Golenbock*,
    680 A.2d 1243 (Conn. 1996) ..................................................................................20

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)..................................................................................14, 18, 23

*Gengaro v. City of New Haven*,
    984 A.2d 1133 (Conn. App. Ct. 2009).......................................................................16

*Grabe v. Hokin*,
    267 A.3d 145 (Conn. 2021) ...................................................................................21

*Green Tree Fin. Corp.-Alabama v. Randolph*,
    531 U.S. 79 (2000)............................................................................................17

*Guyden v. Aetna, Inc.*,
    544 F.3d 376 (2d Cir. 2008)...........................................................................9, 16, 21

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019)....................................................................................17, 18, 19

*Katsoris v. WME IMG, LLC*,
    237 F. Supp. 3d 92 (S.D.N.Y. 2017)........................................................................25

*Levine v. Massey*,
    654 A.2d 737 (Conn. 1995) ..................................................................................11

*Mahant v. Lehman Bros.*,
    No. 99-cv-4421, 2000 WL 1738399 (S.D.N.Y. Nov. 22, 2000)............................................13

*Maity v. Tata Consultancy Servs., Ltd.*,
    No. 19-cv-19861, 2021 WL 6135939 (D.N.J. Dec. 29, 2021)................................22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)..........................................................................................9, 17

*Nicosia v. Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)..........................................................................9, 10

*Oldroyd v. Elmira Sav. Bank, FSB*,
    134 F.3d 72 (2d Cir. 1998)....................................................................................9

*Paguirigan v. Prompt Nursing Emp. Agency LLC*,
    No. 17-cv-1302, 2019 WL 4647648 (E.D.N.Y. Sept. 24, 2019), *aff'd in part,*
    *appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020) ....................................22

*Patushi v. Glob. Lending Servs. LLC*,
    No. 23-cv-946 (JAM), 2024 WL 1281553 (D. Conn. Mar. 26, 2024) .........9, 10, 11

*Pingel v. Gen. Elec. Co.*,
    No. 14-cv-632 (CSH), 2014 WL 7334588 (D. Conn. Dec. 19, 2014).....................13

*Porcelli v. JetSmarter, Inc.*,
    No. 19-cv-2537, 2019 WL 2371896 (S.D.N.Y. June 5, 2019) ...........................9, 16

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)....................................................................................12, 13

*Rent-A-Center, W., Inc. v. Jackson*,
    561 U.S. 63 (2010)...............................................................12, 13, 15, 18, 22

*Riggs v. Akamai Techs.*,
    No. 23-cv-6463, 2024 WL 3347032 (S.D.N.Y. July 8, 2024)................................23

*Shaw Grp. Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003)..................................................................................18

*Shearson/Am. Express, Inc. v. McMahon*,
    482 U.S. 220 (1987)..............................................................................................21

*Smith v. Spizzirri*,
    601 U.S. 472 (2024)....................................................................................24, 25

*Tedesco v. Agolli*,
    189 A.3d 672 (Conn. App. Ct. 2018)....................................................................11

*Walters v. Starbucks Corp.*,
    623 F. Supp. 3d 333 (S.D.N.Y. 2022)...................................................................24

*White v. Kampner*,
   641 A.2d 1381 (Conn. 1994) ...................................................................................17

*Young v. Data Switch Corp.*,
   646 A.2d 852 (Conn. 1994) .....................................................................................16

*Zendon v. Grandison Mgmt., Inc.*,
   No. 18-cv-4545, 2018 WL 6427636 (E.D.N.Y. Dec. 7, 2018)................................22

STATUTES

9 U.S.C. § 2 ...............................................................................................................5, 8

9 U.S.C. § 3 .........................................................................................................1, 17, 24

9 U.S.C. § 4 ...............................................................................................................1, 17

9 U.S.C. § 401(1) ..........................................................................................................23

9 U.S.C. § 402(a) ..........................................................................................................22

18 U.S.C. § 1591, *et seq* ...............................................................................................22

42 U.S.C. § 19403(a) ....................................................................................................15

Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022).........................................................24

OTHER AUTHORITIES

AAA Commercial Arbitration Rules and Mediation Procedures, Rule 7(a) (Sept.
   1, 2022) ....................................................................................................................19

AAA Employment Arbitration Rules and Mediation Procedures, Rule 6(a) (Jan. 1,
   2023) ........................................................................................................................19

House Judiciary Committee Report on EFAA, H.R. Rep. No. 117-234 .......................23

Defendant Vincent K. McMahon respectfully submits this memorandum of law in support of his Motion to Compel Arbitration of Plaintiff Janel Grant's Amended Complaint (the "Complaint" or "Am. Compl."), Dkt. No. 117, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3 and 4.

## PRELIMINARY STATEMENT

The facts here are simple and incontrovertible: Plaintiff Janel Grant, with the assistance and advice of counsel, unequivocally agreed to arbitrate all disputes with Defendant McMahon and Defendant World Wrestling Entertainment ("WWE"). More specifically, in January 2022, Plaintiff, Defendant McMahon, and Defendant WWE entered into a contract that mandates arbitration for "any dispute arising under or out of" that agreement:

> [A]ll parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.

Am. Compl. Ex. A ("Confidential Settlement Agreement, General Release and Covenant Not to Sue") (the "Settlement Agreement" or "Agmt.") § X; *see also* Def. Vincent K. McMahon's D. Conn. R. 56(a)(1) Stmt. of Undisputed Material Facts ("SUMF") ¶ 11.

In January 2024—despite the clear and unambiguous arbitration clause—Plaintiff publicly filed this lawsuit in federal court violating her agreement to arbitrate, wasting this Court's time and resources. The Settlement Agreement delegates *both* the Plaintiff's substantive claims and the threshold issue of the arbitrability of those claims to arbitration. Thus, this case must be stayed immediately and sent to arbitration. Should Plaintiff insist on proceeding with her fictitious and released claims, the FAA, binding United States Supreme Court precedent, and Plaintiff's own agreement all require that she do so in arbitration.

The Settlement Agreement was drafted when Plaintiff and Defendant McMahon, who had engaged in a consensual, intimate relationship for approximately three years, sought to memorialize the end of that relationship. In January 2022, Plaintiff and Defendant McMahon, each represented by counsel, negotiated and executed the Settlement Agreement, with Defendant McMahon signing on his own behalf and, in his capacity as Chairman, on behalf of WWE. That agreement, which explicitly sought "to avoid any damage caused by public disclosure of private matters known to Grant and McMahon," included, among other provisions, terms for Plaintiff's departure from the company where they both worked (WWE), the payment of $3 million to Plaintiff, mutual releases, and a comprehensive agreement to arbitrate any and all disputes.

Pursuant to the Settlement Agreement, Defendant McMahon made an initial payment of $1 million to Plaintiff. When Defendant McMahon later learned that Plaintiff, despite her representations and warranties, had materially breached the Settlement Agreement by wrongfully disclosing both the existence of the Settlement Agreement and their relationship, he exercised his contractual right to withhold further payment otherwise owed under the Settlement Agreement. In response, Plaintiff purposefully sought to besmirch him.

Plaintiff intentionally and knowingly breached the terms of the Settlement Agreement and filed a public lawsuit containing false and defamatory allegations against the Defendants. Moreover, her baldly-asserted position that the entire Settlement Agreement is not enforceable is utterly meritless. In any case, these are all issues for the arbitrator to decide.

As this is a pre-answer motion, Defendant McMahon does not specifically address the legal sufficiency or substantive merits of Plaintiff's claims asserted against him. For the avoidance of doubt, however, Defendant McMahon vehemently and categorically denies all allegations of wrongdoing in the Complaint, including Plaintiff's outrageous false claims, seemingly thrown in

to the Complaint solely to generate publicity.  When the Complaint's allegations are adjudicated in the proper forum (arbitration), witnesses are called to testify under oath, and all communications between the parties are produced (including those authored by Plaintiff, many of which were intentionally omitted from the Complaint in an attempt to skew the public narrative), the allegations and claims will be disproven.  Meanwhile, for the foregoing reasons and as set forth further below, the Court should grant Defendant McMahon's Motion to Compel Arbitration.[1]

## **FACTUAL BACKGROUND**

### I.    **The Parties**

Defendant McMahon engaged in a friendship and consensual, intimate relationship with Plaintiff, who is 44 years old.  *See* Defendant Vincent K. McMahon's Decl. in Support of His Mot. to Compel Arbitration ("McMahon Decl."), filed herewith, ¶ 2; *see also* SUMF ¶¶ 1, 3.  Plaintiff told Defendant McMahon that she needed a job, and he facilitated meetings between Plaintiff and WWE's Human Resources department to discuss a position in the legal department as a legal administrator-coordinator.  SUMF ¶ 2.

### II.    **The Settlement Agreement**

#### A.    **The Settlement Agreement's Negotiation and Monetary Terms**

The consensual relationship between Plaintiff and Defendant McMahon lasted just under three years and ended in or about January 2022.  *Id.* ¶ 3.  At that time, Plaintiff and Defendant McMahon negotiated an agreement resolving several issues, including Plaintiff's resignation from WWE and how best to safeguard the private and confidential nature of their relationship.  *Id.* ¶ 4;

---

[1] In Defendant McMahon's memorandum of law in support of his original motion to compel arbitration, Defendant McMahon advanced certain facts to combat a limited number of the countless fabrications and omissions that riddled Plaintiff's original complaint.  Dkt. No. 30.  Plaintiff moved to strike certain of those statements.  Dkt. No. 31.  In an effort to avoid unnecessary litigation, Defendant McMahon removed those statements from the motion that he subsequently refiled, Dkt. No. 85, and has likewise not included those statements herein, but he fully intends to prove their veracity at the appropriate juncture in arbitration.

Agmt. at 1.  Under the Settlement Agreement, Plaintiff agreed to receive monetary compensation in exchange for and in consideration of various mutual promises and covenants, including a mutual release of all claims.  SUMF ¶¶ 6, 13, 15, 17; Agmt. §§ II, V.

Initially, Plaintiff negotiated on her own behalf.  SUMF ¶ 7.  When she learned that Defendant McMahon was offering monetary consideration in the range of $1,000,000, she negotiated to increase that sum significantly.  *Id.*  Plaintiff insisted that Defendant McMahon's "initial offer of $1,000,000 was not enough to compensate for the lost earning potential and the fact that she would be unable to continue the promised career trajectory of Vice President," and her inability to serve as a Director for a full year.  *Id.*  She persuaded Defendant McMahon to increase the monetary consideration to $3,000,000—triple the amount of his opening offer.  *Id.* ¶¶ 7, 17; *see also* Agmt. § V.

As Plaintiff admits in her Complaint, the parties each retained counsel who were involved in the drafting, editing, and negotiation of the Settlement Agreement.  SUMF ¶ 8; *see also* Agmt. § VII(A).  Indeed, in the course of negotiating the Settlement Agreement and in an effort to reinforce the strength of the arbitration clause (discussed in detail below), Plaintiff's counsel (Jonathan M. Shapiro of Aeton Law Partners LLP), proposed language that ultimately resulted in an arbitration provision that entitles the prevailing party in the arbitration "to recover from the non-prevailing party all of its attorney's fees and costs."  SUMF ¶ 10; *see also* Agmt. § X.

With respect to monetary consideration, the parties ultimately agreed to the following terms:

V.    <u>MONETARY CONSIDERATIONS TO GRANT</u>

A.    Upon execution of this Agreement by the parties, McMahon will pay the sum of One Million Dollars ($1,000,000.00) to Grant within ten (10) days of execution of this Agreement.

B.    Provided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years, McMahon will pay the following sums to Grant within ten (10) days of the dates listed below:

> February 1, 2023 - $500,000.00
> February 1, 2024 - $500,000.00
> February 1, 2025 - $500,000.00
> February 1, 2026 - $500,000.00

In the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement, McMahon shall have no obligation to make any payments set forth above which would otherwise become due on the dates indicated, and all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon in accordance with the terms of this Agreement.

SUMF ¶ 17; Agmt. §§ V(A)-(B).

**B.    The Settlement Agreement's Release of Claims**

In the Settlement Agreement, signed by all parties on January 28, 2022, the parties mutually agreed to release any claims they had or might have against one another. SUMF ¶¶ 13-15; Agmt. § II. Specifically, Plaintiff agreed, among other things, to release Defendants of all claims she ever had "as a result of, or in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel . . . ." SUMF ¶ 13; Agmt. § II(A). The Settlement Agreement states further:

- "BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES." SUMF ¶ 13(a); Agmt. § II(B).

- "Grant agrees that she will not cause, and has not caused, to be filed any legal action, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." SUMF ¶ 13(b); Agmt. § II(C).

- "Grant covenants and agrees that she will forever forebear from pursing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand to claims against McMahon and/or WWE." SUMF ¶ 13(c); Agmt. § II(D).

- "Grant agrees that she shall not institute or be a party to any lawsuits, either individually or as a class representative or member against McMahon and/or WWE as to any matters up to the date of execution of this Agreement." SUMF ¶ 13(d); Agmt. § II(E).

- "Grant knowingly and intentionally waives any rights to any additional recovery that might be sought on her behalf by any other person, entity, or local, state or federal government or agency thereof." SUMF ¶ 13(e); Agmt. § II(E).

It is difficult to conceive of a clearer and more unequivocal release and covenant not to sue.

Defendant McMahon and Defendant WWE similarly agreed to "release and forever discharge Grant . . . from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant." SUMF ¶ 15; Agmt. § II(F).

### C.    The Settlement Agreement's Arbitration Provision

The Settlement Agreement contains a broad and unambiguous arbitration clause, which requires the parties to first attempt to resolve informally "any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach." SUMF ¶ 11; Agmt. § X. If that attempt is unsuccessful, the arbitration clause mandates that "the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act." SUMF ¶ 11; Agmt. § X. Specifically, Section X of the Settlement Agreement, titled "Arbitration," states in relevant part:

> **In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach**, the parties agree to first attempt to resolve

> such disputes informally and prior to taking any formal legal action to resolve such disputes.  In the event any such dispute cannot be resolved informally, all parties hereto agree that **the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration** under the Federal Arbitration Act **pursuant to the procedures of the American Arbitration Association** and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.

SUMF ¶ 11; Agmt. § X.

### D.    The Settlement Agreement's Confidentiality and Severability Provisions

The Settlement Agreement also contains confidentiality provisions pursuant to which Plaintiff "agree[d], represent[ed], and warrant[ed]" to keep the Settlement Agreement, its terms, and information about Defendant McMahon and their relationship confidential.  SUMF ¶ 12; Agmt. § I.

The Settlement Agreement also contains a clear severability provision: "In the event that any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding provided, however, if any of the confidentiality obligations of this Agreement are ever contended to be unenforceable by Grant, or are found to be unenforceable by any tribunal, Grant agrees that she shall return all monies paid pursuant to this Agreement to McMahon."  SUMF ¶ 16; Agmt. § IX.[2]

---

[2] In her Complaint, Plaintiff erroneously contends that the confidentiality provision is unenforceable.  Defendant McMahon therefore reserves his right, at the appropriate time and in the appropriate forum, to demand that in accordance with Section IX (amongst other reasons), Plaintiff return the monetary compensation of $1,000,000 that Defendant McMahon paid Plaintiff under the Settlement Agreement.

E.     **Plaintiff's Acknowledgement That She Knowingly and Voluntarily Entered into the Settlement Agreement**

The Settlement Agreement clearly states that by signing her name, Plaintiff "represents that she is able to read the language and to understand the meaning and effect of this Agreement," that "she has read and understands this Agreement and the effect of it," and that "her attorney . . . has explained it to her." SUMF ¶ 19; Agmt. § VII(A). She also unequivocally acknowledged that "among the rights she is **knowingly and voluntarily** waiving by executing this Agreement is the right to bring or pursue any claims or causes of action against McMahon and/or WWE." SUMF ¶ 14; Agmt. § VII(B) (emphasis added).

III.   **Plaintiff Commences This Action in Violation of the Settlement Agreement**

In violation of the clear terms of the Settlement Agreement and Plaintiff's unambiguous obligations thereunder, Plaintiff commenced the instant action on January 25, 2024. Dkt. No. 1. Initiating litigation—in open court, rather than in the negotiated and contracted for forum (and without "first attempt[ing] to resolve such dispute[] informally," SUMF ¶ 25)—is a material breach of several provisions of the Settlement Agreement, including those addressing confidentiality, releases, and arbitration. While it will never be possible to fully remedy the wrongs caused by publicizing Plaintiff's salacious and false allegations, Defendant McMahon will pursue appropriate remedies at the proper juncture. For the time being, the Court must remedy the improper forum selected by Plaintiff and compel arbitration.

## LEGAL STANDARD

The FAA "provides that written agreements to arbitrate controversies arising out of an existing contract 'shall be valid, irrevocable, and enforceable'" absent specified grounds. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (quoting 9 U.S.C. § 2). Indeed, the FAA "requires enforcement of agreements to arbitrate and embodies a national policy favoring

arbitration." *Patushi v. Glob. Lending Servs. LLC*, No. 23-cv-946 (JAM), 2024 WL 1281553, at *1 (D. Conn. Mar. 26, 2024) (citations omitted); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505-06 (2018) (noting that the FAA reflects "a liberal federal policy favoring arbitration agreements" (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983))); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) ("There is a strong federal policy favoring arbitration as an alternative means of dispute resolution."), *abrogated on other grounds by Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015). In deciding motions to compel arbitration, courts apply "a standard similar to that applicable for a motion for summary judgment" that requires courts to "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, together with affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Patushi*, 2024 WL 1281553, at *1 (quoting *Nicosia v. Amazon.com, Inc*., 834 F.3d 220, 229 (2d Cir. 2016)).

In determining whether to compel arbitration, a court must typically determine "(1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration." *Porcelli v. JetSmarter, Inc.*, No. 19-cv-2537, 2019 WL 2371896, at *3 (S.D.N.Y. June 5, 2019) (citing *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008)).[3]

---

[3] Courts in this District and Circuit sometimes refer instead to a two- or three-part test, though they analyze the same considerations. *See, e.g.*, *Considine v. Brookdale Senior Living, Inc.*, 124 F. Supp. 3d 83, 88 (D. Conn. 2015) ("In applying the FAA, the Court must examine '(1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" (quoting *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)).

**ARGUMENT**

The parties, represented by counsel, negotiated and knowingly entered into a valid and enforceable Settlement Agreement that includes a broad arbitration clause.  Plaintiff cannot circumvent this clear agreement to arbitrate by way of misguided attacks on the Settlement Agreement as a whole.  Here, the parties' arbitration clause requires that they arbitrate both 1) the threshold issue of arbitrability of all claims and 2) the merits of those claims.  Thus, pursuant to the FAA and in accordance with Section X of the Settlement Agreement, and given the absence of any contrary Congressional intent, this case must be stayed immediately and sent to arbitration.

## I.  The Parties Entered into a Valid and Enforceable Agreement to Arbitrate

The parties, both represented by counsel, freely and voluntarily entered into a clear agreement to arbitrate, satisfying the first factor of the Court's analysis.  Plaintiff's challenges to the enforceability of the Settlement Agreement as a whole do not impact the enforceability of the arbitration clause; those challenges are reserved for the arbitrator.

### A.  The Parties, Both Represented by Counsel, Knowingly and Voluntarily Signed a Formal Written Arbitration Agreement with Clear Terms

On January 28, 2022, after more than a week of negotiation, Plaintiff and Defendant McMahon entered into the written Settlement Agreement, inclusive of a clear agreement to arbitrate.  SUMF ¶¶ 9, 20.  "The threshold question of whether the parties indeed agreed to arbitrate is determined by state contract law principles."  *Nicosia*, 834 F.3d at 229; *Patushi*, 2024 WL 1281553, at *2.  Under Connecticut law—the operative law under the Settlement Agreement— "the fact that a party signed a written agreement is usually conclusive evidence of contract formation."  *D'Antuono v. Serv. Road Corp.*, 789 F. Supp. 2d 308, 323 (D. Conn. 2011).  Indeed, "[w]hen an agreement is reduced to writing and signed by all parties, the agreement itself is substantial evidence that a meeting of the minds has occurred."  *Patushi*, 2024 WL 1281553, at *2

(quoting *Tedesco v. Agolli*, 189 A.3d 672, 683 (Conn. App. Ct. 2018)).  It has long been the law in Connecticut that "where a person of mature years, who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it, and notice of its contents will be imputed to him if he negligently fails to do so."  *D'Antuono*, 789 F. Supp. 2d at 323 (citation omitted); *see also Levine v. Massey*, 654 A.2d 737, 741 (Conn. 1995) ("The circumstances surrounding the making of the contract, the purposes which the parties sought to accomplish and their motives cannot prove an intent contrary to the plain meaning of the language used." (citing *Conn. Co. v. Division 425*, 164 A.2d 413, 417-18 (Conn. 1960))).

Not only did the parties sign the Settlement Agreement—including the agreement to arbitrate—each was represented by counsel when it was negotiated and memorialized.  SUMF ¶ 8; Agmt. § VII(A).  Plaintiff also unequivocally represented that: (1) she entered into the Settlement Agreement "knowingly and voluntarily"; (2) she understood the Settlement Agreement and its effect; and (3) her lawyer had explained the terms of the Settlement Agreement to her.  SUMF ¶¶ 14, 19; Agmt. §§ VII(A)-(B).  Indeed, Plaintiff successfully negotiated the Settlement Agreement to her advantage by tripling Defendant McMahon's opening offer, and her attorney negotiated changes to the arbitration clause itself.  SUMF ¶¶ 7, 10.

Thus, the parties entered into an agreement to arbitrate—an agreement that is valid and enforceable, and to which Plaintiff must be bound.  *See, e.g.*, *Carter v. Reilly*, Nos. FST-CV-21-6053770-S & FST-CV-21-5025266-S, 2023 WL 8889473, at *7 (Conn. Super. Ct. Dec. 20, 2023) (compelling arbitration where the "language of the written agreement illustrate[d] that" the agreement at issue was "a valid and enforceable contract between the parties," and where "counsel for both parties were involved in the review and execution of [the] agreement"); *Patushi*, 2024 WL 1281553, at *2-3 (granting motion to compel arbitration of all claims); *see also, e.g.*, *Dighello*

*v. Busconi*, 673 F. Supp. 85, 88-89 (D. Conn. 1987) (enforcing arbitration agreement between individuals), *aff'd*, 849 F.2d 1467 (2d Cir. 1988).

**B.    Plaintiff's Challenges to the Enforceability of the Settlement Agreement as a Whole Do Not Impact the Enforceability of the Arbitration Clause**

Plaintiff cannot avoid the arbitration clause merely by challenging the enforceability of the Settlement Agreement as a whole. Pursuant to decades of binding United States Supreme Court precedent, "the issue of the contract's validity is considered by the arbitrator." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 446 (2006). Plaintiff's handful of new conclusory allegations that purport to extend her prior challenges to the Settlement Agreement as a whole to the arbitration clause specifically miss the mark. Indeed, Plaintiff employs the precise tactic that courts have long rejected.

The Supreme Court has repeatedly held that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Id.* at 446, 449 (holding that when a party challenges a contract "but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract" and "[t]he challenge should therefore be considered by an arbitrator, not a court"); *see also Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010) ("[A]ny challenge to the validity of the Agreement as a whole [is] for the arbitrator[.]"); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) (holding that "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate"). These cases make clear that "where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract," the challenge is to the validity of the agreement as a whole and not suitable for judicial intervention. *Rent-A-Center*, 561 U.S. at 71.

Based on this long-established line of Supreme Court precedent, courts have routinely declined to consider challenges directed at the contract as a whole where, as here, the contract includes an arbitration delegation. *See, e.g.*, *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 667 (2d Cir. 1997) (holding that the distinction drawn by the Supreme Court "would be eviscerated if a claimant could transform a general fraud claim [as to the contract as a whole] into fraud in the inducement of the arbitration clause merely by stating that the arbitration clause is an element of the scheme to defraud"); *Pingel v. Gen. Elec. Co*., No. 14-cv-632 (CSH), 2014 WL 7334588, at *5 (D. Conn. Dec. 19, 2014) (finding that the plaintiff's challenge based on unconscionability "is a challenge to the contract generally, and the same exact losing argument made" in *Rent-A-Center*); *Mahant v. Lehman Bros.*, No. 99-cv-4421, 2000 WL 1738399, at *2 (S.D.N.Y. Nov. 22, 2000) (holding that plaintiff's duress claim must be resolved in arbitration because "as was the case with the fraudulent inducement claim in *Prima Paint*, all of plaintiff's allegations supporting her duress claim relate to the enforcement of the employment application generally—not the enforcement of the arbitration provision alone").

Here, Plaintiff's litany of baseless attacks against the Settlement Agreement fall squarely into the category of challenges that are reserved for the arbitrator to decide: "challenges [to] the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Rent-A-Center*, 561 U.S. at 70 (quoting *Buckeye*, 546 U.S. at 444). For example, Plaintiff's Complaint alleges that the "core term" of the Settlement Agreement is unenforceable under the Speak Out Act, thereby rendering **the entire Settlement Agreement unenforceable**. Am. Compl. ¶ 334. Similarly, Plaintiff alleges that the **entire Settlement Agreement** "is invalid in that Ms. Grant entered into the contract under duress and

undue influence." *Id.* ¶ 339.  These are the exact arguments that the Supreme Court has made clear "must go to the arbitrator."  *Buckeye*, 546 U.S. at 446.

Faced with this fatal line of precedent, Plaintiff recently added a handful of allegations to her complaint that attempt to redirect certain of these attacks to the arbitration clause itself.  *See* Am. Compl. ¶¶ 260-61, 310, 314, 333-35, 344.  Plaintiff's ploy fails for at least two reasons.

*First*, Plaintiff's own language reveals that she is simply extending *the exact same arguments* for unenforceability of the entire Settlement Agreement to the arbitration clause.  For example, Plaintiff now alleges that:

- "The duress experienced by Ms. Grant and the fraudulent inducement engaged in by McMahon *were also* specific and unique *to individual terms* within the [Settlement Agreement], *such as the arbitration provision*."  Am. Compl. ¶ 260 (emphasis added);

- "Ms. Grant was told by her attorney that *terms of the agreement (e.g., the arbitration provision)* could be undesirable as written, but given the perpetuated duress . . . she was not able to make sound decisions *regarding terms like the arbitration provision*."  *Id.* (emphasis added);

- "[P]ursuant to the Speak Out Act, the core term of the [Settlement Agreement], *and thus the [Settlement Agreement] and the arbitration provision themselves*, are judicially unenforceable . . . ."  *Id.* ¶ 334 (emphasis added).

Rather than "demonstrate that the claims of [unenforceability] **relate only to the arbitration clause**," as she must in order for the Court to consider them, *Campaniello Imports*, 117 F.3d at 666 (citations omitted) (emphasis added), Plaintiff's allegations demonstrate the opposite: her claims for unenforceability **apply equally** to the arbitration clause and the Settlement Agreement as a whole.

*Second*, each of Plaintiff's newfound allegations purporting to target the arbitration clause is either conclusory, a facially incorrect statement of law, or both.  For example, Plaintiff summarily alleges that "[t]he arbitration provision violates the Speak Out Act and is thus invalid,"

on the grounds that "[a]n arbitration provision such as the one in this case can never be valid under the Speak Out Act, as its effect necessarily act [sic] as a secondary means to silence victims and survivors, which would undermine the Speak Out Act's entire legislative purpose." Am. Compl. ¶¶ 310, 333. These are inaccurate and unsupported legal assertions that are directly at odds with the Speak Out Act itself, which, by its own terms, affects only the enforceability of particular types of contract clauses—predispute nondisclosure and nondisparagement clauses—not arbitration clauses. 42 U.S.C. § 19403(a).[4]

Otherwise, Plaintiff merely labels her new allegations with buzzwords taken directly from the relevant line of Supreme Court cases and asserts—without an iota of factual detail—that the duress and fraudulent inducement she purportedly experienced in signing the Settlement Agreement were "also specific and unique" to the arbitration clause, and were applied "outside the context of the [Settlement Agreement] generally or as a whole." Am. Compl. ¶¶ 260, 314. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Plaintiff's allegations lack any such support. Unsurprisingly, courts have long rejected unsupported, conclusory attempts just like Plaintiff's that seek to repurpose attacks on the unenforceability of the contract as a whole to the arbitration clause in particular. *See, e.g.*, *Campaniello Imports*, 117 F.3d at 667-68 (holding that

---

[4] Plaintiff's substantive claim based on the Speak Out Act (Count I) is also ill-conceived as a matter of law and fact, as will be shown in arbitration. As a threshold matter, contrary to Plaintiff's conclusory allegations, the nondisparagement and nondisclosure clauses in the Settlement Agreement were agreed to at the termination of the relationship between Plaintiff and Defendant McMahon on January 28, 2022, not "before the dispute ar[ose]," as is required to be covered by the Speak Out Act. 42 U.S.C. § 19403. Further, the nondisclosure and nondisparagement clauses are not "the core term[s]" of the Settlement Agreement such that their invalidity would render the entire Settlement Agreement meaningless. The Settlement Agreement contains numerous other material provisions, such as the release provisions, payment provisions, and a provision providing additional consideration to Plaintiff, amongst other provisions. *See e.g.*, SUMF ¶¶ 13-15, 17, 18; Agmt. §§ II, V, VI. Indeed, Plaintiff admits as much by alleging that "McMahon has **breached a core term** of the [Settlement Agreement]. He paid $1,000,000, but failed to make any further payments . . . ." Am. Compl. ¶ 315 (emphasis added). Finally, the Settlement Agreement also contains a severability clause, providing that the agreement—including the arbitration clause—survives even if certain provisions are deemed unenforceable. SUMF ¶ 16; Agmt. § IX; *see also Rent-A-Center*, 561 U.S. at 71 (holding that arbitration clauses are severable).

"conclusory allegations" of fraudulent inducement targeted at the arbitration clause failed to establish the requisite "substantial relationship between the fraud or misrepresentation and the arbitration clause in particular"); *Ferrie v. DirecTV, LLC*, No. 15-cv-409 (JCH), 2016 WL 183474, at *12 (D. Conn. Jan. 12, 2016) (holding that plaintiff's argument that "DirecTV's Customer Agreement and Arbitration Clause Are Substantively and Procedurally Unconscionable" was not specific to the arbitration clause where it provided "not one" "distinct way[]" in which the arbitration clause, as opposed to the Customer Agreement as a whole, was unconscionable).[5]

Therefore, because Plaintiff, with the assistance of counsel, knowingly entered into an agreement to arbitrate, and because her arguments for unenforceability apply to the Settlement Agreement as a whole, there is no basis for the Court to consider her challenges. They are reserved for arbitration.

## II.    The Settlement Agreement Delegates Both Threshold and Substantive Issues to the Arbitrator

The parties' broad arbitration agreement clearly requires that all threshold and substantive issues be decided in arbitration.

Once a court determines that "the parties entered into an agreement to arbitrate," it must assess "the scope of that agreement." *Porcelli*, 2019 WL 2371896, at *3 (citing *Guyden*, 544 F.3d at 382). In doing so, if the court determines that "the agreement delegates the arbitrability issue"

---

[5] Plaintiff's allegations of duress and undue influence are also unavailing as to the Settlement Agreement as a whole, which will be proven in arbitration. Courts in Connecticut have repeatedly held that "if the party who executed the contract under duress accepts the benefits flowing from it or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or avoid it," that party, because of his or her ratification of the contract, cannot assert duress or undue influence as a matter of law. *Young v. Data Switch Corp.*, 646 A.2d 852, 856-57 (Conn. 1994); *Gengaro v. City of New Haven*, 984 A.2d 1133, 1139-40 (Conn. App. Ct. 2009) (applying same rule to argument based on undue influence). Here, the Settlement Agreement was executed on January 28, 2022; the original complaint was filed almost two years later on January 25, 2024, and, in the interim, as the Complaint admits, Plaintiff received, accepted, and failed to return the initial payment of $1,000,000. SUMF ¶ 21. Plaintiff's clear ratification of the Settlement Agreement and her willing and voluntary acceptance of its benefits refute her allegations of duress and undue influence as a matter of law. *See Young*, 646 A.2d at 856-57. Nevertheless, these are issues for the arbitrator.

to the arbitrator, then the court must let the arbitrator decide whether plaintiff's claims are subject to arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). If, on the other hand, the court takes up the question of arbitrability, then "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000).

Given the strong public policy favoring arbitration, federal courts read arbitration clauses as broadly as possible, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses*, 460 U.S. at 24-25; *see also Byrd*, 470 U.S. at 218 ("[The FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (citing 9 U.S.C. §§ 3, 4); *Daly v. Citigroup Inc.*, 939 F.3d 415, 421 (2d Cir. 2019) (stating that courts "will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (citations omitted); *White v. Kampner*, 641 A.2d 1381, 1384-85 (Conn. 1994) (same) (citation omitted).

Because the Settlement Agreement's broad arbitration clause delegates the threshold question of arbitrability to the arbitrator, this Court need not (and, indeed, cannot) consider whether the agreement delegates Plaintiff's substantive claims to arbitration. But even if the Court were to reach that issue, the arbitration clause clearly encompasses Plaintiff's substantive claims.

### A.    The Settlement Agreement Delegates the Threshold Issue of Arbitrability to the Arbitrator

The Supreme Court has held "that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."

*Henry Schein*, 586 U.S. at 67-68 (citations omitted).  To do so, the parties' agreement must "delegate threshold arbitrability questions to the arbitrator . . . by 'clear and unmistakable' evidence." *Id.* at 69 (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Rent-A-Center*, 561 U.S. at 69 n.1).  Such "clear and unmistakable" evidence can be demonstrated in one of two ways: 1) the use of "broad terms to describe the scope of arbitration," *Bell v. Cendant Corp.*, 293 F.3d 563, 568 (2d Cir. 2002), or 2) the incorporation of arbitration rules that "empower an arbitrator to decide issues of arbitrability," *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005).  Here, both are present.

*First*, the parties' arbitration clause employs "broad terms to describe the scope of arbitration, such as 'all questions in dispute and all claims arising out of' the contract or 'any dispute that cannot be adjudicated.'" *Bell*, 293 F.3d at 568 (citations omitted).  As in *Bell*, here, the parties agreed that "the **sole and exclusive** legal method to resolve **any and all disputes and/or controversies** is to commence binding arbitration."  SUMF ¶ 11; Agmt. § X (referring to "**any dispute** arising under or out of this Agreement, its construction, interpretation, application, performance, or breach") (emphases added).  This language alone is "sufficient to send the issue of arbitrability to the arbitrator." *Bell*, 293 F.3d at 569; *see also Emcon Corp. v. Pegnataro*, 562 A.2d 521, 523-24 (Conn. 1989) (holding that questions of arbitrability had been delegated to the arbitrator where the agreement's "broad and all encompassing language" read as follows: "In the event of any dispute between the parties hereto as to the interpretation or application of the Agreement, such dispute shall be determined or settled by arbitration.").

*Second*, the parties' arbitration clause "explicitly incorporate[s]" AAA arbitration rules that "empower an arbitrator to decide issues of arbitrability." *Contec*, 398 F.3d at 208 (discussing AAA Commercial Arbitration Rules) (citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d

115, 122 (2d Cir. 2003)).  Just like the parties in *Contec*, the parties here agreed that the sole method to resolve all disputes was to "commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association."  SUMF ¶ 11; Agmt. § X. The AAA rules and procedures provide that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[6]  This incorporation of the AAA's rules and procedures "serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."  *Contec*, 398 F.3d at 208; *see also Considine*, 124 F. Supp. 3d at 90-91 ("Moreover, even if the plain language of the contract were not dispositive on this point, the parties also incorporate a set of rules into their agreement, which delegate the authority to decide arbitrability to the arbitrator.").

Thus, because the parties' intent to delegate the gateway question of arbitrability is "clear and unmistakable," the Court need not—and, indeed, cannot—proceed to the question of whether Plaintiff's claims fall within the scope of the arbitration agreement.  *Henry Schein*, 586 U.S. at 68-69 (holding that "a court possesses no power to decide the arbitrability issue" in the face of an agreement to the contrary, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless").

### B.    The Settlement Agreement Delegates Plaintiff's Substantive Claims to the Arbitrator

Though the Court should not reach the question of whether Plaintiff's substantive claims are arbitrable, those claims are clearly encompassed by the arbitration clause.  Section X mandates that the parties arbitrate "*any* dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach."  SUMF ¶ 11; Agmt. § X (emphasis added).

---

[6] *See* Rule 7(a), Commercial Arbitration Rules and Mediation Procedures, AAA (Sept. 1, 2022), https://www.adr.org/sites/default/files/CommercialRules_Web_1.pdf; Rule 6(a), Employment Arbitration Rules and Mediation Procedures, AAA (Jan. 1, 2023), https://www.adr.org/sites/default/files/EmploymentRules_Web_3.pdf.

Courts have found that comparable provisions are "all-embracing, all-encompassing and broad" such that they encompass tort claims and statutory claims akin to those asserted by Plaintiff in this case. *Fink v. Golenbock*, 680 A.2d 1243, 1252 (Conn. 1996) (citing similar cases); *see also Cuseo v. Aquent, Inc.*, No. CV040568982, 2005 WL 532257, at *2 (Conn. Super. Ct. Jan. 31, 2005) ("The inclusion of such broad language within arbitration clauses," such as "[a]ny claim or controversy arising out of or relating to this [a]greement," "generally includes all claims, including tort claims.").

By challenging the enforceability of the Settlement Agreement, Plaintiff has initiated a dispute on the "construction, interpretation, application, performance or breach" of the Settlement Agreement, rendering the entire dispute appropriate for arbitration. SUMF ¶ 11; Agmt. § X. Moreover, all of Plaintiff's other claims concern the very disputes and issues that the Settlement Agreement was explicitly designed to address: her "relationship with McMahon, WWE, or any employees . . . of WWE" and her "employment with WWE." SUMF ¶ 12; Agmt. § I. Thus, all of Plaintiff's claims, whether contractual (Counts I and II), statutory (Counts III and IV), or tort (Counts V to IX), "aris[e] under or out of [the Settlement Agreement], its construction, interpretation, application, performance or breach." SUMF ¶ 11; Agmt. § X; *Fink*, 680 at 1252.[7]

## III.    There Is No Congressional Intent to Render Any Claims Asserted in the Complaint Non-Arbitrable

Congress did not intend for any of the claims in the Complaint to be non-arbitrable, thereby satisfying the third factor of the Court's analysis.

---

[7] Plaintiff must also be compelled to arbitrate her claims asserted against WWE because, like Defendant McMahon, WWE is a party to the Settlement Agreement. *See* SUMF ¶ 5; Agmt. at 1, 6. All of the reasons provided herein in support of Defendant McMahon's motion to compel arbitration apply equally to the WWE. *See* Agmt. § X ("In the event any such dispute cannot be resolved informally, *all parties hereto* agree that the *sole and exclusive* legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association . . . .") (emphasis added).

"When statutory claims are involved, a party can prevent enforcement of the arbitration agreement *only* by showing that 'Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Guyden*, 544 F.3d at 382 (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987)) (emphasis added).  Such an intent may be deduced from "the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Shearson/Am. Express*, 482 U.S. at 227 (citations and alterations omitted); *see also Guyden*, 544 F.3d at 382 (same).  Here, no federal statute renders any of Plaintiff's claims non-arbitrable.

In Count I, Plaintiff seeks to void the Settlement Agreement based on the Speak Out Act, a federal statute that has no bearing on the arbitrability of claims.  As already detailed herein, the Speak Out Act impacts only the enforceability of predispute nondisclosure and nondisparagement clauses, not arbitration clauses.  *See supra*, Arg. § I(B).  Indeed, the Act does not even specify the forum in which enforceability should be determined or suggest in any way that an arbitrator cannot adjudicate enforceability of the Settlement Agreement.  Nothing in the statute's text or legislative history suggests otherwise.  Thus, the Speak Out Act plainly does not impact the arbitrability of Plaintiff's claims.  Furthermore, the agreement's severability clause provides that if "any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding . . . ."  SUMF ¶ 16; Agmt. § IX.  Assuming *arguendo* that the nondisclosure and nondisparagement clauses are unenforceable under the Speak Out Act—which they are not—the remaining provisions in the Settlement Agreement, including the arbitration clause, are nonetheless severable and enforceable. *See Grabe v. Hokin*, 267 A.3d 145, 161 (Conn. 2021) ("[T]he prenuptial agreement contained a severability clause that expressly contemplated that, if one or more of its terms were found to be

invalid, the rest of the agreement would survive."); *Rent-A-Center*, 561 U.S. at 71 (holding that arbitration clauses are severable).

Counts III and IV of the Complaint assert claims based on the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1591, *et seq*., which similarly imposes no prohibition on arbitration.  The TVPA and its legislative history are silent on the issue of arbitration, and no inherent conflict exists between arbitration and the TVPA's underlying purpose, which is to "combat severe forms of worker exploitation that do not amount to actual involuntary servitude." *Paguirigan v. Prompt Nursing Emp. Agency LLC*, No. 17-cv-1302, 2019 WL 4647648, at *17 (E.D.N.Y. Sept. 24, 2019) (citations omitted), *aff'd in part, appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020).  Indeed, courts have repeatedly compelled arbitration of TVPA claims.  *See*, *e.g.*, *Zendon v. Grandison Mgmt., Inc.*, No. 18-cv-4545, 2018 WL 6427636, at *3 (E.D.N.Y. Dec. 7, 2018) (finding that the parties' arbitration agreement encompassed all claims at issue, including those under the TVPA); *Maity v. Tata Consultancy Servs., Ltd.*, No. 19-cv-19861, 2021 WL 6135939, at *7 (D.N.J. Dec. 29, 2021) (compelling arbitration of complaint that alleged violation of the TVPA).

Finally, Plaintiff may attempt to argue that her claims are non-arbitrable pursuant to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act (the "EFAA"), a statute not mentioned in the Complaint.  However, the EFAA is not applicable here. The EFAA, enacted on March 3, 2022, dictates that in cases involving a sexual assault or sexual harassment dispute, "no *predispute arbitration agreement* . . . shall be valid or enforceable with respect to a case which is filed under Federal, Tribal, or State law and relates to the sexual assault dispute or the sexual harassment dispute."  9 U.S.C. § 402(a) (emphasis added).  There are two reasons the EFAA does not apply.

*First*, the EFAA is inapplicable because the parties' arbitration provision is not a "predispute arbitration agreement."  The EFAA can invalidate only a "predispute arbitration agreement," defined by the EFAA as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement."  9 U.S.C. § 401(1).  A "dispute . . . clearly refers to the discriminatory conduct underlying the Complaint," and therefore the EFAA "require[es] the arbitration agreement to be entered into prior to . . . the discriminatory conduct." *Castillo v. Altice USA, Inc.*, 698 F. Supp. 3d 652, 657 (S.D.N.Y. 2023) (citations omitted).  The very nature of the parties' agreement here—entitled "Confidential *Settlement* Agreement, General Release and Covenant Not to Sue" (emphasis added)—and their mutual release of all claims up to and including "the date of execution of th[e] Agreement," evince that the Settlement Agreement addressed and settled the existing disputes that had already arisen at the time of execution.  Indeed, under the Settlement Agreement, Plaintiff agreed to receive monetary compensation in exchange for and in consideration of various mutual promises and covenants, including a mutual release of all claims. SUMF ¶¶ 6, 13, 15, 17; Agmt. §§ II, V.  This stands in stark contrast to non-negotiated, boilerplate arbitration agreements frequently entered into by employees at the commencement of their employment, which are the type of "predispute arbitration agreements" targeted by the EFAA. *See*, *e.g.*, *Riggs v. Akamai Techs.*, No. 23-cv-6463, 2024 WL 3347032, at *3 (S.D.N.Y. July 8, 2024) (denying motion to compel arbitration based on EFAA where parties agreed that plaintiff "signed a valid and relevant arbitration agreement when she ***began her employment***" (emphasis added)); *see also* House Judiciary Committee Report on EFAA, H.R. Rep. No. 117-234, at 3-4 (2022) (addressing "forced arbitration clauses" that are "[o]ften buried deep within the fine print of employment and consumer contracts").  Here, the parties entered into a negotiated agreement releasing claims that had previously arisen in exchange for significant compensation.

*Second*, the EFAA was enacted on March 3, 2022, and does not apply retroactively—it applies only "with respect to any dispute or claim that arises or accrues on or after the date of enactment of [the EFAA]."  Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022); *Castillo*, 698 F. Supp. 3d at 655-56; *Cunningham v. CVS Health Corp.*, No. 23-cv-1328, 2024 WL 2867303, at *11 (S.D.N.Y. June 4, 2024).  As courts in the Second Circuit have held, "a dispute arises when the conduct which constitutes the alleged sexual assault or sexual harassment occurs," and "a claim accrues when the plaintiff has a complete and present cause of action."  *Castillo*, 698 F. Supp. 3d at 656-57 (quoting *Barnes v. Festival Fun Parks, LLC*, No. 22-cv-165, 2023 WL 4209745, at *10 (W.D. Pa. June 27, 2023)); *Walters v. Starbucks Corp.*, 623 F. Supp. 3d 333, 337 (S.D.N.Y. 2022). Accordingly, the EFAA is inapplicable to this case because the allegations of Defendant McMahon's purported misconduct—i.e., when the "dispute or claim[s] . . . ar[ose] or accrue[d]" —predate March 3, 2022, the EFAA's effective date.  Indeed, the Complaint alleges not even a single communication between Plaintiff and Defendant McMahon that occurred after March 3, 2022, let alone any misconduct by McMahon that could cause a "dispute or claim" to "arise or accrue" after that date.  *See Walters*, 623 F. Supp. 3d at 337 ("[Plaintiff's] claims in this lawsuit are not covered by [the EFAA] because each claim arose or accrued before March 3, 2022.  Each of [plaintiff's] claims accrued at the time she experienced discrimination, harassment, or retaliation, and at the latest by December of 2021, when she left her job.").

## IV.    This Court Should Stay the Action Pending Arbitration

Because this "lawsuit involves an arbitrable dispute," the Court must stay the case.  *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024).  Section 3 of the FAA provides that "when any issue in a suit is subject to arbitration, the court 'shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'"  *Id.* at 476 (quoting 9 U.S.C. § 3).  Even if the Court were to find that not all claims are arbitrable (which

it should not), the case should still be stayed.  *See id.* (explaining that a stay is mandatory "when *any issue in a suit* is subject to arbitration" (emphasis added)).  Indeed, a stay "is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims," as would be the case here if the Court ultimately compelled arbitration of only certain claims.  *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110-11 (S.D.N.Y. 2017) (citations omitted).

## CONCLUSION

For the foregoing reasons, Defendant McMahon respectfully requests that the Court grant his motion, compel arbitration of all claims asserted in the Complaint, and stay the litigation pending arbitration.

Date: June 13, 2025                              Respectfully submitted,

                                                **AKIN GUMP STRAUSS HAUER & FELD LLP**

                                    By:    */s/ Jessica T. Rosenberg*

                                                Jessica T. Rosenberg
                                                   (admitted *pro hac vice*)
                                                Ilana Roberts
                                                   (admitted *pro hac vice*)
                                                One Bryant Park
                                                New York, NY 10036
                                                Telephone: (212) 872-1000
                                                Facsimile: (212) 872-1002
                                                jrosenberg@akingump.com
                                                iroberts@akingump.com

                                                **McCARTER & ENGLISH, LLP**
                                                James A. Budinetz (ct16068)
                                                Snigdha Mamillapalli (ct31142)
                                                CityPlace I, 185 Asylum Street
                                                Hartford, CT 06103
                                                Telephone: (860) 275-6765
                                                Facsimile: (860) 724-3397
                                                jbudinetz@mccarter.com
                                                smamillapalli@mccarter.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 13, 2025 a copy of the foregoing was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.


*/s/ Jessica T. Rosenberg*