# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JANEL GRANT,<br><br>                    Plaintiff,<br><br>          v.<br><br>WORLD WRESTLING ENTERTAINMENT, INC.<br>n/k/a WORLD WRESTLING ENTERTAINMENT,<br>LLC; VINCENT K. MCMAHON; and JOHN<br>LAURINAITIS,<br><br>                    Defendants. | Civil Action No.: 3:24-cv-00090 (SFR) |

## DEFENDANT WORLD WRESTLING ENTERTAINMENT, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION

ORAL ARGUMENT REQUESTED

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .....................................................................................................................2

ARGUMENT...........................................................................................................................9

    I.      THE PARTIES UNAMBIGUOUSLY AGREED TO ARBITRATE .........................10

    II.    THE AGREEMENT CLEARLY AND UNMISTAKABLY DELEGATES
          ARBITRABILITY TO THE ARBITRATOR ...........................................................11

    III.   IN THE ALTERNATIVE, THE COURT SHOULD FIND THAT GRANT'S
          LAWSUIT FALLS SQUARELY WITHIN THE SCOPE OF THE
          ARBITRATION PROVISION......................................................................................13

    IV.   ANY CHALLENGES TO THE VALIDITY OF THE CONTRACT MUST
          BE DIRECTED TO AND DECIDED BY THE ARBITRATOR ...............................15

    V.    THE COURT SHOULD STAY ANY REMAINING CLAIMS PENDING
          ARBITRATION ...........................................................................................................17

    VI.   NO FEDERAL STATUTE PREVENTS ARBITRATION .......................................18

          A.      Speak Out Act...............................................................................................18

          B.      Trafficking Victims Protection Act of 2000 ("TVPA") .................................18

          C.      Ending Forced Arbitration of Sexual Assault and Sexual Harassment
               Act ("EFAA")................................................................................................19

CONCLUSION.......................................................................................................................21

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Express Co.* v. *Italian Colors Rest.*,
 570 U.S. 228 (2013).................................................................................................19

*Aminoff & Co.* v. *Parcel Pro, Inc.*,
 2022 WL 987665 (S.D.N.Y. Apr. 1, 2022)................................................................9

*Arrigo* v. *Blue Fish Commodities, Inc.*,
 408 F. App'x 480 (2d Cir. 2011) ............................................................................15

*Bangkok Crafts Corp.* v. *Capitolo di San Pietro in Vaticano*,
 331 F. Supp. 2d 247 (S.D.N.Y. 2004) ....................................................................14

*Baricuatro* v. *Indus. Pers. & Mgmt. Servs.*,
 927 F. Supp. 2d 348 (E.D. La. 2013)......................................................................19

*Barnes* v. *Festival Fun Parks, LLC*,
 2023 WL 4209745 (W.D. Pa. June 27, 2023)..........................................................20

*Billie* v. *Coverall N. Am., Inc.*,
 444 F. Supp. 3d 332 (D. Conn. 2020)......................................................................18

*Buckeye Check Cashing, Inc.* v. *Cardegna*,
 546 U.S. 440 (2006)............................................................................................15, 16

*Castillo* v. *Altice USA, Inc.*,
 698 F. Supp. 3d 652 (S.D.N.Y 2023) ......................................................................20

*Century Indemn. Co.* v. *Viacom Int'l, Inc.*,
 2003 WL 402792 (S.D.N.Y. Feb. 20, 2003)............................................................14

*Cuenca-Vidarte* v. *Samuel*,
 2021 WL 5742066 (D. Md. Nov. 30, 2021) ............................................................19

*D'Antuono* v. *Serv. Rd. Corp.*,
 789 F. Supp. 2d 308 (D. Conn. 2011)......................................................................16

*Davis* v. *Macy's Retail Holdings, Inc.*,
 2018 WL 4516668 (D. Conn. Sept. 19, 2018)..........................................................10

*DDK Hotels, LLC* v. *Williams-Sonoma, Inc.*,
 6 F.4th 308 (2d Cir. 2021) ......................................................................................12

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

*Dean Witter Reynolds, Inc.* v. *Byrd*,
    470 U.S. 213 (1985) ......................................................................................... 9

*Dhue* v. *O'Reilly*,
    2018 WL 11222900 (S.D.N.Y. Oct. 10, 2018) ........................................... 11

*Dowe* v. *Leeds Brown L., P.C.*,
    419 F. Supp. 3d 748 (S.D.N.Y. 2019) ...................................................... 16

*Edwards* v. *CVS Health Corp.*,
    714 F. Supp. 3d 239 (S.D.N.Y. 2024) ...................................................... 21

*Green Tree Fin. Corp.-Ala.* v. *Randolph*,
    531 U.S. 79 (2000) ....................................................................................... 18

*Henry Schein, Inc.* v. *Archer & White Sales, Inc.*,
    586 U.S. 63 (2019) ....................................................................................... 11

*Holick* v. *Cellular Sales of N.Y., LLC*,
    802 F.3d 391 (2d Cir. 2015) ........................................................ 9, 10, 13, 15

*Ipcon Collections LLC* v. *Costco Wholesale Corp.*,
    698 F.3d 58 (2d Cir. 2012) .......................................................................... 10

*Johnson* v. *Everyrealm, Inc.*,
    657 F. Supp. 3d 535 (S.D.N.Y. 2023) ...................................................... 21

*Katsoris* v. *WME IMG, LLC*,
    237 F. Supp. 3d 92 (S.D.N.Y. 2017) .................................................... 17, 18

*Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO* v. *Niagara Mohawk Power Corp.*,
    67 F.4th 107 (2d Cir. 2023) ........................................................................ 13

*Maity* v. *Tata Consultancy Servs.*,
    2021 WL 6135939 (D.N.J. Dec. 29, 2021) ............................................... 19

*McCrae* v. *Oak St. Health, Inc.*,
    2024 WL 4692047 (S.D.N.Y. Nov. 4, 2024) ............................................. 12

*Metro. Life Ins. Co.* v. *Bucsek*,
    919 F.3d 184 (2d Cir. 2019) ........................................................................ 11

*Mitura* v. *Finco Serv. Inc.*,
    712 F. Supp. 3d 442 (S.D.N.Y. 2024) ...................................................... 21

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*,
460 U.S. 1 (1983) ..............................................................................................9

*NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*,
770 F.3d 1010 (2d Cir. 2014) .....................................................................11, 12

*Offshore Expl. & Prod., LLC* v. *Morgan Stanley Priv. Bank, N.A.*,
626 F. App'x 303 (2d Cir. 2015) ..................................................................12

*Oldroyd* v. *Elmira Sav. Bank*,
134 F.3d 72 (2d Cir. 1998) ..........................................................................9

*Oriental Republic of Uru.* v. *Chem. Overseas Holdings, Inc.*,
2006 WL 164967 (S.D.N.Y. Jan. 24, 2006) ...............................................14

*Reale* v. *Match Grp., LLC*,
2022 WL 4115660 (D. Conn. Sept. 9, 2022) ..........................................9, 13

*Rent-A-Center, W., Inc.* v. *Jackson*,
561 U.S. 63 (2010) ...................................................................................15, 17

*Ron* v. *Ron*,
836 F. App'x 192 (5th Cir. 2020) ................................................................14

*S.E.C.* v. *Collector's Coffee Inc.*,
2021 WL 1539225 (S.D.N.Y. Apr. 19, 2021) .............................................14

*Schnabel* v. *Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) ........................................................................10

*Simon J. Burchett Photography, Inc.* v. *Maersk Line Ltd.*,
2020 WL 8261580 (S.D.N.Y. Dec. 30, 2020) .........................................12, 14

*Simon J. Burchett Photography, Inc.* v. *Maersk Line Ltd.*,
2021 WL 1040472 (S.D.N.Y. Mar. 18, 2021) .........................................12, 14

*Syngenta Crop Prot., LLC* v. *Ins. Co. of N. Am.*,
2018 WL 1587601 (S.D.N.Y. Mar. 29, 2018) ............................................14

*Watson* v. *USA Today Sports Media Grp.*,
2018 WL 2316634 (S.D.N.Y. May 8, 2018) ...............................................13

*Zendon* v. *Grandison Mgmt., Inc.*,
2018 WL 6427636 (E.D.N.Y. Dec. 7, 2018) ..............................................19

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**Statutes**

9 U.S.C. § 2.........................................................................................................................9

9 U.S.C. § 4.........................................................................................................................9

18 U.S.C. § 1589 *et seq.*...................................................................................................19

42 U.S.C. § 19403 .............................................................................................................19

**Rules**

AAA Commercial Rule R-7................................................................................................12

AAA Employment Rule 6...................................................................................................13

Fed. R. Civ. P. 12(b)(6)........................................................................................................1

Defendant World Wrestling Entertainment, LLC ("WWE") respectfully submits this memorandum of law in support of its motion to compel arbitration.

## PRELIMINARY STATEMENT

Plaintiff Janel Grant pursues this action against Vincent K. McMahon and WWE alleging that, while employed at WWE, she was subjected to physical and emotional abuse, sexual assault, and sex trafficking by McMahon and recently-dismissed Defendant John Laurinaitis. WWE disputes Grant's allegations. But, as a threshold matter, this dispute cannot be heard in court because Grant agreed to arbitrate her claims. WWE therefore moves to compel this action to arbitration.

Simply put, Grant has no claims actionable in this Court because the separation and non-disclosure agreement she signed with McMahon (who signed on behalf of himself and WWE) (the "Agreement")—the monetary benefits of which she concededly accepted and retained—contains an arbitration provision that unambiguously precludes this Court from adjudicating her claims. In particular, Grant agreed that "the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act." The language is clear and unconditional. Not only are Grant's allegations squarely within the scope of the arbitration provision, but the Agreement also expressly commits to arbitration the issue of arbitrability itself. Accordingly, this Court should enforce the parties' agreed-upon method of addressing Grant's claims and compel this action to arbitration.[1]

---

[1]    If the court declines to compel arbitration, WWE plans to move to dismiss the Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 119 ("In the event that the court denies, in whole or in part, one or more of Defendants' motions to compel arbitration, the Defendant(s) whose motion(s) have been denied shall serve answers or responsive pleadings, including any motions pursuant to Federal Rule of Civil Procedure 12(b), within 30 days after the court denies the motion(s) to compel arbitration[.]").

### BACKGROUND

WWE disputes Grant's allegations.  But, for purposes of this Motion only, we assume the truth of facts alleged in the First Amended Complaint (the "Amended Complaint"). The Amended Complaint also incorporates by reference and attaches the Agreement, dated January 28, 2022, between Grant, McMahon, and WWE.  *See* First Amended Complaint ("Am. Compl."), No. 3:24-cv-00090-SFR (D. Conn.), ECF No. 117, at 95, Ex. A.

*Grant's Employment with WWE*.  Grant alleges that she met McMahon in March 2019 and, soon after, McMahon promised her "a yet-to-be-determined role at WWE."  *See* Defendant World Wrestling Entertainment, LLC's Local Rule 56(a)(1) Statement of Undisputed Material Facts in Support of its Motion to Compel Arbitration ("SUMF"), ¶ 1.[2]  McMahon and Grant began a sexual relationship in May 2019 and, on June 17, 2019, Grant began working in WWE's legal department in "an entry-level position as an 'administrator-coordinator'" with a starting salary of $75,000.  SUMF ¶¶ 2, 3.  On February 10, 2020, she was "temporarily relocated to the XFL workforce."  SUMF ¶ 3.  "On or around January 25, 2021," Grant was reassigned to support a high-ranking hire in WWE's legal department.  *Id.*

In early March 2021, Grant was transferred to the Talent Relations department, where she worked as a director of operations and reported to the head of the department, John Laurinaitis.  *Id.*  Grant worked in Talent Relations for the remainder of her tenure at WWE.

*The Agreement*.  According to the Amended Complaint, in early January 2022, McMahon told Grant that his wife had found out about their relationship and threatened to divorce him.  SUMF ¶ 4.  McMahon allegedly told Grant "that if she left WWE and signed an NDA," his

---

[2]    As stated, in light of the fact that the parties have not undertaken discovery regarding the background events alleged in Plaintiff's Amended Complaint, WWE assumes the truth of those allegations for purpose of this Motion to Compel Arbitration.

wife would not leave him, and "Grant would avoid reputational harm." *Id.* The Amended Complaint claims that McMahon initially offered Grant $1 million in "exchange[] for the NDA." SUMF ¶ 5. Grant allegedly told McMahon that $1 million "was not enough," and McMahon ultimately agreed to pay Grant $3 million in installments. *Id.* On or about January 19, 2022, Grant retained counsel to help her navigate her separation from WWE and to negotiate the proposed NDA. SUMF ¶ 6. Grant's counsel actively represented her interests during the course of the negotiations. SUMF ¶ 7.

On January 28, 2022, McMahon and Grant executed the six-page Agreement, titled the "Confidential Settlement Agreement, General Release and Covenant Not to Sue." SUMF ¶ 8. Grant and McMahon both signed the Agreement, with McMahon signing both on his own behalf and, in his capacity as Chairman, on behalf of WWE. SUMF ¶ 9.

Relevant here, the Agreement contains the following provisions:

1. *Grant's Obligations: Resignation from WWE, Confidentiality, and Non-Disparagement*. Grant agreed to resign from her employment with WWE upon execution of the Agreement. SUMF ¶ 10. And, in a section titled "Grant's Consideration, Representation and Warranties to McMahon and WWE," Grant agreed: (i) to keep confidential her relationship with McMahon and the existence and terms of the Agreement; and (ii) not to disparage McMahon or WWE. SUMF ¶ 11.

2. *McMahon's Payment Obligations*. In exchange for Grant's promise of confidentiality, McMahon assumed exclusive responsibility for paying Grant, in installments over a four-year period, a total of $3 million. SUMF ¶ 12. As the first installment, McMahon agreed to pay Grant $1 million within 10 days of execution of the Agreement. *Id.* McMahon committed to make further payments of $500,000 each year, on February 1, for the next four years,

"[p]rovided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years." *Id.* However, "[i]n the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement," the Agreement provides that "all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon[.]" SUMF ¶ 13.

In addition to monetary payments by McMahon, the Agreement provides, as "Additional Consideration to Grant," that WWE will "provide a positive evaluation and recommendation to any . . . possible employer of Grant," either via Laurinaitis or another WWE employee. SUMF ¶ 14.

*3. Mutual Releases.* The parties to the Agreement, including WWE, provided mutual releases of any and all potential claims related to Grant's and McMahon's relationship and Grant's employment at WWE. SUMF ¶ 15.

Grant's release language reads:

> Except for any rights under this Agreement, and as otherwise stated herein, Grant hereby agrees to release, remise and forever discharge, and by these presents does, for herself, her heirs, executors, and administrators, release, remise and forever discharge McMahon, WWE, and the present, former and future directors, officers, employees, agents and representatives of WWE personally and as directors, officers, employees, agents and representatives of WWE from all manner of action and actions, causes of action, sums of money, covenants, contracts, controversies, agreements, promises, damages, claims and demands whatsoever, in law or in equity, that she ever had, may have had, now has or that her heirs, executors or administrators can, shall or may have as a result of, or **in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel,** and whether known or unknown, asserted or unasserted, suspected or unsuspected which she may have as a result of any act which has occurred at any time up to and including the date of her execution of this Agreement.

SUMF ¶ 16 (emphasis added).

4

The Agreement also provides that Grant "will not cause, and has not caused, to be filed any legal actions, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." SUMF ¶ 17. Grant further "covenants and agrees that she will forever forbear from pursuing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand or claims against McMahon and/or WWE." SUMF ¶ 18.

For the avoidance of doubt, Grant specifically agreed—in a passage set apart in all-caps—that:

> BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES.

SUMF ¶ 19.

McMahon, on behalf of himself and WWE, provided a reciprocal release to Grant:

> McMahon and WWE, individually and jointly, for and in consideration of the representations, warranties and covenants of Grant contained herein, hereby release and forever discharge Grant, her heirs, executors, administrators, successors and assigns from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant.

SUMF ¶ 20.

4. _Agreement to Arbitrate_.  The Agreement provides that any dispute between the parties must be resolved through informal discussion and, failing resolution, by arbitration. Specifically, the parties must first attempt to resolve their dispute informally:

> In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach, the parties agree to first attempt to resolve such disputes informally and prior to taking any formal legal action to resolve such disputes.

SUMF ¶ 21.

If the parties are unable to resolve their dispute informally, the matter must be adjudicated in arbitration pursuant to the rules of the American Arbitration Association ("AAA"):

> In the event any such dispute cannot be resolved informally, all parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement.

_Id._

5. _Severability_.  If any part of the Agreement is found to be void or unenforceable, the Agreement's severability provision provides that the remainder of the Agreement will remain in effect and enforceable:

> In the event that any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding provided, however, if any of the confidentiality obligations of this Agreement are ever contended to be unenforceable by Grant, or are found to be unenforceable by any tribunal, Grant agrees that she shall return all monies paid pursuant to this Agreement to McMahon.

SUMF ¶ 22.

6. _Additional Representations_.  Finally, Grant explicitly represented that "she is able to read the language and to understand the meaning and effect of this Agreement."  SUMF

¶ 23.  Moreover, Grant represented "that she has read and understands this Agreement and the effect of it and that her attorney, Mr. Jonathan Shapiro, has explained it to her."  *Id.*

     *Post-Agreement Events*.  Following execution of the Agreement, and pursuant to its Section V, McMahon wired the initial payment of $1 million to Grant on February 4, 2022.  SUMF ¶ 24.  McMahon also made additional payments not provided for in the Agreement.  McMahon wired Grant $10,000 to cover her attorneys' fees in connection with the Agreement, SUMF ¶ 25, and paid for certain of her medical expenses until April 15, 2022, SUMF ¶ 26.

     On February 9 and 10, 2022, less than a week after receiving McMahon's initial $1 million payment, Grant provided notice to Laurinaitis and WWE's Human Resources department that she was leaving WWE.  SUMF ¶ 27.

     On March 30, 2022, McMahon's counsel notified Grant's counsel of "an anonymous email about the relationship between Ms. Grant and McMahon and Laurinaitis."  SUMF ¶ 28.  Subsequently, in June and July 2022, various media stories were published "regarding the matter of McMahon's multiple NDAs with various women."  SUMF ¶ 29.

     Under the Agreement, McMahon's second scheduled payment of $500,000 would have been due on February 1, 2023, on the condition that "all confidentiality obligations of Grant under this Agreement are complied with."  SUMF ¶¶ 12, 30.  Grant alleges that McMahon did not make this payment or any subsequent payment provided for under the Agreement's payment schedule.  SUMF ¶ 31.

     Without first notifying WWE or attempting to resolve the dispute informally or through arbitration, as required by Section X of the Agreement, Grant filed her original Complaint on January 25, 2024 and initiated the present lawsuit.  SUMF ¶ 32.

Pursuant to the Court's May 8, 2024 scheduling order, WWE initially filed the present Motion to Compel Arbitration on May 14, 2024. SUMF ¶¶ 33–34. Grant failed to file an opposition to WWE's Motion to Compel Arbitration by the June 4, 2024 deadline to do so. SUMF ¶ 34. On June 11, 2024, the Court entered an order staying this action until December 11, 2024 and denying all pending motions to compel arbitration "without prejudice to renewal within two weeks of any future order of the Court lifting the stay." SUMF ¶ 35. Following the expiration of the stay on December 11, 2024, WWE filed its renewed Motion to Compel Arbitration on December 23, 2024. SUMF ¶¶ 36–37. Grant failed to file an opposition to WWE's renewed Motion to Compel Arbitration by the deadline to do so, instead filing a motion on the day her opposition was due for an extension of time to oppose the Defendants' motions to compel arbitration and for a scheduling order that would allow her to amend her complaint. SUMF ¶¶ 37–38.

On January 16, 2025, the Court entered an order denying all pending motions to compel arbitration "without prejudice to renewal following the Court's decision on Plaintiff's motion for leave to amend the complaint." SUMF ¶ 39. On May 7, 2025, the Court granted Grant's Motion for Leave to Amend the Complaint, stayed discovery, and directed the Defendants to renew their motions to compel arbitration by June 13, 2025. SUMF ¶ 40.[3] Accordingly, WWE now refiles an updated version of its Motion to Compel Arbitration.

## ARGUMENT

This action should be compelled to arbitration. The Agreement—which Grant concededly negotiated, signed, and accepted the benefits of—contains a clear and unambiguous

---

[3] Grant filed the Amended Complaint, which adds no new parties or causes of action, on May 7, 2025. SUMF ¶ 41.

arbitration provision.  That provision requires not only that all claims Grant asserts here be decided in arbitration, but also that the threshold question of the arbitrability of those claims be decided by an arbitrator.  The Court should grant WWE's motion to compel arbitration and order that the claims proceed to arbitration, as the parties intended and as the Agreement requires.

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  A party aggrieved by a "failure, neglect or refusal of another to arbitrate under a written agreement for arbitration" may petition for "an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 218 (1985).  Courts should "construe arbitration clauses as broadly as possible," *Oldroyd* v. *Elmira Sav. Bank*, 134 F.3d 72, 76 (2d Cir. 1998), and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

In deciding motions to compel arbitration, courts follow a two-part test: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue."  *Holick* v. *Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015); *see also Reale* v. *Match Grp., LLC*, 2022 WL 4115660, at *3 (D. Conn. Sept. 9, 2022) (same).  Once the moving party has shown, by a preponderance of the evidence, that "an arbitration agreement exists," the "burden shifts to Plaintiff" to show that "it did not consent to the arbitration," "the arbitration agreement is invalid or unenforceable," or "the arbitration agreement

does not encompass its claims." *Aminoff & Co.* v. *Parcel Pro, Inc.*, 2022 WL 987665, at *3 (S.D.N.Y. Apr. 1, 2022) (citation omitted). "A court may not deny arbitration where there is a valid arbitration agreement that covers the asserted claims." *Davis* v. *Macy's Retail Holdings, Inc.*, 2018 WL 4516668, at *2 (D. Conn. Sept. 19, 2018). In "resolving any ambiguities respecting the enforceability or scope of an arbitration agreement," the court must give "due regard" to the [FAA's] "national policy favoring arbitration." *Id.*

The application of these considerations requires arbitration of Grant's claims.

## I.    THE PARTIES UNAMBIGUOUSLY AGREED TO ARBITRATE

Grant unquestionably entered into an agreement to arbitrate. "Whether or not the parties have agreed to arbitrate is a question of state contract law." *Schnabel* v. *Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). "The essential terms of a valid contract are an offer, acceptance of that offer, and consideration." *Davis*, 2018 WL 4516668, at *3. "Fully executed contracts" demonstrate the "required *objective* meeting of the minds." *Ipcon Collections LLC* v. *Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012) (enforcing arbitration provision despite party's argument that the contract containing the clause was fraudulently induced). Where the parties do not dispute that they entered an agreement to arbitrate, courts do not question that agreement. *See, e.g.*, *Holick*, 802 F.3d at 394 ("In this case, the parties agreed in the Compensation Agreement to arbitrate. Thus, our discussion focuses on the scope of that agreement.").

There is no dispute here that the parties agreed to arbitrate. The Agreement contains an arbitration clause. *See* SUMF ¶ 21. Grant represented in the Agreement that she "underst[ood] the meaning and effect of this Agreement," and that "her attorney, Mr. Jonathan Shapiro, ha[d] explained it to her." SUMF ¶ 23. And Grant acknowledges in her Amended Complaint that she "signed the [Agreement] in exchange for payments." SUMF ¶ 31. The fully executed Agreement thus demonstrates conclusively the required, objective agreement to arbitrate.

## II.    THE AGREEMENT CLEARLY AND UNMISTAKABLY DELEGATES ARBITRABILITY TO THE ARBITRATOR

The Court need not—and, indeed, should not—consider whether Grant's claims fall within the scope of the arbitration provision because the Agreement requires the issue of arbitrability to be decided by an arbitrator.  "[P]arties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by clear and unmistakable evidence."  *Henry Schein, Inc.* v. *Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019).  In such situations, a court must refer the matter to arbitration even before deciding whether the plaintiff's claims fall within the scope of the arbitration agreement.  *See, e.g.*, *Dhue* v. *O'Reilly*, 2018 WL 11222900, at *3 (S.D.N.Y. Oct. 10, 2018) ("We do not reach the merits of this argument [that this dispute falls outside the scope of the agreement].  We instead conclude that the threshold question, whether Plaintiff agreed to arbitrate this issue, must be decided by an arbitrator.").  The court "may not override the contract, even if the court thinks that the arbitrability claim is wholly groundless." *Henry Schein, Inc.*, 586 U.S. at 63.

Where an agreement does not "directly state whether the arbitrator or the court will decide the issue of arbitrability," courts "look to other provisions of the agreement[] to see what contractual intention can be discerned."  *Metro. Life Ins. Co.* v. *Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019).  Courts find "clear and unmistakable" evidence of the parties' intent to delegate the question of arbitrability to an arbitrator "where a broad arbitration clause expressly commits all disputes to arbitration, concluding that *all* disputes necessarily includes disputes as to arbitrability."  *NASDAQ OMX Grp., Inc.* v. *UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014).  Courts also find such evidence "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability," because such incorporation can "serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator."  *DDK Hotels, LLC* v.

11

*Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021) (citing the AAA Commercial Arbitration Rules as an example); *see also Offshore Expl. & Prod., LLC* v. *Morgan Stanley Priv. Bank, N.A.*, 626 F. App'x 303, 305–06 (2d Cir. 2015) (affirming district court finding that the question of arbitrability itself was arbitrable when the arbitration clause "cover[ed] all disputes arising under an agreement and explicitly incorporate[d] rules that empower an arbitrator to decide issues of arbitrability"); *Simon J. Burchett Photography, Inc.* v. *Maersk Line Ltd.*, 2020 WL 8261580, at *6 (S.D.N.Y. Dec. 30, 2020) (report and recommendation); *Simon J. Burchett Photography, Inc.* v. *Maersk Line Ltd.*, 2021 WL 1040472, at *3 (S.D.N.Y. Mar. 18, 2021) (adopting report and recommendation and noting that arbitration clause in settlement agreement "indisputably delegate[d] the question of arbitrability to the arbitrator" when it covered "any dispute" and incorporated JAMS procedural rules (quoting report and recommendation)); *McCrae* v. *Oak St. Health, Inc.*, 2024 WL 4692047, at *8–9 (S.D.N.Y. Nov. 4, 2024) (finding "the parties' choice to incorporate by reference the Rules of the American Arbitration Association" is "an example of clear and unmistakable evidence" that "the parties intended that the question of arbitrability shall be decided by the arbitrator").

Here, the Agreement's arbitration provision contains precisely these indicia of a "clear and unmistakable" agreement to commit the issue of arbitrability to an arbitrator. First, the Agreement commands that "any and all disputes and/or controversies" shall be arbitrated. *See* SUMF ¶ 21; *NASDAQ OMX Grp.*, 770 F.3d at 1031 ("*[A]ll* disputes necessarily includes disputes as to arbitrability."). Second, the arbitration provision instructs that arbitration proceed "under the Federal Arbitration Act pursuant to the procedures of the [AAA]." SUMF ¶ 21. As noted in *DDK Hotels*, the AAA procedures explicitly empower arbitrators to decide issues of arbitrability. *See, e.g.*, AAA Commercial Rule R-7 ("The arbitrator shall have the power to rule on his or her own

jurisdiction, including . . . the arbitrability of any claim or counterclaim."); AAA Employment Rule 6 ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement.").

The Court thus should grant the motion to compel arbitration without reaching the question whether the arbitration agreement encompasses all of Grant's claims, as that issue should be adjudicated by the arbitrator. *See, e.g.*, *Reale*, 2022 WL 4115660, at *7.

## III. IN THE ALTERNATIVE, THE COURT SHOULD FIND THAT GRANT'S LAWSUIT FALLS SQUARELY WITHIN THE SCOPE OF THE ARBITRATION PROVISION

If the Court nonetheless decides to address the issue of arbitrability, it should still compel arbitration because the claims and allegations in Grant's Amended Complaint fall squarely within the scope of the Agreement's arbitration provision.

Courts rely on "[o]rdinary principles of contract law" to determine "whether the parties consented to arbitrate a particular dispute." *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO* v. *Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023). If "the factual allegations made in the plaintiff's complaint . . . touch matters covered by the parties' agreements, then those claims must be arbitrated, whatever the legal labels attached to them." *Holick*, 802 F.3d at 395; *see also, e.g.*, *Watson* v. *USA Today Sports Media Grp.*, 2018 WL 2316634, at *2 (S.D.N.Y. May 8, 2018) (finding that arbitration clause covering "[a]ny dispute arising under this Agreement" also covered claims "related to" the Agreement, even though it did not contain that language).

Where an arbitration agreement is contained within a settlement agreement, claims are within its scope when they "fall within the [s]ettlement [a]greement's definition of [c]laims released" or when they relate to "a continuation or maintenance of past conduct covered by the [s]ettlement [a]greement." *Simon J. Burchett Photography, Inc.*, 2020 WL 8261580, at *8 (report

and recommendation); *Simon J. Burchett Photography, Inc.*, 2021 WL 1040472, at \*3 (adopting report and recommendation and noting that plaintiff's "allegations are properly construed as 'a continuation or maintenance of past conduct covered by the Settlement Agreement'" (quoting report and recommendation)); *see also Ron* v. *Ron*, 836 F. App'x 192, 196–97 (5th Cir. 2020) (affirming that arbitration clause in settlement agreement applied to claims when the settlement agreement jointly released "any and all claims" of the parties, and plaintiff's complaint "repeatedly referenced the [settlement agreement]"). Indeed, whenever a release provision "potentially disposes of [the plaintiff's] claims," courts require "arbitration concerning the effect of the release on the plaintiff's claims before allowing those claims to proceed in federal court." *Oriental Republic of Uru.* v. *Chem. Overseas Holdings, Inc.*, 2006 WL 164967, at \*1, 6 (S.D.N.Y. Jan. 24, 2006); *see also S.E.C.* v. *Collector's Coffee Inc.*, 2021 WL 1539225, at \*5 (S.D.N.Y. Apr. 19, 2021) (collecting cases); *Syngenta Crop Prot., LLC* v. *Ins. Co. of N. Am.*, 2018 WL 1587601, at \*1 (S.D.N.Y. Mar. 29, 2018) ("[D]isputes between the parties concerning the scope and enforceability of the release must be submitted to an arbitrator in the first instance."); *Bangkok Crafts Corp.* v. *Capitolo di San Pietro in Vaticano*, 331 F. Supp. 2d 247, 257 (S.D.N.Y. 2004) ("The dispute as to whether the release entered into . . . bars all of the claims asserted . . . shall be determined by arbitration in accordance with the terms of the release."); *Century Indemn. Co.* v. *Viacom Int'l, Inc.*, 2003 WL 402792, at \*5 (S.D.N.Y. Feb. 20, 2003) (holding that whether a settlement agreement released plaintiff's claim was subject to arbitration under provision referring to arbitrator "any dispute or claim in any way arising out of this Agreement").

Grant's claims are well within the scope of the Agreement's expansive arbitration provision. The arbitration provision broadly applies to "any dispute arising under or out of this Agreement, its construction, interpretation, application, performance, or breach," and states that

"the sole and exclusive legal method to resolve any and all disputes and/or controversies" is arbitration. SUMF ¶ 21. The Agreement, in turn, releases all claims arising "as a result of, or in connection with [Grant's] employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel." SUMF ¶ 16. Grant's claims plainly "touch matters covered by the parties' agreements," *Holick*, 802 F.3d at 395, because they concern her "employment relationship with WWE" and her "relationship with McMahon and/or other WWE personnel." Indeed, the Amended Complaint's allegations culminate in the negotiation and execution of the Agreement itself. *See* SUMF ¶¶ 4–9. The viability of Grant's claims, in light of the broad release provisions, is thus a question of the construction and application of the Agreement—issues committed to arbitration by the plain language of the arbitration provision. Accordingly, Grant's claims fall squarely within the scope of the arbitration clause and must be arbitrated.

## IV.    ANY CHALLENGES TO THE VALIDITY OF THE CONTRACT MUST BE DIRECTED TO AND DECIDED BY THE ARBITRATOR

Grant's scattershot challenges to the validity and enforceability of the Agreement do not alter the Court's obligation to direct these claims to arbitration. As the U.S. Supreme Court has ruled, because Grant's challenges are to the Agreement as a whole, and not to the arbitration provision specifically, those challenges must be heard by the arbitrator.

Where an agreement contains an arbitration provision, courts decide issues of contractual validity only if those challenges are "directed specifically to the agreement to arbitrate." *Rent-A-Center, W., Inc.* v. *Jackson*, 561 U.S. 63, 71 (2010). By contrast, it is up to the arbitrator to decide "challenge[s] to the validity of the contract as a whole." *Buckeye Check Cashing, Inc.* v. *Cardegna*, 546 U.S. 440, 449 (2006); *see also Arrigo* v. *Blue Fish Commodities, Inc.*, 408 F. App'x 480, 482 (2d Cir. 2011) ("[U]nless the challenge is to the arbitration clause

itself, the issue of the contract's validity is considered by the arbitrator in the first instance."

(quoting *Buckeye*, 546 U.S. at 445–46)); *D'Antuono* v. *Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 319

(D. Conn. 2011) (Because "[a]n arbitration provision is severable from the remainder of the

contract[,] the issue of the contract's validity is usually considered by the arbitrator."); *Dowe* v.

*Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 759 (S.D.N.Y. 2019) ("A court may consider a claim

of fraud in the inducement of the arbitration clause itself, but claims of fraud in the inducement of

the contract generally are for arbitrators to decide.").

   Grant's Amended Complaint raises a number of challenges to the validity of the

Agreement as a whole, and specifically to the *confidentiality provision* of the Agreement. *See* Am.

Compl., ¶¶ 308–16, 327–45. Having twice now seen WWE's motion to compel arbitration, Grant

added to her Amended Complaint a series of conclusory assertions that the arbitration provision

itself was induced by fraud or duress. The complete set of those allegations are the following:

- "The duress experienced by Ms. Grant and the fraudulent inducement engaged in by McMahon were also specific and unique to individual terms within the NDA, such as the arbitration provision. Specifically, Ms. Grant was coerced and fraudulently induced to accept the arbitration provision. This is illustrated, in part, by the fact that Ms. Grant was told by her attorney that terms of the agreement (*e.g.*, the arbitration provision) could be undesirable as written, but given the perpetuated duress that had now been elevated by Ms. Grant's chronic abuser, McMahon, she was not able to make sound decisions regarding terms like the arbitration provision." Am. Compl., ¶ 260.

- "The arbitration provision, individually and outside the general NDA agreement, was entered into under duress and/or as result of fraudulent inducement engaged in by McMahon, and the same is void as a matter of law." Am. Compl. ¶ 261.

- "Additionally, and as detailed above, the arbitration provision, outside the context of the NDA generally or as a whole, was entered into under duress and/or by fraudulent inducement. Am. Compl., ¶ 314.

- "As detailed herein, [the] arbitration provision contained within the NDA was entered into under duress or as a result of fraudulent inducement, and the arbitration provision, separate and distinct from the NDA, is invalid."  Am. Compl., ¶ 344.

These are legal conclusions, not factual allegations.  They do not come close to being "directed specifically" to the Agreement's arbitration provision, because they do not actually allege any way in which the arbitration provision, as opposed to the Agreement as a whole, was the product of duress or fraud.  In its nearly 400 paragraphs, the Amended Complaint asserts only a single fact regarding Grant's agreement to the arbitration provision—that Grant was specifically apprised of the arbitration provision by her counsel—which *undercuts* her claim that she was somehow tricked or unduly pressured into agreeing to that provision.  Am. Compl., ¶ 260.  Not a single allegation of duress or fraudulent inducement in the entire Amended Complaint relates specifically to Grant's agreement to the arbitration provision, as distinct from the Agreement as a whole.  *See Rent-A-Center*, 561 U.S. at 71 ("[W]here the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene.").  Accordingly, these challenges to the Agreement must be decided by the arbitrator, not the Court.

## V.    THE COURT SHOULD STAY ANY REMAINING CLAIMS PENDING ARBITRATION

For the reasons detailed above, the entirety of Grant's Amended Complaint is subject to the Agreement's arbitration provision and should be referred to arbitration.  To the extent that the Court declines to refer any particular claims or allegations to arbitration, litigation of those claims or allegations should be stayed pending resolution of the arbitration.

Courts have discretion to stay proceedings "where some but not all claims are referable to arbitration."  *Katsoris* v. *WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017).

In deciding whether to stay remaining claims, courts consider "economy of time and effort for [the court], for counsel, and for litigants," as well as "the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Id*. A stay is "particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims," in part because "the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration." *Id*. at 110–11.

Grant's claims and allegations all relate to and stem from her relationship with McMahon. Because the allegations are inextricably intertwined with one another, it would be impossible to sever any allegations from the Amended Complaint as a whole and to litigate those allegations in isolation. It therefore would be inefficient to proceed with a parallel litigation of some of Grant's claims while the arbitration is pending. And it would risk inconsistent outcomes. As a result, if the Court were to determine that any of Grant's claims or allegations are not subject to arbitration, litigation of those claims or allegations should be stayed pending resolution of the arbitration.

## VI.    NO FEDERAL STATUTE PREVENTS ARBITRATION

Finally, neither of the two federal statutes Grant references in her Amended Complaint impacts the arbitrability of her claims, nor would a separate federal statute, unmentioned in the Amended Complaint, affect the relevant analysis. In determining whether to compel arbitration, courts consider "whether Congress intended the federal statutory claims asserted by the plaintiff, if any, to be non-arbitrable." *Billie* v. *Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 343 (D. Conn. 2020). As the Supreme Court has instructed, "the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue." *Green Tree Fin. Corp.-Ala.* v. *Randolph*, 531 U.S. 79, 92 (2000) (citation omitted). Such congressional intent to overcome the FAA's presumption of arbitrability

must be shown by an express "congressional command." *Am. Express Co.* v. *Italian Colors Rest.*, 570 U.S. 228, 233 (2013). No such intent exists here.

### A.    Speak Out Act

Grant alleges that arbitration provisions "such as the one in this case can never be valid under the Speak Out Act" because they "necessarily act as a secondary means to silence victims and survivors," thereby "undermin[ing] the Speak Out Act's entire legislative purpose." *See* Am. Compl., ¶ 333. Not so. The Speak Out Act concerns *pre-dispute* "nondisparagement" and "nondisclosure" clauses, and therefore does not apply to the Agreement. *See* 42 U.S.C. § 19403. Moreover, the Speak Out Act does not mention or concern arbitration, and thus does not evince any congressional intent to preclude arbitration. *Id.* A claim brought pursuant to the Speak Out Act therefore is still subject to the claimant's agreement to arbitrate.

### B.    Trafficking Victims Protection Act of 2000 ("TVPA")

Grant also asserts violations of the TVPA. Am. Compl., ¶¶ 346–64. The TVPA likewise does not mention or refer to arbitration. *See* 18 U.S.C. § 1589 *et seq.* Nor is there any indication in the TVPA's legislative history that Congress intended claims brought under it to be non-arbitrable. To the contrary, courts routinely find that TVPA claims are subject to arbitration. *See, e.g.*, *Zendon* v. *Grandison Mgmt., Inc.*, 2018 WL 6427636, at *1, *2–3 (E.D.N.Y. Dec. 7, 2018) (granting motion to compel arbitration of TVPA and other claims against an employer without reference to any effect of TVPA on arbitrability); *Maity* v. *Tata Consultancy Servs.*, 2021 WL 6135939, at *1, *7 (D.N.J. Dec. 29, 2021) (granting motion to compel arbitration of TVPA claims against an employer where there was a valid agreement to arbitrate); *Cuenca-Vidarte* v. *Samuel*, 2021 WL 5742066, at *1, 12 (D. Md. Nov. 30, 2021) (granting motion to compel arbitration of TVPA and other claims against an employer); *Baricuatro* v. *Indus. Pers. & Mgmt. Servs.*, 927 F. Supp. 2d 348, 351, 371 (E.D. La. 2013) (granting motion to compel arbitration of

TVPA and other claims and noting that plaintiffs "failed to present any argument suggesting" that TVPA claims were not arbitrable).

C.    **Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA")**

Finally, although Grant does not raise it in her Amended Complaint, to the extent she intends to oppose arbitration based on the EFAA, that argument also would be unavailing.

*First*, the EFAA applies only to pre-dispute arbitration agreements, which means agreements "entered into prior to the dispute—the discriminatory conduct." *Castillo* v. *Altice USA, Inc.*, 698 F. Supp. 3d 652, 657 (S.D.N.Y. 2023) (quoting *Barnes* v. *Festival Fun Parks, LLC*, 2023 WL 4209745, at \*10 (W.D. Pa. June 27, 2023)). Indeed, the EFAA's legislative history makes clear that the Act was meant to target arbitration clauses in employment agreements entered into *before* the alleged sexual assault or harassment occurred. *See, e.g.*, 168 Cong. Rec. H983-09, Testimony of Rep. Scanlon ("[The EFAA] would ban the use of forced arbitration in employment contracts in cases of sexual assault and harassment."); *id.*, Testimony of Rep. Griffith ("[N]obody signs on to an employment agreement thinking that oh, I am going to be sexually harassed. . . . The handbook will then have buried in it language that says all disputes must go to mandatory arbitration."). Under the EFAA, a "'dispute arises when the conduct which constitutes the alleged sexual assault or sexual harassment occurs' whereas 'a claim accrues when the plaintiff has a complete and present cause of action.'" *Castillo*, 698 F. Supp. 3d at 656–57 (quoting *Barnes*, 2023 WL 4209745, at \*10). "Courts have repeatedly rejected the notion that 'disputes' arise—and that the EFAA applies—only when complaints or charges are filed." *Id*. at 657 (collecting cases). Here, by the Amended Complaint's clear account, "the dispute—the discriminatory conduct" underlying Grant's claims occurred before the Agreement was negotiated and executed. *See id.* Indeed, the Agreement was what precipitated Grant's *departure* from WWE. SUMF ¶ 10. Only

20

a few paragraphs of the Amended Complaint's lengthy factual recitation concern conduct post-dating execution of the Agreement. *See* Am. Compl., ¶¶ 266–70. Any possible claims related to these post-Agreement allegations could not practically be litigated separately from, and in parallel with, the pre-Agreement claims that are subject to arbitration.

*Second*, the EFAA does not apply retroactively. Rather, it "applies only to claims that accrued on or after March 3, 2022, the day President Biden signed the EFAA into law; it does not have retroactive effect." *Johnson* v. *Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023) (citing, *inter alia*, Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022)); *Mitura* v. *Finco Serv. Inc.*, 712 F. Supp. 3d 442, 451 (S.D.N.Y. 2024) (same); *Edwards* v. *CVS Health Corp.*, 714 F. Supp. 3d 239, 242–43 (S.D.N.Y. 2024) (same). Only two paragraphs in the Amended Complaint, ¶¶ 269–70, involving explicit text messages with wrestler Brock Lesnar, concern alleged conduct post-dating the effective date of the EFAA. These allegations of texts with a third party do not give rise to any claims or causes of action against WWE, and even if they could, they could not be severed and litigated separately from the pre-March 3, 2022 claims that unquestionably are outside the purview of the EFAA.

## CONCLUSION

For the foregoing reasons, the Court should grant WWE's motion to compel this action to arbitration.

Dated: June 13, 2025

Respectfully submitted,

By: */s/ Daniel J. Toal*

**MORGAN LEWIS & BOCKIUS LLP**

Christopher M. Wasil (ct28578)
One State Street
Hartford, CT 06103-3178
Phone: (860) 240-2700
Fax: (860) 240-2701
Email: christopher.wasil@morganlewis.com

David A. McManus
One Federal Street
Boston, MA 02110-1726
Phone: (617) 341-7700
Fax: (617) 341-7701
Email: david.mcmanus@morganlewis.com

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**

Daniel J. Toal (phv10907)
Liza M. Velazquez (phv02132)
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
Email: dtoal@paulweiss.com
        lvelazquez@paulweiss.com

Mitchell D. Webber (phv207889)
2001 K Street, NW
Washington, DC 20006-1047
Phone: (202) 223-7442
Fax: (202) 379-4162
Email: mwebber@paulweiss.com

*Attorneys for Defendant World Wrestling
Entertainment, LLC*

22

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on June 13, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ Daniel J. Toal*
Daniel J. Toal