**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JANEL GRANT | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) Case No.: 3:24-cv-00090-SFR |
| v. | ) |
| | ) |
| WORLD WRESTLING ENTERTAINMENT, | ) |
| INC. n/k/a WORLD WRESTLING, | ) |
| ENTERTAINMENT LLC; and VINCENT | ) |
| K. MCMAHON, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTIONS TO COMPEL ARBITRATION</u>**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT................................................................................. 1

FACTUAL BACKGROUND ................................................................................. 3

    A.  McMahon Recruits Ms. Grant to Work Under Him At WWE.................................. 4

    B.  Ms. Grant Suffers Three Years of Horrific Abuse At The Hands of Her Employer, While WWE Leaders Sit By In Complicit Silence. .................................. 5

    C.  McMahon Exploits His Authority and Coercive Control over Ms. Grant to Compel Her NDA Signature, When She Lacks Capacity to Consent......................... 6

    D.  McMahon Assaults Ms. Grant Again, After the NDA Was Signed. ......................... 12

    E.  In Response to a Whistleblower Complaint, WWE Leadership Conducts a Sham "Investigation" Without Interviewing Ms. Grant. ........................................... 13

    F.  WWE and McMahon Repudiated the NDA They Now Seek to Enforce by Stopping Payment to Ms. Grant Without Excuse or Explanation.............................. 13

    G.  Ms. Grant Filed This Lawsuit As a Last Resort.......................................................... 14

    H.  Two Separate Tribunals Found That McMahon's Hush Money NDAs, Including This One, Were Created in Furtherance of a Crime. ................................. 15

    I.  Defendants Move To Compel Arbitration Under the Void NDA to Keep Ms. Grant From Telling Her Story in Open Court. ...................................................... 16

ARGUMENT......................................................................................................... 16

  I.  THE NDA IS VOID PER PUBLIC POLICY BECAUSE IT WAS DRAFTED AND SIGNED IN FURTHERANCE OF MULTIPLE CRIMES. .................................. 17

    A.  The NDA Was Part of a Cover-Up of McMahon's Misuse of WWE Resources From Police, Shareholders, and Government Regulators. ......................................... 18

    B.  The NDA Was Part of McMahon's Abuse of Ms. Grant. ......................................... 20

  II.  THE NDA AND ITS ARBITRATION CLAUSE ARE VOID UNDER FEDERAL LAWS ENACTED TO PROTECT VICTIMS OF WORKPLACE ABUSE.................... 20

    A.  The Speak Out Act Nullified the NDA and Its Arbitration Clause. ........................... 20

      1.  The Pre-Dispute Agreement Is Void Under The Speak Out Act.......................... 20

      2.  The Arbitration Clause Is Independently Void Under the Speak Out Act Because It Contains a Prohibited Nondisclosure Covenant. ......................... 22

    B.  The Arbitration Clause Is Unenforceable Under the EFAA. ..................................... 25

  III.  CLAIMS ARISING FROM POST-NDA ABUSE ARE NOT SUBJECT TO COMPULSORY ARBITRATION.............................................................................. 28

  IV.  MS. GRANT LACKED CAPACITY TO CONSENT TO THE NDA AND THE ARBITRATION CLAUSE. ................................................................................... 29

    A.  The Arbitration Agreement Is Void Because McMahon Caused Ms. Grant's Incapacity. ................................................................................................................ 30

    B.  The Arbitration Clause Itself Was Induced by McMahon's Coercion. ...................... 34

    C.  The Terms of the Arbitration Clause Are Overly Broad, Eliminating Any Possible Meeting of the Minds. ................................................................................ 35

V.  IN THE ALTERNATIVE, THE NDA AND ARBITRATION CLAUSE SHOULD BE ASSESSED WITH THE BENEFIT OF A FULL RECORD. ..................................... 38

CONCLUSION ............................................................................................................. 39

ii

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages(s)**

*Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793 (10th Cir. 1995) ..............................................33

*Artache v. Goldin*, 133 A.D.2d 596 (N.Y. App. Div. 1987)........................................................23

*Aventine Props., LLC v. Branchinelli*, 62 Misc. 3d 149(A), (N.Y. App. Term. 2019) ..................................................................................................................................23

*Baldwin v. TMPL Lexington LLC*, No. 23 CIV. 9899 (PAE), 2024 WL 3862150 (S.D.N.Y. Aug. 19, 2024)....................................................................................................25, 27

*Branzburg v. Hayes*, 408 U.S. 665 (1972)..................................................................36, 38

*Bridgeport Pipe Eng'g Co. v. DeMatteo Const. Co.*, 268 A.2d 391 (Conn. 1970) .......................36

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) ..................................................35

*Bushey v. Home Direct Logistics, LLC*, No. UWY-CV-21-6061586 S, 2022 WL 2298419 (Conn. Super. Ct. June 24, 2022)...............................................................................17

*Chase Manhattan Mortg. Corp. v. Machado*, 850 A.2d 260 (Conn. App. Ct. 2004) ....................31

*Comley ex rel. Fitzroy v. Bd. Of Trs. of Firemen's Relief Fund of City of Bridgeport*, 191 A. 729 (Conn. 1937).....................................................................................18

*Conflict Int'l, Inc. v. Komorek*, No. 23-CV-02165 (ER), 2024 WL 1347577 (S.D.N.Y. Mar. 29, 2024) ...........................................................................................................37

*D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308 (D. Conn. 2011).........................................30

*De Moura Castro by Hilario v. Loanpal, LLC*, 715 F. Supp. 3d 373 (D. Conn. 2024) ...............................................................................................................................17, 31, 36

*Demattia v. Mauro*, 860 A.2d 262 (Conn. App. Ct. 2004) ...........................................................24

*Denson v. Donald J. Trump for President, Inc.*, 530 F. Supp. 3d 412 (S.D.N.Y. 2021) ....................................................................................................................................36, 37

*Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498 (S.D.N.Y. 2024)..........................................25

*Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245 (2d Cir. 2019).............................................30

*Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438 (2d Cir. 1995)......................................................39

*Doe 3 v. Indyke*, 801 F. Supp. 3d 200 (S.D.N.Y. 2025) ..............................................................27

*Epic Systems Corp. v. Lewis*, 584 U.S. 497, 138 S.Ct. 1612 (2018) .............................................17

*Famuyide v. Chipotle Mexican Grill, Inc.*, Civ. No. 23-1127, 2023 WL 5651915
(D. Minn. Aug. 31, 2023) ...............................................................................................26

*Flores v. Nat'l Football League*, 2022 WL 3098388 (S.D.N.Y. Aug. 4, 2022)..............................39

*Gibbs v. Conn. Gen. Life Ins.*, No. CV97 0567009, 1998 WL 123010 (Conn.
Super. Ct. Mar. 3, 1998) ..................................................................................................35

*Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019)..............................................................24

*Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60 (D. Conn. 2020)..............................................30

*Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734 (Conn. 2005) .................................................38

*Helenese v. Oracle Corp.*, No. 309-CV-351CFD, 2010 WL 670172 (D. Conn.
Feb. 19, 2010) ..........................................................................................................30, 35

*Hodgin v. Intensive Care Consortium, Inc.*, No. 22-81733-CV-
MIDDLEBROOKS, 2023 WL 2751443 (S.D. Fla. Mar. 31, 2023).........................................26

*Hudson v. Babilonia*, No. 3:14-CV-01646 (MPS), 2015 WL 1780879 (D. Conn.
Apr. 20, 2015) ..........................................................................................................38, 39

*In re: Grand Jury Subpoenas Dated September 13 (2025)*, Case Nos. 24-1588-cv
(L), 24-1589-cv (Con) (2d Cir. 2025) ............................................................................16

*In re Mason*, 300 B.R. 160 (Bankr. D. Conn. 2003).................................................................30, 31

*In re World Wrestling Entertainment, Inc. Merger Litigation*, Case No. 2023-
1166-JTL (Del. Ch. 2023).................................................................................................16

*Indelicato v. Provident Life & Acc. Ins. Co.*, No. 89 CIV. 8436 (RJW), 1990 WL
145149 (S.D.N.Y. Sept. 28, 1990)...................................................................................33

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Loc. 145
v. Purity Food Co.*, 17 Conn. Supp. Ct. 12, 12–13 (Conn. Super. Ct. 1950)...........................30

*Jenks v. Jenks*, 642 A.2d 31 (Conn. App. Ct. 1994) .....................................................................31

*Jenks v. Jenks*, 657 A.2d 1107 (Conn. 1995)................................................................................32

*Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535 (S.D.N.Y. 2023)............................................25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ........................33

*Montanus v. Columbia Mgmt. Inv. Advisers, LLC*, No. 25 CIV. 2798 (PAE), 2025
WL 2503326 (S.D.N.Y. Sept. 2, 2025)............................................................................27

*Munn v. Hotchkiss Sch.*, 933 F. Supp. 2d 343 (D. Conn. 2013) ...................................................38

*Nielsen v. Van Leuven*, No. 3:15-CV-1154 (MPS), 2017 WL 3925412 (D. Conn. Sept. 7, 2017) ...........................................................................................................................24

*Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74 (2d Cir. 2024) ..............................................26, 27

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) .........................................35

*Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010) .................................................................35

*Silverman v. DiscGenics, Inc.*, No. 2:22-cv-00354, 2023 WL 2480054 (D. Utah Mar. 13, 2023) ......................................................................................................................26

*Smith v. Meta Platforms, Inc.*, No. 24 CIV. 4633 (JPC), 2025 WL 2782484 (S.D.N.Y. Sept. 30, 2025) ................................................................................................25

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26 (2d Cir. 2001) ...........................30

*Squillante v. Cap. Region Dev. Auth.*, 266 A.3d 940 (Conn. App. Ct. 2021) ................................24

*Steward Partners Global Advisory, LLC v. Tucker*, 2024 WL 4202697 (S.D.N.Y. Sept. 16, 2024) ...........................................................................................................21

*Timely Products, Inc. v. Costanzo*, 465 F. Supp. 91 (D. Conn. 1979) .....................................24, 25

*Traystman, Coric and Keramidas v. Daigle*, 855 A.2d 996 (Conn. App. Ct. 2004) .....................31

*United States v. Grossmayer*, 76 U.S. 72 (1869) ..........................................................................18

*Vaccaro v. Ins. Co. of N. Am.*, No. 3:96CV1161 AHN, 1996 WL 762234 (D. Conn. Dec. 23, 1996) ...........................................................................................................17

*Van Housen v. Monico*, 378 A.2d 609 (Conn. Super. Ct. 1976) ...............................................36, 38

*Venture Partners, Ltd. v. Synapse Techs., Inc.*, 679 A.2d 372 (Conn. App. Ct. 1996) ..............................................................................................................................23

*Watts v. Chittenden*, 22 A.3d 1214 (Conn. 2011) ...................................................................26, 27

*Zebedeo v. Martin E. Segal Co.*, 582 F. Supp. 1394 (D. Conn. 1984) .........................................29

**Rules**

Fed. R. Civ. P. 56(d) .......................................................................................................................39

Local Rule 56(a)1 ..............................................................................................................................4

Local Rule 56(a)2 ..............................................................................................................................4

**Statutes**

9 U.S.C. § 402(b) ................................................................................................................25

42 U.S.C. § 19402(1) ..........................................................................................................22

42 U.S.C. § 19403(a) ..........................................................................................................21

Ending Forced Arbitration Act, 9 U.S.C. § 401 *et seq.* ........................................ *passim*

Ending Forced Arbitration Act, Pub. L. No. 117-90, 136 Stat. 26 (2022) ................................. 26

Federal Arbitration Act, 9 U.S.C. § 4 .............................................................................20, 34

Securities Exchange Act, 15 U.S.C. § 78a *et seq.* . ...................................................14,15

Speak Out Act, 42 U.S.C. §§ 19401–19404 .......................................................... *passim*

Trafficking Victims Protection Act, 22 U.S.C. § 7101 *et seq.* ........................................1

**Other Authorities**

Restatement of Contracts § 475, Comment .................................................................18

Restatement (Second) of Contracts § 175 Comment.................................................33

Restatement (Second) of Contracts § 175 Comment a (1981) ......................................33

Restatement (Second) of Contracts § 184 (1981)..........................................................23

Susan Randall, *Judicial Attitudes Toward Arbitration and the Resurgence of Unconscionability*, 52 Buff. L. Rev. 185, 218–20 (2004) .......................................23

8 Williston on Contracts § 19:70 (4th ed. 1993 & Supp. 2010) .....................................23

Plaintiff Janel Grant ("**Plaintiff**" or "**Ms. Grant**") respectfully submits this memorandum of law and the accompanying declarations of Janel Grant and Dr. Chitra Raghavan, in opposition to Defendant Vincent K. McMahon ("**McMahon**")'s and World Wrestling Entertainment, Inc. n/k/a World Wrestling, Entertainment LLC ("**WWE**")'s renewed motions to compel arbitration (the "**Motions**"), filed June 13, 2025 (ECF Nos. 122, 124, respectively).

## PRELIMINARY STATEMENT

Janel Grant is a former WWE employee who was subjected to repeated physical and emotional abuse, sexual assault, and sexual trafficking perpetrated by former WWE Chairman Vince McMahon. McMahon was the mastermind, and WWE employees at all levels, including its most senior officials and talent, knew about and facilitated the abuse that Ms. Grant experienced. Some received explicit pictures of Ms. Grant from McMahon; others participated directly in her sexual abuse and joined in sex acts, often inside WWE's headquarters. Some simply turned a blind eye. Instead of protecting Ms. Grant, WWE and McMahon conspired to use his coercive control over her to conceal its leaders' wrongdoing and bar Ms. Grant from speaking out or seeking help.

Ms. Grant refuses to be silenced. She filed this action in January 2024 to assert claims against Defendants under the Speak Out Act, the Trafficking Victims Protection Act ("**TVPA**"), and Connecticut law for negligence, civil battery, and intentional or negligent infliction of emotional distress. Defendants have moved to compel arbitration, arguing that Ms. Grant is precluded from having her day in court because of the void non-disclosure agreement (the "**NDA**" or "**Agreement**") she was coerced into signing by her employer and abuser.

The NDA that WWE seeks to hide behind is void and unenforceable as a matter of law. *First*, it was drafted and signed in furtherance of crimes and is void as a matter of public policy. This is not Ms. Grant's allegation—it is a matter of record. Two federal courts, the Southern

District of New York and the Second Circuit Court of Appeals, found sufficient evidence of criminal intent by McMahon and WWE's counsel in the negotiation and signing of this NDA to pierce the attorney-client privilege. Further, in a consent agreement with the Securities and Exchange Commission ("**SEC**"), WWE and McMahon admitted that several NDAs, including the one at issue here, were entered into by McMahon to mislead investors and hide his use of WWE funds both to perpetrate and cover up his abuse of women, including Ms. Grant. WWE pinned the issue on McMahon and insisted he entered WWE into multiple NDAs without its consent, and McMahon was ordered to repay WWE $1.3 million as a result. WWE cannot now turn around and claim that it is entitled to enforce that same illicit agreement. Allowing WWE to wield the NDA to silence Ms. Grant here, after accepting a seven-figure victim restitution payment from McMahon for that same NDA, would be a perversion of justice. *See* Part I, *infra*.

*Second*, the NDA and its arbitration clause are void under federal reforms passed in the wake of the #MeToo Movement to protect victims like Ms. Grant from being coerced into signing restrictive covenants by their employers. The Speak Out Act bars this Court from enforcing any pre-dispute nondisclosure or nondisparagement clauses. As the Amended Complaint alleges, there was no active dispute between Ms. Grant and her employer when McMahon proposed the NDA or when Ms. Grant signed the NDA, and the text of the arbitration clause includes a requirement of absolute confidentiality, above and beyond the other non-disclosure covenants in the purported agreement. *See* Am. Compl., Ex. A, at § X ("NDA"). This is precisely the type of clause the law forbids. As the secrecy requirement is integral to and not severable from the arbitration clause, the whole clause is unenforceable under the Speak Out Act. *See* Part II.A, *infra*. Likewise, the Ending Forced Arbitration Act ("**EFAA**") bars this Court from ordering victims to arbitration for any claims that accrue after March 3, 2022, when the law went into effect. Ms. Grant pleads that

2

Defendants' course of misconduct continued after the effective date of this law and includes discrete acts that occurred *after* March 3, 2022. Thus, the EFAA bars Defendants from removing this dispute to arbitration. *See* Part II.B, *infra*.

*Third*, the Amended Complaint pleads that McMahon's acts of abuse, trafficking, and coercive control continued *after* the NDA, and describes acts of sexual assault and trafficking perpetrated by McMahon and other WWE agents that post-date the NDA and its arbitration clause. Even if Ms. Grant had capacity to agree to release or privately arbitrate pre-NDA assaults—which she did not—it could not bar her from asserting claims for sexual assaults she endured post-NDA.

*Fourth,* Ms. Grant was coerced into signing the NDA while she lacked capacity to consent. She was extremely sleep deprived and in an extreme state of duress, and any assessment of the validity of the NDA's restrictive obligations must grapple with the coercive circumstances surrounding their formation. McMahon's coercive control over Ms. Grant eliminated her capacity to consent and tainted the negotiation of the NDA, and specifically the negotiation of the arbitration clause. *See* Part IV, *infra*. These defects are fatal to Defendants' insistence that the Court has no choice but to enforce the NDA's arbitration clause on its face and that the circumstances surrounding its creation are irrelevant.

*Fifth*, for the reasons set forth above, the NDA and its component arbitration clause are void as a matter of law. Alternatively, if the Court determines that the validity of the arbitration clause must be adjudicated as a threshold question, that determination should be made with the benefit of a complete record. *See* Part V, *infra*.

For the reasons set forth herein, Ms. Grant respectfully requests that this Court deny Defendants' Motions and allow her to have her day in court.

## FACTUAL BACKGROUND

Janel Grant is a former employee of WWE who was a victim of physical and emotional

abuse, sexual assault, and sexual trafficking at WWE. *See* First Amended Complaint ("Am. Compl."), No. 3:24-cv-00090-SFR (D. Conn.), ECF No. 117, ¶ 1.[1] Ms. Grant brought this action to shine a light on Defendants' misconduct and speak out for other victims. *Id.*

### A.  McMahon Recruits Ms. Grant to Work Under Him At WWE.

Ms. Grant met McMahon during a state of profound grief and hyper vulnerability. *See* Declaration of Janel Grant In Support of Plaintiff's Opposition To Defendants' Motions To Compel Arbitration ("Grant Decl.") ¶ 3. Both of her parents, for whom she served as the primary caretaker, had recently passed and she lost her family home. Am. Compl. ¶ 3. During a time of emotional and financial strain, Ms. Grant's apartment building's resident manager suggested that McMahon could help her. *Id.* ¶ 5. Upon introduction, McMahon presented himself as a friend, ally, and sympathetic ear to the isolated, inexperienced, and emotionally sheltered Ms. Grant. *Id.* ¶¶ 56–59. In reality, McMahon preyed on her vulnerabilities—the first step to grooming Ms. Grant to submission. *See* Expert Declaration of Dr. Chitra Raghavan ("Expert Decl.") ¶ 41.

During initial meetings with McMahon, Ms. Grant was transparent about her recent struggles and that she was searching for a job. Grant Decl. ¶ 3. McMahon used detailed and invasive questions about Ms. Grant's upbringing and personal matters to learn about her vulnerabilities and prime her for grooming. Expert Decl. ¶ 41. After answering these questions, McMahon expressed his desire to employ Ms. Grant. Grant Decl. ¶ 3. In a move confirmed by a high-ranking WWE employee as highly unusual, McMahon then facilitated and prepped Ms. Grant for meetings with high-ranking WWE officials—former Senior Vice President and Chief of Staff

---

[1] Given that Defendants McMahon and WWE filed different versions of their Statement of Undisputed Material Facts pursuant to Local Rule 56(a)1 (*see* ECF Nos. 122-3 and 124-2) Ms. Grant has filed simultaneously herewith two separate Statements of Undisputed Material Facts pursuant to Local Rule 56(a)2. Because both Defendants' 56(a)1 Statements cite to Ms. Grant's Amended Complaint (ECF No. 117), for ease of reference, Plaintiff cites to her Amended Complaint herein for the factual background.

& Chief Operating Officer Brad Blum and former Senior Vice President, General Counsel & Secretary Brian Nurse—to discuss her role at WWE. Am. Compl. ¶¶ 56, 63, 67, 84–87, 91. McMahon eventually hired Ms. Grant under false pretenses to work in a non-existent role at WWE to maintain proximity and control over her. *Id.* ¶¶ 10, 16. For nearly three years thereafter, Ms. Grant was exploited and sexually trafficked by her employer's CEO, direct supervisor, and WWE talent. *See generally id.*

### B. Ms. Grant Suffers Three Years of Horrific Abuse At The Hands of Her Employer, While WWE Leaders Sit By In Complicit Silence.

Ms. Grant was under the extreme coercive control of McMahon throughout their entire three-year "relationship", including during the NDA process. Expert Decl. ¶ 24. McMahon controlled every aspect of Ms. Grant's life, including her sexual relationships, employment prospects, income, personal interactions, and medical care.[2] Grant Decl. ¶ 16. He alternated between ignoring Ms. Grant, intimidating and threatening her if he did not get his way, claiming he loved her and that their relationship was sacred, threatening to ruin her life if she did not obey, and degrading her and using her body as a sex object, sometimes multiple times a day, and with multiple other men. Expert Decl. ¶ 28. Throughout the three years, sex was violent, invasive, degrading, and produced injuries that could not heal because there would consistently be subsequent violent encounters, often involving other men or objects. *Id.* Ms. Grant did not raise a complaint concerning her abuse because she lived in a state of duress and was fully under McMahon's control, her survival ultimately depending on her complete submission to McMahon.

---

[2] Coercive control is a strategic and systematic pattern of behavior designed to dominate, intimidate, and control another person through psychological, emotional, physical, sexual, and/or economic abuse, which undermines the victim's autonomy, liberty, and sense of self, and often results in residual and long-term psychological effects. *See* Expert Decl. ¶ 12. Individuals subject to coercive control often experience isolation, surveillance, control over resources and actions, exploitation, threats and intimidation, psychological manipulation, and sexual abuse. *Id.*

Am. Compl. ¶¶ 239–40; *see also* Expert Decl. ¶¶ 27, 46–49.

### C. McMahon Exploits His Authority and Coercive Control over Ms. Grant to Compel Her NDA Signature, When She Lacks Capacity to Consent.

After abruptly distancing himself from Ms. Grant, McMahon invited Ms. Grant over to his condo on January 9, 2022, to explain that his wife, Linda McMahon, learned about their relationship and would divorce him, and that he was going to lose his condo. Am. Compl. ¶¶ 237–38. McMahon emphasized someone was trying to hurt him and Ms. Grant needed to formulate a solution for damage control. Grant Decl. ¶ 93. He stressed that a public divorce would make Ms. Grant a headline. Am. Compl. ¶ 238. McMahon said that if Ms. Grant left WWE and signed an NDA, Linda McMahon would not divorce him, he could keep the condo, and Ms. Grant would avoid reputational harm, including public dissemination of the sexual content McMahon coerced Ms. Grant into producing for him and other WWE employees. *Id.* ¶¶ 239–40.

The signs of Ms. Grant's incapacity to consent were clear. McMahon spent years asserting coercive control over Ms. Grant and Ms. Grant repeatedly informed McMahon via text about her extreme state of panic, physical distress, and apprehension of signing any legal document. Expert Decl. ¶¶ 38–39, 47; Grant Decl. ¶¶ 94, 98–99, 101–04, 107–109, 111, 113, 120–21, 123. In response, McMahon pushed her to quickly sign the document without editing any terms, threatening imminent harm and what she perceived as a threat to her safety. Grant Decl. ¶¶ 118–119.

Defendants go to great lengths to suggest that Ms. Grant was of sound mind or even a shrewd negotiator during the NDA process. On the contrary, Ms. Grant was under such extreme coercive control well before and into the NDA process that she suggested—just two days before signing the NDA—that she could instead sign a napkin or a Post-it note. Am. Compl. ¶ 252. Throughout the entire NDA process, Ms. Grant was sleep-deprived, emotionally and physically

6

distressed, and experiencing suicidal ideations, all of which McMahon knew even as he pushed her to sign the Agreement. Grant Decl. ¶¶ 63, 94, 99, 101–04, 107–109, 111, 113, 118, 120, 123. McMahon purports that Ms. Grant was aided by counsel during the NDA process, but he fails to represent that he continued to contact Ms. Grant directly to sow distrust in her counsel and demand that she sign the NDA without edits. *Id.* ¶ 117.

McMahon controlled every aspect of the "negotiations" to protect his personal and business needs. He directed a single attorney, Jerry McDevitt, to draft the NDA on behalf of WWE and McMahon—both parties to the Agreement. Am. Compl. ¶ 303. McDevitt is the same person whom McMahon routinely referenced to Ms. Grant as a high-powered attorney he had on retainer who was world class at making problems go away. *Id.* ¶ 254. This was engrained in Ms. Grant during her time at WWE and reinforced throughout the NDA process. Grant Decl. ¶¶ 9, 45, 93.

Before Ms. Grant could retain counsel, McMahon informed her that McMahon and WWE's attorney insisted on installment payments due to "cash flow purposes." Am. Compl. ¶ 246; Grant Decl. ¶ 104. Ms. Grant said that this reasoning did not make sense for a billionaire, but McMahon insisted that it was not his idea. *Id.* McMahon instructed Ms. Grant not to go to the WWE office and immediately lessen her involvement on open work items. Am. Compl. ¶ 240. He suggested that he or Nick Khan, a high-ranking employee and Board member at WWE, would personally help Ms. Grant find another job. Grant Decl. ¶ 105. McMahon instructed Ms. Grant not to share this news with anyone and suggested she offer health-related excuses if asked about leaving WWE. Am. Compl. ¶ 241. He also insisted that she continue seeing his doctor, Dr. Colker of Peak Wellness. Grant Decl. ¶ 96. She asked who in WWE's legal department would see any of this paperwork, to which McMahon stated that these agreements do not go to legal, but rather to McDevitt's firm, into a dusty drawer along with "the others." *Id.* ¶ 97.

7

From January 9th through January 19th, an already vulnerable Ms. Grant represented herself. Am. Compl. ¶¶ 238–47. From the beginning of NDA process, she told McMahon that she was in a state of shock, stressed, and sleep deprived. Grant Decl. ¶¶ 94, 101. On January 10th, Brock Lesnar contacted Ms. Grant, which she reported to McMahon in accordance with his instructions. *Id.* ¶ 99. McMahon then attempted to orchestrate a sexual encounter between Ms. Grant and Lesnar that night across state lines in Philadelphia. *Id.* He provided Ms. Grant with the time of Lesnar's WWE performance segment, detailed the length of her commute, and ordered her to "have some fun with him." *Id.* Too distressed to drive, Ms. Grant informed McMahon that she was unstable and in a state of shock. *Id.* McMahon responded to monitor the progression of her exchanges with Brock. McMahon probed, "R U keeping me up on all the Brock pics, texts and video Ur sending Brock?" *Id.* ¶ 100. He then sent Ms. Grant a selfie of his groin. *Id.*

On January 12th, Ms. Grant sent McMahon a series of panicked and paranoid texts detailing her depression, her mistrust of everyone around her, and a screenshot of a step counter to show the physical impact of her stress. *Id.* ¶ 102. Late that night, McMahon convinced Ms. Grant to sexually perform for him, during which McMahon said he was making love to her. *Id.* ¶ 103. Ms. Grant was taken aback by this rare display of affection, causing her to succumb to his manipulation. *Id.*

On January 13th, Ms. Grant sent a series of texts detailing her mental state, suicidal thoughts, doubts of her understanding of everything, and concerns for her safety and reputation. *Id.* To escape reality, Ms. Grant took an excessive amount of prescription sleep medication. *Id.* Instead of showing concern for her safety, McMahon sent Ms. Grant a voice memo pressuring her to quickly sign the Agreement without pushback, promising she would come out with her reputation and their "relationship" intact. *Id.*

8

On January 14th, McMahon sent Ms. Grant a to-do list for purposes of effectuating the NDA—which he conceded was drafted by WWE Executive Brad Blum—directing Ms. Grant to retain counsel, resign from WWE, and sign the Agreement. Am. Compl. ¶ 244; Grant Decl. ¶ 105.

Between January 15th and 17th, McMahon continued to monitor and dictate Ms. Grant's texts with Brock Lesnar and send her sexually violent messages. Grant Decl. ¶ 106. On January 18th, Ms. Grant informed McMahon of the rashes on her body that developed as a stress response and desperately sought his assurances. *Id.* ¶ 107.

On January 19th, McMahon ordered Ms. Grant to hire an attorney that day and instructed her to treat it as a mere formality for finalizing the Agreement. *Id.* ¶ 108. That day, Ms. Grant hired an attorney who Dr. Colker referred and McMahon approved of. Am. Compl. ¶ 247. McMahon then explicitly instructed Ms. Grant to withhold all information about her work life, private life, sexual relationships, and plans from her attorney. Grant Decl. ¶ 108. Later that day, Ms. Grant texted McMahon: "can you tell I'm scared?" *Id.* McMahon ignored her concerns and instead gave Ms. Grant feedback to incorporate in her texts with Lesnar. Am. Compl. ¶ 248.

Ms. Grant expressed to McMahon she felt scared, isolated, and vulnerable, texting him, "I'm not really ok. . . . It's painfully scary to be this vulnerable as you are the only person in the world I trust implicitly. And not to mention the only one I can even talk to." *Id.* ¶ 109. The next morning, McDevitt sent Ms. Grant's attorney the first draft of the NDA. Grant Decl. ¶ 110. That same day, McMahon texted Ms. Grant to get the paperwork "done and over . . . by tomorrow if possible" and to remain in touch with him. *Id.* ¶ 111. At that point, Ms. Grant had not yet even seen McDevitt's first draft of the NDA. *Id.*

Ms. Grant's legal representation lasted eight days, during which time her attorney repeatedly expressed concern about moving forward so quickly. Am. Compl. ¶ 249. Any attempts

by Ms. Grant or her attorney to materially amend provisions were flatly rejected without negotiation. *Id.* Ms. Grant was told by her attorney that several terms may be undesirable as written, but she was not able to make sound decisions regarding provisions like the arbitration clause given the perpetuated duress that had been elevated by her chronic abuser. *Id.* ¶ 260. McMahon's coercive tactics and Ms. Grant's resulting state of duress were specific to the arbitration clause. *Id.* ¶¶ 259–61, 314, 344; *see also* Grant Decl. ¶ 130.

On January 24th, in response to Ms. Grant's text message about her distressed mental state, McMahon continued to engage in sexual text message exchanges with Ms. Grant, including encouraging her to send explicit photos to Lesnar. Am. Compl. ¶ 248. McMahon again requested Ms. Grant send him content she sent to Lesnar. *Id.* During this time, McMahon finalized a booking for Lesnar to perform in a live event at Madison Square Garden, where it was expected that Ms. Grant and Lesnar would have sexual relations. *Id.*

Around January 25th, McMahon told Ms. Grant that McDevitt had not signed an affidavit needed for an upcoming WWE Board meeting, blaming her for delay. Grant. Decl. ¶ 116. When Ms. Grant asked her counsel about the significance of the unsigned affidavit, McMahon responded by attacking her counsel's competence and suggesting that he and McDevitt believed her counsel could leak information and thus posed a threat. *Id.* ¶ 117. McMahon again manufactured a sense of fear, causing Ms. Grant to distrust her counsel and his competing influence. *Id.*

On January 26th, Ms. Grant visited McMahon's condo and pleaded to back out of the NDA. She told him she did not understand the purpose of paperwork and lawyers, and she pleaded with him to recognize her loyalty and devotion. *Id.* ¶ 118. McMahon told Ms. Grant to ***stop reading the NDA*** and ***not to focus on the words*** but rather on what the contract does in effect: protect him from personal and professional ruin and shield her reputation. *Id.* He manipulated her by claiming

"they" were in the "driver's seat" dictating what the attorneys do, when in reality he controlled everything. *Id.* McMahon then articulated an even more pressing need to get the NDA signed immediately: he was under a tight deadline to report pending or threatened legal actions to the WWE Board of Directors (specifically the Audit Committee) and that he and his attorney could not do so unless Ms. Grant signed the NDA. Am. Compl. ¶ 250. McMahon told Ms. Grant that she needed to sign the contract by January 31st but, hours later, he moved the deadline up to January 28th. Grant. Decl. ¶ 120. Once again, Ms. Grant informed McMahon that she was experiencing physical distress and had not been sleeping. *Id.*

McMahon exacerbated Ms. Grant's duress using his coercive tactics during the NDA process, calling her multiple times and leaving voice notes instructing her to sign the Agreement quickly and without editing material terms. *Id.* ¶ 119. On January 27, 2022, just eight days after Ms. Grant retained counsel, and just *one day* before McMahon's imposed deadline to sign, McMahon left Ms. Grant a lengthy audio message pushing her to immediately sign the NDA and advising that he would be "double fucked" if she did not. Am. Compl. ¶ 253.

On the morning of January 28th, McDevitt sent Ms. Grant's attorney a draft with his revisions and expressed that it reflected conversations that he understood McMahon and Ms. Grant were having. Grant Decl. ¶ 124. He added that it was his "sense that the parties want to wrap this up today." *Id.* Ms. Grant's attorney sent his draft and said it reflected conversations that *he* understood Vince and Ms. Grant were having. *Id.* ¶ 125. Later that day, McMahon called Ms. Grant to tell her that he and McDevitt had a heated phone conversation about the fact that she had not yet signed the NDA. *Id.* ¶ 126. He claimed that McDevitt directed him to deal with Ms. Grant himself and that he was concerned McDevitt would drop him as a client. *Id.* During this time, Ms. Grant's attorney informed her that McDevitt was non-responsive. *Id.* ¶ 129.

11

Ms. Grant made one last plea to back out, and McMahon reacted with fury. *Id.* ¶ 126. They engaged in several calls during which McMahon yelled at her and threatened that they would both suffer serious harm if she did sign the paperwork by 8:00 p.m., including public harm to McMahon, his family and marriage, his empire, and Ms. Grant's reputation and safety. *Id.* Ms. Grant was sleep deprived, mentally defeated, broken in spirit, desperate, and felt utterly trapped. *Id.* ¶¶ 126–27. She again contemplated suicide. *Id.* ¶ 127.

Ms. Grant succumbed to McMahon's coercive tactics on January 28, 2022. *Id.* ¶ 128. In other words, a $3,000,000.00 agreement was considered for a total of nineteen days—eleven of which Ms. Grant was unrepresented and during all of which she was under McMahon's coercion and lacked capacity. Ms. Grant signed the document and sent it to McMahon but did not tell her attorney, per McMahon's instructions. *Id.* ¶ 129. About an hour later, Ms. Grant's attorney explained the paperwork and his concerns, including McDevitt's non-responsiveness. *Id.*

### D.  McMahon Assaults Ms. Grant Again, After the NDA Was Signed.

***After the NDA was signed***, McMahon sexually assaulted Ms. Grant again. Grant Decl. ¶ 132. In February 2022, McMahon, wearing only a white robe, met Ms. Grant in his condo under the guise of reviewing outstanding business items. Am. Compl. ¶ 266. As Ms. Grant proceeded to the door to leave, McMahon grabbed her arm and commanded her to do "one last thing" and get "on your knees." Grant Decl. ¶ 132. McMahon grabbed the back of Ms. Grant's head and slammed her face into his crotch multiple times until she gagged and pushed him away, telling him to stop and that she could not breathe. *Id.* McMahon said she would not get away that easily and held her head as he forced himself back in her mouth. *Id.* Ms. Grant tried to push him away, but he held her head firmly in place and loudly commanded her to "Look up!" followed by "Take it, bitch." *Id.* His force caused Ms. Grant's body to convulse and retch with tears down her face. *Id.*

On March 2, 2022, McMahon called Ms. Grant to advise her that they would not be in

12

contact for a while and to contact WWE Executives Nick Khan or Brad Blum if she needed anything. Am. Compl. ¶ 268; Grant Decl. ¶ 136. During the approximately half-hour call, McMahon lamented his inability to focus on the upcoming WrestleMania, how his personal life had blown up over the past few weeks, and that he and Ms. Grant would resume contact after WrestleMania. Am. Compl. ¶ 268. He also instructed Ms. Grant to continue having sexual relations with other men, including Brock Lesnar, in the meantime. *Id.* In line with McMahon's orders, Ms. Grant continued to sexually engage with WWE talent Brock Lesnar. Grant Decl. ¶ 137.

### E. In Response to a Whistleblower Complaint, WWE Leadership Conducts a Sham "Investigation" Without Interviewing Ms. Grant.

The WWE Board had notice of Mr. McMahon's abusive conduct toward Ms. Grant as early as March 2022 but ignored it until the Wall Street Journal published an article about Ms. Grant months later. Am. Compl. ¶¶ 271, 273–74. After the article, WWE announced that a Special Committee of its Board of Directors was investigating McMahon's misconduct. *Id.* ¶ 275.  In an effort to continue Defendants' criminal cover-up, this sham investigation excluded Ms. Grant— despite her vocal willingness to cooperate. *Id.* ¶ 276. Then, in November 2022, WWE touted the conclusion of the Special Committee investigation despite its failure to interview or request any documents from Ms. Grant. *Id.*

### F. WWE and McMahon Repudiated the NDA They Now Seek to Enforce by Stopping Payment to Ms. Grant Without Excuse or Explanation.

Even if Ms. Grant had the requisite capacity to consent to the arbitration agreement, Defendants repeatedly repudiated the Agreement they now seek to enforce, all while baselessly accusing Ms. Grant of breach. McMahon falsely claims that she repudiated first by "wrongfully disclosing both the existence of the Settlement Agreement and their relationship" (ECF No. 122-1, at 2), leading to the cease in payments. However, Defendants have not provided a shred of evidence to support this falsity. Ironically, both Defendants undeniably repudiated by: (1) failing

13

to investigate a possible breach after notice to the Board in March 2022; (2) ceasing payments under the NDA without informal dispute resolution; and (3) renouncing the NDA to save WWE from SEC enforcement action, holding itself out as the unwitting victim of McMahon's actions to blame McMahon for WWE's material misstatements in public filings and to receive $1.3 million in restitution from McMahon for contracts he signed on WWE's behalf. WWE claimed in these actions to have known nothing about the agreements, despite multiple high-ranking executives being privy to McMahon's sexual relations and NDAs with employees. Now, Defendants claim that they nevertheless deserve to retain the preclusive benefits of the contract they previously disavowed.

### G.  Ms. Grant Filed This Lawsuit As a Last Resort.

After two years of silently suffering from the debilitating injuries left by Defendants' physical and emotional abuse, sexual assault and trafficking, Ms. Grant filed her Complaint on January 25, 2024 to address not only her own pain, but also to act for those who are afraid to speak out about their abuse. *See* ECF No. 1. Then on June 11, 2024, following a request from the federal government to stay the proceedings, the Court stayed this case until December 11, 2024, with leave for the government to seek an extension. *See* ECF No. 68. During that stay, multiple government investigations into Defendants' conduct proceeded and, in January 2025, Defendants reached a stipulated settlement with the SEC. Am. Compl. ¶¶ 318–19. The SEC charged McMahon for violating federal securities laws by failing to disclose two settlement agreements totaling $10.5 million, one of which is the NDA in dispute here.[3]  *Id.* ¶ 317. "McMahon consented to the entry of the SEC's order finding that he violated the Securities Exchange Act by knowingly circumventing

---

[3] Order Instituting Cease and Desist Proceedings Pursuant to Section 21c of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease and-Desist Order, Exchange Act Release No. 102143, SEC Docket 3-22391 (Jan. 10, 2025), https://www.sec.gov/files/litigation/admin/2025/34-102143.pdf (the "**SEC Orde**r").

WWE's internal accounting controls and that he directly or indirectly made or caused to be made false or misleading statements to WWE's auditor."[4] *Id.* To avoid prosecution for securities law violations and blame WWE's material misstatements in public filings squarely on McMahon, WWE held itself out to the government as the unwitting victim of McMahon's actions. *Id.* WWE received $1.3 million in restitution from McMahon for two contracts he signed on its behalf—including Ms. Grant's—that it claimed ignorance towards, effectively allowing WWE to avoid SEC charges even though "WWE benefitted from the Settlement Agreements, receiving releases and avoiding reputational harm caused by allegations of misconduct by its CEO being made public." *Id.* ¶ 318.

### H. Two Separate Tribunals Found That McMahon's Hush Money NDAs, Including This One, Were Created in Furtherance of a Crime.

According to a January 2025 Consent Order that Defendants negotiated with the SEC, **the government concluded that the NDA was drafted and signed in furtherance of crimes**, including several violations of federal securities law. The SEC charged McMahon for failing to disclose two settlement agreements totaling $10.5 million, one of which is the NDA in dispute here.[5] "McMahon consented to the entry of the SEC's order finding that he violated the Securities Exchange Act by knowingly circumventing WWE's internal accounting controls and that he directly or indirectly made or caused to be made false or misleading statements to WWE's auditor."[6]

On February 7, 2025, a Second Circuit Order revealed that the government conducted discovery into the formation of the NDA and the circumstances under which Defendants WWE

---

[4] Press Release, U.S. Securities and Exchange Commission, Vince McMahon, Former CEO of WWE, Charged for Failure to Disclose to WWE Two Settlement Agreements He Executed on Behalf of WWE (Jan. 10, 2025), https://www.sec.gov/newsroom/press-releases/2025-1 (the "**SEC Press Release**").
[5] SEC Order at 3–4.
[6] SEC Press Release at 1.

and McMahon demanded Ms. Grant sign it. *See In re: Grand Jury Subpoenas Dated September 13 (2025)*, Case Nos. 24-1588-cv (L), 24-1589-cv (Con) (2d Cir. 2025) (the "**CA2 Crime Fraud Order**"). The Department of Justice presented sufficient evidence to the Southern District of New York and Second Circuit to find that communications related to the NDA between Defendants and their former outside counsel—Jerry McDevitt—were subject to the ***crime-fraud exception*** to attorney-client privilege. *Id.* at 7. These findings, in addition to Ms. Grant's allegations, provide more than mere legal conclusions or naked assertions that McMahon leveraged his systematic control to strip Ms. Grant of her capacity and coerce her into a sham "contract" intended to protect his position of power and WWE's business interests.

WWE is also facing civil claims arising from McMahon's misuse of company funds to negotiate and pay out hush money under NDAs, like this one, and WWE's failure to properly disclose the agreements to shareholders. *See In re World Wrestling Entertainment, Inc. Merger Litigation*, Case No. 2023-1166-JTL (Del. Ch. 2023).

## I. Defendants Move To Compel Arbitration Under the Void NDA to Keep Ms. Grant From Telling Her Story in Open Court.

Despite WWE claiming to know nothing about the NDA and McMahon repeatedly repudiating it by, in part, ceasing payments without informal dispute resolution, on June 13, 2025, Defendants moved to compel arbitration before this Court claiming they nevertheless deserve to retain the preclusive benefits of the illegal contract. *See* ECF Nos. 122, 124, respectively.

## ARGUMENT

Ms. Grant's claims should be resolved by this Court. In reviewing a motion to compel arbitration, a Court must determine: (1) whether the parties agreed to arbitrate; (2) the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be non-arbitrable; and (4) whether non-arbitrable claims should be stayed pending arbitration if

16

there are arbitrable claims. *Vaccaro v. Ins. Co. of N. Am.*, No. 3:96CV1161 AHN, 1996 WL 762234, at *2 (D. Conn. Dec. 23, 1996) (denying defendant's motion to compel because a sufficient factual dispute over the formation of the agreement warrants a jury trial). Motions to compel arbitration are akin to motions for summary judgment. *de Moura Castro by Hilario v. Loanpal, LLC*, 715 F. Supp. 3d 373, 380 (D. Conn. 2024). To overcome a motion to compel arbitration, the nonmoving party must raise a genuine issue of material fact concerning the agreement to arbitrate. *Id*. at 395. "Where the making of an arbitration agreement is in dispute, section 4 of the Federal Arbitration Act ['**FAA**']) provides that 'the court shall proceed summarily to the trial' of that issue." *Vaccaro*, 1996 WL 762234, at *2 (quoting 9 U.S.C. § 4). Although Connecticut's public policy favors arbitration, "a few chinks in the armor have appeared" that advocate against arbitration in a context such as this. *Bushey v. Home Direct Logistics, LLC*, No. UWY-CV-21-6061586 S, 2022 WL 2298419, at *4 n.4 (Conn. Super. Ct. June 24, 2022) (citing *Epic Systems Corp. v. Lewis*, 584 U.S. 497, 506, 138 S.Ct. 1612, 1621–22 (2018) (the Speak Out Act, bills banning arbitration in employment disputes, and Connecticut's legislative history emphasize the effectiveness of commercial arbitration)).

Defendant's Motions should be denied because (1) the NDA was signed in furtherance of McMahon's crimes and is thus void per public policy; (2) the NDA and arbitration clause are void and unenforceable under the Speak Out Act and EFAA; and (3) Ms. Grant was coerced during the negotiation period and lacked capacity to consent to the NDA. Further, the Complaint pleads abusive acts by Defendants that post-date the NDA and thus are not subject to it, even if the NDA was effective. Defendants cannot rely on a void NDA to bury these claims in arbitration and avoid engaging in the merits of this case.

I.    **THE NDA IS VOID PER PUBLIC POLICY BECAUSE IT WAS DRAFTED AND SIGNED IN FURTHERANCE OF MULTIPLE CRIMES.**

17

The NDA was McMahon's modus operandi, just one of the many NDAs he has orchestrated to protect himself using WWE resources. *See* Am. Compl. ¶ 304(b). McMahon pressured Ms. Grant to leave her job and sign the NDA under duress to perpetuate his criminal scheme to deceive the WWE Board and mislead investors about his illegal workplace conduct. Because the NDA and its arbitration clause attempt to conceal illegal conduct, it is an illegal and therefore void contract. *See Comley ex rel. Fitzroy v. Bd. Of Trs. of Firemen's Relief Fund of City of Bridgeport*, 191 A. 729, 733 (Conn. 1937) ("There can be no ratification or estoppel as to an agreement which is void for illegality."); *United States v. Grossmayer*, 76 U.S. 72, 75 (1869) ("a transaction originally unlawful cannot be made any better by being ratified"); Restatement of Contracts § 475, cmt. b (1932).

### A. The NDA Was Part of a Cover-Up of McMahon's Misuse of WWE Resources From Police, Shareholders, and Government Regulators.

McMahon pressured Ms. Grant to sign the NDA not to save his marriage, as he falsely claimed, but to line his own pocket. McMahon was desperate to paper over his misuse of company assets prior to sharing WWE's books for diligence on the business combination with Endeavor, a deal which netted him and his family billions. The NDA further attempted to gag Ms. Grant from ever speaking of her experience to anyone—including a ban on cooperating with future investigations of his misconduct by WWE or law enforcement.

The NDA's role in McMahon's criminal activities is not merely Ms. Grant's speculation—it is a matter of public record. Two federal courts, the Southern District of New York and the Second Circuit Court of Appeals, found sufficient evidence of criminal intent by McMahon and WWE's counsel in the negotiation and signing of this NDA to pierce the attorney-client privilege. On appeal, the Second Circuit affirmed that "**[e]very edit to the draft agreement and every discussion about the negotiations and how to structure the deals played a role in keeping**

18

**[Ms. Grant] quiet and the Company . . . in the dark**.”  CA 2 Crime Fraud Order at 42–43 (emphasis added). Because the NDA was “structured and negotiated . . . to keep [it] hidden from [WWE],” the Second Circuit affirmed that **“all communications about the claims and settlement agreement[] were made in furtherance of the criminal scheme to keep [WWE] and its auditors unaware**” of the situation. *Id.* at 20 (emphasis added). McMahon “cautioned one board member that digging into allegations about Victim 1 and other women risked opening ‘Pandora’s box’ and causing ‘damage . . . to them . . . and to the company for sure.’” *Id.* at 16. On February 7, 2025, McMahon and WWE’s joint attorney, Jerry McDevitt, were accordingly ordered to turn over related communications and records to government investigators.

Further, in a January 2025 consent agreement with the SEC, WWE and McMahon admitted that several NDAs, including the one at issue here, were entered into as part of a scheme by McMahon to mislead investors and hide his use of WWE company funds to perpetrate and cover up his abuse of women like Ms. Grant for decades.[7] WWE pinned the issue on McMahon and insisted he entered WWE into multiple NDAs without proper notice or consent, which is why WWE failed to adequately disclose this issue to shareholders. *Id.* The SEC charged McMahon for violating federal securities laws by failing to disclose two settlement agreements totaling $10.5 million, one of which is the NDA in dispute here. The SEC ordered McMahon to pay $400,000 to the commission and reimburse WWE for just over $1.3 million as a result.

WWE accepted a seven-figure victim restitution payment from McMahon for entering WWE into the NDA. Allowing WWE to simultaneously wield the NDA as shield against the government and a sword to silence Ms. Grant in this suit would be manifestly unjust. After denouncing McMahon and disclaiming any knowledge of the NDAs to avoid criminal sanctions

---

[7] SEC Order at 2.

19

for securities fraud, WWE cannot now claim that it is entitled to enforce that same illicit agreement.

### B.  The NDA Was Part of McMahon's Abuse of Ms. Grant.

Furthermore, the NDA is illegal on its face because it prohibits Ms. Grant from cooperating with law enforcement investigations into Defendants' crimes, including the sexual assaults she suffered at McMahon's hands and through his direction by other WWE agents. *See* NDA § II(C) (prohibiting Ms. Grant from causing to be filed "**any legal action… or charges of any nature whatsoever relating to McMahon or WWE concerning the matters within the scope of this Agreement.**") (emphasis added). On that basis alone, the NDA and its arbitration clause are void. Because the NDA and its arbitration clause were entered into in furtherance of crimes, they are illegal contracts that cannot be ratified for public policy reasons.

II.      **THE NDA AND ITS ARBITRATION CLAUSE ARE VOID UNDER FEDERAL LAWS ENACTED TO PROTECT VICTIMS OF WORKPLACE ABUSE.**

Defendants argue that Congress intended Ms. Grant's claims to be arbitrable. ECF No. 122-1, at 20–24; ECF No. 124-1, at 18–21. They focus on the FAA, without sufficiently accounting for the federal reforms passed in the wake of the #MeToo Movement to protect victims like Ms. Grant from being coerced into signing restrictive covenants by their employers. These laws, the Speak Out Act, 42 U.S.C. §§ 19401–19404 (2022), and the Ending Forced Arbitration Act, 9 U.S.C. § 401 *et seq.* (2022), each render the NDA and its arbitration clause void.

### A.  The Speak Out Act Nullified the NDA and Its Arbitration Clause.

#### 1.  *The Pre-Dispute Agreement Is Void Under The Speak Out Act.*

The Speak Out Act bars this Court from enforcing any pre-dispute nondisclosure or nondisparagement clauses and provides that with respect to a sexual assault or harassment, any nondisclosure or nondisparagement clause agreed to ***before the dispute arises*** shall not be judicially enforceable in instances in which conduct is alleged to have violated Federal, Tribal, or

State law. 42 U.S.C. § 19403(a). The Act applies to any "claim that is filed under Federal, State, or Tribal law on or after December 7, 2022." *Id.* § 19404. Courts in the Second Circuit have held that "the plain meaning of 'dispute' is a disagreement among two or more parties" and in the context of the Speak Out Act, "the more logical interpretation is that a sexual harassment dispute. . . does not arise when a former employee was harassed, ***but when she raised those allegations with [Defendant]*.**" *Steward Partners Global Advisory, LLC v. Tucker*, 2024 WL 4202697, at *5 n.1 (S.D.N.Y. Sept. 16, 2024) (cleaned up and emphasis added).

There can be no dispute that Ms. Grant pleads she is a victim of multiple sexual assaults at the hands of her employer. *See* Am. Compl. Sections I (B)-(D), (F)-(K). However, she did not raise allegations or claims with Defendants until she initiated this lawsuit in 2024, ***after*** the NDA. Rather, it was McMahon who demanded that she sign the NDA to avoid a purported issue before the audit committee and protect himself personally. *Id.* ¶¶ 239, 250.

The NDA was an invention of McMahon's, done to protect himself—not a result of any demand or dispute from Ms. Grant. Ms. Grant expressed no desire to file a complaint or take legal action before she signed the NDA. *Id.* ¶¶ 25, 239. Ms. Grant showed clear signs of trauma-coerced attachment and submission to McMahon before and after the NDA, such as offering to resign without payment by signing a napkin or Post-it note, asking her attorney to change course after manipulative conversations with McMahon, and prioritizing McMahon's safety over her own. *Id.* ¶¶ 252, 259; Expert Decl. ¶ 48. It was only well after the NDA was signed—and after McMahon and WWE repudiated the Agreement by, in part, unilaterally ceasing payments without ever articulating how or when Ms. Grant allegedly breached or following the dispute resolution procedures in the Agreement—that Ms. Grant initiated this lawsuit. The dispute first arose well after the NDA was signed.

21

### 2. *The Arbitration Clause Is Independently Void Under the Speak Out Act Because It Contains a Prohibited Nondisclosure Covenant.*

The NDA and arbitration clause each contain a nondisclosure provision, neither of which re judicially enforceable under the Speak Out Act.[8] *First*, Section I(A) requires Ms. Grant to "not disclose or discuss or reveal any claims against, or information about, McMahon, her relationship with McMahon, WWE, or any employees or independent contractors of WWE, to third parties, on social media, in any public forum, or to any member of the media." NDA § I(A). *Second*, the arbitration clause operates both as the mechanism by which Section I(A) is enforced and contains a separate nondisclosure clause, requiring Ms. Grant to bring any disputes in arbitration "by sealed proceedings, which preserve the confidential and private nature of this Agreement." *Id.* § X.

Requiring sealed proceedings is merely another unenforceable mechanism to subject Ms. Grant to nondisclosure. Legal scholars and courts have acknowledged the cumulative advantage of confidential arbitration that accrues to corporate actors, like Defendants, which was part of the unconscionability analysis that convinced lawmakers to enact the EFAA. As one scholar aptly summarized:

> Many arbitration agreements provide that the arbitration proceedings and the award must be kept confidential. The majority of courts have held these provisions unconscionable. . . . Despite their facial neutrality, these provisions favor the drafter of arbitration agreements. The drafter is likely a repeat participant in arbitrations, and so has advantages in arbitrator selection and case presentation. One-time participants in arbitration have no hope of countering these advantages if information about past arbitrations is kept secret. The one-sided advantages of confidentiality clauses thus create substantive unconscionability. . . . Additionally, confidentiality in both arbitration and settlement presents problems for potential claimants. Institutions which enter confidential settlements, like institutions which resolve disputes through confidential arbitration, are able to minimize information available to potential claimants. Both potential litigants and potential participants in arbitration will consequently be impeded in their

---

[8] The Speak Out Act defines a "nondisclosure clause" as a provision in a contract or agreement that requires the parties to not disclose or discuss conduct, the existence of a settlement involving conduct, or information covered by the terms and conditions of the contract or agreement. 42 U.S.C. § 19402(1).

22

efforts to build a case, particularly if they attempt to prove intentional misconduct or a pattern and practice of misconduct.

Susan Randall, *Judicial Attitudes Toward Arbitration and the Resurgence of Unconscionability*, 52 Buff. L. Rev. 185, 218–20 (2004).

Defendants argue that if the nondisclosure and nondisparagement clauses are void under the Speak Out Act, the arbitration clause is still severable and enforceable under the severability provision of the NDA. ECF No. 122-1, at 21; ECF No. 124-1, at 16. However, the confidentiality requirement was integral to the arbitration clause. "Where an agreement consists of a legal and an illegal component, a court may sever the illegal component and enforce the legal one, so long as the illegal aspects of the agreement are ***merely incidental to the legal aspects and are not the main objectives of the agreement.***" *Aventine Props., LLC v. Branchinelli*, 62 Misc. 3d 149(A), (N.Y. App. Term. 2019) (emphasis added); *see also* 8 Williston on Contracts § 19:70 (4th ed. 1993 & Supp. 2010); Restatement (Second) of Contracts § 184 (1981). "Courts will be particularly ready to sever the illegal components and enforce the other components of a contract where the injured party is less culpable and the other party would otherwise be unjustly enriched by using his own misconduct as a shield against otherwise legitimate claims." *Artache v. Goldin*, 133 A.D.2d 596, 599 (N.Y. App. Div. 1987). It is Defendants, not Ms. Grant, who are the drafters of the illegal clause. They are the culpable parties who would be unjustly enriched if the Court blue-pencils the arbitration clause in their favor as Defendants request.

Severability is also not workable here because the unenforceable nondisclosure provision goes to the essence of the NDA. "The determinative test is in ascertaining from the language used, read in the light of the surrounding circumstances, what was the intention of the parties." *Venture Partners, Ltd. v. Synapse Techs., Inc.*, 679 A.2d 372, 377 (Conn. App. Ct. 1996). Severing the nondisclosure provision from the NDA and arbitration clause would render the entire Agreement

23

meaningless. *See, e.g.*, *Nielsen v. Van Leuven*, No. 3:15-CV-1154 (MPS), 2017 WL 3925412, at *2 (D. Conn. Sept. 7, 2017) (refusing to sever the challenged oral sex provision because it was central to the obligation under the contract and there was no evidence that the provision was independent and thus could be severed without destroying the entire bargain); *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 128 (2d Cir. 2019) (refusing to sever any provision of the arbitration agreement because severing the pervasive, unconscionable effects of the arbitration agreement interwoven within the agreement would leave nothing meaningful to enforce). "[A]n essential term is one without which a party would not have entered into an agreement." *Squillante v. Cap. Region Dev. Auth.*, 266 A.3d 940, 950 (Conn. App. Ct. 2021). The purpose of the NDA is clear: to silence Ms. Grant. In fact, the NDA states:

> Grant represents and acknowledges that ***any disclosure by Grant of the matters required to be kept confidential*** under this Agreement will do irreparable harm to McMahon and to WWE and ***would defeat their purpose in entering into this Agreement***.

NDA § (I)(C) (emphasis added). Thus, by the terms of the NDA, if both nondisclosure provisions are unenforceable, the entire purpose of the NDA is meaningless. Here, the arbitration and its nondisclosure clause go to the essence of the Agreement because the purpose of the entire NDA was to conceal Ms. Grant's abuse from the public and prohibit her from taking legal actions against McMahon and WWE. Severing the nondisclosure provisions renders the entire NDA meaningless.

Further, the language of the arbitration clause indicates Defendants did not intend for the arbitration and nondisclosure provision to be severable, and the provisions and consideration exchanged were single and common. *Demattia v. Mauro*, 860 A.2d 262, 269 (Conn. App. Ct. 2004) (severing a provision where the parties made a separate and severable contract regarding the consideration). Determining severability requires an assessment of whether the provisions and its considerations are common or independent. *Timely Products, Inc. v. Costanzo*, 465 F. Supp. 91, 97

24

n. 6 (D. Conn. 1979). In addition to the Agreement's expressly stated purpose to silence Ms. Grant, the nondisclosure clause within the arbitration clause shows Defendants' intent not to consider the two provisions independent. Nor was there any separate consideration for Ms. Grant's nondisclosure and agreement to arbitrate.

This NDA and its arbitration clause are void under the Speak Out Act's prohibition of pre-dispute nondisclosure agreements. Further, secrecy was the entire point of the bargain for Defendants. They would not have entered this NDA or arbitration clause without the illegal nondisclosure covenants; thus, Defendants are not entitled to partial enforcement.

### B.   The Arbitration Clause Is Unenforceable Under the EFAA.

The Ending Forced Arbitration Act bars courts from ordering victims to arbitration for any claims that accrue after March 3, 2022, when the law went into effect. It protects Ms. Grant's claims because she pleads that coercion, trafficking, and sexual abuse, perpetrated by her employer continued after the EFAA's enactment on March 3, 2022. The ***final*** act in a series of misconduct accrues an EFAA claim. Thus, the EFAA bars Defendants from removing this dispute to arbitration.

"A court, rather than an arbitrator, determines whether the EFAA applies, 'irrespective of whether the party resisting arbitration challenges the arbitration agreement' and 'irrespective of whether the agreement purports to delegate such determinations to an arbitrator.'" *Baldwin v. TMPL Lexington LLC*, No. 23 CIV. 9899 (PAE), 2024 WL 3862150, at *5 (S.D.N.Y. Aug. 19, 2024) (quoting 9 U.S.C. § 402(b)); *see also Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 550 (S.D.N.Y. 2023). While such claims must be plausibly pled, this standard has been lowered—"a plaintiff need only plead *nonfrivolous* claims relating to ... sexual harassment to defeat a motion to compel arbitration under the EFAA." *Smith v. Meta Platforms, Inc.*, No. 24 CIV. 4633 (JPC), 2025 WL 2782484, at *5 (S.D.N.Y. Sept. 30, 2025) (quoting *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 533 (S.D.N.Y. 2024)) (cleaned up).

Defendants incorrectly argue that the EFAA is inapplicable because Ms. Grant's claims relate to events that occurred before the Act's enactment and that the Agreement predates the dispute. ECF No. 122-1, at 22–24; ECF No. 124-1, at 20–21. WWE conflates the meaning of the words "arise" and "accrue" and cites decisions dismissing cases under the EFAA, where the conduct forming the basis of the claim occurred (i.e., *accrued*) before the Act. But while the EFAA uses the language "arises or accrues," the Speak Out Act applies to "a claim that is filed" after its enactment. *Compare* EFAA, Pub. L. No. 117-90, 136 Stat. 26, § 3 (2022) ("This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act.") *with* Speak Out Act, 42 U.S.C. § 19404 ("This chapter shall apply with respect to a claim that is filed under Federal, State, or Tribal law on or after December 7, 2022."). Several federal jurisdictions also recognize that a dispute does not arise under the EFAA until a party asserts a form of a complaint, right, claim, or demand—which Ms. Grant did not do until filing this lawsuit—that leads to a disagreement or conflict between the parties.[9]

The Second Circuit and Connecticut Supreme Court have held that the ***final*** act in a series of misconduct accrues an EFAA claim and employed the continuing harm doctrine to reinforce the Congressional intent that misconduct pre-dating the EFAA can support a violation if the misconduct post-dates the statute's enactment. *See Olivieri v. Stifel, Nicolaus & Co.*, 112 F.4th 74 (2d Cir. 2024) (holding that claims did not accrue until the last violating act); *see also Watts v. Chittenden*, 22 A.3d 1214, 1223 (Conn. 2011) (finding that the continuing harm doctrine permits filing a claim "at any time until the expiration of the limitations period following the last act" of

---

[9] *See, e.g., Famuyide v. Chipotle Mexican Grill, Inc.*, Civ. No. 23-1127 (DWF/ECW), 2023 WL 5651915 (D. Minn. Aug. 31, 2023); *Silverman v. DiscGenics, Inc.*, No. 2:22-cv-00354, 2023 WL 2480054, at *2 (D. Utah Mar. 13, 2023); *Hodgin v. Intensive Care Consortium, Inc.*, No. 22-81733-CV-MIDDLEBROOKS, 2023 WL 2751443, at *2 (S.D. Fla. Mar. 31, 2023).

misconduct). In the context of a sexual harassment and abuse claim, "because such a claim is a single and indivisible claim arising from numerous specific acts undertaken in a continuing course, the claim reaccrues—it is essentially reborn—with each successive act that is part of that continuing course." *See id.* at 85. Applying the EFAA in this manner is not an impermissible retroactive application of the EFAA. *Id.* at 91–92 (holding that it would be unfair to prohibit relief under the EFAA where plaintiff continued to be subject to hostile work environment after the act was signed into law, even though the conduct originally began before the EFAA's enactment). This is particularly true because retroactivity is not present when the dispute, predicated on a series of acts, includes conduct occurring post-EFAA.

There is extensive precedent applying the continuing course of conduct doctrine and equitable tolling to sexual misconduct. *See Watts*, 22 A.3d at 1223 (collecting cases); *Olivieri*, 112 F.4th at 87–88; *Montanus v. Columbia Mgmt. Inv. Advisers, LLC*, No. 25 CIV. 2798 (PAE), 2025 WL 2503326, at *5 (S.D.N.Y. Sept. 2, 2025). This tolling serves two public policy considerations. "[I]t would be inequitable for the limitations period to begin to run when a plaintiff is incapable of bringing an action because he or she is under the control of the defendant and is thus unable to bring an action." *Watts*, 22 A.3d at 1224. Further, requiring plaintiffs to file a separate lawsuit for each instance of abuse would be unreasonable for the parties and "impose an unreasonable burden on the courts to entertain an indefinite number of suits and apportion damages among them." *Id.* at 1222. Requiring Ms. Grant to split her claims would run afoul of the EFAA's stated purpose. *Baldwin*, 2024 WL 3862150, at *8. Thus, Ms. Grant could file an action after the first act and at "any time until the expiration of the limitations period following the last act." *Watts*, 22 A.3d at 1223. This tolling is also recognized in TVPA and other sexual abuse cases. *See, e.g., Doe 3 v. Indyke*, 801 F. Supp. 3d 200, 208 (S.D.N.Y. 2025).

Ms. Grant's claims are predicated on McMahon's systemic abuse and trafficking, which occurred over many years and continued after she signed the NDA and after the EFAA went into effect. Am. Compl. ¶¶ 266–70. As such, her claims accrued and re-accrued each time Defendants subjected her to sexual abuse and trafficking. McMahon sexually abused and trafficked Ms. Grant to prospective WWE talent *after* the EFAA's enactment in a manner consistent with his pre-EFAA patterns and abuse. Because Ms. Grant's final alleged instance of sexual abuse and trafficking post-dates the EFAA, this Court should apply the EFAA's prohibition on forced arbitration consistent with Congressional intent. *Id.* ¶ 270.

Congress passed the Speak Out Act and EFAA specifically to empower victims like Ms. Grant to have access to the courts, and bar employers like Defendants from burying their victims into secret arbitration. Exposing abusers and their enablers to public accountability is necessary to provide meaningful justice to victims and is equally important to warn others and prevent Defendants from perpetrating the cycle of abuse with new victims. The Court should apply these laws as intended to allow Ms. Grant to have her day in court.

## III.  CLAIMS ARISING FROM POST-NDA ABUSE ARE NOT SUBJECT TO COMPULSORY ARBITRATION.

Even if this Court finds the arbitration clause enforceable (which it is not), Ms. Grant's claims concerning conduct after the NDA's execution are nevertheless exempt from arbitration and the NDA's release provision. Defendants admit that the NDA only covers conduct "up to and including the date of her execution of this Agreement." NDA § II(A); ECF No. 122-1, at 23; ECF No. 124-1, at 4. However, McMahon's sexual abuse and trafficking continued after the NDA was executed. Because claims IV, V, VI, VIII, and IX include post-NDA conduct, they must remain in court as they are not covered by the arbitration clause.

Ms. Grant pleads that McMahon committed acts of violence after the NDA was signed on

January 28, 2022, and while Ms. Grant was still formally employed by WWE. After Ms. Grant signed the NDA, McMahon lured Ms. Grant to his residence under the guise of a business-related discussion and forced her to perform oral sex on him, forcing Ms. Grant's body to convulse and retch with tears streaming down her face. Am. Compl. ¶¶ 266–67. McMahon continued to exert control over Ms. Grant in other ways immediately after the NDA was signed and for months thereafter. McMahon requested explicit content from Ms. Grant, sent her sexually violent texts, and continued to traffic Ms. Grant to WWE talent after the NDA by instructing her to continue engaging with WWE talent, which she heeded. *Id.* ¶ 268. Brock Lesnar continued to contact Ms. Grant after the NDA was signed, which Ms. Grant understood was an indication of McMahon's continued control, in accordance with his previous pattern of trafficking. Am. Compl. ¶ 269–70. In line with McMahon's prior orders, Ms. Grant texted Brock Lesnar explicit content post-NDA, coordinated sexual encounters, and communicated with other WWE talent. *Id.*

As such, even if this Court found that pre-NDA claims must be arbitrated, the acts that occurred after the NDA was signed are not within the scope of the NDA. Accordingly, Claims IV, V, VI, VIII, and IX, at minimum, must remain with this Court.

## IV.     MS. GRANT LACKED CAPACITY TO CONSENT TO THE NDA AND THE ARBITRATION CLAUSE.

McMahon's coercive control over Ms. Grant eliminated her capacity to consent to an arbitration agreement between herself and Defendants. *See Zebedeo v. Martin E. Segal Co.*, 582 F. Supp. 1394, 1417 (D. Conn. 1984) ("[I]f one party's wrongful conduct strips the other party of his or her free will for the purposes of obtaining a contract, and succeeds in so doing, such a contract is *void ab initio*."). Thus, she cannot be forced to arbitrate claims when no valid agreement to arbitrate formed.

29

### A. The Arbitration Agreement Is Void Because McMahon Caused Ms. Grant's Incapacity.

The arbitration agreement is *void ab initio* because Ms. Grant lacked the capacity requisite for mutual assent and contract formation due to the immense duress inflicted by McMahon's systematic and persistent abuse. "[D]espite the FAA's strong policy in favor of rigorously enforcing arbitration agreements, arbitration is a matter of consent, not coercion… and [a]ccordingly, federal law does not require parties to arbitrate when they have not agreed to do so." *Helenese v. Oracle Corp.*, No. 309-CV-351CFD, 2010 WL 670172, at \*2 (D. Conn. Feb. 19, 2010) (internal citations omitted). "If there is an issue of fact as to the making of the agreement for arbitration, then a trial [on that issue] is necessary." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 320 (D. Conn. 2011) (internal citations omitted).

Defendants' argument that this matter should be referred to arbitration because Ms. Grant did not specifically challenge the arbitration clause lacks merit because the Agreement is *void ab initio*, not merely voidable, due to her lack of capacity. "[A]n agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all." *Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60, 67 (D. Conn. 2020) (quoting *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (cleaned up)). "If a party alleges that a contract is void and provides some evidence in support, then the party need not specifically allege that the arbitration clause in that contract is void, and the party is entitled to a trial on the arbitrability issue pursuant to 9 U.S.C.A. § 4 and the rule of *Interocean* . . . . Accordingly, to defeat the arbitration clauses in the contracts at issue, [the nonmoving party] must allege that the contracts as a whole are void or that the arbitration clauses in the contracts are voidable." *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001); *see also In re Mason*, 300 B.R. 160, 165 (Bankr. D. Conn. 2003) (contracts obtained via duress are *void ab initio*); *Int'l Bhd. of Teamsters, Chauffeurs,*

30

*Warehousemen & Helpers of Am., Loc. 145 v. Purity Food Co.*, 17 Conn. Supp. Ct. 12, 12–13 (Conn. Super. Ct. 1950) ("An arbitration agreement obtained by duress is unenforceable . . . . It is undoubtedly true that a contract obtained by duress is unenforceable"); *Jenks v. Jenks*, 642 A.2d 31, 34 (Conn. App. Ct. 1994) ("Contracts obtained by duress or undue influence are deemed invalid because in both circumstances the free assent of one of the parties in making the contract is lacking."); *see de Moura Castro by Hilario,* 715 F. Supp. 3d at 396, 401 (denying arbitration where plaintiff raised genuine issues of material fact concerning the formation of the entire agreement and, thus, the embedded arbitration provision).

Duress is subjective. "The fundamental question is whether the threat *actually* induced assent, not whether succumbing to the threat was objectively reasonable." *In re Mason*, 300 B.R. at 166. Inflicting trauma[10] on another individual can result in that individual experiencing duress, which negates that individual's capacity to consent to an agreement. *See Chase Manhattan Mortg. Corp. v. Machad*o, 850 A.2d 260, 264–65 (Conn. App. Ct. 2004) ("The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it impossible for [the party] to exercise his own free will.") (internal citations omitted). Duress requires "[1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim." *Traystman, Coric and Keramidas v. Daigle*, 855 A.2d 996, 998, 1000 (Conn. App. Ct. 2004) (finding duress where the individual did not feel there was any reasonable alternative other than to acquiesce and sign the note). McMahon's wrongful acts and threats left Ms. Grant with no

---

[10] Trauma is the "[e]xposure to actual or threatened death, serious injury, or violence," and includes, but is not limited to, physical abuse, sexual abuse, psychological abuse, domestic violence, and sexual exploitation. *See Trauma-Informed Legal Advocacy: A Resource for Juvenile Defense Attorneys*, National Child Trauma Stress Network, at 3, available at https://www.americanbar.org/content/dam/aba/administrative/child_law/trauma-informed-legal-advocacy-juv-defense.pdf.

31

other alternative but to sign the Agreement, which, if enforced, sets a dangerous precedent for sexual assault victims silenced by NDAs.

The agreement to arbitrate was procured without Ms. Grant's voluntary consent; accordingly, it is void from the outset. McMahon chipped away at Ms. Grant's mental capacity and autonomy through a pattern of coercive control over Ms. Grant in the years before, during, and after the NDA process. He manufactured a romantic connection between himself and Ms. Grant through a false sense of affection, causing a vulnerable Ms. Grant to develop a trauma-coerced attachment. Expert Decl. ¶¶ 24, 35. Meanwhile, he isolated, exploited, threatened, and intimidated her, controlled her resources, inflicted physical and sexual abuse, and provided intermittent affection. *Id.* ¶¶ 36–37, 43. McMahon's violent history and Ms. Grant's isolation resulted in her fearing McMahon and developing loyalty towards him as a survival mechanism. *Id.* ¶¶ 37, 41.

Ms. Grant's duress peaked during the NDA "negotiation" period. Initially, Ms. Grant represented herself, leaving her vulnerable to McMahon's coercive tactics. Ms. Grant retained counsel upon McMahon's demand and approval; this referral came from Dr. Colker, McMahon's loyal doctor. McMahon then instructed Ms. Grant to withhold information from and not trust her attorney, which she heeded. McMahon placed extreme, direct pressure on Ms. Grant to quickly sign the NDA without edits. He called Ms. Grant several times and left numerous voice memos stressing the urgency of her signing the NDA and berating her for "delaying" by requesting edits. In many of these voice memos, McMahon threatened that her refusal to sign the NDA would subject him and WWE to legal risks and reputational harm, and that public headlines would destroy her own reputation. *See, e.g.*, Am. Compl. ¶ 253.

These threats, pressure, lies, and history of violence put Ms. Grant in a heightened state of panic, so much so that she did not possess the free will to autonomously enter into the arbitration

32

agreement. Expert Decl. ¶¶ 27, 38–39; *see also Jenks v. Jenks*, 657 A.2d 1107, 1107 (Conn. 1995) (finding that the emotional abuse led defendant into believe they had no real alternative but to sign the stipulated agreement under duress); *see also* Restatement (Second) of Contracts § 175 cmt. b (1981) ("It is sometimes said that the threat must arouse such fear as precludes a party from exercising free will and judgment or that it must be such as would induce assent on the part of a brave man or a man of ordinary firmness."). "The threat may be expressed in words or it may be inferred from words or other conduct. Past events often import a threat." Restatement (Second) of Contracts § 175 cmt. a (1981).

Given McMahon's violent history and pattern of sharing her explicit content without consent, Ms. Grant reasonably feared physical violence and public dissemination of her explicit content if she did not sign the NDA. Ms. Grant's diminished capacity eliminated her ability to determine any reasonable alternative—she believed she had no choice but to sign the contract to escape McMahon's cycle of abuse. Grant Decl. ¶ 128.

McMahon also took advantage of Ms. Grant's diminished capacity by hiding his true intent—to conceal his sexual trafficking and to silence her. He told Ms. Grant her signature would not alter their "relationship" and would secure McMahon's continued protection, keep her reputation intact, and protect her career prospects. Am. Compl. ¶ 256. "Although the parties' intent controls regarding whether they agreed to arbitrate a particular dispute, determining their intent is a question of law for the court to decide." *Armijo v. Prudential Ins. Co. of Am.*, 72 F.3d 793, 797 (10th Cir. 1995) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Finally, Defendants' assertion that Ms. Grant's ability to negotiate a higher settlement payment does not "resolve the issue of her mental competence, but rather demonstrates that a

material factual dispute indeed exists as to her competency." *Indelicato v. Provident Life & Acc. Ins. Co.*, No. 89 CIV. 8436 (RJW), 1990 WL 145149, at *5 (S.D.N.Y. Sept. 28, 1990) (managing one's daily affairs, college acceptance, doctor supervision, and a low dose of depression medication is not indicative of competence given testimony the individual "may have been capable of making certain types of decisions, but not others."); *see also* Expert Decl. ¶ 39, 45.

Because a genuine issue of material fact exists as to whether Ms. Grant had the capacity requisite to enter into an arbitration agreement, Defendants' Motions to Compel should be denied.

**B.  The Arbitration Clause Itself Was Induced by McMahon's Coercion.**

As detailed above, because McMahon caused Ms. Grant's incapacity, the arbitration clause is invalid, and the inquiry should end. Nevertheless, Defendants' argument that the Amended Complaint only includes "conclusory assertions" regarding coercion and resulting duress specific to the arbitration clause must fail for two reasons.

*First*, as illustrated herein and in Ms. Grant's Declaration, McMahon's coercive tactics **specifically** included a shift to demanding that Ms. Grant accept the NDA quickly and without further change (*i.e.,* without revisions to unfavorable terms like the arbitration clause, which Ms. Grant does not even recall because of the state of duress). Thus, it follows that McMahon engaged in coercive tactics **specific** to the arbitration provision, and it necessarily follows that duress attributable to those coercive tactics is, too, **specific** to the arbitration provision.

*Second*, the enactments of both the Speak Out Act and the EFAA show unequivocal Congressional intent to eliminate the weaponization of non-disclosure agreements and arbitration clauses in cases involving sexual misconduct, not an intent to strictly construe the FAA against victims and survivors of that conduct. Yet both Defendants present arguments that fail to consider this concept in connection with their focus on Supreme Court FAA opinions and instead make great efforts to bifurcate the issues. But the legislative shift is necessarily linked to the issue of

34

validity of an arbitration clause versus validity of a contract—the Agreement in the instant case—as a whole. And, moreover, the Supreme Court holdings in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) and *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63 (2010), or earlier in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)—which were all already factually distinguishable in that none of those cases involve allegations of sexual abuse and misconduct—must be harmonized with these new laws. Arguably, the lengthy dissent joined by four of nine Justices in the *Rent-A-Center* case—a case involving employment discrimination allegationa—already shows some reluctance by the Court to extend the *Prima Paint* holding any further. *See Rent-A-Center, W., Inc.*, 561 U.S. at 76 (Stevens, J., dissenting). Of course, the Court in the *Rent-A-Center* case was not presented with any new legislation relevant to employment discrimination that would be akin to application of the Speak Out Act and EFAA in instances of sexual misconduct. Regardless, in the year 2026 and in the face of this recently enacted legislation, an arbitration clause that would benefit an alleged sex trafficker—and importantly, one who was recently criminally investigated—simply cannot be viewed the same as an arbitration clause that would benefit an unscrupulous lender in *Buckeye* twenty years ago. Because Ms. Grant has sufficiently alleged duress specific to the arbitration clause here, Defendants' motions to compel arbitration should be denied.

### C. The Terms of the Arbitration Clause Are Overly Broad, Eliminating Any Possible Meeting of the Minds.

The agreement to arbitrate would be utterly meaningless without the several provisions within the Agreement that give it legal significance. When these provisions are overly broad, mutual assent cannot be established as to the agreement to arbitrate. Under Connecticut law, an enforceable contract requires "that the parties' minds had truly met . . . . If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds

35

have never met, no contract has been entered into by them." *Helenese*, 2010 WL 670172, at *3 (quoting *Gibbs v. Conn. Gen. Life Ins.*, No. CV97 0567009, 1998 WL 123010, at *2 (Conn. Super. Ct. Mar. 3, 1998)). Indeed, "[t]o constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties." *de Moura Castro by Hilario*, 715 F. Supp. 3d at 393 (cleaned up). "The acceptance of the offer must . . . be explicit, full and unconditional." *Bridgeport Pipe Eng'g Co. v. DeMatteo Const. Co.*, 268 A.2d 391, 393 (Conn. 1970).

Numerous material provisions of the NDA are so unreasonably vague such that Ms. Grant could not have fully known what constitutes "confidential." *See Denson v. Donald J. Trump for President, Inc.*, 530 F. Supp. 3d 412 (S.D.N.Y. 2021) (finding no mutual assent where the non-disclosure provision was exceptionally broad and did not define or limit the categories). The arbitration clause is overly broad on its face. There is no carve out for Ms. Grant to break the confidentiality provision if she receives a subpoena implicating these facts, let alone leniency for her to discuss her WWE employment at any future interview. When read with the covenant not to sue, Ms. Grant is prevented from taking any action against WWE or even speaking about the existence of the Agreement (NDA § I), restrictions which again apply only to her. This would permit WWE to initiate an informal resolution process against Ms. Grant, but she would be prevented from even engaging in the communication necessary for doing so.

Ms. Grant also could not have consented to concealing illegal conduct, as the confidentiality, release, and nondisparagement provision require. *See Branzburg v. Hayes*, 408 U.S. 665, 697 (1972) (longstanding jurisprudence finding that "concealment of crime and agreements to do so are not looked upon with favor"); *Van Housen v. Monico*, 378 A.2d 609, 610 (Conn. Super. Ct. 1976) ("[a]n agreement made in whole or in part to suppress an enquiry into the

36

commission of an offense, or to prevent, in any measure, the administration of criminal justice is void") (internal quotations omitted).

The NDA's confidentiality provision provides that should Ms. Grant "become aware that the disclosure of confidential information under this Agreement is sought from her . . . she shall give McMahon and WWE prompt [] notice. . . . Grant shall cooperate . . . to limit the scope and use of the Confidential Information." NDA § VIII. However, nowhere in the NDA is "Confidential Information" defined. *Compare Conflict Int'l, Inc. v. Komorek*, No. 23-CV-02165 (ER), 2024 WL 1347577, at \*9 (S.D.N.Y. Mar. 29, 2024) (finding the confidentiality agreement was clear because it defined confidential information) *with Denson,* 530 F. Supp. 3d at 432–37 (finding the nondisclosure provision unenforceable because it was too vague to support mutual assent).

The NDA also provides Ms. Grant will "not disclose, discuss or reveal any claims against, or information about, McMahon, her relationship with McMahon, WWE, or any employees or independent contractors of WWE, to third parties, on social media, in any public forum, or to any member of the media." NDA § I(A). As written, this would prohibit Ms. Grant from mentioning she worked for WWE, disclosing information to a therapist, or cooperating with law enforcement. Meanwhile, Defendants could discuss and disparage Ms. Grant. Given the gross overbreadth of the confidentiality provision and failure to define material terms, there was no mutual assent as to the scope of information considered confidential. *See, e.g.*, *Denson,* 530 F. Supp. 3d at 433 ("the vagueness and breadth of the provision is such that a Campaign employee would have no way of what may be disclosed, and accordingly Campaign employees are not free to speak about anything concerning the Campaign.").

The release provision prohibits Ms. Grant from filing "any legal actions, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE

37

concerning matters within the scope of this Agreement." NDA § II(C). This would prohibit Ms. Grant from reporting the crimes committed by Defendants (both crimes completed before the NDA was drafted, and forthcoming violence that Ms. Grant could not appreciate when she signed the NDA) or cooperating with law enforcement, in violation of longstanding jurisprudence. *See Branzburg*, 408 U.S. at 697; *Van Housen*, 378 A.2d at 610. Despite Defendants' cries that Ms. Grant breached the Agreement by filing this action in lieu of arbitration, Section II(C) of the NDA would prevent her from doing just that. *See* ECF No. 122-1, at 8; ECF No. 124-1, at 7.

Defendants also claim that a broad arbitration provision on its face is clear and unmistakable evidence of the Parties' intent to delegate the threshold question of arbitrability to an arbitrator. ECF No. 122, at 16–20; ECF No. 124, at 11–13. This lacks merit because the arbitration agreement is void *ab initio*. The law "does not favor contract provisions which relieve a person from his own negligence." *Hanks v. Powder Ridge Rest. Corp.*, 885 A.2d 734, 737 (Conn. 2005) (internal citations omitted). "Unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts." *Munn v. Hotchkiss Sch.*, 933 F. Supp. 2d 343, 345 (D. Conn. 2013) (citing *Hanks*, 885 A.2d at 739).

For the reasons above, and in making all reasonable inferences in favor of Ms. Grant, Defendants' Motions to Compel should be denied because there is a genuine issue of material fact regarding Ms. Grant's capacity and the formation of the agreement to arbitrate.

## V.      IN THE ALTERNATIVE, THE NDA AND ARBITRATION CLAUSE SHOULD BE ASSESSED WITH THE BENEFIT OF A FULL RECORD.

As set forth more fully in Ms. Grant's Renewed Motion for Discovery, filed contemporaneously herewith, a motion to compel arbitration is evaluated under a summary judgment standard, and the Court may deny or defer ruling on a motion for summary judgment

until necessary discovery is provided. *Hudson v. Babilonia*, No. 3:14-CV-01646 (MPS), 2015 WL 1780879, at *1 (D. Conn. Apr. 20, 2015); Fed. R. Civ. P. 56(d).  "[D]iscovery on a motion to compel arbitration is appropriate when the party opposing arbitration comes forth with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Flores v. Nat'l Football League*, 2022 WL 3098388, at *2 (S.D.N.Y. Aug. 4, 2022) (cleaned up).  If an "arbitration clause was induced by fraud," then the defrauded party is not bound by that clause and "there can be no arbitration." *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 457 (2d Cir. 1995) (internal citations omitted).

As explained throughout this brief, Defendants seek to enforce an illegal arbitration provision within an illegal NDA. Each of Plaintiff's requests for production is directed at the formation of the NDA and one or more of these disputed issues of fact are raised by Defendants' motions.  Targeted discovery into the formation and enforceability of the arbitration clause at issue in this case is necessary to resolve these issues of disputed fact and demonstrate that Defendants have no right to deprive Plaintiff of her right to be heard in court.

Finally, assuming arguendo that the Court (1) declines to rule on the validity of the NDA or arbitration clause as a matter of law, (2) denies Ms. Grant's request for targeted discovery, and (3) refers the question of arbitrability to an arbitrator, it should refrain from finding that the NDA or its arbitration clause are valid on their face, as Defendants urge. Whether decided by this Court or an arbitrator, justice requires that this issue be evaluated with the benefit of a full record.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motions to Compel Arbitration in their entireties.

Dated:        April 1, 2026

Respectfully submitted,

/s/ Ann E. Callis
HOLLAND LAW FIRM, LLC
Eric D. Holland (phv207692)
Gregory R. Jones (phv207693)
211 North Broadway, Suite 2625
St. Louis, MO 63102
Tel: (314) 241-8111/Fax: (314) 241-5554
eholland@hollandtriallawyers.com
gjones@hollandtriallawyers.com

Ann E. Callis (phv207694)
6181 Bennett Drive, Suite 210
Edwardsville, Illinois 62025
Tel: (618) 452-1323/Fax: (618) 452-8024
acallis@hollandtriallawyers.com

/s/ Aaron C. Lang
Aaron C. Lang (phv51511)
NELSON MULLINS RILEY & SCARBOROUGH LLP
330 Madison Avenue, 27th Floor
New York, New York 10017
Tel: (267) 229-6029/Fax: (646) 428-2610
aaron.lang@nelsonmullins.com

/s/ Erica O. Nolan
David A. Slossberg (ct13116)
Erica O. Nolan (ct31097)
Julie V. Pinette (ct30573)
HURWITZ, SAGARIN & SLOSSBERG, LLC
135 Broad Street
Milford, CT 06460
Tel: (203) 877-8000/Fax: (203) 878-9800
DSlossberg@hss.law
ENolan@hss.law
JPinette@hss.law

*Attorneys for Plaintiff Janel Grant*

40

41

## **CERTIFICATE OF SERVICE**

This is to certify that on April 1, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

*/s/ Erica O. Nolan*
Erica O. Nolan (ct31097)