UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANEL GRANT, | : | |
| | : | |
| Plaintiff, | : | Case No.: 3:24-cv-00090-SFR |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING | : | |
| ENTERTAINMENT, INC. n/k/a WORLD | : | April 1, 2026 |
| WRESTLING ENTERTAINMENT, LLC | : | |
| and VINCENT K. MCMAHON, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S LOCAL 56(a)2 STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO DEFENDANT MCMAHON'S MOTION TO COMPEL ARBITRATION**

Pursuant to Rule 56(a)2 of the Local Rules of Civil Procedure and the Court's May 7, 2025

Order (ECF No. 116), Plaintiff Janel Grant respectfully submits this counter statement of facts and

disputed facts in support of her opposition to Vincent K. McMahon's motion to compel arbitration.

ECF No. 122-3. As the parties have not yet conducted any discovery, the allegations in Ms. Grant's

Amended Complaint must be assumed as true for the purposes of Defendants' Motions to Compel

Arbitration. Ms. Grant reserves the right to revise and supplement the factual assertions as the

matter proceeds and the factual record is developed.

## I.    RESPONSES TO 56(a)1 STATEMENT

1.      Plaintiff Janel Grant ("Plaintiff") and Defendant McMahon met in or about March

2019. Defendant Vincent K. McMahon's Decl. in Support of His Mot. to Compel Arbitration

("McMahon Decl."), filed herewith, ¶ 2; Plaintiff Janel Grant's Amended Complaint ("Am.

Compl."), Dkt. No. 117, ¶ 3.

**Response:** ADMITTED.

2.       Plaintiff told Defendant McMahon she needed a job, and he facilitated meetings between Plaintiff and WWE's Human Resources department to discuss a position in the legal department as a legal administrator-coordinator. McMahon Decl. ¶ 3; Am. Compl. ¶¶ 56, 63, 76, 85-87, 91.

Response: ADMITTED. *See* § II ¶ 1, *infra*.

3.       Defendant McMahon and Plaintiff, who is 44 years old, commenced a relationship, which lasted just under three years and ended in or about January 2022. McMahon Decl. ¶ 2; Am. Compl. ¶¶ 3, 237.

Response: DENIED. Defendant McMahon coerced Ms. Grant into a relationship, which lasted just under three years and ended in or about March 2022. Am. Compl. ¶¶ 3, 268; Expert Declaration of Dr. Chitra Raghavan ("Expert Decl.") ¶¶ 24, 47-49.

4.       In January 2022, Plaintiff and Defendant McMahon negotiated and entered into a contract entitled "Confidential Settlement Agreement, General Release and Covenant Not to Sue" (the "Settlement Agreement" or "Agmt."), Am. Compl. Ex. A. McMahon Decl. ¶ 4; Am. Compl. ¶ 328.

Response: ADMITTED that Ms. Grant and Defendant McMahon signed a contract entitled "Confidential Settlement Agreement, General Release and Covenant Not to Sue."  Am. Compl. Ex. A.; Am. Compl. ¶ 328; Grant. DENIED that Ms. Grant negotiated or is bound by the Settlement Agreement. Am. Compl. ¶ 249; Expert Decl. ¶¶ 24, 47-49.

5.       Defendant McMahon signed the Settlement Agreement both on his own behalf and, in his capacity as Chairman, on behalf of Defendant World Wrestling Entertainment, Inc. ("WWE"), which was also party to the Settlement Agreement. Agmt. at 6; Am. Compl. ¶ 303; McMahon Decl. ¶ 8.

**Response:** ADMITTED.

6.      The parties entered into the Settlement Agreement, in part, to "terminate Grant's employment with WWE," and "to avoid any damage caused by public disclosure of private matters known to Grant and McMahon." Agmt. at 1; McMahon Decl. ¶ 4. Under the Settlement Agreement, Plaintiff agreed to receive monetary compensation in exchange for and in consideration of various mutual promises and covenants, including a release of any claims Grant had against Defendant McMahon or WWE. Agmt. §§ II, V; McMahon Decl. ¶ 4.

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

7.      Before the parties involved their respective attorneys in the negotiation of the Settlement Agreement, Plaintiff herself negotiated the monetary compensation that Defendant McMahon would pay her under the Settlement Agreement from $1,000,000 (the amount initially offered by Defendant McMahon) to $3,000,000. McMahon Decl. ¶ 5; Am. Compl. ¶ 245. Plaintiff insisted that Defendant McMahon's "initial offer of $1,000,000 was not enough to compensate for the lost earning potential and the fact that she would be unable to continue the promised career trajectory of Vice President," and her inability to serve as a Director for a full year. Am. Compl. ¶ 245. She persuaded Defendant McMahon to increase the monetary consideration to $3,000,000— triple the amount of his opening offer. *Id.*; McMahon Decl. ¶ 5; Agmt. § V.

**Response:** DENIED that McMahon's attorney was not involved. Before the Settlement Agreement was ever brought to Ms. Grant's attention, McMahon routinely and painstakingly referenced his attorney, Jerry S. McDevitt of K&L Gates, when telling Ms. Grant about the high-powered attorney he had on speed dial who was "world class at making problems go away." Am. Compl. ¶ 254; Declaration of Janel Grant In Support of Plaintiff's Opposition To Defendants'

3

Motions To Compel Arbitration ("Grant Decl.") ¶ 9. ADMITTED that Ms. Grant told McMahon his initial offer of $1,000,000 was not enough to compensate her. Am. Compl. ¶ 245.

8.    The parties were represented by counsel in connection with the drafting, editing, and negotiation of the Settlement Agreement: Jonathan M. Shapiro of Aeton Law Partners LLP for Plaintiff, and Jerry S. McDevitt of K&L Gates for Defendant McMahon. McMahon Decl. ¶ 6; Agmt. at 5; Am. Compl. ¶¶ 247, 249.

**Response:** DENIED that Ms. Grant and her counsel drafted, edited, and negotiated the Settlement Agreement. Am. Compl. ¶ 249; Expert Decl. ¶¶ 24, 47-49. ADMITTED that Ms. Grant was represented by Jonathan M. Shapiro of Aeton Law Partners LLP, an attorney whom she never met in person, during the final eight days of the NDA process. Am. Compl. ¶¶ 247, 249, 254.

9.    On or about January 20, 2022, Defendant McMahon's attorney sent a draft of the Settlement Agreement to Plaintiff's attorney. McMahon Decl. ¶ 6; *see also* Am. Compl. ¶ 249.

**Response:** ADMITTED.

10.    On or about January 27, 2022, Plaintiff's attorney sent a revised version of the draft Settlement Agreement to Defendant McMahon's attorney. In this revised version, Plaintiff's attorney proposed language that ultimately resulted in an arbitration provision that entitles the prevailing party to recover attorney's fees and costs. McMahon Decl. ¶ 7.

**Response:** DENIED that Plaintiff's attorney proposed language that ultimately resulted in an arbitration provision. Grant Decl. ¶ 130. ADMITTED that on or about January 27, 2022, Plaintiff's attorney sent a revised version of the draft Settlement Agreement to Defendant McMahon's attorney. Grant Decl. ¶¶ 122, 124.

11.    The Settlement Agreement contains a broad and unambiguous arbitration clause, which requires the parties to first attempt to resolve informally "any dispute arising under or out

4

of this Agreement, its construction, interpretation, application, performance or breach." Agmt. §

X; Am. Compl. ¶ 258. If that attempt is unsuccessful, the arbitration clause mandates that "the sole

and exclusive legal method to resolve any and all disputes and/or controversies is to commence

binding arbitration under the Federal Arbitration Act[.]" Agmt. § X; Am. Compl. ¶ 258. Section

X of the Settlement Agreement, the arbitration clause, states in its entirety:

> X. <u>ARBITRATION</u>
>
> In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach, the parties agree to first attempt to resolve such disputes informally and prior to taking any formal legal action to resolve such disputes. In the event any such dispute cannot be resolved informally, all parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement. The parties agree to discuss the venue for any such arbitration proceeding if and when such a dispute arises which cannot be informally resolved; but in the event the parties cannot agree on a venue then the exclusive venue for any arbitration proceeding shall be in Stamford, Connecticut. The prevailing party, as determined by the arbitration tribunal, shall be entitled to recover from the non-prevailing party all of its attorney's fees and costs.

Agmt. § X; Am. Compl. ¶ 258.

**Response:** DENIED that the arbitration clause is broad and unambiguous or that Ms. Grant

is bound to the arbitration clause. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the

document.

12.    The Settlement Agreement contains provisions pursuant to which Plaintiff

"agree[d], represent[ed], and warrant[ed]" to keep the Settlement Agreement, its terms, and

information about Defendant McMahon and their relationship confidential, and to not disparage

McMahon and/or WWE. Agmt. § I.

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

13.    By signing the Settlement Agreement all parties mutually agreed to release any claims they might have against one another. Agmt. § II. Plaintiff specifically agreed, among other things, "to release, remise and forever discharge McMahon, WWE, and the present, former and future directors, officers, employees, agents and representatives of WWE . . . from all manner of action and actions, causes of action, sums of money . . . damages, claims and demands whatsoever, in law or in equity, that she ever had, may have had, [or] now has . . . as a result of, or in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel . . . ." *Id.* § II(A). Section II of the Settlement Agreement states further:

a. "BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES." *Id.* § II(B).

b. "Grant agrees that she will not cause, and has not caused, to be filed any legal actions, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." *Id.* § II(C).

c. "Grant covenants and agrees that she will forever forbear from pursing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand to claims against McMahon and/or WWE." *Id.* § II(D).

d. "Grant agrees that she shall not institute or be a party to any lawsuits, either individually or as a class representative or member against McMahon and/or WWE as to any matters up to the date of execution of this Agreement." *Id.* § II(E).

e. "Grant knowingly and intentionally waives any rights to any additional recovery that might be sought on her behalf by any other person, entity, or local, state or federal government or agency thereof." *Id.*

6

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document. The Agreement contains one provision in Section II wherein Defendants agree to release and discharge Ms. Grant for any claims they might have against one another. Agmt. § II(F). That section contains five provisions that place burdens *solely* on Ms. Grant and retain Defendants' right to disparage Ms. Grant and discuss information that she is required to keep confidential. *See* Agmt. § II(A)-(F).

14.    In the Settlement Agreement, Plaintiff also acknowledged that "among the rights she is knowingly and voluntarily waiving by executing this Agreement is the right to bring or pursue any claims or causes of action against McMahon and/or WWE." Agmt. § VII(B).

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement or had the capacity to "knowingly and voluntarily" waive the right to pursue claims against Defendants. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

15.    McMahon and Defendant WWE similarly agreed to "release and forever discharge Grant . . . from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant." Agmt. § II(F).

**Response:** ADMITTED as to the content of the document.

16.    The Settlement Agreement also contains a severability provision: "In the event that any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding provided, however, if any of the confidentiality obligations of this Agreement are ever contended

7

to be unenforceable by Grant, or are found to be unenforceable by any tribunal, Grant agrees that she shall return all monies paid pursuant to this Agreement to McMahon." Agmt. § IX.

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

17.    The Settlement Agreement provides that Plaintiff was to be paid $1,000,000 within ten (10) days of the execution of the Agreement and the remaining $2,000,000 in four equal installments of $500,000, and that "[i]n the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement, McMahon shall have no obligation to make any payments set forth" therein. Agmt. §§ V(A)-(B); Am. Compl. ¶¶ 315, 341. Section V of the Settlement Agreement, "Monetary Considerations to Grant," states in subsections V(A)-(B):

V. <u>MONETARY CONSIDERATIONS TO GRANT</u>

A.  Upon execution of this Agreement by the parties, McMahon will pay the sum of One Million Dollars ($1,000,000.00) to Grant within ten (10) days of execution of this Agreement.

B.  Provided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years, McMahon will pay the following sums to Grant within ten (10) days of the dates listed below:

> February 1, 2023 - $500,000.00
>
> February 1, 2024 - $500,000.00
>
> February 1, 2025 - $500,000.00
>
> February 1, 2026 - $500,000.00

In the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement, McMahon shall have no obligation to make any payments set forth above which would otherwise become due on the dates indicated, and all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon in accordance with the terms of this Agreement.

Agmt. §§ V(A)-(B).

8

**Response:** ADMITTED as to the content of the document.

18.    In addition to the monetary payments, the Settlement Agreement provides that as "additional consideration" to Plaintiff, WWE would "provide a positive evaluation and recommendation" to any possible employer of Grant, either via Laurinaitis or another WWE employee in the event that "Laurinaitis is no longer employed by WWE at the time." Agmt. § VI.

**Response:** ADMITTED as to the content of the document.

19.    The Settlement Agreement states that by signing her name, Plaintiff "represents that she is able to read the language and to understand the meaning and effect of this Agreement," that "she has read and understands this Agreement and the effect of it," and that "her attorney . . . has explained it to her." Agmt. § VII(A).

**Response:** DENIED as to Ms. Grant's ability to "understand the meaning and effect of the Agreement" and that Ms. Grant is bound by the Agreement. ADMITTED as to the content of the document.

20.    The parties signed and dated the Settlement Agreement on January 28, 2022. McMahon Decl. ¶ 8; Agmt. at 6; Am. Compl. ¶ 328.

**Response:** ADMITTED.

21.    Within ten (10) days of the Settlement Agreement's execution, Defendant McMahon paid Plaintiff the first payment specified in Section V(A) of the Settlement Agreement in the amount of $1,000,000. McMahon Decl. ¶ 9; Am. Compl. ¶ 262.

**Response:** ADMITTED.

22.    In or around March 2022, Defendant McMahon learned that information governed by the Settlement Agreement had been shared with a third party. McMahon Decl. ¶ 10; Am. Compl. ¶ 271 (acknowledging notice from Defendant McMahon's counsel of leaked information).

9

**Response:** ADMITTED to the extent Ms. Grant learned through her counsel that Defendant McMahon alleged information had been shared with a third party on or around that date. Am. Compl. ¶ 271. DENIED as to any implication that Ms. Grant impermissibly shared confidential information with a third party. Am. Compl. ¶ 321.

23.     Given Defendant McMahon's position that Plaintiff had breached the Settlement Agreement by sharing protected information with a third party, he exercised his right under the Settlement Agreement to withhold further payment to Plaintiff. McMahon Decl. ¶ 10; Am. Compl. ¶ 315 (acknowledging no payments beyond initial $1 million payment).

**Response:** DENIED that Ms. Grant breached the Settlement Agreement. Am. Compl. ¶¶ 271; 321. ADMITTED that McMahon breached a core term of the Settlement Agreement by failing to make payments to Ms. Grant under Section V.B of the agreement. Am. Compl. ¶ 315.

24.     Plaintiff commenced the instant action against Defendant McMahon on January 25, 2024 by filing a public lawsuit, rather than commencing arbitration. Dkt. No. 1.

**Response:** ADMITTED.

25.     Plaintiff did not "first attempt to resolve [her] disputes informally and prior to taking any formal legal action," as the Settlement Agreement requires. McMahon Decl. ¶ 11.

**Response:** DENIED that Ms. Grant is bound by the Settlement Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

II.     <u>**ADDITIONAL MATERIAL FACTS**</u>

1.     After Ms. Grant told Defendant McMahon she needed a job, he facilitated meetings between Ms. Grant and WWE Executive Brad Blum and WWE's Senior Vice President, General Counsel & Secretary Brian Nurse to discuss a position in the legal department as a legal administrator-coordinator. Am. Compl. ¶¶ 56, 63, 67, 84-87, 91.

10

2.      In early January 2022, McMahon abruptly distanced himself from Ms. Grant, saying that he could not speak to or be in the same room as her. Am. Compl. ¶ 237.

3.      On January 9, 2022, McMahon agreed to speak with Ms. Grant at his condo and told Ms. Grant that his wife, Linda McMahon, had learned about his relationship with Ms. Grant, that he was losing his condo, and that she would divorce him. Am. Compl. ¶ 238; Grant Decl. ¶ 93. He stressed that a public divorce would make Ms. Grant a headline. *Id.*

4.      McMahon told Ms. Grant that if she left WWE and signed an NDA, he was confident Linda McMahon would not divorce him, he could remain in the condo, and Ms. Grant would avoid reputational harm. Am. Compl. ¶ 239; Grant Decl. ¶ 95. At that time, Ms. Grant had expressed no desire to take legal action against Defendant McMahon or WWE. Am. Compl. ¶ 239.

5.      McMahon instructed Ms. Grant that she should not go back to the office and immediately lessen her involvement on open work items. Am. Compl. ¶ 240; Grant Decl. ¶ 96. Ms. Grant expressed concerns about both her name being mentioned in the media and the loss of control over her image, especially as McMahon had shared content of her for close to two years, and the ramifications for her career. Am. Compl. ¶ 240. McMahon suggested that he would attempt to help keep Ms. Grant's reputation intact and that he or Nick Khan would personally help Ms. Grant find another job. Am. Compl. ¶ 240; Grant Decl. ¶ 96.

6.      McMahon instructed Ms. Grant not to share this news with anyone and suggested she offer health-related excuses if asked about leaving WWE. Am. Compl. ¶ 241; Grant Decl. ¶ 96.

7.      Regarding the NDA, Ms. Grant asked McMahon, "Is this when Jerry sends the papers?" Am. Compl. ¶ 242. McMahon nodded and assured Ms. Grant that they would be "in the driver's seat" to iron out terms together but she would need an attorney to make things official and

11

approved of Ms. Grant asking Dr. Colker for an attorney referral. Am. Compl. ¶ 242; Grant Decl. ¶ 118.

8.      Following this discussion, McMahon led Ms. Grant to his bedroom for another sexual encounter. Am. Compl. ¶ 243.

9.      On January 14, 2022, McMahon sent Ms. Grant a to-do list for purposes of effectuating the NDA, such as retaining counsel and resigning from WWE. Am. Compl. ¶ 244; Grant Decl. ¶ 105. McMahon suggested the list had been drafted by Brad Blum. *Id.*

10.     McMahon directed a single attorney, his personal attorney Jerry McDevitt, to negotiate the NDA on behalf of WWE and McMahon—both parties to the agreement. Am. Compl. ¶ 303.

11.     Before Ms. Grant retained counsel, McMahon called Ms. Grant with an update and informed her that McMahon's attorney and counsel for WWE insisted on installment payments due to "cash flow purposes."  Am. Compl. ¶ 246; Grant Decl. ¶ 104. When Ms. Grant responded that this reasoning did not make sense for a billionaire, McMahon insisted that it was not his idea. Am. Compl. ¶ 246.

12.     Throughout the entire NDA process, Defendant McMahon continued to send Ms. Grant sexually charged text messages and encouraged her to participate in sexual acts and produce explicit content. Am. Compl. ¶ 243, 248. On January 24, 2022, McMahon encouraged Ms. Grant to send an explicit photo to Brock Lesnar. Am. Compl. ¶ 248; Grant Decl. ¶ 113. McMahon also demanded that Ms. Grant send him the content she sent to Lesnar. Grant Decl. ¶ 98. At this same time, McMahon finalized a booking for Lesnar to perform in a live event at Madison Square Garden, during which it was expected that Ms. Grant and Lesnar would engage in a sexual encounter. Am. Compl. ¶ 248; Grant Decl. ¶ 113.

13.     The NDA was under discussion for 19 days. Am. Compl. ¶ 237-39, 257. Ms. Grant did not have legal representation for the initial eleven days of the "negotiation." Am. Compl. ¶ 249. Ms. Grant had legal representation for only eight days before the Agreement was executed. *Id.* During the eight days that he represented her, Ms. Grant's attorney expressed apprehension about moving forward so quickly with the NDA. Grant Decl. ¶ 129. Ms. Grant requested to McMahon that the NDA should reference people who knew about their relationship, including, but not limited to: Nick Khan, Brad Blum, John Laurinaitis, and McMahon's personal assistants. Am. Compl. ¶ 249. Ms. Grant and her attorney sought to incorporate the list of individuals who had knowledge of the relationship into a Schedule A in the NDA, which included the five people Ms. Grant would continue to interact with after her employment at WWE ended. *Id.* Ms. Grant's requested revisions were flatly rejected by McMahon and WWE, who reverted to their original draft rather than incorporate any of her proposed changes—with the exception that, as of the date of execution, Ms. Grant would not speak of the relationship. *Id.*

14.     On or around January 26, 2022, McMahon articulated an even more pressing need to get the NDA signed immediately, informing Ms. Grant that he was under a tight deadline to report pending or threatened legal actions to the WWE Board of Directors—specifically the Audit Committee—and that McMahon and his attorney could not do so unless Ms. Grant signed the NDA. Am. Compl. ¶ 250; Grant Decl. ¶ 119.  He informed Ms. Grant that Board members were concerned about the delay. *Id.*

15.     Furthermore, McMahon repeatedly pressed Ms. Grant to stop her attorney from any further "wordsmithing" and blamed Ms. Grant's attorney for not understanding the urgency of the situation. Am. Compl. ¶ 251; Grant Decl. ¶ 117.  Also, despite his previous approval, McMahon now expressed that both he and his attorney had concerns about Ms. Grant's attorney and warned

her that her counsel could not be trusted, which in turn caused Ms. Grant to question her trust in her attorney. *Id*.

16.     On or around January 26, 2022, Ms. Grant became so overwhelmed that she asked to simply resign without the need for a payment, even offering to sign a napkin or Post-It as a sign of goodwill. Am. Compl. ¶ 252; Grant Decl. ¶ 117. McMahon flatly rejected her desire to back out. *Id.*

17.     On January 27, 2022, eight days after Ms. Grant had hired an attorney, McMahon left Ms. Grant a lengthy audio message explaining why they needed to go through with the NDA, pushing her to hurry up and sign the NDA and advising that he would be "double fucked" if she did not. Am. Compl. ¶ 253; Grant Decl. ¶ 119. McMahon again rejected Ms. Grant's desire to back out of the agreement, acknowledging the extreme repercussions that he and WWE would face if she did not sign the NDA. *Id.*

18.     McMahon's attorney who negotiated the NDA—Jerry McDevitt—was also the person whom McMahon routinely and painstakingly referenced when telling Ms. Grant about the high-powered attorney he had on speed dial. Am. Compl. ¶ 254; Grant Decl. ¶ 9. Namely, McMahon referred to Mr. McDevitt as someone who was "world class at making problems go away." *Id.* All of this was known to Ms. Grant and being reinforced by McMahon throughout the NDA process, while Ms. Grant was being represented by an attorney she had never met in person and who McMahon viewed as merely a formality. Am. Compl. ¶ 254; Grant Decl. ¶ 96.

19.     Between January 27, 2022 and January 28, 2022, there were unresolved edits that led to panicked phone calls, including an attorney confidentiality clause and signatory line that Ms. Grant's counsel said he would never sign. Am. Compl. ¶ 255. Also, the deadline to sign the NDA was pushed up from January 31 to January 28, 2022. Am. Compl. ¶ 255; Grant Decl. ¶ 120.

14

20.     McMahon continued pressuring Ms. Grant with calls, during which he pleaded, demanded, threatened, and begged her to sign the NDA and reminded her that by not signing, she would jeopardize him, the Company, and his family, and that she would surely become the subject of national headlines and ruin her reputation if she did not sign the NDA by the start of WWE's live programming schedule on January 28, 2022. Am. Compl. ¶ 256; Grant Decl. ¶ 126. He reassured her that nothing would change between them, and she would emerge with her reputation intact if she would simply sign the NDA. *Id.*

21.     In a state of mental defeat from McMahon's threats, instilling a fear in her that if she did not sign, he would expose her intimate content publicly, as well as any narrative necessary—whether true or false—that could expose her to serious personal and financial harm, Ms. Grant succumbed to his unrelenting coercion and signed the NDA just before the deadline on January 28, 2022. Am. Compl. ¶ 257; Grant Decl. ¶ 128.

22.     Over the course of these several weeks from early January until January 28, 2022, the nature of Ms. Grant's mental state had changed substantially—she feared she would never be free from McMahon and WWE. Am. Compl. ¶ 257. In addition to the prolonged state of fear and anxiety that Ms. Grant had been living with since meeting McMahon, McMahon was now also adding this immense level of coercive control over everything involving the NDA process. Am. Compl. ¶ 257; Expert Decl. ¶ 24. Ms. Grant expressed to Defendant McMahon several times throughout the "negotiation" period that her mental and physical health were worsening as a result of the NDA process, and that she felt that she had no decision in signing the NDA. Expert Decl. ¶¶ 38-39; Grant Decl. ¶¶ 63, 94, 99, 101-104, 107-109, 111, 113, 118, 120, 123.

23.     Ms. Grant was coerced and fraudulently induced to accept the arbitration provision. Am. Compl. ¶ 260; Expert Decl. ¶¶ 24, 47-49. Ms. Grant was told by her attorney that terms of the

agreement (*e.g.*, the arbitration provision) could be undesirable as written, but given the perpetuated duress that had now been elevated by Ms. Grant's chronic abuser, McMahon, she was not able to make sound decisions regarding terms like the arbitration provision. *Id.*

24.    On February 4, 2022, Ms. Grant was wired $1,000,000 as the first installment of the NDA. On February 28, 2022, Ms. Grant was wired $10,000 to cover her attorneys' fees incurred in connection with the NDA. Am. Compl. ¶ 262. Both wires were sent with originator described as "Vincent K. McMahon C/O WWF, Brad M. Blum," and originator address "1241 EAST MAIN STREET, STAMFORD, CONNECTICUT, 06902 UNITED STATES." *Id*.

25.    On February 9 and 10, 2022, Ms. Grant gave notice to John Laurinaitis and put Human Resources at WWE on official notice that she was leaving WWE. Am. Compl. ¶ 263; Grant Decl. ¶ 133.

26.    After signing the NDA, Ms. Grant continued to ask about who had told Linda McMahon. Am. Compl. ¶ 264. McMahon deflected her questions. *Id*.

27.    In the weeks following the NDA's execution, Defendant McMahon sent Ms. Grant violent, sexually charged sex messages and directed her to produce explicit content for him. Am. Compl. ¶ 264; Grant Decl. ¶¶ 134-137.

28.    After the NDA was executed, Ms. Grant expressed multiple times to Defendant McMahon confusion regarding the scope of the Agreement, including whom she could communicate with and whether she could reference WWE on her resume. Grant Decl. ¶¶ 134-135.

29.    WWE asserted that, as a company, it had no knowledge of various settlement agreements, releases, covenants not to sue and/or non-disclosure agreements entered into by McMahon, including, of course, the NDA at issue in this instant case. Am. Compl. ¶ 265. Specifically, and by way of example, WWE has maintained the following:

16

> On June 17, 2022, the Company and its Board of Directors announced that the Special Committee was formed to investigate alleged misconduct by Mr. McMahon, who remains a stockholder with a controlling interest, and another executive, who is also no longer with the Company. The findings of the Special Committee investigation identified **agreements executed by Mr. McMahon *which were previously unknown* to the Company**.[1]

30.    ***After the NDA was signed***, McMahon, wearing only a white robe, met Ms. Grant in his condo to review outstanding business items. Am. Compl. ¶ 266; Grant Decl. ¶ 132. As Ms. Grant was proceeding to the door to leave, McMahon grabbed her arm and commanded her to do "one last thing" and get "on your knees." *Id*.

31.    As Ms. Grant knelt on the hard floor, barely a few feet away from the front door, McMahon opened his robe and ordered her to "Eat him!" Am. Compl. ¶ 267; Grant Decl. ¶ 132. McMahon grabbed the back of Ms. Grant's head and slammed her face into his crotch several times until she gagged and pushed him away, telling him to stop and that she couldn't breathe. *Id.* McMahon responded that she wouldn't get away that easily and held her head as he forced himself back in her mouth until she had no air. *Id*. Ms. Grant tried to push him away, but Defendant McMahon held her head firmly in place and loudly commanded her to "Look up!" followed by "Take it, bitch." *Id*. They momentarily made eye contact before McMahon's force caused Ms. Grant's body to convulse and retch with tears streaming down her face. *Id.* McMahon then released his hold and closed his robe as she stood up. *Id.* After leaving, Ms. Grant never saw McMahon again. Am. Compl. ¶ 267.

32.    On March 2, 2022, while Ms. Grant was away on a trip to Florida, McMahon called Ms. Grant to advise that it would probably be the last time she would hear from him and, if she needed anything, to contact Nick Khan or Brad Blum. Am. Compl. ¶ 268; Grant Decl. ¶ 136. Over

---

[1] *See, e.g.*, WWE's August 14, 2022 United States Securities and Exchange Commission Form 10-Q, at 28 (emphasis added).

the course of an approximately half-hour call, McMahon lamented both his inability to focus on the upcoming WrestleMania and how his personal life had blown up over the past few weeks. Am. Compl. ¶ 268. Towards the end of their conversation, McMahon and Ms. Grant agreed to resume contact after WrestleMania. Am. Compl. ¶ 268; Grant Decl. ¶ 136. He also instructed Ms. Grant to continue having sexual relations with other men, including Brock Lesnar, in the meantime. *Id.*

33. On or around March 4, 2022, Lesnar messaged Ms. Grant that he was in New York and, in line with McMahon's orders, Ms. Grant texted Lesnar explicit pictures. Am. Compl. ¶ 269; Grant Decl. ¶ 137.

34. On March 27, 2022, Lesnar reached out to Ms. Grant again. Am. Compl. ¶ 270. Ms. Grant understood that these back-to-back advances were an indication of McMahon's continued control. *Id.*

35. Despite assurances from McMahon that he would cover Ms. Grant's medical care and the costs associated with her tax liability for the $1,000,000 payment, McMahon has refused to cover those costs. Am. Compl. ¶ 271. McMahon continued to pay for Ms. Grant's medical care until April 15, 2022, when it abruptly ceased. *Id.*

36. In June and July 2022, stories were published regarding the matter of McMahon's multiple NDAs with various women associated with WWE and others. Am. Compl. ¶ 273.

37. On June 13, 2022, Ms. Grant received an email to her personal account from an attorney at Simpson Thacher & Bartlett LLP seeking to talk to her about an investigation surrounding "[her] time at WWE, including matters relating to the January 2022 agreement between [her], Vince McMahon, and WWE." Am. Compl. ¶ 274.

38. The qualitative scope of the investigation was confirmed and reiterated to Ms. Grant and her counsel on multiple occasions by WWE's General Counsel and Simpson Thacher &

Bartlett LLP on behalf of the WWE Board of Directors' Special Committee, as investigating, among other things, "Mr. McMahon's relationship with Ms. Grant and the circumstances surrounding the settlement between [Ms. Grant], the WWE, and Mr. McMahon." Am. Compl. ¶ 275.

39.     Despite being told by her counsel that Ms. Grant was available and willing to participate in the investigation, including through the substantial provision of relevant documents, the Special Committee never interviewed her. Am. Compl. ¶ 276. In fact, Ms. Grant was actively preparing for the investigation with her attorney. *Id.* Instead, the Special Committee announced in November 2022 that the investigation had been completed. *Id.*

40.     Ms. Grant did not receive another payment under her NDA in February of 2023. Am. Compl. ¶ 277.

41.     As a result of the power dynamics and the trauma endured by Ms. Grant for so many years by Defendants, Ms. Grant has continued to be in a depleted mental state even after entering into the NDA. Am. Compl. ¶ 278.

Dated: April 1, 2026

Respectfully submitted,

**PLAINTIFF JANEL GRANT**


By  */s/ Ann E. Callis*

HOLLAND LAW FIRM, LLC
Eric D. Holland (phv207692)
Gregory R. Jones (phv207693)
211 North Broadway, Suite 2625
St. Louis, MO 63102
Tel: (314) 241-8111/Fax: (314) 241-5554
eholland@hollandtriallawyers.com
gjones@hollandtriallawyers.com

Ann E. Callis (phv207694)
6181 Bennett Drive, Suite 210
Edwardsville, Illinois 62025
Tel: (618) 452-1323/Fax: (618) 452-8024
acallis@hollandtriallawyers.com

*/s/ Aaron C. Lang*
Aaron C. Lang (phv51511)
NELSON MULLINS RILEY & SCARBOROUGH LLP
330 Madison Avenue, 27th Floor
New York, New York 10017
Tel: (267) 229-6029
aaron.lang@nelsonmullins.com

*/s/ Erica O. Nolan*
David A. Slossberg (ct13116)
Erica O. Nolan (ct31097)
Julie V. Pinette (ct30573)
HURWITZ, SAGARIN & SLOSSBERG, LLC
135 Broad Street
Milford, CT 06460
Tel: (203) 877-8000/Fax: (203) 878-9800
DSlossberg@hss.law
ENolan@hss.law
JPinette@hss.law

20

21

**CERTIFICATE OF SERVICE**

This is to certify that on April 1, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

/s/ Erica O. Nolan
Erica O. Nolan