UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JANEL GRANT, | : | |
| | : | |
| Plaintiff, | : | Case No.: 3:24-cv-00090-SFR |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING | : | |
| ENTERTAINMENT, INC. n/k/a WORLD | : | April 1, 2026 |
| WRESTLING ENTERTAINMENT, LLC | : | |
| and VINCENT K. MCMAHON, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S LOCAL 56(a)2 STATEMENT OF MATERIAL FACTS IN OPPOSITION
TO DEFENDANT WWE'S MOTION TO COMPEL ARBITRATION**

Pursuant to Rule 56(a)2 of the Local Rules of Civil Procedure and the Court's May 7, 2025

Order (ECF No. 116), Plaintiff Janel Grant respectfully submits this counter statement of facts and

disputed facts in support of her opposition to Defendant World Wrestling Entertainment, Inc. n/k/a

World Wrestling Entertainment, LLC's ("WWE") motion to compel arbitration (ECF No. 124-2).

As the parties have not yet conducted any discovery, the allegations in Ms. Grant's Amended

Complaint must be assumed as true for the purposes of Defendants' Motions to Compel

Arbitration. Ms. Grant reserves the right to revise and supplement the factual assertions as the

matter proceeds and the factual record is developed.

I.    **RESPONSES TO 56(a)1 STATEMENT**

1.    Grant alleges that she met Vincent K. McMahon in March 2019 and, soon after,

McMahon promised her "a yet-to-be-determined role at WWE." *See* First Amended Complaint,

No. 3:24-cv-00090-SFR (D. Conn), dated May 7, 2025 ("Am. Compl."), ECF No. 117, ¶¶ 3, 6.

**Response:** ADMITTED.

2.      Grant alleges that she and McMahon began a sexual relationship in May 2019. Am. Compl., ECF No. 117, ¶¶ 92–95.

**Response:** ADMITTED.

3.      Grant alleges that her employment history with WWE was as follows:

- On June 17, 2019, Grant began working in WWE's legal department in an "entry-level position as an 'administrator-coordinator'" with a starting salary of $75,000. Am. Compl., ECF No. 117, ¶¶ 10, 91.

- On February 10, 2020, Grant was "temporarily relocated to the XFL workforce." *Id.* ¶ 134.

- "On or around January 25, 2021," Grant was reassigned to support a high-ranking hire in WWE's legal department. *Id.* ¶ 178.

- In early March 2021, Grant was transferred to the Talent Relations department, where she worked as a director of operations and reported to the head of the department, John Laurinaitis. *Id.* ¶¶ 11–12, 187, 195.

**Response:** ADMITTED.

4.      Grant alleges that, in early January 2022, McMahon told her that his wife had found out about their relationship and threatened to divorce him. Am. Compl., ECF No. 117, ¶ 238. McMahon allegedly told Grant that "if she left WWE and signed an NDA," his wife would not leave him, and "Grant would avoid reputational harm." *Id.* ¶ 239.

**Response:** ADMITTED.

5.      Grant alleges that McMahon initially offered her $1 million in "exchange[] for the NDA." Am. Compl., ECF No. 117, ¶ 245. Grant alleges that she told McMahon that $1 million

was not enough, and McMahon ultimately agreed to pay her $3 million in installments. *Id.* ¶¶ 245–251, 255.

**Response:** ADMITTED.

6.      On or about January 19, 2022, Grant retained counsel in connection with her separation from WWE and her negotiations of the proposed NDA. Am. Compl., ECF No. 117, ¶ 247.

**Response:** ADMITTED.

7.      The negotiation of the NDA lasted eight days. Am. Compl., ECF No. 117, ¶ 249. Grant's counsel participated actively in the negotiations, requesting revisions, "wordsmithing," and rejecting certain proposed terms. *Id.* ¶¶ 249–55.

**Response:** DENIED. The NDA was under discussion for 19 days, and Ms. Grant's counsel only participated in the final eight days of such discussions. Am. Compl. ¶ 249. Ms. Grant's counsel expressed apprehension about moving forward so quickly with the NDA, and most of Ms. Grant's requested revisions were repeatedly flatly rejected by Defendants. *Id.*; Declaration of Janel Grant In Support of Plaintiff's Opposition To Defendants' Motions To Compel Arbitration ("Grant Decl.") ¶ 129.

8.      On January 28, 2022, McMahon and Grant executed the six-page Agreement, titled the "Confidential Settlement Agreement, General Release and Covenant Not to Sue" (the "Agreement"). Am. Compl., ECF No. 117, ¶ 257; "Confidential Settlement Agreement, General Release and Covenant Not to Sue," signed by J. Grant, Jan. 28, 2022 (the "Agreement"), ECF No. 117, at 101, Ex. A.

**Response:** ADMITTED.

9.      Grant and McMahon both signed the Agreement, with McMahon signing both on his own behalf and, in his capacity as Chairman, on behalf of WWE. Agreement, ECF No. 117, at 101, Ex. A.

**Response:** ADMITTED.

10.      Grant agreed to resign from her employment with WWE upon execution of the Agreement. Agreement, ECF No. 117, at 98, Ex. A § IV.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Declaration of Dr. Chitra Raghavan ("Expert Decl.") ¶¶ 24, 47-49. ADMITTED as to the content of the document.

11.      In a section titled "Grant's Consideration, Representation and Warranties to McMahon and WWE," Grant agreed: (i) to keep confidential her relationship with McMahon and the existence and terms of the Agreement; and (ii) not to disparage McMahon or WWE. Agreement, ECF No. 117, at 96–97, Ex. A § I.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

12.      The Agreement provides that McMahon would pay Grant, in installments over a four-year period, a total of $3 million. Agreement, ECF No. 117, at 98–99, Ex. A § V. For the first installment, McMahon agreed to pay Grant $1 million within 10 days of execution of the Agreement. *Id.* at 98, Ex. A § V.A. McMahon committed to make further payments of $500,000 each year, on February 1, for the next four years, "[p]rovided all confidentiality obligations of Grant under this Agreement are complied with in ensuing years." *Id.* at 98–99, Ex. A § V.B.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

13.    However, "[i]n the event of any disclosure by Grant of the matters required to be kept confidential under this Agreement," the Agreement provides that "all monies previously paid to Grant pursuant to this Agreement shall be returned to McMahon[.]" Agreement, ECF No. 117, at 98–99, Ex. A § V.B.; *see also id*. at 99, Ex. A § V.E.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

14.    In addition to monetary payments by McMahon, the Agreement provides, as "Additional Consideration to Grant," that WWE will "provide a positive evaluation and recommendation to any . . . possible employer of Grant," either via Laurinaitis or another WWE employee. Agreement, ECF No. 117, at 99, Ex. A § VI.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

15.    The parties to the Agreement, including WWE, provided mutual releases of any and all potential claims related to Grant's and McMahon's relationship and Grant's employment at WWE. Agreement, ECF No. 117, at 97–98, Ex. A § II.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

16.    Grant's release language reads:

> Except for any rights under this Agreement, and as otherwise stated herein, Grant hereby agrees to release, remise and forever discharge, and by these presents does, for herself, her heirs, executors, and administrators, release, remise and forever discharge McMahon, WWE, and the present, former and future directors, officers, employees, agents and representatives of WWE personally and as directors, officers, employees, agents and representatives of WWE from all manner of action and actions, causes of action, sums of money, covenants, contracts, controversies, agreements, promises, damages, claims and demands whatsoever, in law or in equity, that she ever had, may have had, now has or that her heirs, executors or administrators can, shall or

may have as a result of, or in connection with her employment relationship with WWE, the termination of that employment relationship, and/or any and all matters involved in her relationship with McMahon and/or other WWE personnel, and whether known or unknown, asserted or unasserted, suspected or unsuspected which she may have as a result of any act which has occurred at any time up to and including the date of her execution of this Agreement.

Agreement, ECF No. 117, at 97, Ex. A § II.A (emphasis added).

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

17.     The Agreement provides that Grant "will not cause, and has not caused, to be filed any legal actions, administrative proceedings, arbitrations or charges of any nature whatsoever relating to McMahon or WWE concerning matters within the scope of this Agreement." Agreement, ECF No. 117, at 98, Ex. A § II.C.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

18.     The Agreement also provides that Grant "covenants and agrees that she will forever forbear from pursuing any legal proceedings (except if necessary to enforce this Agreement), and that she will not in any other way make any additional demand or claims against McMahon and/or WWE." Agreement, ECF No. 117, at 98, Ex. A § II.D.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

19.     The Agreement further provides that:

> BY SIGNING THIS AGREEMENT, GRANT ACKNOWLEDGES THAT SHE WILL HAVE WAIVED ANY RIGHT SHE MAY HAVE HAD TO PURSUE OR BRING A LAWSUIT OR MAKE ANY LEGAL CLAIMS AGAINST MCMAHON AND/OR WWE, AND/OR ANY OF ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND REPRESENTATIVES.

Agreement, ECF No. 117, at 97, Ex. A § II.B.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

20.    McMahon and WWE provided the following release:

> McMahon and WWE, individually and jointly, for and in consideration of the representations, warranties and covenants of Grant contained herein, hereby release and forever discharge Grant, her heirs, executors, administrators, successors and assigns from any and all disputes and causes of action, claims, demands, suits, damages, attorneys' fees, expenses, debts, contracts, agreements, and any and all other claims of any other nature whatsoever against Grant whether known or unknown or whether asserted or unasserted from the beginning of time to the date of execution of this Agreement, which McMahon and/or WWE might have or could claim against Grant.

Agreement, ECF No. 117, at 98, Ex. A § II.F.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

21.    The Agreement includes the following arbitration provision:

> In the event of any dispute arising under or out of this Agreement, its construction, interpretation, application, performance or breach, the parties agree to first attempt to resolve such disputes informally and prior to taking any formal legal action to resolve such disputes. In the event any such dispute cannot be resolved informally, all parties hereto agree that the sole and exclusive legal method to resolve any and all disputes and/or controversies is to commence binding arbitration under the Federal Arbitration Act pursuant to the procedures of the American Arbitration Association and to do so by sealed proceedings which preserve the confidential and private nature of this Agreement. The parties agree to discuss the venue for any such arbitration proceeding if and when such a dispute arises which cannot be formally resolved; but in the event the parties cannot agree on a venue then the exclusive venue for any arbitration proceeding shall be in Stamford, Connecticut. The prevailing party, as determined by the arbitration tribunal, shall be entitled to recover from the non-prevailing party all of its attorney's fees and costs.

Agreement, 117, at 100–01, Ex. A § X.

7

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

22.    The Agreement contains the following severability provision:

> In the event that any provision of this Agreement is held to be void or unenforceable by any arbitration panel or court reviewing an arbitration decision, the remaining provisions shall nevertheless be binding provided, however, if any of the confidentiality obligations of this Agreement are ever contended to be unenforceable by Grant, or are found to be unenforceable by any tribunal, Grant agrees that she shall return all monies paid pursuant to this Agreement to McMahon.

Agreement, ECF No. 117, at 100, Ex. A § IX.

**Response:** DENIED that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

23.    The Agreement states that "Grant represents that she is able to read the language and to understand the meaning and effect of this Agreement" and that "she has read and understands this Agreement and the effect of it and that her attorney, Mr. Jonathan Shapiro, has explained it to her." Agreement, ECF No. 117, at 100, Ex. A § VII.A.

**Response:** DENIED as to Ms. Grant's ability to "understand the meaning and effect of the Agreement" and that Ms. Grant is bound by the Agreement. Expert Decl. ¶¶ 24, 47-49. ADMITTED as to the content of the document.

24.    "On February 4, 2022, Grant was wired $1 million as the first installment" of the Agreement. Am. Compl., ECF No. 117, ¶ 262; *see also* Agreement, ECF No. 117, at 98, Ex. A § V.A

**Response:** ADMITTED.

25.    "On February 28, 2022, Grant was wired $10,000 to cover her attorneys' fees incurred in connection with" the Agreement. Am. Compl., ECF No. 117, ¶ 262.

**Response:** ADMITTED.

26. "McMahon continued to pay for Grant's medical care until April 15, 2022." Am. Compl., ECF No. 117, ¶ 272.

**Response:** ADMITTED.

27. On February 9 and 10, 2022, Grant provided notice to Laurinaitis and WWE's Human Resources department that she was leaving WWE. Am. Compl., ECF No. 117, ¶ 263.

**Response:** ADMITTED.

28. On March 30, 2022, McMahon's counsel notified Grant's counsel of "an anonymous email about the relationship between Ms. Grant and McMahon and Laurinaitis." Am. Compl., ECF No. 117, ¶ 271.

**Response:** ADMITTED.

29. In June and July 2022, various media stories were published "regarding the matter of McMahon's multiple NDAs with various women." Am. Compl., ECF No. 117, ¶ 273.

**Response:** ADMITTED.

30. Under the Agreement, McMahon's second scheduled payment of $500,000 would have been due on February 1, 2023. Agreement, ECF No. 117, at 98–99, Ex. A § V.B.

**Response:** ADMITTED.

31. Grant alleges that McMahon did not make the scheduled payment on February 1, 2023, or any subsequent payment provided for under the Agreement's payment schedule. Am. Compl., ECF No. 117, ¶ 315. According to Grant, she had "signed the NDA in exchange for payments—which McMahon later stopped making." Am. Compl., ECF No. 117, ¶ 26.

**Response:** ADMITTED.

32. Grant filed the original Complaint on January 25, 2024. Compl., ECF No. 1, at 67.

**Response:** ADMITTED.

33.     On May 8, 2024, the Court entered a scheduling order with respect to any motions to compel arbitration. ECF No. 49. The Court directed that such motions be filed by May 14, 2024; Grant's opposition be filed by June 4, 2024; and replies be filed by June 18, 2024. *Id*. The Court also ordered that "[a]ny applicable deadline(s), pursuant to Federal Rule of Civil Procedure pleadings, including any motions pursuant to Federal Rule of Civil Procedure 12(b), shall be suspended pending the Court's adjudication of Defendants' motions to compel arbitration." *Id.*

**Response:** ADMITTED.

34.     WWE filed its Motion to Compel Arbitration on May 14, 2024. ECF No. 61. (McMahon and Laurinaitis each previously filed a Motion to Compel Arbitration on April 23, 2024 and May 2, 2024, respectively. ECF Nos. 30, 35.) Grant did not file an opposition to the then-pending Motions to Compel Arbitration by the June 4, 2024 deadline. *See* ECF No. 49.

**Response:** ADMITTED. *See* §II ¶ 28, *infra*.

35.     On June 11, 2024, the Court entered an order staying this action to December 11, 2024. ECF No. 68 ("On the basis of the Court's understanding that the parties mutually consent to a stay of these proceedings for a period of approximately six months, the Court STAYS this action to December 11, 2024."). The Court also denied all pending motions to compel arbitration "without prejudice to renewal within two weeks of any future order of the Court lifting the stay." *Id.*

**Response:** ADMITTED.

36.     The Court did not extend its June 11, 2024 stay order, and thus, on December 11, 2024, the stay expired. *See* ECF No. 68.

**Response:** ADMITTED.

37.    On December 23, 2024, WWE filed its renewed Motion to Compel Arbitration. ECF No. 86. (McMahon and Laurinaitis also filed renewed Motions to Compel Arbitration on December 23, 2024 and December 24, 2024, respectively. ECF Nos. 85, 87.) Grant did not file an opposition to the then-pending Motions to Compel Arbitration by the deadline. *See* L.R. 7(a)(2) ("Unless otherwise ordered by the Court, all opposition memoranda shall be filed within twenty-one (21) days of the filing of the motion[.]").

**Response:** ADMITTTED. *See* § II ¶ 29, *infra*.

38.    On January 2, 2025, Grant filed a Motion for Status Conference in which, for the first time, she indicated to the Court that she planned to amend the Complaint. *See* ECF No. 88. Grant filed a Renewed Motion for Status Conference on January 13, 2025, in which she requested an extension of the deadline to oppose Defendants' pending Motions to Compel Arbitration. *See* ECF No. 90, at 5.

**Response:** ADMITTED. *See* § II ¶ 30, *infra*.

39.    On January 16, 2025, the Court entered an order denying Grant's motions for a status conference and permitting her to file, by January 31, 2025, a motion for leave to file an amended complaint addressing why she should be permitted to amend "despite the expiration of the deadline for filing amended pleadings contained in ECF No. 7." ECF No. 93. The Court also denied all pending motions to compel arbitration "without prejudice to renewal following the Court's decision on Plaintiff's motion for leave to amend the complaint." *Id.* On January 31, Grant filed a Motion for Leave to Amend the Complaint along with a proposed First Amended Complaint. ECF Nos. 94, 95, 96.

**Response:** ADMITTED.

40.    On May 7, 2025, the Court entered an order granting Grant's Motion for Leave to Amend the Complaint, ECF No. 115, and an order staying discovery and directing Defendants to refile, once again, their motions to compel arbitration on or before June 13, 2025, ECF No. 116.

**Response:** ADMITTED. *See* § II ¶ 31, *infra*.

41.    Grant filed the First Amended Complaint on May 7, 2025. Am. Compl., ECF No. 117, at 93. The Amended Complaint adds no new parties or causes of action.

**Response:** ADMITTED.

## II.    ADDITIONAL MATERIAL FACTS

1.    In early January 2022, McMahon abruptly distanced himself from Ms. Grant, saying that he could not speak to or be in the same room as her. Am. Compl. ¶ 237. Then on January 9, 2022, McMahon agreed to speak with Ms. Grant at his condo and told Ms. Grant that his wife, Linda McMahon, had learned about his relationship with Ms. Grant, that he was losing his condo, and that she would divorce him. Am. Compl. ¶ 238; Grant Decl. ¶ 92. He stressed that a public divorce would make Ms. Grant a headline. Am. Compl. ¶ 238; Grant Decl. ¶ 93.

2.    McMahon instructed Ms. Grant that she should not go back to the office and immediately lessen her involvement on open work items. Am. Compl. ¶ 240.  Ms. Grant expressed concerns about both her name being mentioned in the media and the loss of control over her image, especially as McMahon had shared content of her for close to two years, and the ramifications for her career. Am. Compl. ¶ 240; Grant Decl. ¶ 93. McMahon suggested that he would attempt to help keep Ms. Grant's reputation intact, and that he or Nick Khan would personally help Ms. Grant to find another job. Am. Compl. ¶ 240; Grant Decl. ¶ 96. McMahon instructed Ms. Grant not to share this news with anyone, and suggested she offer health-related excuses if asked about leaving WWE. Am. Compl. ¶ 241; Grant Decl. ¶ 96.

3.      Regarding the NDA, Ms. Grant asked McMahon, "Is this when Jerry sends the papers?" Am. Compl. ¶ 242. McMahon nodded and assured Ms. Grant that they would be "in the driver's seat" to iron out terms together but she would need an attorney to make things official and approved of Ms. Grant asking Dr. Colker for an attorney referral. Am. Compl. ¶ 242. Following this discussion, McMahon led Ms. Grant to his bedroom for another sexual encounter. Am. Compl. ¶ 243.

4.      On January 14, 2022, McMahon sent Ms. Grant a to-do list for purposes of effectuating the NDA, such as resigning from WWE and retaining counsel. Am. Compl. ¶ 244; Grant Decl. ¶ 105. McMahon suggested the list had been drafted by Brad Blum. *Id.*

5.      McMahon directed a single attorney, his personal attorney Jerry McDevitt, to negotiate the NDA on behalf of WWE and McMahon—both parties to the agreement. Am. Compl. ¶ 303. Before Ms. Grant retained counsel, McMahon called Ms. Grant with an update and informed her that McMahon's attorney and counsel for WWE insisted on installment payments due to "cash flow purposes." Am. Compl. ¶ 246; Grant Decl. ¶ 104. When Ms. Grant responded that this reasoning did not make sense for a billionaire, McMahon insisted that it was not his idea. Am. Compl. ¶ 246.

6.      Throughout the entire NDA process, Defendant McMahon continued to send Ms. Grant sexually charged text messages and encouraged her to participate in sexual acts and produce explicit content. Am. Compl. ¶ 243, 248. On January 24, 2022, McMahon encouraged Ms. Grant to send an explicit photo to Brock Lesnar. Am. Compl. ¶ 248; Grant Decl. ¶ 113. McMahon also demanded that Ms. Grant send him the content she sent to Lesnar. Grant Decl. ¶ 98. At this same time, McMahon finalized a booking for Lesnar to perform in a live event at Madison Square

13

Garden, during which it was expected that Ms. Grant and Lesnar would engage in a sexual encounter. Am. Compl. ¶ 248; Grant Decl. ¶ 113.

7.      The NDA was under discussion for 19 days. Am. Compl. ¶¶ 237-257. Ms. Grant did not have legal representation for the initial eleven days of the "negotiation." Am. Compl. ¶ 249. Ms. Grant had legal representation for only eight days before the Agreement was executed. *Id.* During the eight days that he represented her, Ms. Grant's attorney expressed apprehension about moving forward so quickly with the NDA. Grant Decl. ¶ 129. Ms. Grant requested to McMahon that the NDA should reference people who knew about their relationship, including, but not limited to: Nick Khan, Brad Blum, John Laurinaitis, and McMahon's personal assistants. Am. Compl. ¶ 249. Ms. Grant and her attorney sought to incorporate the list of individuals who had knowledge of the relationship into a Schedule A in the NDA, which included the five people Ms. Grant would continue to interact with after her employment at WWE ended. *Id.* Ms. Grant's requested revisions were flatly rejected by McMahon and WWE, who reverted to their original draft rather than incorporate any of her proposed changes—with the exception that, as of the date of execution, Ms. Grant would not speak of the relationship. *Id.*

8.      On or around January 26, 2022, McMahon articulated an even more pressing need to get the NDA signed immediately, informing Ms. Grant that he was under a tight deadline to report pending or threatened legal actions to the WWE Board of Directors—specifically the Audit Committee—and that McMahon and his attorney could not do so unless Ms. Grant signed the NDA. Am. Compl. ¶ 250; Grant Decl. ¶ 119. He informed Ms. Grant that Board members were concerned about the delay. *Id.*

9.      Furthermore, McMahon repeatedly pressed Ms. Grant to stop her attorney from any further "wordsmithing" and blamed Ms. Grant's attorney for not understanding the urgency of the

14

situation. Am. Compl. ¶ 251; Grant Decl. ¶ 117.  Also, despite his previous approval, McMahon now expressed that both he and his attorney had concerns about Ms. Grant's attorney and warned her that her counsel could not be trusted, which in turn caused Ms. Grant to question her trust in her attorney. *Id.*

10.    On or around January 26, 2022, Ms. Grant became so overwhelmed that she asked to simply resign without the need for a payment, even offering to sign a napkin or Post-It as a sign of goodwill. Am. Compl. ¶ 252; Grant Decl. ¶ 117. McMahon flatly rejected her desire to back out. *Id.*

11.    On January 27, 2022, eight days after Ms. Grant had hired an attorney, McMahon left Ms. Grant a lengthy audio message explaining why they needed to go through with the NDA, pushing her to hurry up and sign the NDA, and advising that he would be "double fucked" if she did not. Am. Compl. ¶ 253; Grant Decl. ¶ 119. McMahon again rejected Ms. Grant's desire to back out of the agreement, acknowledging the extreme repercussions that he and WWE would face if she did not sign the NDA. *Id.*

12.    McMahon's attorney who negotiated the NDA—Jerry McDevitt—was also the person whom McMahon routinely and painstakingly referenced when telling Ms. Grant about the high-powered attorney he had on speed dial. Am. Compl. ¶ 254. Namely, McMahon referred to Mr. McDevitt as someone who was "world class at making problems go away."  Am. Compl. ¶ 254; Grant Decl. ¶ 9. All of this was known to Ms. Grant and being reinforced by McMahon throughout the NDA process, while Ms. Grant was being represented by an attorney she had never met in person and who McMahon viewed as merely a formality. Am. Compl. ¶ 254; Grant Decl. ¶ 96.

13.    Between January 27, 2022 and January 28, 2022, there were unresolved edits that led to panicked phone calls, including an attorney confidentiality clause and signatory line that Ms. Grant's counsel said he would never sign. Am. Compl. ¶ 255. Also, the deadline to sign the NDA was pushed up from January 31 to January 28, 2022. Am. Compl. ¶ 255; Grant Decl. ¶ 120.

14.    McMahon continued pressuring Ms. Grant with calls, during which he pleaded, demanded, threatened, and begged her to sign the NDA and reminded her that by not signing, she would jeopardize him, the Company, and his family, and that she would surely become the subject of national headlines and ruin her reputation if she did not sign the NDA by the start of WWE's live programming schedule on January 28, 2022. Am. Compl. ¶ 256; Grant Decl. ¶ 126. He reassured her that nothing would change between them, and she would emerge with her reputation intact if she would simply sign the NDA. *Id.*

15.    In a state of mental defeat from McMahon's threats, instilling a fear in her that if she did not sign, he would expose her intimate content publicly, as well as any narrative necessary—whether true or false—that could expose her to serious personal and financial harm, Ms. Grant succumbed to his unrelenting coercion and signed the NDA just before the deadline on January 28, 2022. Am. Compl. ¶ 257; Grant Decl. ¶ 128.

16.    Over the course of these several weeks from early January until January 28, 2022, the nature of Ms. Grant's mental state had changed substantially—she feared she would never be free from McMahon and WWE. Am. Compl. ¶ 257. In addition to the prolonged state of fear and anxiety that Ms. Grant had been living with since meeting McMahon, McMahon was now also adding this immense level of coercive control over everything involving the NDA process. Am. Compl. ¶ 257; Expert Decl. ¶¶ 24, 48. Ms. Grant expressed to Defendant McMahon several times throughout the "negotiation" period that her mental and physical health were worsening as a result

16

of the NDA process, and that she felt that she had no decision in signing the NDA. Expert Decl. ¶¶ 38-39; Grant Decl. ¶¶ 63, 94, 99, 101-104, 107-109, 111, 113, 118, 120, 123.

17.     Ms. Grant was coerced and fraudulently induced to accept the arbitration provision. Am. Compl. ¶ 260; Expert Decl. ¶¶ 24, 47-49. Ms. Grant was told by her attorney that the terms of the agreement (*e.g.*, the arbitration provision) could be undesirable as written, but given the perpetuated duress that had now been elevated by Ms. Grant's chronic abuser, McMahon, she was not able to make sound decisions regarding terms like the arbitration provision. *Id.*

18.     On February 4, 2022, Ms. Grant was wired $1,000,000 as the first installment of the NDA. On February 28, 2022, Ms. Grant was wired $10,000 to cover her attorneys' fees incurred in connection with the NDA. Am. Compl. ¶ 262. Both wires were sent with originator described as "Vincent K. McMahon C/O WWF, Brad M. Blum," and originator address "1241 EAST MAIN STREET, STAMFORD, CONNECTICUT, 06902 UNITED STATES." *Id.*

19.     ***After the NDA was signed***, McMahon, wearing only a white robe, met Ms. Grant in his condo to review outstanding business items. Am. Compl. ¶ 266; Grant Decl. ¶ 132. As Ms. Grant was proceeding to the door to leave, McMahon grabbed her arm and commanded her to do "one last thing" and get "on your knees." *Id.* As Ms. Grant knelt on the hard floor, barely a few feet away from the front door, McMahon opened his robe and ordered her to "Eat him!" Am. Compl. ¶ 267; Grant Decl. ¶ 132. McMahon grabbed the back of Ms. Grant's head and slammed her face into his crotch several times until she gagged and pushed him away, telling him to stop and that she couldn't breathe. *Id.* McMahon responded that she wouldn't get away that easily and held her head as he forced himself back in her mouth until she had no air. *Id.* Ms. Grant tried to push him away, but Defendant McMahon held her head firmly in place and loudly commanded her to "Look up!" followed by "Take it, bitch." *Id.* They momentarily made eye contact before

17

McMahon's force caused Ms. Grant's body to convulse and retch with tears streaming down her face. *Id.* McMahon then released his hold and closed his robe as she stood up. *Id.* After leaving, Ms. Grant never saw McMahon again. Am. Compl. ¶ 267.

20.    On March 2, 2022, while Ms. Grant was away on a trip to Florida, McMahon called Ms. Grant to advise that they would not speak for a while and, if she needed anything, to contact Nick Khan or Brad Blum. Am. Compl. ¶ 268; Grant Decl. ¶ 136. Over the course of an approximately half-hour call, McMahon lamented both his inability to focus on the upcoming WrestleMania and how his personal life had blown up over the past few weeks. Am. Compl. ¶ 268. Towards the end of their conversation, McMahon and Ms. Grant agreed to resume contact after WrestleMania. Am. Compl. ¶ 268; Grant Decl. ¶ 136. He also instructed Ms. Grant to continue having sexual relations with other men, including Brock Lesnar, in the meantime. *Id.*

21.    On or around March 4, 2022, Lesnar messaged Ms. Grant that he was in New York and, in line with McMahon's orders, Ms. Grant texted Lesnar explicit pictures. Am. Compl. ¶ 269; Grant Decl. ¶ 137. On March 27, 2022, Lesnar reached out to Ms. Grant again. Am. Compl. ¶ 270. Ms. Grant understood that these back-to-back advances were an indication of McMahon's continued control. *Id.*

22.    In June and July 2022, stories were published regarding the matter of McMahon's multiple NDAs with various women associated with WWE and others. Am. Compl. ¶ 273.

23.    On June 13, 2022, Ms. Grant received an email to her personal account from an attorney at Simpson Thacher & Bartlett LLP seeking to talk to her about an investigation surrounding "[her] time at WWE, including matters relating to the January 2022 agreement between [her], Vince McMahon, and WWE."  Am. Compl. ¶ 274.

24.     The qualitative scope of the investigation was confirmed and reiterated to Ms. Grant and her counsel on multiple occasions by WWE's General Counsel and Simpson Thacher & Bartlett LLP on behalf of the WWE Board of Directors' Special Committee, as investigating, among other things, "Mr. McMahon's relationship with Ms. Grant and the circumstances surrounding the settlement between [Ms. Grant], the WWE, and Mr. McMahon." Am. Compl. ¶ 275.

25.     Despite being told by her counsel that Ms. Grant was available and willing to participate in the investigation, including through the substantial provision of relevant documents, the Special Committee never interviewed her. Am. Compl. ¶ 276. In fact, Ms. Grant was actively preparing for the investigation with her attorney. *Id.* Instead, the Special Committee announced in November 2022 that the investigation had been completed. *Id.*

26.     Ms. Grant did not receive another payment under her NDA in February of 2023. Am. Compl. ¶ 277.

27.     As a result of the power dynamics and the trauma endured by Ms. Grant for so many years by Defendants, Ms. Grant has continued to be in a depleted mental state even after entering into the NDA. Am. Compl. ¶ 278.

28.     To accommodate the Department of Justice criminal investigation into Defendants and the forthcoming stay related to said investigation (ECF No. 68), Ms. Grant did not file an opposition to the then-pending Motions to Compel Arbitration by the June 4, 2024 deadline. *See* ECF No. 49.

29.     On December 23, 2024, WWE filed its renewed Motion to Compel Arbitration. ECF No. 86. (McMahon and Laurinaitis also filed renewed Motions to Compel Arbitration on December 23, 2024 and December 24, 2024, respectively. ECF Nos. 85, 87.) Because the Court

19

had not yet filed an order lifting its June 11, 2024 stay, and because Ms. Grant intended to file an amended complaint, Ms. Grant filed a motion for status conference (ECF No. 88) and renewed motion for status conference (ECF No. 90) to gain clarity on the briefing schedule. In response, the Court clarified that the stay entered on June 11, 2024 was no longer in effect and denied Defendants' motions to compel arbitration without prejudice to renewal following the Court's Decision on Ms. Grant's forthcoming motion for leave to amend the amend the complaint. *See* ECF No. 93.

30.     Plaintiff wrote to Defendants on December 16, 2024, to advise that Plaintiff was preparing to amend her complaint and proposed a joint briefing schedule. *See* ECF No. 88-1, Ex. A at 2. Counsel for Defendant McMahon, on behalf of all Defendants, asked for time to confer with their clients on December 16, waited a week, then responded by email on December 23, 2024, that "Defendants are filing their motions to compel arbitration." ECF No. 88-1, Ex. A at 1. Plaintiff then moved for a status conference on January 2, 2025 to request the Court's guidance on a schedule for submitting her Amended Complaint and any responsive motions. *See* ECF No. 88. On January 7, 2025, this case was reassigned to Judge Sarah F. Russell, a newly-appointed member of the District of Connecticut federal bench. *See* ECF No. 89. Plaintiff then moved for a renewed motion for status conference on January 13, 2025, (ECF No. 90), to again request guidance on a schedule for submitting her Amended Complaint and any responsive motions.

31.     On May 7, 2025, the Court entered an order granting Ms. Grant's Motion for Leave to Amend the Complaint, ECF No. 115, and an order staying discovery and directing Defendants to refile, once again, their motions to compel arbitration on or before June 13, 2025, ECF No. 116. The Order also specified that upon reviewing Defendants' motions to compel arbitration, Plaintiff may file a motion seeking leave to take motion-related discovery on or before June 23, 2025, after

conferring with Defendants to determine whether the parties can resolve the discovery dispute without Court intervention. ECF No. 116.

Respectfully submitted,

**PLAINTIFF JANEL GRANT**

By  */s/ Ann E. Callis*
      HOLLAND LAW FIRM, LLC
      Eric D. Holland (phv207692)
      Gregory R. Jones (phv207693)
      211 North Broadway, Suite 2625
      St. Louis, MO 63102
      Tel: (314) 241-8111/Fax: (314) 241-5554
      eholland@hollandtriallawyers.com
      gjones@hollandtriallawyers.com

      Ann E. Callis (phv207694)
      6181 Bennett Drive, Suite 210
      Edwardsville, Illinois 62025
      Tel: (618) 452-1323/Fax: (618) 452-8024
      acallis@hollandtriallawyers.com

      */s/ Aaron C. Lang*
      Aaron C. Lang (phv51511)
      NELSON MULLINS RILEY & SCARBOROUGH LLP
      330 Madison Avenue, 27th Floor
      New York, New York 10017
      Tel: (267) 229-6029
      aaron.lang@nelsonmullins.com

      */s/ Erica O. Nolan*
      David A. Slossberg (ct13116)
      Erica O. Nolan (ct31097)
      Julie V. Pinette (ct30573)
      HURWITZ, SAGARIN & SLOSSBERG, LLC
      135 Broad Street
      Milford, CT 06460
      Tel: (203) 877-8000/Fax: (203) 878-9800
      DSlossberg@hss.law
      ENolan@hss.law
      JPinette@hss.law

21

22

**CERTIFICATE OF SERVICE**

This is to certify that on April 1, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

/s/ Erica O. Nolan
Erica O. Nolan (ct31097)

22