**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JANEL GRANT,<br><br>　　　Plaintiff,<br><br>v.<br><br>WORLD WRESTLING<br>ENTERTAINMENT, INC. n/k/a WORLD<br>WRESTLING ENTERTAINMENT, LLC;<br>and VINCENT K. MCMAHON<br><br>　　　Defendants. | Case No.: 3:24-cv-00090-SFR<br><br><br>April 1, 2026 |

## EXPERT DECLARATION OF DR. CHITRA RAGHAVAN

1.　　　I am Dr. Chitra Raghavan, a licensed clinical psychologist, and I have been retained as a potential testifying expert in this matter. I am submitting this declaration regarding my evaluation of Ms. Janel Grant and my professional opinions concerning the circumstances surrounding the execution of the so-called nondisclosure agreement ("NDA") between Ms. Janel Grant and Defendants Vincent McMahon and World Wrestling Entertainment ("WWE"), dated January 28, 2022. Specifically, among other issues, counsel for Ms. Grant requested that I evaluate Ms. Grant to address three questions: (1) whether psychological factors consistent with duress were present that may have impaired Ms. Grant's autonomous decision making at the time of the NDA's execution; (2) whether her cognitive and emotional functioning at that time may have been sufficiently compromised to diminish her ability to meaningfully process, reflect upon, and evaluate complex legal information, including the implications of the agreement's provisions; and (3) whether Ms. Grant's presentation is consistent with someone who is continuing to experience duress during the events following the NDA.

2.      My expert opinions are based on 30 hours of clinical interview with Ms. Grant (May 7 – August 15, 2024), psychological testing, and review of relevant documents including the NDA, various legal documents,[1] communications between Ms. Grant and Defendant McMahon, communication between Ms. Grant and other parties, photos and videos, supplemented by scientific literature and my own clinical experience with coercive control.

3.      In addition to a clinical interview, I administered multiple tests and assessments that are standard and accepted methodology in forensic evaluations: these included the Structured Clinical Interview for DSM-5 Disorders (SCID-V),[2] the Clinician Administered PTSD Scale (CAPS),[3] the Personality Assessment Inventory 2nd Edition (PAI), the Trauma Symptom Inventory-2 (TSI-2) and the Structured Interview of Reported Symptoms 2nd Edition (SIRS-2).[4] The PAI, the TSI-2 and the SIRS-2 also provide data on whether a client is feigning or malingering.

4.      I reviewed approximately 81,000 texts, emails, videos, and photographs provided by Ms. Grant as well as those produced by the DOJ. Given the sheer volume of materials—and the diminishing utility of citing hundreds of communications conveying the same content—I have

---

[1] Am. Compl., *Grant v. WWE*, No. 24-cv-0090-SFR (D. Conn. May 7, 2025); Def. World Wrestling Ent., LLC's Mem. of L. in Supp. of its Mot. to Compel Arb., *Grant v. WWE*, No. 24-cv-0090-SFR (D. Conn. June 13, 2025); Def. Vincent K. McMahon's Mem. of L. in Supp. of his Mot. to Compel Arb., *Grant v. WWE*, No. 24-cv-0090-SFR (D. Conn. June 13, 2025).

[2] Michael B. First et al., *Structured Clinical Interview for DSM-5 Disorders: Clinician Version (SCID-5-CV)* (2016).

[3] *See* U.S. Dep't of Veterans Affs., *Clinician-Administered PTSD Scale for* DSM-5 *(CAPS-5)*, https://www.ptsd.va.gov/professional/assessment/adult-int/caps.asp (last visited Feb. 25, 2026); Jon D. Elhai, Matt J. Gray, Todd B. Kashdan & C. Laurel Franklin, *Which Instruments Are Most Commonly Used to Assess Traumatic Event Exposure and Posttraumatic Effects?: A Survey of Traumatic Stress Professionals*, 18 J. Traumatic Stress 541 (2005).

[4] Leslie C. Morey, *Personality Assessment Inventory: Professional Manual*, Psychological Assessment Resources (2d ed. 2007); John Briere, *Trauma Symptom Inventory: Professional Manual*, Psychological Assessment Resources (2d ed. 2011); Rogers, R., Sewell, K. W., & Gillard, N. D., *Structured Interview of Reported Symptoms: Professional Manual*, Psychological Assessment Resources (2d ed. 2010).

selected representative examples throughout this report rather than cataloguing each instance individually.

5.    I do not opine on legal causation or whether the alleged abuse occurred, but rather on the psychological likelihood and expected nature of harm arising from the pattern of alleged abuse described herein. My conclusions assume the factual accounts provided are substantially accurate and may require revision should that change materially.

6.    This is a summary declaration. If requested by the court or other parties, I can provide a more detailed written report or testimony as relevant.

**Credentials and Expertise**

7.    I am a licensed clinical psychologist with more than twenty years of experience in the field of clinical psychology. Currently, I am a tenured and full Professor of Psychology, Director of the Forensic Mental Health Counseling Program, and Coordinator of Victimology Studies in Forensic Psychology at John Jay College of Criminal Justice (City University of New York). My post-high school education includes obtaining a B.A. in French Language and Literature and Psychology from Smith College in 1992; a Doctorate in Community and Clinical Psychology from the University of Illinois in Urbana-Champaign in 1998; a Postdoctoral Fellowship at Yale University School of Medicine in 2000; and working as a Research Scientist at the National Center on Addiction and Substance Abuse (CASA) at Columbia University in 2002. I received my license to practice psychology in New York in 2005 and am in good standing.

8.    A complete record of my academic and professional background is detailed in my Curriculum Vitae, attached as Exhibit A. A list of cases in which I have recently testified in provided in Exhibit B.

3

9.      Among my specialties are coercive control and sexual assault in domestic violence, sex trafficking, and other interpersonal contexts, and how forms of prolonged psychological captive trauma can lead to posttraumatic stress disorders such as PTSD and Complex-PTSD, dissociative disorders such as trauma bonding, and mood disorders such as depression and persistent depression. Throughout my career, I have conducted extensive research on coercive control patterns and the psychological impact on survivors. I have made over two hundred conference presentations on these topics. I have also published over sixty peer-reviewed publications and edited two books, including *Domestic Violence: Methodologies in Dialogue*, Northeastern Series on Gender, Crime, and Law, Northeastern University Press (2013). A third book on the assessment of coercive control is under contract with Oxford University Press (2026 publication date).

10.     Additionally, I have given several keynote speeches and participated in panels on topics related to coercive control, behavioral habits of survivors of domestic violence and trafficking, post-traumatic stress disorder, and coercive bonding between the survivor and attacker. I have also led several trainings in New York on the topic of sex trafficking.

11.     Furthermore, I have qualified as an expert witness and provided testimony in several cases related to coercive control, domestic violence, and sex trafficking. Documentation of my prior expert testimony is attached as Exhibit B. In addition to civil cases, I have worked with public prosecutors and public defenders in New York State Supreme Court in New York County, Kings County, Ulster County, and the Bronx, and at the federal level in the Southern District of New York, the Eastern District of Michigan, New Mexico, Minnesota, and Washington, D.C., as well as in Hague Proceedings in the Eastern District of New York.

4

**Coercive Control and Psychological Impacts**

12.    Coercive control is a strategic pattern of behavior designed to dominate, intimidate, and control another person through psychological, emotional, physical, sexual, and/or economic abuse.[5] Individuals subject to coercive control often experience isolation, surveillance, control over resources and actions, exploitation, threats and intimidation, psychological manipulation, and sexual abuse. Unlike isolated incidents of violence, coercive control represents a systematic control over another, undermines the victim's autonomy, liberty, and sense of self, and often results in residual and long-term psychological effects. The primary goals of coercive control are to obtain obedience and submission—thus fundamentally undermining the psychological foundations necessary for autonomous decision-making—while validating the abuser's actions as justified.

13.    To retain power and control over their subjects, abusers move on two parallel tracks: they instill fear on one track while creating a manipulated affectionate or romantic connection on the second. Fear enables abusers to easily control their subjects while creating an environment where the subject feels helpless to escape. Meanwhile, the manufactured emotional connection entraps the subject by a constant terror of abandonment because they have been coerced into believing that they cannot exist without the abuser. The abuser is viewed as all-powerful, and when abuse happens, it is because the victim failed in some way. Earning the abuser's love is the only way to keep from their anger, which is perceived as all-powerful and destructive. This

---

[5] The topic of coercive control and sexual coercion has been written about extensively by myself and other professionals in the field. *See* Appendix A and B; *see also, e.g.*, Chitra Raghavan & Kendra Doychak, *Assessing Coercive Control in Forensic Settings: Development, Psychometrics, and Application of the Brief Interview Of Coercive Control (BICC)*, Journal of Forensic Psychology Research and Practice, 1-18 (2025), https://doi.org/10.1080/24732850.2025.2551643; Jennifer E. Loveland & Chitra Raghavan, *Coercive Control, Physical Violence, and Masculinity*, 4 Violence & Gender 5 (2017); Evan Stark, *Coercive Control: How Men Entrap Women in Personal Life*, Oxford University Press (2007); Hannah Kaplenko, Jennifer E. Loveland & Chitra Raghavan, *Relationships Between Shame, Restrictiveness, Authoritativeness, and Coercive Control in Men Mandated to a Domestic Violence Offenders Program*, 33 Violence & Victims 296 (2018).

manufactured emotional connection resulting from coercive control is also known as a trauma bond or trauma-coerced attachment with their abusers.[6] In other words, victims "bond" with their abusers as a survival mechanism because they are too psychologically beaten down to exit the abusive situation and, at the same time, need human connection to survive the abuse. Individuals who develop a trauma bond are highly dependent on and loyal to their abuser, submitting to their demands out of fear of further abuse. This enables the oppressor to serve as both the abuser and sole source of comfort and security, entrapping the subject in a cycle of abuse. Because showing temper or unwillingness can result in punishment, victims often fake enthusiasm for decisions or actions that they do not wish to engage in. From the outside, such actions can appear "voluntary" or that the victim is a "willing participant." While trauma bonds can present in various levels of coercive control, it is more likely in severe cases of coercive control.

14.     To the outside world, snapshots of the victim's mood and behavior can appear puzzling: they may exhibit moments of affection and activity, which are desperate attempts at self-preservation, alternating with numb and withdrawn behaviors, which are also survival behaviors intended to protect from further harm. In these situations, individuals subject to coercive control cannot make autonomous decisions. Rather, the psychological impact of the coercive control creates a narrow focus on immediate safety, causing the individual to act in ways that appease their abuser's demands to avoid retaliation.

15.     Coercive control can produce a psychological state of duress that, depending on its severity and duration, may significantly diminish an individual's ability to engage in voluntary and informed decision making. Tactics such as microregulation (controlling one's appearance, time, and bodily autonomy), intimidation (creating fear and dread), and manipulation (deception and

---

[6] Please see later reference to Other Specified Dissociative Disorder.

pressure) destroy foundational autonomy and make it difficult for the victim to make small decisions, let alone significant ones. Isolation and restriction destroy opportunities and initiative to seek effective outside help, especially if the individual is afraid and under pressure. Further, when fearful, confused, and traumatized, victims often cannot clearly articulate what is going on with them, rendering them less credible in the eyes of the outside world and lowering the chances of effective help. Physically injurious tactics such as sleep deprivation, sexual abuse, and physical abuse can cause the victim to experience pain, injury, and exhaustion, all of which affect clear thinking and decision making. The totality of coercive controlling abuse generates pervasive physical and psychological traumatic sequelae, including cognitive disruption (confusion, poor concentration, dissociation), affective dysregulation (fear, shame, hypervigilance, self-blame), and somatic deterioration (exhaustion, sleep disruption, appetite disturbance). In a vicious cycle, the severe and pervasive state of confusion, overwhelm, hypervigilance, and fear renders the victim vulnerable to continuing pressure and intimidation. In addition to abusive tactics, the presence of a trauma bond can further control the victim by making them feel that loyalty is an obligation and that disobedience will have catastrophic life or death consequences.

16.    Such a pattern of coercive control and its associated psychological consequences would impede and impair any reasonable person's ability to make informed decisions or choices, or cause them to act out of fear, necessity, and a reasonable belief that no meaningful alternatives existed. Ms. Grant's abuse,  associated trauma, and actions around signing the NDA are consistent with the description above.

### Scope of Evaluation

17.    I have been retained by counsel for Ms. Janel Grant to conduct a psychological evaluation and provide my expert opinions regarding the abuse Ms. Grant endured, the resulting

psychological state when she executed the NDA, and any residual psychological impacts that continued for years thereafter. Specifically, I was asked to evaluate: (1) whether psychological factors consistent with duress were present that may have impaired Ms. Grant's autonomous decision making at the time of the NDA's execution; (2) whether her cognitive and emotional functioning at that time may have been sufficiently compromised to diminish her ability to meaningfully process, reflect upon, and evaluate complex legal information, including the implications of the agreement's provisions; and (3) whether Ms. Grant's presentation is consistent with someone who is continuing to experience duress during the events following the NDA.

18.     My expert opinions herein are based on my evaluation of Ms. Grant following six comprehensive clinical interviews for a total of 30 hours and a further review of relevant documentation and research. The interview dates and times are as follows: My first interview with Ms. Grant occurred on May 7, 2024 for 4.5 hours; followed by session 2 on June 6, 2024 for 6 hours and 45 minutes; session 3 on June 11, 2024 for 4.5 hours; session 4 on July 30, 2024 for 4 hours and 15 minutes; session 5 on August 1, 2024 for 5 hours; and session 6 on August 15, 2024 for 5 hours. Throughout these interviews, I conducted objective tests and clinical assessments, gathered detailed information regarding Ms. Grant's personal and psychological history, the nature and timeline of her relationship with Defendant McMahon, specific instances and patterns of coercive abuse and sexual abuse, her psychological state at various points during the relationship including, but not limited to, during the time she signed the NDA, and her current psychological status. I conducted psychological testing to determine the potential for malingering and ensure the validity of Ms. Grant's reported symptoms. I also reviewed a robust number of documents as detailed earlier to form my expert opinion.

19. In addition to my direct evaluation of Ms. Grant and a significant body of relevant documents, I reviewed scientific literature and research papers regarding coercive control, psychological aspects of sex trafficking, and associated trauma responses, as well as my own clinical, teaching, and research experience on the function and outcomes of using coercive control and sexual assault.

20. I do not make any definitive conclusions regarding legal causation of harm, past or present, and do not opine whether the alleged abuse occurred. Rather, I opine on the psychological likelihood and expected nature of harm arising from the pattern of alleged abuse described herein. When background material regarding alleged abuse is provided, it is offered to contextualize the potential psychological impact and not to establish that the abuse occurred. Unless otherwise clearly stated, background material regarding alleged abuse was obtained—as is customary in forensic psychological evaluations—from the alleged victim, in this case Ms. Grant. I also reviewed emails, texts, medical reports, and other documents as provided by the attorneys. My clinical opinions are based on the assumption that the factual accounts provided are substantially accurate; should these underlying assumptions change materially, my opinions may require revision.

21. I requested to speak with witnesses who may have knowledge of Ms. Grant's abuse but understand that they cannot be located or refuse to be contacted.

22. I reserve the right to amend my opinions should new data be presented.

23. I am being compensated at a rate of $400 per hour for my time in this matter. My compensation is not contingent upon the outcome of this case or the nature of my opinions.

**Clinical Findings and Observations**

24.     Defendant McMahon engaged in a sexual relationship with Ms. Grant around or about March 2019 ending around or about March 2022 although contact and alleged coercion continued after he exited the relationship. It is my professional and expert opinion, to a reasonable degree of psychological certainty, that Ms. Grant's description and allegations of abuse by Defendant McMahon throughout their three-year relationship are consistent with a pattern of severe coercive control including the time during and after Ms. Grant executed the NDA. This alleged coercive control likely produced conditions of extreme duress that, in my clinical opinion, would be expected to significantly compromise Ms. Grant's cognitive and emotional ability to engage in informed, autonomous decision-making during the period in which the NDA was negotiated and executed.

25.     As is common with many abusive situations, Defendant McMahon expressed affection for Ms. Grant, which Ms. Grant reciprocated. Presence of affection is common in abusive relationships, and such dynamic does not negate acts of abuse. Indeed, without such gestures, few alleged victims would remain in a relationship that was marked only by coercion and violence.

26.     Further, as is common with many abusive situations, there were moments during which Ms. Grant would attempt to assert her independence; such instances are more consistent with reflexive, survival-driven responses than with sustained, deliberative psychological agency. Further, what limited capacity Ms. Grant may have retained in Defendant McMahon's absence to make an occasional personal decision was, in my clinical opinion, likely substantially further diminished whenever Defendant McMahon or his agents were present and actively directing her to comply with the NDA. It is further my opinion that Defendant McMahon's conduct during negotiations and after the NDA's execution is consistent with the pattern of sexual abuse and

10

trafficking that Ms. Grant alleged that she endured throughout their entire relationship and, thus, her duress likely persisted well after she signed the NDA. The prolonged and severe coercive control that Ms. Grant alleged likely resulted in significant psychological impacts, which she continues to present.

**I.      Ms. Grant exhibited psychological indicators consistent with duress associated with coercive control behaviors, which materially impaired her capacity for voluntary and informed decision making at the time of the NDA's Execution.**

27.      It is my professional and expert opinion that the coercive control and sexual abuse that Ms. Grant allegedly experienced likely produced the psychological conditions assessed during the evaluation—including cognitive impairment, dissociation, and trauma-driven hypervigilance—that would be expected to significantly diminish, and during high stress episodes likely severely compromised, her ability to engage in informed decision-making, particularly those that required detailed thinking, reflection, and consultation, such as legal matters. Specifically, Ms. Grant's exhibits severe psychological (and physical) trauma and such trauma is consistent with repeated sexual abuse, physical and verbal abuse, surveillance, control, and other acts of sex trafficking that Ms. Grant attributes to Defendant McMahon.

28.      Ms. Grant explained that Defendant McMahon would alternate between ignoring her, intimidating her[7] if he didn't get his way, claiming that he loved her more than anyone else and their relationship was sacred, threatening to ruin her life if she didn't obey, and degrading her and using her body like a sex object, sometimes multiple times a day, and with multiple other men.

---

[7] Ms. Grant noted that most moments of intimidation occurred when they were interacting in person and felt that she could not please him. Some of these instances were non-verbal, such as giving her a cold look or ignoring her. At other times, she felt terror because he discussed how well-connected he was and that he had and could destroy lives of those who displeased him. Ms. Grant expressed terror several times that her life could be ruined to Defendant McMahon towards the end of the relationship and received assurances that it would not be.

11

Grant described that Defendant McMahon's fantasies were violent and degrading to her[8] and in parallel, sex was violent, invasive, degrading, and produced injuries that could never heal because there would be new sexual encounters that were rough or violent, often involving other men or objects. Defendant McMahon also constantly demanded nude or semi-nude photos and videos of Ms. Grant masturbating and showing her desire for him. Initially, Ms. Grant reported that she was somewhat/reluctantly willing to send photos because she believed that they were private. When Defendant McMahon allegedly violated that privacy, she noted that she did not want to send any images but felt coerced to do so or believed that she had no other option.[9] Ms. Grant desperately tried to end or change the nature of the relationship early on and when she failed, she alternated between magical thinking (e.g., somehow this will work out, the violence will end, I will get a job, and Defendant McMahon won't hurt me because he loves me) and dissociation (e.g., If I am not mentally present, I can survive another day).

29.    Ms. Grant also noted that on rare occasions, she tried to find polite ways to discourage Defendant McMahon's sexual demands and assaults particularly when he distributed her photos and videos to other men[10] and demanded group sex.[11]

---

[8] Defendant McMahon writes about how Chris has become "unsatiable" because of Ms. Grant, how Defendant McMahon and Johnny will "*double team*" Ms. Grant, how a third-party Tim shared private photos of Ms. Grant with another friend, who then per Defendant McMahon wanted to "*fuck*" her, and how Tim masturbated to Ms. Grant.

[9] Multiple nude or semi-nude photos exist in addition to a video of masturbation. Ms. Grant noted that she made the videos unwillingly and after a while, grew to dread them but dared not refuse Defendant McMahon.

[10] Defendant McMahon shared private sexual pictures of Ms. Grant with "Johnny," and writes that Johnny shared the pictures with his friends after masturbating, who asked if they could share it with their friends. When Ms. Grant doesn't respond, Defendant McMahon asks if she is Ok. Ms. Grant tries to express that she was not comfortable and tried to indicate to Defendant McMahon by saying that she needed to "exhale and digest."

[11] For example, on June 15, 2021, Defendant McMahon set up a threesome with "Johnny" and Ms. Grant declined saying that she is too busy but perhaps another time. Ms. Grant noted that she dared not refuse outright but was hoping to avoid the encounter.

30.     The first time Defendant McMahon arranged a threesome, Ms. Grant tried to ensure her own safety and express her reluctance and anxiety without angering him.[12] However, she more often than not pretended to like Defendant McMahon's fantasies and tried to engage in sex talk to please and placate him. She noted that she felt uncomfortable as this was not her style; as a result, she was rarely graphic or particularly inspired. In contrast, Defendant McMahon frequently was explicit and used crude terms for sex, sexual organs, and climaxes.[13] Over time, Ms. Grant noted that she would cry off from sex when she felt unwell;[14] more often than not, she noted that she was genuinely unwell and Defendant McMahon would sometimes accept her excuses but on other occasions demand sexual videos. Ms. Grant's narrative is consistent with research on how abusers manipulate and intimidate their targets.

31.     The clinical data and Ms. Grant's reported symptom history are consistent with a significant intensification of traumatic effects around the time her relationship with Defendant McMahon began in 2019,[15] throughout the relationship, and during and after the period

---

[12] On May 8, 2020, Defendant McMahon replies in a seeming manipulative manner to her concerns over a threesome that she does not want and fears that it will become aggressive: "*I've already invited Chris Baby. He would B CRUSHED and I'd temporarily lose a friendship but he would get over it. He's NEVER seen a woman like U before.*" Ms. Grant continues: "*I'm putting all my trust in you Vince. More than ever. This is as vulnerable as it gets for a girl. Please make sure it doesn't get too aggressive and that although I'm treated like a fantasy girl, that it doesn't transition into being degrading....*"

[13] For example, on October 26, 2020, Defendant McMahon responds that he will "*fist*" her. On May 19th, after Ms. Grant begs that there not be aggressive sex in person, Defendant McMahon claims that Chris wrote the following: "*The following is a text chain from Chris to me after i sent him the pic before last (bath room tiny little waist) 'She needs to B double teamed !!! I'll fuck her good while U eat her tits Then i'll pull her over with her head hanging off the side of the bed and stick my dick in her throat. I've never done that. While U bang the hell out of her. Let's have a contest to C who can eat her out the best.'*"

[14] For example, *see infra* note 22.

[15] For example, Ms. Grant writes the following to her friend and building concierge Tracey on November 12, 2019, about six months after Defendant McMahon began a sexual relationship with her: "*Hi. I'm hitting the fucking wall and am exhausted. Labs are normal. Having next round tmw or Thur bcuz it's not normal to feel like this. I'm literally in slow motion. My hands And feet are so cold they hurt... and I'm wearing my boots! It makes no sense. Next bloods will be more sensitive to test for auto immune stuff. I'm using the gum as a booster to prevent becoming incoherent but still...*"

surrounding the execution of the agreement in 2022 and beyond.[16] The three years of consistent control, as Ms. Grant has described to me, physically and mentally weakened her. In addition to clinical evaluation and testing, her deteriorating physical and mental state is corroborated by messages she sent to different friends, colleagues, and Defendant McMahon himself about her physical and mental state as well numerous doctor's visits.

32.    Likely as a result of the alleged abuse, Ms. Grant developed severe **Posttraumatic Stress Disorder, Dissociative Subtype** as detailed in the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, Text Revision.[17] She also developed a **trauma bond or Other Specified Dissociative Disorder**.

33.    Administration of the SCID-5-CV yielded the following current diagnoses: **Current Major Depressive Episode, Persistent Depressive Disorder (F34.1), Panic Disorder (F41.0), Generalized Anxiety Disorder (F41.1), and Major Depressive Disorder — Recurrent Episode, Severe (F33.2), as well as Agoraphobia (F40.00)** in the past six months.

34.    Ms. Grant's symptoms have waxed and waned since, with some periods being worse than others. Additionally, Ms. Grant suffered constant illness, fatigue,[18] and a host of

---

[16] For example, on January 13, 2022, Ms. Grant writes around the time of discussing the NDA: "*It's not even like being on a ledge. The mental fuck is just enough that I contemplate the jump. That's why I need the assurances from you that you're not going anywhere. And that an exchange of money (that feels so wrong and shouldn't be happening in the first place) will not change things between us. . . . I'm protecting you. . . . I'm protecting you with everything I have.*" Further on January 28th, after signing the NDA, Ms. Grant writes: "*I'm scared..I'm scared about everything.*" On February 4, 2022, she writes: "*I'd give anything in the world for an adderall. Or a bullet in my head. I'm so sad & isolated. It's a dark place.*" *See also* notes 18-25 for other examples of distress.

[17] *Diagnostic and Statistical Manual of Mental Disorders*, American Psychiatric Association (5th ed., text rev. 2022), https://doi.org/10.1176/appi.books.9780890425787.

[18] On October 21, 2019, about five months after Defendant McMahon began a sexual relationship with her, Ms. Grant writes the following to Tracey: "*I feel terrible today. So cold. So tired. Fucking EXHAUSTED.*" She also writes: "*I'm SO READY to come home. It's a moment where - despite my being so grateful for this job - I feel exhausted and drained and run down. Hair is falling out of my head.*" In December 2019, she writes to a friend and colleague Michelle: "*Fever 101.3! Yay I'm sick AF!* 😜 *you should see all the pill bottles. I'm embarrassed for myself...*" She further writes, "*The doctor is already thinking about changing antibiotics if this doesn't come down. I'm not getting f'in full blown pneumonia for the holidays. That's the LAST THING I need. Uggghhhhhhhhhhhh.*"

physical injuries which she associates with her allegations of being beaten and used roughly during sex by Defendant McMahon and his allies, including chronic back[19] and knee pain,[20] aches and pains throughout her body, pain[21] and chronic swelling in her genitalia and anal area, bruises throughout her body, incontinence, diarrhea, and difficulty walking and lying down. She also described that her stomach was often bloated for hours, making eating and bowel movements agonizing.[22] She also had repeated flu and other cold, pneumonia, and respiratory-type symptoms.[23][24]

35.    Throughout these experiences, Ms. Grant tried to make sense of her symptoms, including attributing to whatever proximal causes were present, including stress at work and exposure to COVID, because she could not understand why she was falling ill so often and all the time. Consistent with a trauma bond or OSDD, she did not attribute any of her suffering openly to Defendant McMahon while in the relationship. Once the relationship with Defendant McMahon

[19] On July 6, 2019, about two months after Defendant McMahon began a sexual relationship with Ms. Grant, she writes to Christine Lewandowski the following message, "*Heyyyy!! Thank u for asking. It STILL feels tweaked. I'm ok until I'm reaching for something, halfway bending down... actually it's LESS or barely any discomfort when I go to stand up. It's MORE then I start to sit down. The tweak totally flares up at that moment when I sit or bend/reach for anything at a downward angle*."

[20] For example, Ms. Grant has several pictures of a bruised knee which she alleges occurred because of rough sex.

[21] On February 27, 2020, Ms. Grant writes to Michelle: "*Had my annual exam today with my gyno. Told her I have had stomach issues lately that feel like a deeper ache. Turns out they think my iud shifted…..... i can feel the ache practically in my teeth. I'm just doubled over*."

[22] On December 11, 2021, Ms. Grant lets Defendant McMahon know that she could not have sex because she is having difficulty with bowel movements, which she attributes to new medication.

[23] On March 18, 2020, Ms. Grant writes to Michelle: "*It feels apocalyptic…..It's agreed I'm sick with something unpleasant. But no fever or cough. But it has knocked me on my ass so hard that Dr Colker was like wooooow u actually look terrible. Lol. They're going to monitor my symptoms daily but we don't suspect its something terrible. More like is it flu? Got an IV*."

[24] On January 23, 2021, Ms. Grant writes to Defendant McMahon: "*I feel rotten. My voice is shot. Fatigue. My throat feels like fire. My upper stomach is waves of nausea and like I've been sucker punched. Eating sucks. I can't get comfortable*."

ended and Ms. Grant was under mental health care, she began to have more insight into her symptoms and as is common in trauma victims, expressed rage, despair, and betrayal simultaneously with increasing perspective around her exploitation.[25]

36.    Traumatic symptoms are not static and flare up when there is a real or perceived threat. Thus, during periods of crisis or increased violence as described by Ms. Grant, her symptoms worsened sharply, including increased anxiety,[26] fear, hypervigilance, complete dissociative blackouts during sex and lengthy periods of "zoning out" in between, mental confusion including poor concentration and clarity, and chronic sleep disturbances. Socially, Ms. Grant appears to have been isolated—surrounded primarily by the defendant's loyal network. Ms. Grant indicated she regularly had panic attacks, consistent with when she felt threatened. For example, Ms. Grant described panic attacks during alleged forced visits to Dr. Colker,[27] when she was in the WWE office and feared harm, and when she feared that Defendant McMahon would use sexual pictures and videos of her as a weapon to humiliate and control her and remove what little dignity she had in her life.

---

[25] On September 15, 2022, following her separation from Defendant McMahon, she writes to a close friend about her nightmares and emotional pain, consistent with PTSD symptoms: "*Barely slept. Bad dreams I can't remember. I burst into sweats…All night long. I want to cry so hard..I was tortured..I'm not a broken person but they broke me….It would be much easier to die."* On September 26, 20200, Ms. Grant continues to express pain, rage, confusion, and fear saying: "*IM SCARED. IM SO FUCKING SCARED. I'm sad and scared and hurt and having break through but my body is completely broken down today. I'm not yelling at you bcuz not a single person would understand what I'm going thru right now. Nobody can use logic or anything.*"

[26] On January 1, 2020, Ms. Grant writes to Tracey: "*Anxiety. Depression. . . . Vince. There's so much ground to cover. I was set off so bad last night, I took way too much meds. I knocked myself out all day too. It's a tidal wave of emotions.*" On January 14, 2020, she writes to Tracey*: "I'm at home under my wonderful anxiety blanket. 70% everyone in legal is sick. My issue is prob more emotional stress with a migraine from hell.*"

[27] Ms. Grant describes Dr. Colker as a doctor referred by and close with Defendant McMahon and whom she received care from for multiple years and throughout the NDA process. Ms. Grant also expressed that Defendant McMahon paid for the medical care she received from this doctor.

37.     Consistent with how trauma bonds operate, as her PTSD appeared to worsen under crisis, Ms. Grant's trauma bond strengthened likely because of Defendant McMahon's alleged alternating violence and promises of undying love and protection.[28] That is, when Defendant McMahon allegedly told her he loved her, that only she could understand him, that his wife would divorce and punish him for his behavior, and that his family had abandoned him, Ms. Grant described feeling fiercely loyal and was ready to sacrifice her own well-being to protect him. When Defendant McMahon was allegedly cold or punitive, Ms. Grant reported terror that he would harm her and would find any way to obtain his attention and end his displeasure.

38.     Ms. Grant reported that she initially refused when Defendant McMahon first pressured her to sign the NDA. She reported that she initially felt confused and hurt that she was being viewed as a threat. She then alleged that Defendant McMahon persistently pressured her, alternating between being sweet and threatening, Ms. Grant recalled numerous incidents of how Defendant McMahon ruined or threatened to ruin the lives of others, and described how terror overtook her. According to Ms. Grant, it was in this weakened state of physical pain, mental confusion, severe symptoms of trauma, and alternating between terror of being harmed and duty to be loyal, that Defendant McMahon coerced Ms. Grant to sign the NDA.[29]

39.      It is therefore my clinical opinion to a reasonable degree of psychological certainty that Ms. Grant's psychological state at the time of signing—likely characterized by severe trauma

---

[28] In addition to a clinical interview, evidence consistent with a trauma bond or Other Specified Dissociative Disorder appears throughout numerous messages. For example, on March 21, 2021, Ms. Grant write to Defendant McMahon: "*I'm so scared that any hurt will come to you that I swear I'll leave. ..Never expected to fall in love with you & find happiness. That's worth more than a paycheck & hurting people.*" Similarly, on January 13, 2022, despite being terrified for her reputation, Ms. Grant notes that she will protect Defendant McMahon and remains loyal to him: "*I cried & held u when I thought u we're going thru pain. I'm protecting you with everything I have. ..and I tucked you in this morning and kissed your forehead before I left .... Baby you haven't lost me & my sunshine at all.*" *See also* note 16.

[29] *See* various notes reflecting fear, loyalty, and psychological distress including 16, 28, 30, and 31. Additionally, on January 19, 2022, in a series of messages, Ms. Grant incoherently describes her distress, fears, not being OK, and being in love with Defendant McMahon in the same message, jumping from topic to topic.

symptoms, cognitive impairment, and an active trauma bond—was of a nature and severity that would be expected to substantially diminish an individual's ability to meaningfully process, evaluate, and weigh complex information such as the terms and implications of a legal agreement. Further, at the time, Ms. Grant reported that she believed she had no meaningful alternative to signing, as refusal would expose her to imminent harm. She also noted that she had not voluntarily placed herself in this situation (i.e. had not wanted a sexual relationship with Defendant McMahon or any of the men he had ordered her to sleep with, send him photos, and or engage with him in other sexual ways), nor did she have any realistic means of extricating herself from it.

40. Ms. Grant described that she was in a heightened state of vulnerability when she met Defendant McMahon, having recently lost her parents and suffering both emotionally and financially. Ms. Grant was the primary caretaker of both of her parents and had been raised to devote her life to caring for them, leaving her little time or opportunity for relationships, friendships, or a career. Ms. Grant's inexperience and vulnerability during this period likely made her highly susceptible to Defendant McMahon's grooming and coercive control.

41. Ms. Grant explained how Defendant McMahon presented himself as a friend, ally, and sympathetic ear; meanwhile she described situations consistent with isolation, experience, and heightened emotional vulnerability. During her initial meetings with Defendant McMahon, Ms. Grant reported that she sincerely wished to find a job and support herself and answered all of Defendant McMahon's detailed and invasive questions about her challenging upbringing and skills. Defendant McMahon's behavior during this period is consistent with grooming tactics identified in the coercive control literature, including the strategic exploitation of a target's vulnerabilities through offers of support and opportunity—he appears to have supplied the

attention and promises of a good career that Ms. Grant needed, likely tailoring his narrative to her vulnerabilities.

42.    Ms. Grant's vulnerabilities and underdeveloped social skills likely made her an easy target. Per Ms. Grant, Defendant McMahon presented an idealized profile of himself as powerful yet kind to successfully entrap her. At the beginning, Ms. Grant noted that she believed that the universe had presented her with another father figure to help her career, and she was delighted. The swiftness of the relationship is also consistent with this type of predatory behavior—con men and abusers are aware that their window of opportunity is very narrow. With time, their targets may discover that the abuser is not who they claim to be, thus ending the potential benefits. In this case, Ms. Grant described that within weeks, their relationship turned sexual because Defendant McMahon allegedly coerced Ms. Grant into increasingly sexual acts.

43.    After gaining her trust, Defendant McMahon behavior as described by Ms. Grant is consistent with the following:  he began stripping her autonomy, via microregulation, manipulation, and restrictions, controlling her time, her availability, her work life, her social life, her appearance, and when, where, how, and with whom she would engage in sexual acts. Defendant McMahon stripped Ms. Grant of her autonomy each time that he degraded her verbally and via text, shared intimate photos of her, demanded she create explicit content for third parties, physically and sexually abused her, and trafficked her to his physical therapist and WWE executives, employees, and talent as a bargaining chip.

44.    The language Defendant McMahon allegedly used is common among abusers to desensitize their subjects to abuse. Ms. Grant never found the violence and degradation pleasant or desirable, but rather as the only way to please and not anger Defendant McMahon. For example, Ms. Grant explained that Defendant McMahon frequently referred to her as his "bitch," said "no

means yes," described his violent sexual fantasies including gang rapes by strangers, and other violent fantasies involving Ms. Grant and WWE talent. Meanwhile, Defendant McMahon maintained his coercive control over Ms. Grant by manufacturing a romantic relationship through allegedly giving her expensive gifts and using language to mimic romance, such as referring to her as his "girlfriend" and "baby" and saying he loves her, that they shared a unique connection, that she was special, that she knew his secrets, and that no one understood him like she could. This false sense of romance and intimacy that Ms. Grant believed in, combined with Defendant McMahon's alleged coercive tactics, likely resulted in Ms. Grant developing a trauma bond with Defendant McMahon.

45. I have reviewed Defendant McMahon's declaration filed on June 13, 2025. Defendant McMahon purports that he and Ms. Grant engaged in a "consensual, intimate relationship." However, it is my professional and expert opinion that the psychological conditions allegedly present throughout their relationship—including the power imbalance, coercive control dynamics, and Ms. Grant's trauma responses—are inconsistent with the psychosocial conditions necessary for autonomous, voluntary participation in an intimate relationship. Initially, Ms. Grant did not want an intimate relationship with a man whom she viewed as a father figure; later, she noted that she repeatedly attempted to end the relationship in various non-confrontational ways. Ms. Grant noted that she feared angering Defendant McMahon were she to state directly that she wished the relationship to end and feared his retaliation, including physical harm, a destroyed reputation, and being homeless and unemployed. Once Ms. Grant was employed by WWE and supervised by Defendant McMahon's current favorite employees, she believed that she was even less able to consent to continuing or ending a relationship because she had no safe sources of protection. Defendant McMahon was Ms. Grant's superior at work and, therefore, categorically,

20

more powerful. Even if there had been no chronic coercive control, meaningful consent requires that both parties possess sufficient autonomy to negotiate the terms of a relationship, including its initiation and termination, without fear of significant retaliation. In this case, Defendant McMahon was unambiguously more powerful. Finally, Defendant McMahon's coercive control and trafficking of Ms. Grant throughout their acquaintance likely caused her severe duress and likely stripped her ability to effectively consent to such "relationship."

46.    The extent to which Defendant McMahon' alleged conduct impacted Ms. Grant's employment likely intensified her duress. Ms. Grant described Defendant McMahon as a wealthy and prominent individual with power over her employment who frequently flaunted his ability and willingness to ruin her life through his powerful connections, such as McMahon's attorney, who represented him during his NDA "negotiations" with Ms. Grant. Additionally, she explained that several individuals at her workplace were involved in or knew about her sexual abuse. Specifically, Ms. Grant's supervisor allegedly participated directly in her sexual abuse, high-ranking executives were privy to her relationship with McMahon, Defendant McMahon often "sold" Ms. Grant to lure in prospective talent, and Defendant McMahon shared intimate photos of Ms. Grant with several WWE employees without her consent. To a reasonable degree of psychological certainty, these factors—if they occurred as alleged, combined with workplace culture description consisting of violence and misogyny, likely contributed to Ms. Grant's increasing entrapment, learned helplessness, and inability to report misconduct. Ms. Grant's described experience is consistent with workplace situations where there were no safe avenues to report misconduct, eventually leading her to near complete submission to Defendant McMahon's demands.

47.    Ms. Grant described how Defendant McMahon's coercive control impacted her health and eliminated her ability to make autonomous medical decisions. My psychological

21

evaluation of Ms. Grant's psychological state found to a reasonable degree of psychological certainty that her mental health deteriorated to a point so severe that, in addition to the emotional trauma symptoms, she developed physical symptoms, including panic attacks, sleep disturbances and deprivation, dizziness, exhaustion, rashes, hair loss, severe weight loss, migraines, bleeding, incontinence, and swelling and bruising in her genital area. It is my professional and expert opinion that these symptoms are consistent with individuals who suffer prolonged, extreme physical and psychological abuse. According to Ms. Grant, Defendant McMahon exerted control over her medical care, including choosing and paying for her doctor, weighing in on her medical treatments, and communicating with her doctor without her consent. When Ms. Grant expressed illness, pain, or psychological distress because of the sexual abuse, Defendant McMahon allegedly demanded that she visit Dr. Colker and would be displeased if she refused. Additionally, Ms. Grant expressed that she was given IV fluids absent informed consent on several occasions and had to send photos of the procedure to Defendant McMahon as evidence that she was obedient. Ms. Grant explained that when she asked her doctor about the content of these fluids, Dr. Colker challenged whether Ms. Grant trusted him and suggested they part ways if she did not. Further, Ms. Grant has explained that her doctor has withheld her complete medical record throughout this lawsuit. Ms. Grant's alleged inability to make autonomous medical decisions is consistent with a pattern of coercive control and possible extreme duress she was under when she negotiated and signed the NDA.

48.    Ms. Grant's behavior in the days leading up to her signing the NDA is consistent with individuals who are subjected to severe coercive control and develop a trauma bond. Ms. Grant appeared to be exceptionally vulnerable to Defendant McMahon's coercive control at the time the NDA was negotiated and signed likely as a result of the level of physical and psychological trauma that she endured for years. Ms. Grant described that, in the days leading up

22

to the NDA's execution, Defendant McMahon engaged in several coercive control tactics that she noted exacerbated her distress. Specifically, she alleges that Defendant McMahon called her multiple times and left several voice memos, stressing it was urgent that she sign the agreement and putting the pressure of saving the public perception of his marriage and the future of WWE on her doing so. Further, Ms. Grant described that while she retained counsel during negotiations, Defendant McMahon had influence over which attorney represented her and convinced her not to trust him. Defendant McMahon's coercive control during this time became so severe that Ms. Grant explained that she impulsively suggested that she sign a napkin or Post-it note to satisfy Defendant McMahon's demand for an NDA signature. It is my expert opinion that Ms. Grant's constant, genuine state of fear of physical harm, (likely linked to Defendant McMahon or others at his request), and her deteriorated mental state associated with Defendant McMahon's physical, sexual, and emotional abuse is consistent with—and would be expected to contribute to—her compliance with Defendant McMahon's demands regarding the NDA, and is consistent with individuals whose autonomy has been substantially compromised by coercive control.

49.    It is my expert opinion that the severe and prolonged coercive control Ms. Grant allegedly experienced produced psychological conditions—including cognitive impairment, dissociation, trauma-driven hypervigilance, and the effects of a trauma bond—that, in my clinical opinion, would be expected to substantially compromise an individual's ability to process complex information, weigh long-term consequences, consider alternatives, or engage in decision making aligned with their own interests. As such, the pattern of evidence indicates that Ms. Grant was likely under severe duress, and these psychological conditions are inconsistent with the cognitive and emotional functioning typically associated with voluntary, informed decision making.

**II.    The duress likely caused by McMahon's alleged abuse persisted after the agreement was signed**.

50.    Coercive control creates lasting psychological trauma that does not end when the immediate control relationship terminates. It is my professional and expert opinion to a reasonable degree of psychological certainty that the effects of the alleged coercive control Ms. Grant experienced persisted beyond the date that the NDA was executed and, at the time of my evaluation, Ms. Grant continued to exhibit severe and complex signs of psychological trauma likely stemming from McMahon's alleged abuse. It is also my professional and expert opinion that the events following the NDA are consistent with, and a continuation of, the pattern of coercive control and consistent with sex trafficking behaviors that Ms. Grant allegedly experienced before signing the NDA. Specifically, Ms. Grant explained that she was subject to sexual abuse by Defendant McMahon and was continually trafficked by Defendant McMahon and to prospective WWE talent after she signed the NDA.[30]

51.    The psychological evaluation found no credible evidence of malingering. Overall, the data supports that Ms. Grant's reported mental and physical health symptoms—while elevated and complex—are genuine and consistent with the injuries she suffered from the abuse. To conclude that someone is malingering, there must be a credible reason for them to fake or exaggerate symptoms. While Ms. Grant is seeking financial compensation, financial gain alone is not enough to support a malingering finding without other evidence of fabrication. It is also worth noting that throughout the relationship, and even after the end was in sight, Ms. Grant consistently acted to protect rather than harm or retaliate against Defendant McMahon.[31] This does not reflect

---

[30] For example, on February 4, 2022, (*see* note 31) after Ms. Grant expresses how sad and desperate she is and would take an Adderall or a bullet in her head, notes that she feels sad about receiving money and doesn't want the relationship to end this way, Defendant McMahon asks if she can send him a video (presumably a sex video).

[31] After January 9th, multiple texts reflect Ms. Grant's willingness to sacrifice her career and her housing for Defendant McMahon's benefit. For example, on January 11th, Ms. Grant writes about signing an NDA: "*is easy. Actually there*

the behavior of someone motivated to fabricate or exaggerate her symptoms. The data supports that her reporting is genuine.

52.    Throughout my interviews with Ms. Grant, I observed and assessed continued signs of psychological trauma. Specifically, Ms. Grant meets criteria for and continues to suffer from **Posttraumatic Stress Disorder** (including nightmares, sleep disturbances, numbness, dissociation, mistrust, and fears of being physically harmed alternating with a belief that Defendant McMahon may still value her). She also met criteria for **Persistent Depressive Disorder** (depressed mood that has continued for over two years), and Agoraphobia (pathological fear of different open spaces resulting in never or rarely leaving her apartment). In addition, she exhibited a wide range of other social anxieties and a litany of continuing somatic symptoms, some of which may constitute additional formal diagnoses. This constellation of mood, dissociation, and anxiety symptoms is complex and consistent with victims of severe, chronic, and captive abuse.

53.    In any forensic evaluation, alternative hypotheses for distress must be considered and where relevant, ruled in or ruled out. I considered and clinically assessed for other explanations for her reported distress including possible past traumatic events including her parents' death and an attempted sexual assault. While past events likely shaped how Ms. Grant responds to distress, the best explanation for her psychological state at the time of the evaluation is the alleged abuse by Defendant McMahon. As such, it is my professional and expert opinion that Ms. Grant's reported and observed symptoms and behaviors after she signed the NDA are consistent with, and

---

is no decision. . . . I'll protect you forever. Other parts require thinking.*" She also writes: "*I can work remotely most of the time, I can lessen my presence and I will work harder …. I can & will bow out gracefully if I'm a problem… I love you. I love this this company. I love it's people. I've always said I will do what's in the best interest of all of those things. And I will do that in whatever form needs to take….*" *See also* notes 16, 28, 29, and 30, all of which reflect her continuous assurances of her love and loyalty despite her extreme distress.

in my clinical opinion best explained by, the alleged severe and prolonged coercive control and sex trafficking that she experienced at the hands of Defendant McMahon.

### Declaration

54.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was prepared by me and reflects my professional opinions based on my evaluation of Ms. Grant and relevant documentation and expertise in the field of coercive control, domestic violence, and sex trafficking and associated traumatic outcomes.

Executed on April 1, 2026.

*/s/ Dr. Chitra Raghavan*

Dr. Chitra Raghavan
Clinical Psychologist
John Jay College of Criminal Justice
524 West 59th Street
New York, N.Y. 10019
craghavan@jjay.cuny.edu

Professional License: 016466

# EXHIBIT A

RAGHAVAN 1

UPDATED 02/25/2026

CHITRA RAGHAVAN, Ph.D.
Department of Psychology
John Jay College of Criminal Justice                    Office: 10:63:10 NB
524 West 59th Street                                    Please contact via email
New York, N.Y. 10019                                    craghavan@jjay.cuny.edu

**EMPLOYMENT**

**2002-Current**        **John Jay College of Criminal Justice,**
                        **City University of New York**.
                        Professor (tenured in January 2007),
                        Director, Forensic Mental Health Counseling Program (Fall 2020-
                        current)

                        Program Director, BA/MA Program (appointed Spring 2007-2016)
                        Deputy Director, Forensic Mental Health Counseling Program
                        (Fall 2015-Summer 2020)
                        Doctoral Faculty, Program in Criminal Justice
                        Doctoral Faculty, Program in Forensic Psychology

**2001-2002**           **Research Associate**
                        National Center on Addiction and Substance Abuse at Columbia
                        University.

**1998-1999**           **Post-doctoral Fellow**
                        Yale University School of Medicine, Department of Psychiatry.

**CLINICAL LICENSURE**

**2005**                License number 016466

**EDUCATION**

**Ph.D. 1998**          **University of Illinois at Urbana-Champaign**
                        Major: Clinical and Community Psychology.
                        Minor: Quantitative methods and Personality/Social Ecology.

**MA 1995**             **University of Illinois at Urbana-Champaign**

1

UPDATED 02/25/2026

|  |  |
|---|---|
|  | Major: Clinical and Community Psychology. |
| **A.B. 1992** | **Smith College, Magna cum Laude**<br>Major: Psychology and French Language and Literature. |
| **1990-1991** | **Université Paris (V).**<br>Participated in the Smith Junior Year Abroad program |
| **Statistics** | Conversant with advanced statistical techniques including discriminate function analyses, structural equation modeling, factor analysis and cluster analysis. |
| **Languages** | Tamil, English, Malay, French, Basic Portuguese. |

**RESEARCH AND CLINICAL EXPERTISE**
**PEER REVIEWED BOOKS AND BOOK CHAPTERS**

Multicultural issues in assessment and treatment of coercive control tactics, partner violence, sexual assault and sex trafficking and the traumatic outcomes including PTSD, dissociative disorders, and trauma bonding. Forensic evaluations and court-qualified expert witness for above areas in civil, criminal, family, and parole settings.

Case law: https://law.justia.com/cases/new-york/other-courts/2018/2018-ny-slip-op-28161.html

**LIFETIME HONOR**

| **February 2023** | Selected as one of 10 Smith College alumna who have contributed to psychology in the U.S. in the past 100 years.<br>https://www.smith.edu/academics/psychology#chitra-raghavan-%E2%80%9992-4 |
|---|---|

**SELECTED KEYNOTE ADDRESS, TRAININGS AND CLINICAL-RELATED PROFESSIONAL SERVICES**

RAGHAVAN 3

UPDATED 02/25/2026

| | |
|---|---|
| **April 10-11, 2026** | Co-Chair and Organizing committee for International Coercive Control Conference, (ICCC) to be held at John Jay College of Criminal Justice, April 2026. |
| **April 04 2023** | Predatory Helpfulness and Coercive Control Provide the Framework for Understanding Domestic Abuse and Sex Trafficking: Training Given to judges at National Judicial Network, Peer to Peer |
| 2 | |
| **March 23 2023** | Using Coercive Control to Close the Gap Between Victim Experience and the Criminal Justice System: Panelist at: Tackling Domestic Violence: Analyzing the situation and finding ways to create healthier communities, Public Policy Exchange |
| **March 17 2023** | Science First: Assessing Predatory Helpfulness and Coercive Control to More Accurately Understand Exploitation and Abuse: Talk Given at King's County District Attorney's Office |
| **Oct 13 2022** | Using Coercive Control To Challenge Disbelieve: Telling it Like It Really Happened Key note speaker at International Coercive Control Conference, 2022. |
| **Oct 13 2022** | Coercive Control: Nuts and Bolts. Invited Panelist at Coercive Control, Lethality and Femicide Panel at Aligning the Law With Today's Concepts of Domestic Violence, Justice for Survivors of Intimate Partner Violence, Family Law Conference. Presentation made to over 600 lawyers in New York State. |
| . | |
| **Sep 29 2022** | Predatory Helpfulness to Trauma Bonding: Pimp Strategies to Entrap Women. Training given to HTIC judges during New York State Unified Court System's 2022 Human Trafficking Intervention Court (HTIC) Conference. |
| **June 3 2022** | Panel member at Enlightened Family Court Representation, New York State Bar Education. Presented to over 200 lawyers in New York State. |
| **November 11 2021** | DVSJA and Coercive Control: Making Invisible Visible. Training given at Understanding the DVSJA. Organized by Family Violence Task Force, NYS Unified Court System, Office of Court Administration—Office of Policy and Planning. Training presented to 100+ New York State judges and court personnel. |

UPDATED 02/25/2026

**October 22 2021**   Coercive Control & Domestic Violence: What Is It?  How Do You Prove It? Panelist, New York State Bar Association, Committee on Families and the Law, Family Law Section

**October 8 2020**   Keynote Speaker on Coercive Control and Trauma-Coerced Attachment in Domestic Violence: The Science and Significance for Litigation", in the Domestic Violence Keynote Series, Office of Court Administration, New York. Training for NYS Supreme Court judges and legal personnel.

**January 17 2020**   Invited panelist on "*Expert Evidence*" at Innovations in Prosecution Human Trafficking in New York State, NY, NY.

**October 24 2019**   Keynote Speaker "*The Mind Body Connection: Attachment Perspectives on Human Trafficking*" at the Sixth See the Girl" Summit, Delores Barr Weaver Policy Center, Jacksonville, Florida.

**February 8 2019**   Invited Panelist on "*Expert Witness Considerations in Custody and Visitation Matters Involving Domestic Violence Survivors Domestic Violence 2019*: Skills and Key Considerations in Custody and Visitation Cases, Public Law Institute (PLI)

**January 22 2019**   Invited speaker on "*The Mind Body Connection: Medical and Psychological Perspective on Human Trafficking,*" NYC Administration for Children Services, Office of Child Trafficking, Prevention, and Policy (OCTPP).

**September 13 2018**   Key note speech on "*Science of Trauma: Integrating Mind and Body,* at Not On my Watch: Combatting Human Trafficking and Domestic Violence, Fifth Annual Conference, Brooklyn, NY.

**November 11 2018**   Invited Panelist at A Roadmap for the Future: Key Strategies for Child Sex Trafficking Prevention and Intervention, convened by the Manhattan District Attorney's Office and the Administration for Children's Services, NY, NY.

**April 26 2018**   Training on "Science of Trauma and PTSD" in Incarcerated Gender Violence Survivors Initiative, Meeting of Parole Board Committee

**January 11 2016**   Training on "*Understanding Coercive Control and Pathways to Sex Trafficked Survivors*" for Human Trafficking Intervention Court Judicial Training by Office of Court Administration, Albany, NY.

RAGHAVAN 5

UPDATED 02/25/2026

| | |
|---|---|
| **October 9 2015** | Training on "*Increasing Identification of Survivors of Trafficking: Assessing Coercive Control and Trauma-Coerced Bonding*" for RESTORE, NY, NY. |
| **May 5 2015** | Training on *"Coercive Control and Traumatic Bonding in Sex Trafficking Contexts"* for *NYC Queens Family Justice Center and Human Trafficking Intervention Court, Queens.* |
| **October 8 2014** | Training on "*Coercive control and trauma bonding in sex trafficking contexts"* for the Manhattan District Attorney's Office, Special Victim's Unit. |
| **October 9 2014** | Training on "*Coercive control and implications for parenting and post-separation abuse"* for the Appellate Division, Third Judicial Department and the office of Court Administration, Attorney Child Contracts, Albany |
| **October 24 2013** | Training on "*Coercive control and traumatic bonding in sex trafficking contexts*" at the first Human Trafficking Intervention Court Training in New York State, New York State Unified Court System, Office of Court Administration, to judges and court personnel, Brooklyn, NY. |
| **2007-2008** | Organizing Co-Chair of Femicide Conference in partnership with Urban Resource Institute: Understanding and Preventing the Murder of Women in Intimate Relationships (Nov 7, 2008). |
| **2003-2006** | NYPD (New York Police Department), Psychology Trainer. Jointly ran innovative training programs with police tactical trainers on how to negotiate using safe non-violent procedures with violent and mentally disturbed individuals. Conducted basic trainings for new recruits, and advanced training for Hostage Negotiation Unit, and Emergency Services Unit of the NYPD. |

## CLASSES TAUGHT

BA: Psychological Analysis of Criminal Behavior, Global Portraits of Domestic Violence, Gender, Community, and Violence, Multicultural Issues in Forensic Psychology, Culture, Psychopathology, and Healing, Psychology of Gender

UPDATED 02/25/2026

MA: Trauma and Dissociation, Psychology of the Victim, Family Violence and Disputes, Advanced Research Methods, Clinical Interviewing
PhD: Cognitive and Affective Aspects of Behavior, Diversity, Psychopathology

Study Abroad**:** Created and led program to Rabat, Morocco (Gender, Islam, and Feminism) in 2008 and Bali, Indonesia, (Culture, Healing, and Psychopathology), 2010. Ongoing.

**INTERNATIONAL WORK**

**June 2010**          Chair of International Biennial John Jay Conference: Societies in Transition: Balancing Security, Social Justice, and Tradition. Marrakesh, Morocco.

**Jan-February 2009**   Visiting Professor at the Psychiatric Institute, Hospital As Clinicas, Sao Paulo, Brazil.

**2007-2010**          External PhD Examiner Avinashilingam University, Coimbatore, India.

**STUDENTS SUPERVISED**

20+ completed MA theses and 4 completed doctoral thesis, 4 ongoing doctoral student supervision, doctoral thesis committee member of multiple students, over 100 non-thesis students supervised at BA and MA levels.

**CREATIVE WORK**
Forensic Consultant on *Evil* Pilot and First and Second Seasons, CBS series. (February, 2019-current).

**Consultant and Featured Expert** *Wedding.Con* — Documentary Series (BBC Studios

India for Amazon Prime Video, 2023)

**Raghavan, C** and Foudy, M. S., (Producers), and Foudy, M. S. (Director). (2014 release date). *Children of Zina*. HD/DV Documentary Production, New York City. Women Make Movies Fiscal Sponsorship Program. NYSCA (New York State Council for the Arts)

UPDATED 02/25/2026

*Student first author; **student authors

## PEER REVIEWED BOOKS AND BOOK CHAPTERS

Doychak, K., & **Raghavan, C**. (2021). Queering forensic psychology: What intimate partner violence and sex trafficking can tell us about inclusivity. In *Queer Psychology* (pp. 291-310). Springer, Cham.

Kerns, J. G., Karcher, N., **Raghavan, C**., & Berenbaum, H. (2014). Anomalous experiences, peculiarity, and psychopathology.

**Raghavan C**. & Cohen, S.J. (Eds.) (2013). *Domestic Violence: Methodologies in Dialogue*. Northeastern Series on Gender, Crime, and Law, Northeastern University Press.

*Markus, K., Loveland, J., Ha, D. & **Raghavan, C**. Publication Trends in Intimate Partner Violence: Bridging the Division in Qualitative and Quantitative Methods. In C. Raghavan and S. Cohen (Eds.). (2013). *Domestic Violence: Methodologies in in Dialogue*. Northeastern Series on Gender, Crime, and Law, Northeastern University Press.

**Raghavan, C**. & Levine, J. (Eds.). (2012). *Self-Determination and Women's Rights in the Muslim World*. HBI Series on Gender, Culture Religion, and Law. Boston: Brandeis University Press.

Berenbaum, H., Kerns, J., & **Raghavan, C**. (2000). Anomalous experiences, peculiarities, and psychopathology. In J. Cardena, Lynn, & S. Krippner (Eds.), *The varieties of anomalous experience,* (pp.25-46). Washington, D.C.: American Psychological Association.

Berenbaum, H., **Raghavan, C**., Le, H.N., Vernon, L., & Gomez, J. (1999). Disturbances in emotion. In D. Kahneman, E. Diener, & N. Schwarz (Eds.), *Well-being: The foundation of hedonic psychology* (pp.267-287).  New York: Russell Sage.


## REPORTS & MONOGRAPHS

**Raghavan, C.** & Pipitone, J.M. (2014). *Engaging Students with the Arts through the Teaching of Psychology in Bali: A Teaching Guide and Evaluation Codebook.* Prepared for the Baruch-Rubin Museum of Art Project Faculty Incentive Program for Integrating Arts Across the Curriculum. New York, NY: Baruch College School of Public Affairs (ahead21.org).

UPDATED 02/25/2026

**PEER REVIEW ARTICLES (* Student first author)**

*Juraschek, E., Legg, A., & **Raghavan, C**. (in press). Privilege and power: Sexual coercion in violent intimate partner relationships. *Violence Against Women*.

*Doychak, K., & **Raghavan, C**. (in press). Coercive control in commercial sexual exploitation: Frequency, severity, and advantages and limitations of semi-structured interviews versus Likert-scale self-reports. *Journal of Interpersonal Violence*.

*Williams, Y. A., & **Raghavan, C.** (in press). Do prior religious beliefs play a role in cult susceptibility?: A descriptive study. *International Journal of Coercion, Abuse, and Manipulation*.

*Khan, Z. K., & **Raghavan, C.** (2025). Self-Concealment as a Trauma Response: Examining the Mediating Role of Shame and Dissociation in the Link Between PTSD Symptoms and Self-Concealment Among Women Who Were Sex-Trafficked. *Journal of Human Trafficking*, 1–15. https://doi.org/10.1080/23322705.2025.2472319

**Raghavan, C** & Doychak, K. (2025).  Assessing coercive control in forensic settings: development, psychometrics, and application of the Brief Interview of Coercive Control (BICC). *Journal of Forensic Psychology Research and Practice*, 1-18.https://doi.org/10.1080/24732850.2025.2551643

*Morales, S. P., & **Raghavan, C.** (2024). An examination of sexual coercion experiences among Latinx female college students. *Journal of Sexual Aggression*, 1–17. https://doi.org/10.1080/13552600.2024.2347223

#
*Kenney, T., & **Raghavan, C.** (2024). Predatory helpfulness: A replication (and expansion) study examining grooming and recruitment tactics in sex trafficking. *Journal of Human Trafficking*, 1–16. https://doi-org.ez.lib.jjay.cuny.edu/10.1080/23322705.2024.2327950

*Juraschek, E., Legg, A., & **Raghavan, C.** (2024). The Reconsecration of the Self: Qualitative Analysis of Sex Trafficking Survivors' Experience of the Body. Violence Against Women, 0(0). https://doi.org/10.1177/10778012241239948 (authorship is by alphabetical order as all authors contributed equally).

*Basra, I.K., Kenney, T., Forrest-Bank, S., Zottarelli, L.K., & **Raghavan, C**. (2023). Predatory helpfulness: An empirical framework to identify fraudulent tactics used by pimps to recruit and commercially sexually exploit young girls and women. Journal of Human Trafficking. DOI: 10.1080/23322705.2023.2259263

Viñas-Racionero, R., **Raghavan, C**., Soria-Verde, M.A., Scalora, M., Santos-Hermoso,

UPDATED 02/25/2026

J., González-Alvarez, J.L., & Garrido-Anton, M.J. (2023). Enhancing the Assessment of Coercive Control in Spanish Femicide Cases: A Nationally Representative Qualitative Analysis. *Journal of Family Violence.*

*Doychak and **Raghavan, C**. (2023). Trauma-Coerced Attachment: Developing DSM-5's"Other Specified Dissociative Disorder". *European Journal of Trauma & Dissociation.*

*Unger, L. D., Doychak, K., **Raghavan, C.** (2021). Isolation and support dynamics among women in a pimp-based commercial sex ring. *Journal of Human Trafficking.* DOI: 10.1080/23322705.2021.1918966

*Pomerantz, J., Cohen, S.J., Doychak, K., **Raghavan, C**. (2021). Linguistic Indicators of Coercive Control: in Sex Trafficking Narratives. *Violence and Gender.* DOI: 10.1089/vio.2020.0105

*Pipitone, J.M., & **Raghavan, C.** (2020): *Art as a cultural tool: deconstructing exotified notions of Balinese society during an American study abroad programme*, Pedagogy, Culture & Society.  https://doi.org/10.1080/14681366.2020.1844788

*Legg, A., & **Raghavan, C.** (2020). *Not Safe for All: A Mixed Methods Study of Violence in Men in Commercial Sex.* Psychology of Sexual Orientation and Gender Diversity. Advance Online Publication. https://doi.apa.org/doi/10.1037/sgd0000374

*Hagan, E., **Raghavan**, C., & Doychak, K. (2019). Functional Isolation: Understanding isolation in trafficking survivors. *Sexual Abuse.* DOI: 10.1177/1079063219889059

*Mitchell, J., & **Raghavan**, C. (2019). *The impact of coercive control on use of specific sexual coercion tactics*. Violence Against Women. 1077801219884127.

**Raghavan, C.,** Beck, C. J. A., Menke, J. M., & Loveland J. E. (2019). Coercive controlling behaviors in intimate partner violence in male same-sex relationships: A mixed methods study. *Journal of Gay and Lesbian Social Services*.  DOI: 10.1080/10538720.2019.1616643

*Doychak, K & **Raghavan, C**. (2018). "No voice or cote:" trauma-coerced attachment in victims of sex trafficking. *Journal of Human Trafficking*, DOI: https://doi.org/10.1080/23322705.2018.1518625

*Barbaro, L. & **Raghavan, C**. (2018). Patterns in coercive controlling behaviors among men mandated for batterer treatment: Denial, minimization, and consistency of tactics across relationships. *Partner Abuse*, 9(3), 270-290.

UPDATED 02/25/2026

\*Kaplenko, H., Loveland, J. E**.**, & **Raghavan, C**. (2018). Relationships among shame, restrictiveness, authoritativeness, and coercive control in men mandated to batterer treatment. *Violence and Victims, 33(2), 296-309*.

\*Kavanagh, A. M., Loveland, J. E., & **Raghavan, C**. (2017). Male rape in men who have sex with men: Help-seeking and social support responses. *Criminal Justice and Law Enforcement Annual: Global Perspectives, 7*(2), 75-103.

\*Pipitone, J. M. & **Raghavan, C**. (2017). Socio-spatial analysis of study abroad student experiences in/of place in Morocco. *Journal of Experiential Education.* 1053825917709823.

\*Loveland, J. E., & **Raghavan, C**. (2017). Coercive control, physical violence, and masculinity. *Violence and Gender, 4*(1), 1-6.

\*Viñas-Racionero, R., **Raghavan, C**., Soria-Verde, M. Á., & Prat-Santaolaria, R. (2017). The association between stalking and violence in a sample of Spanish partner violence cases. *International journal of offender therapy and comparative criminology*, 61(5), 561-581.

\***Raghavan, C**., Cohen, S., & Tamborra, T. (2015). Development and preliminary validation of the multidimensional sexual coercion questionnaire (MSCQ). *Journal of Sexual Aggression*, *21*(3), 271-289.

\***Raghavan, C**., & Doychak, K. (2015). Trauma-coerced Bonding and Victims of Sex Trafficking: Where do we go from here? *International Journal of Emergency Mental Health and Human Resilience*, 17(2), 583-587.

\*Loveland, J.E., & **Raghavan, C**. (2014). Near-lethal violence in a sample of high-risk men in same-sex relationships. *Psychology of Sexual Orientation and Gender Diversity*, 1, 51-62.

\*Johnson, M., **Raghavan, C**., Citron, K., Kavanagh, A-M., and Massey, C. (2014). Interrogation Expectations: Individual and race/ethnic group variation among an adult sample. *Journal of Ethnicity in Criminal Justice, 1-14*

\*Dejanova, T. E., & **Raghavan**, C. (2013). Report from the field: evaluating an alternative to incarceration program for "highly probable trafficking victims". *Dialectical Anthropology*, 1-8.

\*Jones, C.A. & **Raghavan, C**. (2012). Sexual Orientation, Social Support Networks and Dating Violence in an Ethnically Diverse Group of College Students. *Journal of Gay and Lesbian Social Services*, 24, 1-22.

UPDATED 02/25/2026

Beck, C.J.A., & **Raghavan, C**. (2010). Intimate partner violence screening in custody mediation: The importance of assessing coercive control. *Family Court Review, 48,* 555-565.

Jahn, C. & Raghavan, C. (2020). Partnergewalt neu denken. Eine Einführung in Coercive Control. Trauma & Gewalt, 14 (4), 000 – 000. DOI 10.21706/tg-14-4-00000.

Tanha, M., Beck, C.J.A., & Figueredo, A.J., & **Raghavan, C** (2010). Coercive control as motivational factor for intimate partner violence. *Journal of Interpersonal Violence, 25,* 1836-1854.

**\*\*Raghavan, C.**, Rajah, V., & Gentile, K., Collado, L., & Kavanagh, A-M. (2009). Community Violence, social support networks, ethnic group differences, and male perpetration of intimate partner violence. *Journal of Interpersonal Violence,* 24, 1615-1632.

Kingston, S., & **Raghavan, C.**  (2009). The relationship of sexual abuse, early initiation of substance use, and adolescent trauma to PTSD. *Journal of Traumatic Stress, 22, 65-68.*

\*Allen, C.T., Swan, S.C., **Raghavan, C**. (2009). Gender symmetry, sexism and intimate partner violence. *Journal of Interpersonal Violence, 24,* 1816-1834.

**Raghavan, C.**, & Mennerich, A.  (2007). Networks, neighborhoods, and depression: Negative interactions by social support members as mediators of neighborhood characteristics and depressive symptoms in a sample of recovering substance abusing women.  *Journal of Social Distress and the Homeless, 16,* 67-87.

\*\*Gentile, K., **Raghavan, C.,** Rajah, V., & Gates, K. (2007).  It doesn't happen here: An assessment of eating disorders in ethnically diverse urban sample of male and female college students. *International Journal of Eating Disorders, 15,* 405-425

**Raghavan, C.**, & Berenbaum, H. (2006). A study of values as cross-cultural competencies: A potential source of self-esteem? *Psicologia: Teoria e Practica, 8,* 51-68.

**Raghavan, C.**, Mennerich, A., Sexton, E., & James, S. (2006). Community violence and it's direct, indirect, and mediating effects on intimate partner violence. *Violence Against Women, 12,* 1-18.

**Raghavan, C.**, & Kingston, S. (2006).  PTSD in substance abusing women: The role of early drinking and exposure to violence. *Journal of Traumatic Stress, 19, 269-278*.

**Raghavan, C.**, Swan, S., Snow. D., & Mazure, C.  (2005). The mediational role of relationship efficacy and resource utilization in the link between physical and

UPDATED 02/25/2026

psychological abuse and relationship termination. *Violence Against Women, 11,* *65-88.*

James, S. E., Johnson, J., **Raghavan, C.**, & Woolis, D.  (2004). "I couldn't go anywhere": social networks, violence and drug abuse.  *Violence Against Women, 10, 991-1014.*

Berenbaum, H., **Raghavan, C.**, Le, H.N., Vernon, L., & Gomez, J.  (2003). A taxonomy of emotional disturbances. *Clinical Psychology: Science and Practice, 10,* 206-226.

Snow, D. L., Swan, S. C., **Raghavan, C.**, Connell, C., & Klein, I.  (2003). The effects of work stressors, coping, and social support on psychological symptoms among female secretarial employees. *Work and Stress, 17,* 241-263.

James, S. E., Johnson, J., **Raghavan, C.**, Lemos, T., Smith, M., &  Woolis, D. (2003). The violent matrix: a study of structural, interpersonal and intra-personal violence among a sample of poor women.  *American Journal of Community Psychology,* 129-141.

Le, H.N., Berenbaum, H., & **Raghavan, C.**  (2002). Culture and alexythymia: Mean levels, correlates, and the role of parental socialization of emotions. *Emotion, 2,* 341-360.

**Raghavan, C.** ,Le H.N., & Berenbaum, H. (2002).  Predicting depression and hostility using the diathesis-stress model of sociotropy and autonomy in a contextualized stress setting. *Cognitive Therapy and Research, 26*, 231-244.

Mazure, C., **Raghavan, C.**, Maciewiejewski, P., Jacobs, S.C., & Bruce, M.L. (2001). Cognitive personality characteristics as unipolar predictors of major depression. *Cognitive Therapy and Research, 25*, 215-225.

## ENCYCLOPEDIA ARTICLES, BOOK REVIEWS, AND NON-PEER REVIEW ARTICLES

*Loveland, J. E., & **Raghavan, C.** (2017). Intimate partner violence in same-sex couples. In  K. Nadal (Ed.) *The SAGE Encyclopedia of Psychology and Gender*. Thousand Oaks, CA: SAGE Publications Ltd. doi: 10.4135/9781483384269.n329

*Pipitone, J. M.  &  **Raghavan, C.** (2017). Amok. In  A.  Wenzel (Ed.), *The Sage Encyclopedia of Abnormal and Clinical Psychology* (Vol. 7, p. 161). Thousand Oaks, CA: SAGE Publications Ltd. doi: 10.4135/9781483365817.n64

UPDATED 02/25/2026

*Sriken, J., & **Raghavan**, C. (2012). Domestic Violence.  In D. Jones-Brown & B.D. Frazier (Eds.), African Americans and the Criminal Justice System: An Encyclopedia. Greenwood Press.

**Raghavan, C.** (2010). Review of the book *Listening to Battered Women. A Survivor-Centered Approach to Advocacy, Mental Health, and Justice* by L. A. Goodman and D. Epstein. Journal of Trauma and Dissociation, 11, 124-126.

*Tuller, A., & **Raghavan**, C. (2010). Dating Violence. In B. Fisher & S. Lab (Eds.), *Encyclopedia of victimology and crime prevention.* Thousand Oaks, CA: Sage.

*Reardon, L., & **Raghavan**, C. (2009). Cyberstalking. In Wilson, J.  (Ed.), *Praeger Handbook of Victomology*. (pp. 67-69). Santa Barbara, CA: Praeger.

*Ranjan, S., & **Raghavan,** C. (2010). *The Economic Recession and Intimate Partner Violence.* The Journal of Employee Assistance, 40.


## MANUSCRIPTS

*Juraschek, E., & Legg, A. & **Raghavan, C.**  (accepted pending revisions) How sexual coercion manifests in abusive relationships. *Violence Against Women.*


*Feliciano, S. E., & **Raghavan**, C. (submitted). An application of the coercive control framework to cults: How power imbalance is created and maintained. International Journal of Coercion, Abuse, and Manipulation (IJCAM).

**SELECTED INVITED TALKS**

**Raghavan, C** (2019, September)**.** Invited Panelist on "*Survivors and Mental Health",* at Not On My Watch: Dare to Care, Sixth Annual Conference, NY, NY.

**Raghavan, C.** (2016, May). *Understanding Trauma-Coerced Attachment: Collaborating with Mental Health Professionals When Representing Victims of Intimate Partner Violence*, The Twentieth Annual Fordham Forum on Domestic Violence, NY. NY.

**Raghavan, C.** (2015, February)**.** *Coercive control, gender, and sexual orientation: Furthering our understanding of intimate partner violence across differing context.* Psychology Department Colloquuim Series, University of Vermont, Burlington, VT.

**Raghavan, C.** (2014, March). *Surviving Revictimization: Challenging Social and Institutional Responses to Gender Violence.* Panelist at the 18th Annual Fordham Forum on Domestic Violence, NY, NY.

UPDATED 02/25/2026

**Raghavan, C.** (2012, March). *Trauma in the Courtroom*. Talk presented at *the Role of Mental Health Professionals in the Court,* The 16th Annual Fordham Forum on Domestic Violence, NY, NY.

**Raghavan, C.** (2011, March). *The conceptualization of non-violent sexual coercion tactics in young dating couples*. Paper presented at the Vera Institute of Justice, New York, New York.

**Raghavan, C**. (2010, April). *Violence and coercive control in male same sex relationships*. Paper presented at Dickinson College, Carlisle, PA.

**Raghavan, C**. (2008, December,). *Cognitive behavior therapy, gender and violence: A comparison of Indian and US contexts*. Paper presented at the Avinashilingam Women's University.

**Raghavan, C**. (2007, October). *The changing definition of date rape*. Invited panelist on grey rape sponsored by Cosmopolitan and John Jay College of Criminal Justice.

**Raghavan, C**.  (2007, October). *The role of community violence and peer affiliation in understanding partner violence*. Invited speaker at the Colloquium Series at the University of Arizona, Tucson.

**Raghavan, C**.  (2007,October). *Structural risk factors for perpetration of intimate partner violence*. Invited speaker at the Research to Practice Series, New York City Alliance Against Sexual Assault.

**Raghavan, C.**, Gentile, K., Collado, L., & Rajah, V. (2007, May) *How relationships between young men impact on violence.* Invited Speaker at Moving Our Systems Forward. The Role of Human Service Providers in Ending Violence Against Women, sponsored by John Jay College, Safe Horizon, New York State Office for the Prevention of Domestic Violence, A Call to Men. New York, NY.

**Raghavan, C.** (2005).  *Responding to engaging men*. Invited Panelist at Ending Violence Against Women: A Call to Men: Safe Horizon and John Jay College of Criminal Justice, New York City, New York.

**Raghavan, C.** (2003).  *Domestic violence prevention & treatment*. Invited speaker at the Rotary Club International, Kuala Lumpur, Malaysia.

**Raghavan, C.** (2002). *Family violence research, prevention & treatment.*  Invited talk given at the Graduate Lecture Series, John Jay College of Criminal Justice – The City University of New York.

UPDATED 02/25/2026

**POSTERS AND PRESENTATIONS (LAST TEN YEARS)**
**Raghavan, C., Doychak, K., Juraschek, E., Legg, A., & Feliciano, S. (September, 2023). Coercive Control and Intimate Partner Violence: Applications in Differing Contexts. European Conference on Domestic Violence. Reykjavik, Iceland.**

**Ali, Y., Raghavan, C., & Feliciano, S. (2022, August). What Role Does Prior Religious Belief Play in Cult Susceptibility: A Descriptive Study. In E. Juraschek (Chair),** *Power and Control in Cults* **[Symposium]. American Psychological Association 2022 Annual Convention, Minneapolis, MN, United States.**

**Ali, Y., Raghavan, C., & Feliciano, S. (2021, November). What Role Does Prior Religious Belief Play in Cult Susceptibility: A Descriptive Study. In E. Juraschek (Chair),** *A Flexible Framework: Using Coercive Control to Operationalize Abuse in Sex Trafficking and Cults* **[Panel]. American Society of Criminology 2021 Annual Convention, Chicago, IL, United States.**

Legg, A., **Raghavan, C**., & Morales, S. (2019, November). Not safe for all: Violence against men in commercial sex. Paper presented at the annual meeting of the American Society of Criminology Conference, San Francisco, CA.

Doychak, K., & **Raghavan, C.** (2018, November). No voice or vote: Coercive control and trauma-coerced attachment in sex-trafficking victims. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Juraschek, E., & **Raghavan, C.** (2018, November). How sexual coercion manifests in abusive relationships. In E. Juraschek (Chair), *What is Still Unseen in Violent Relationships: Sexual Coercion, Impression Management, and Cultural Definitions.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Legg, A., **Raghavan, C.**, & Doychak, K. (2018, November). *Client perpetrated violence against male sex workers*. Poster session presented at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Pomerantz, J., **Raghavan, C**., Doychak, K., & Mitchell, E. (2018, November). Power imbalances within a sex trafficking dynamic: A linguistic analysis of compliance. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA..

**Raghavan, C**., & Doychak, K. (2018, November). Broadening our understanding of

UPDATED 02/25/2026

coercive control as a marker of abusive power imbalances. In J. Pomerantz (Chair), *Coercive Control: Different Contexts, Different Measures, Different Issues.* Symposium conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Reissman, B., Doychak, K., Crossman, A., & **Raghavan, C.** (2018, November). "I'm the greatest:" Pride, impression management, and denial of coercive control and physical abuse by perpetrators of intimate partner violence. In E. Juraschek (Chair), *What is Still Unseen in Violent Relationships: Sexual Coercion, Impression Management, and Cultural Definitions*. Symposium conducted at the 74[t h] Annual Meeting of the American Society of Criminology, Atlanta, GA..

Unger, L. D., Doychak, K., Juraschek, E. F., Pomerantz, J., & **Raghavan, C**. (2018, November). Characteristics of isolation and social support among victims of sex trafficking. In L. D. Unger (Chair), *Victimization of Women and Persons of Color*. Session conducted at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Sriken, J. & **Raghavan, C**. (2018). Prevalence and correlates of intimate partner violence among at-risk men who have sex with men. Poster to be presented at the 74th Annual Meeting of the American Society of Criminology, Atlanta, GA.

Doychak, K. & **Raghavan, C**. (2018, March). Intermittent reward and punishment: Emotional exploitation in a sex-trafficking context. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context.* Symposium conducted at the meeting of the Eastern Psychological Association, Philadelphia, PA.

Mitchell, J.E., Juraschek, E., & **Raghavan, C.** (2018, march). *The Impact of Coercive Control on Use of Specific Sexual Coercion Tactics.* Poster presented at the Eastern Psychological Association Conference. Philadelphia, PA.

Pomerantz, J., Cohen, S., & **Raghavan, C.** (2018, March). Elaboration as Compliance Tactic: A Linguistic Analysis within Sex Trafficking. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context*. Symposium conducted at the meeting of the Eastern Psychological Association, Philadelphia, PA.

Unger, L. D., Doychak, K., Pomerantz, J., & **Raghavan, C.** (2018, March). Coercive control by proxy in victims of sex trafficking. In K. Doychak (Chair), *Coercive Control: Tactics and Responses in a Sex-Trafficking Context*. Symposium conducted at the Annual Meeting of the Eastern Psychological Association, Philadelphia, PA.

*Mahan, E., Doychak, K., & **Raghavan, C**. (2017, March). *Shrinking Social Space:*

UPDATED 02/25/2026

*Understanding Isolation in Trafficking Survivors*. Poster presented at the annual meeting of Eastern Psychological Association, Boston, MA.

*Pomerantz, J., Cohen, S.J., & **Raghavan, C**. (2017, March). *Compliance in the Absence of Proximal Intimidation within Abusive Interpersonal Dynamics.* Poster presented at the annual meeting of Eastern Psychological Association, Boston, MA.

*Pipitone, J.M. & **Raghavan, C**. (2015, September). *Physical Environments of Study Abroad: Student Experiences of Self and Place in Morocco and Indonesia.* **Individual paper** presented on the "Influence of Place and Space on Young People's Mobilities in Urban and Rural Contexts" **Panel Session** at the Royal Geographic Society (RGS) with the Institute of British Geographers (IBG), Exeter, United Kingdom.

*Pipitone, J.M. & **Raghavan, C**. (2015, September). *Integrating the Physical and Psychological: Adolescent Experiences of a Therapeutic Wilderness.* **Individual paper** presented on the "Children and Nature in the Anthropocene: Impacts of children, families, and young people connecting with nature " **Panel Session** at the Royal Geographic Society (RGS) with the Institute of British Geographers (IBG), Exeter, United Kingdom.

*Pipitone, J.M. & **Raghavan, C**. (2015, March). *International Learning Environments: Student Experiences and Experiential Pedagogies in Morocco and Bali.* **Individual paper** presented at the annual meeting of the Eastern Psychological Association, Philadelphia, PA.

***Raghavan, C.,** Loveland, J. E., & Tuller, A. (2014, November). Use of sexual coercion as a control tactic by abusive men. Presentation at the American Society of Criminology's Annual Meeting, San Francisco, CA.

*Crossman, A., **Raghavan, C.**, & Loveland, J. E. (2014, March). Shame, self-deception, and the batterer. Poster presentation at the Eastern Psychological Association Meeting, Boston, MA.

*Kaplenko, H., Loveland, J. E.**, & **Raghavan, C**. (2014, November). Relationships among shame, restrictiveness, authoritativeness, and coercive control in a sample of men mandated to batterer treatment. Poster Presentation at the American Society of Criminology's Annual Meeting, San Francisco, CA.

*Loveland, J. E., & **Raghavan, C.** (2014, March). The disjuncture between sexual labels and sexual behavior. Poster presentation at the Eastern Psychological Association Meeting, Boston, MA.

UPDATED 02/25/2026

*Pipitone, J.M. & **Raghavan, C**. (2014, April). *Assessing Student Engagement with the Arts through the Teaching of Psychology in Bali.* **Individual paper** presented at The Arts & Higher Education: Building Creative Partnerships and Assessing Program Impacts Conference, Baruch College, New York, NY.

*Loveland, J.E., & **Raghavan, C**. (2013, March). *Near Lethal Violence Among Men in Same Sex Relationships.* Poster presentation at the Eastern Psychological Association Meeting, New York, New York.

*Loveland, J.E**.**, & **Raghavan, C**. (2013, March). *Near Lethal Violence Among Women in Same Sex Relationships.* Poster presentation at the American Psychology-Law Society Conference, Portland, Oregon.

*Barbaro, L. M. & **Raghavan, C**. (2012, November). *Resistance to violence*: *Differences between heterosexual, gay and lesbian victims if intimate partner violence*. Paper presented at 68th Annual Meeting of the American Society of Criminology, Chicago, IL.

**\***Barbaro, L. M. & **Raghavan, C.** (2012, October). *Types of resistance: The effect on fight resolution among LGBT intimate partners*. Paper presented at 12th Annual Diversity Challenge, Boston, MA.

*Loveland, J. E., & **Raghavan, C**. (2012, November). *Staying with the Perpetrator: Differences between Heterosexual and Same Sex Victims*. Paper presentation at the American Society of Criminology's Annual Meeting, Chicago, Illinois.

**\***Loveland, J. E**.**, & **Raghavan, C**. (2012, August). *The complex relationship between women's sexual identity and sexual preference*. Poster presentation at the American Psychological Association Conference, Orlando, Florida.

**\*Raghavan, C**, Beck, C, Anderson, E.R., & Brewster, K.O. (2011, November). *How are violence tactics gendered? Examination of partner violence behaviors in male same sex relationships*. Paper presented at the annual meeting of the American Society of Criminology, Washington, D.C.

*Viñas-Racionero, R., **Raghavan, C**., Soria-Verde M. A., & Prat-Santaolària, R. (2011, August). *Severity of Intimate Partner Violence Behaviors in Spain: What is the role of stalking?*. Paper presented at the 119th American Psychological Association (APA) Annual Convention, Washington, D.C.

**\*Raghavan, C**., Cohen, S., & Tamborra, T. (2011, June). *A New Model of Sexual Coercion: Theory and Measure Development*. Paper presented at the meeting of the Society of Community Research and Action, APA Division 45, Chicago, IL.

UPDATED 02/25/2026

(Portions of this talk were presented at the 6th National Congress of Legal and Forensic Psychology, Palma de Mallorca, Spain and at Vera Institute of Justice, New York, New York).

**\*Raghavan, C**., Cohen, S., & Tamborra, T. (2011, April). *A New Model of Sexual Coercion: Theory and Measure Development.* Paper presented at the 6th National Congress of Legal and Forensic Psychology, Palma de Mallorca, Spain.

\*Viñas-Racionero, R., Soria-Verde M. A., **Raghavan, C.,** & Prat-Santaolària, R. (2011, April). *El incremento del riesgo de las dinámicas de acoso con finalidad romática o vengadora: Pefiles de agresión domestica [The increasing risk of romantic and revenge stalking dynamics: A domestic aggression profile].* Paper presented in the VI Congreso de Psicología Jurídica y Forense, Palma de Mallorca, Spain.

\*Soria-Verde M. A., Viñas-Racionero, R., **Raghavan, C**., & Prat-Santaolària, R. (2011, July). *Investigación Prelimiar de los perfiles de las tentativas de homicidio domestico [Preliminary investigation of profiles of domestic homicide attempts*]. Paper presented in the Congreso internacional sobre: manipulación psicológica, grupos sectarios, socioadicciones y sus daños, Barcelona, Spain.

\*Viñas-Racionero, R., Soria-Verde M. A., Prat-Santaolària, R., & **Raghavan, C**. (2011, March). *Domestic stalking violence in Spain: Could certain types of stalking behaviors be related with aggressions?* Paper presented at the IV International Congress on Psychology and Law, Miami, FL.

**\*Raghavan, C**, Tamborra, T, & Cohen, S. (2010, November). *Development of a new gender sensitive sexual coercion scale*. Paper presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

\*Decker, M., Tuller, A., **Raghavan, C**. (2010, November). *Resistance to sexual assault: A comparison of male, female & transgender survivors*. Poster presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

\*Duro, A.S., Sriken, J. & **Raghavan, C**. (2010, November). *Client Violence during Male Sex Work:  Hidden and Unknown Violence among Men Who Have Sex with Men*. Poster presented at the 62nd Annual Meeting of the American Society of Criminology, San Francisco, CA.

\*Decker, M. & **Raghavan, C**. (2010, November). *Media's creation of the ineffective bystander*. Paper presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

\*Sriken, J. & **Raghavan, C.** (2010, November). *"Wanna get dirrty": The internalization of sexual and racial objectification*.  Paper presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

UPDATED 02/25/2026

*Simons, K. & **Raghavan, C**. (2010, November). *Make her say aah: The evolution of television media and its impact on society's objectification of Black women.* Paper  presented at the 2010 Annual Meeting of the American Society of Criminology, San Francisco, CA.

**Raghavan, C**., and Beck, C. (2010, March). *What About Coercive Control in Same Sex Relationships*? Paper presented at the annual meeting of American Psychological-Law Society conference in Vancouver, Canada.

**Raghavan, C**., and Beck, C.  (2010, June). *Coercive Control in Abusive Relationships.* Paper presented at the Ninth Biennial International Conference, John Jay College of Criminal Justice, Marrakesh, Morocco

**Raghavan, C**., and Ranjan, S. (2009, November). *Development of a Community Response to Partner Violence Scale*. Poster presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

*Sriken, J., **Tuller, A.,** & Raghavan, C. (2009, November*). Risk of intimate partner homicide among marginalized men who have sex with men.* Poster presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

***Tuller, A.,** & Raghavan, C. (2009, November). *Coercive control in same sex relationships*. Paper presented at the annual meeting of the American Society of Criminology, Philadelphia, PA.

**Raghavan, C**. (2008, March). Chair: *Is cyberstalking stalking?  Legal, theoretical, and measurement issues*. Panel presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Jones, C., Reardon, L., & **Raghavan, C**. (2008, March). *The Development of the Cyber Stalking Scale (CSTS)*. Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Tuller, A., Jones, C., & **Raghavan, C**. (2008, March). *Is cyberstalking part of intimate partner violence?* Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Davis, S. M., & **Raghavan, C**. (2008, March). *Stalking and jealousy: Does the relationship hold across gender and culture?* Paper presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Ha, D., Williams, J. F., **Raghavan, C**., Tuller, A., & Schraft, C. (2008, March). *Does the CTS really measure the worst conflict? Evidence from college students*

UPDATED 02/25/2026

*suggests not.* Poster presented at the American Psychological-Law Society conference in in Jacksonville, F.L.

*Jones, C., Tuller, A., & **Raghavan, C**. (2008, March). *Intimate partner violence and social support peer networks in gay, lesbian, and straight students*. Poster presented at the American Psychological-Law Society conference in Jacksonville, F.L.

*Tuller, A., & **Raghavan, C.** (2008, November). *Shame, Anger, and Violence Among Men Who Have Sex with Men.* Paper presented at the annual meeting of the American Society of Criminology, St. Louis, MO.

**Raghavan, C**. (2007, November). Chair: *Conceptualizing intimate partner violence in a gender and culture-sensitive framework*. Panel presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*DeSimone, L. J., Davis, S. M., & **Raghavan, C**. (2007, November). *Why did we fight and what made it so bad: Narratives of intimate partner conflict*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., DeSimone, L. J., & **Raghavan, C**. (2007, November). *The role of jealousy in intimate partner violence: Gender and ethnic group differences*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

**Raghavan, C**., Kavanagh, A. M., Rajah, V., Gentile, K., & Collado, L. (2007, November). *Community violence, violence in the social support networks, and male perpetration of intimate partner violence*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

Johnson, M., **Raghavan, C.**, Citron, K., & Kavanagh, A. M. (2007, November). *Examining 'Expectations of police compliance with Miranda protections': Ethnic group differences*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Kassen, M., & **Raghavan, C.** (2007, November). *Exposure to urban violence and contributory factors to posttraumatic stress in a diverse college sample*. Paper presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., Jones, C., & **Raghavan, C**. (2007, November). *Peer validation of partner violence*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*DeSimone, L. J., Attoh, A., & **Raghavan, C**. (2007, November). *Abusive childhood experiences: differentiating anger in adulthood*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

UPDATED 02/25/2026

*Hey, A. L., Kassen, M., & **Raghavan, C**. (2007, November). *Methodological or real differences among intimate partner femicide research: a qualitative meta-analysis*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Jenkins, J., Sergenian, S., & **Raghavan, C**. (2007, November). *Dating violence and school performance among college students*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Jones, C., Reardon, L. M., & **Raghavan, C**. (2007, November). *Does social support mediate or moderate the relationship between community violence and intimate partner violence?* Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Kavanagh, A. M. J., & **Raghavan, C**. (2007, November). *Personality traits of males who perpetrate sexual coercion and/or physical abuse in dating relationships*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Reardon, L. M., Davis, S. M., & **Raghavan, C**. (2007, November). *Relationship monitoring or stalking?* Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Tuller, A., Schraft, C. V., & **Raghavan, C**. (2007, November). *The role of shame, isolation and hostility within intimate partner violence.* Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Williams, J. F., Ha, D., Davis, S. M., & **Raghavan, C**. (2007, November). *Emotions felt after a worst conflict among intimate partners: Initial validation of the ATWC scale*. Poster presented at the meeting of the American Society of Criminology, Atlanta, G.A.

*Davis, S. M., DeSimone, L., & **Raghavan, C**. (2007, May). *Jealousy and intimate partner violence in a culturally diverse college population*. Poster presented at the Association for Psychological Science Convention, Washington, DC.

*DeSimone, L., Kamath, G., & **Raghavan, C**. (2007, May). *Intimate partner violence in a diverse college population: A preliminary test of intersectionality*. Poster presented at the Association for Psychological Science Convention, Washington, DC.

**Raghavan, C**. (2007). Chair, *Victimization; Psychology & Law*. 3rd Annual Forensic Psychology Graduate Research Conference, John Jay College of Criminal Justice, NY, NY.

UPDATED 02/25/2026

*DeSimone. L, & **Raghavan, C**. (2007, May). *A test of intersectionality: Intimate partner violence in a culturally diverse lesbian, gay, and heterosexual college population*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Reardon, L., Jones, C., & **Raghavan, C**. (2007, May). *Community violence and intimate partner violence in an ethnically diverse population: The role of social support*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Tuller, A., Schraft, C., & **Raghavan, C**. (2007, May). *Emotional consequences of intimate partner conflict: An exploratory investigation of gender differences*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Williams, J., Ha, D., Davis, S. M., & **Raghavan, C**. (2007, May). *Exploring the factor structure and determining the reliability of the After the Worst Conflict Scale*. Poster presented at the John Jay Graduate Forensic Psychology Research Conference, New York, NY.

*Davis, S. M., DeSimone, L., & **Raghavan, C**. (2007, March). *Ethnic and gender group differences in intimate partner jealousy in a diverse college population*. Paper presented at the Mid-Hudson Undergraduate Psychology Research Conference, New Paltz, NY.

**Raghavan, C**. (2006, Nov). Session Chair: *Gender, sex, and violence*. Panel presented at the meeting of the American Society of Criminology, Los Angeles, CA.

**Raghavan, C**. (2006, Nov). *A Feminist-community model of intimate partner violence*. In C. Raghavan (Chair), Gender, sex, and violence. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

**Raghavan, C**., Collado, L., & Desimone, L. (2006, November). *Gender differences in dating scripts and IPV*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Collado, L. & **Raghavan, C**. (2006, November). *The effects of acculturation on intimate partner violence among Hispanics and Non-Hispanic immigrants*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*McHenry, S. P., Gates, K., & **Raghavan, C**. (2006, November). *Sexual coercion and sexual confusion*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

UPDATED 02/25/2026

*Jenkins, J, & **Raghavan, C**. (2006, November). *The association of social development/Age on juvenile fear of crime levels In New York City Public Schools*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Yazykova, K., **Raghavan, C**., & O'Connor, M. (2006, November). *Categories of stalking tactics and their associations with intimate partner violence*. Paper presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Yazykova, K., **Raghavan, C**., O'Connor, M., & Dernison, A. (2006, November). *Associations between stalking tactics, intimate partner violence, and underlying motivations*. Poster presented at the meeting of the American Society of Criminology, Los Angeles, CA.

*Gates, K., **Raghavan, C**., & Kavanagh, A-M. (2006, August). *Predictive factors for men who sexually coerce intimate partners*. Poster presented at the annual meeting of the American Psychology Association, New Orleans, LA.

**Raghavan, C**. ,& Cruz, G. (2006, May). *A test of two models of intimate partner violence*. Poster presented at the annual American Psychological Society Conference, New York, NY.

*Gates, K., McHenry, S., **Raghavan, C**., & Kavanagh, A-M. (2006, May). *Sexual abuse in intimate relationships: Effect on female victims*. Poster presented at the annual meeting of the American Psychology Society, New York, NY.

*Carter, A., R**aghavan, C**., & Kavanagh, A-M. (2006, May). *Is alcohol use a cause or a consequence of dating violence in an urban college sample?* Poster presented at the annual American Psychological Society Conference, New York, NY.

*Kavanagh, A-M., **Raghavan, C**., & Gates, K. (2006, March). *Personality traits of men and women who perpetrate sexual coercion*. Poster presented at the annual American Psychological Society Conference, New York, NY.

*Kavanagh, A-M., **Raghavan, C**., & Gates, K. (2006, March). *The relationship between gender and sexual coercion*. Poster presented at the American Psychological-Law Society conference in Florida, March, 2006.

*Kavanagh, A-M., & **Raghavan, C**., (2006, March). *The influence of social support on intimate partner violence*. Poster presented at the American Psychological-Law Society conference in Florida, March, 2006.

Falkenbach, D., **Raghavan, C**., & Krishnan, S. (2006, March). *Consideration of psychopathic traits in perpetrators of domestic violence*. Poster presented at the

UPDATED 02/25/2026

annual meeting of the American Psychology-Law Society Conference, St. Petersburg, FL.

*Ranjan, S., **Raghavan, C**., & O'Connor, M. (2005). *Stalking and intimate partner violence victimization in an urban sample of immigrant commuter college students*. Paper presented at the 14th World Congress of Criminology, Philadephia, PA.

**Raghavan, C**. (2005). Session Chair: *Dating violence in an ethnically diverse sample of college students: Correlates and consequences*. Panel conducted at the American Psychology-Law Society Conference, La Jolla, California.

**Raghavan, C**.,  Kavanagh, A-M., Gentile, K., Rajah, V., &  Collado, L. (2005). *Description of dating violence and associated community risk factors in an urban college sample*. Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

Gentile, K., **Raghavan, C**.,  Kavanagh, A-M.,  & Rajah, V. (2005). *It doesn't happen here: An assessment of eating disorders in ethnically diverse urban sample of male and female college students*. Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

Rajah, V., **Raghavan, C**., & Gentile, K. (2005). *Gender differences in accounts for dating violence among a low income minority college sample*. Paper presented at the American Psychology-Law Society Biennial Conference, La Jolla, California.

*Carter, A., **Raghavan, C**., Rajah, V., Gentile, K., &  Kavanagh, A-M. (2005). *Alcohol use and dating violence in an urban college sample. A dual model of traumatic response*. Paper presented at the American Psychology-Law Society Biennial Conference, La Jolla, California.

*Kavanagh, A-M., & Raghavan, C. (March, 2005). Male peer support and dating violence.  Poster presented at the American Psychological-Law Society conference in Arizona, March, 2005.

O'Connor, M., Galietta, M., & **Raghavan, C**. (2005). *Level of exposure to stalking in an urban college sample: implications for policy and services.* Paper presented at the American Psychology-Law Society Conference, La Jolla, California.

**Raghavan, C**. (March, 2004). Chair: *Issues in Domestic Violence*. Panel conducted at the American Psychology-Law Society Conference, Scottsdale, Arizona.

**Raghavan, C**., Mennerich, A., & James, S. (March, 2004). *Domestic violence in a neighborhood context: Links between neighborhood disorder, drug use, criminal activity, and community violence*. In Raghavan, C. (Chair), Issues in domestic

UPDATED 02/25/2026

violence. Panel conducted at the American Psychology-Law Society Conference, Scottsdale, Arizona.

**Raghavan, C**. (Feb, 2004).  Chair: *Collective and individual space: views from the abstract, transnational and local perspectives.* Panel conducted at the Third International Conference on Crime and Criminal Justice in the Caribbean, Kingston, Jamaica.

**Raghavan, C**., Mennerich, A., & James, S. (Feb, 2004). *The influence of public life on private: A study of crime, drugs and domestic violence*. In C. Raghavan (Chair), Collective and individual space: Views from the abstract, transnational and local perspectives. Panel conducted at the Third International Conference on Crime and Criminal Justice in the Caribbean, Kingston, Jamaica.

**FUNDED RESEARCH PROJECTS AT JOHN JAY**

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2020-2022)

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2018-2019)

PSC-CUNY Research Grant, John Jay College of Criminal Justice (2013-2014)

Research Assistant Fund, John Jay College of Criminal Justice (2009-2010)
    Title: *An Investigation of Physical and Sexual Violence among Drug using Men who have Sex with Men*
    PI: **C. Raghavan**
    Amount: $1,000

Research Assistant Fund, John Jay College of Criminal Justice (2008-2009)
    Title: *An Investigation of Severe and Near Lethal Violence among Gay Men*
    PI: **C. Raghavan**
    Amount: $1,000

PSC-CUNY Research Grant, City University of New York (2006-2007)
    Title: *Gender symmetry, intimate partner violence, and post-traumatic stress disorder*.
    PI: **C. Raghavan**
    Amount: $5,940

Faculty Fellowship Publication Program, City University of New York (2006).
    Title: *The differential risk hypothesis: a theory predicting minor and severe forms of intimate partner violence.*
    PI: **C. Raghavan**
    Amount: $3,800

UPDATED 02/25/2026


PSC-CUNY Research Grant, City University of New York (2005-2006)
>   Title: *Why are rates of violence so much higher in this urban college sample?* An in-depth exploration of contributing community factors.
>   PI: **C. Raghavan**
>   Amount: $3,800

PSC-CUNY Research Grant, City University of New York (2004-2005)
>   Title: *Dating violence and academic performance in first year students at John Jay College Of Criminal Justice.*
>   PI: **C. Raghavan**
>   Amount: $4,900

Research Assistance Fund, Jay College of Criminal Justice (2004-2005)
>   Title: *An examination of drinking and violence using the calendar method.*
>   PI: **C. Raghavan**
>   Amount: $1000

Forensic Psychology Research Grant, John Jay College of Criminal Justice (2004-05)
>   Title: *An examination of dating violence in first year students at John Jay College Of Criminal Justice.*
>   PI: **C. Raghavan**
>   Co-PI: Katie Gentile and Valli Rajah
>   Amount: $6,660

PSC-CUNY Research Grant, City University of New York (2003-2004)
>   Title: *Exposure to community violence as a mediator of individual and neighborhood risk factors for domestic violence.*
>   PI: **C. Raghavan**
>   Amount: $4,920


## DOCTORAL DISSERTATION
>   Title: An investigation of cross-cultural differences and similarities between Asian Americans and European Americans based on a new multidimensional model of esteem.

**University of Illinois at Urbana Champaign, Department of Psychology**
>   Chair: Howard Berenbaum, Ph.D


## OTHER PROFESSIONAL SERVICES

University Service

UPDATED 02/25/2026

Elected to University-Wide Personnel and Budget Committee (P & B) (2010-2011, 2011-2012).
Governance Committee of the MA in International Crime and Justice (2009-current)
Sexual Harassment Awareness Committee (2010-current).
President's Advisory Committee on International Programs (2008-current).
Appointed Director of BA/MA Program (2007-current).
Member of Committee on Graduate Studies (2007-current).
Elected to Department Personnel and Budget Committee (P & B) (2004, 2005, 2006, 2007-2008).
Organizing committee of the proposed M.A. in International Crime and Justice (2006-2009).
Appointed to Affirmative Action Committee (2006-2010).
Member of the Gender Studies Committee (2002-2010)

Ad Hoc Reviewer

Feminist Criminology (September, 2008, April 2010, May 2011, July 2013).
International Journal of Forensic Mental Health (June 2010, December, 2010).
Violence Against Women (March 2004, January 2008, November 2010, March 2011).
International Journal of Offender Therapy and Comparative Criminology (November 2010, March 2011).
Women Studies Quarterly (July, 2010).
Journal of Consulting and Clinical Psychology (August 2008, November, 2009).
Book Review for Journal of Trauma and Dissociation (March, 2009).
Book Review for Oxford University Press (August, 2007).
Violence and Victims (January, 2008).
Journal of Abnormal Psychology (1997).
Journal of Traumatic Stress, (Jan 1998, Apr 1998).
Cognitive Behavior and Therapy (June 2000).
Journal of Substance Abuse Treatment (July 2002)

## PROFESSIONAL AFFILIATIONS

New York Psychological Association
American Society of Criminology
American Psychological Association

## PAST HONORS AND AWARDS

2013        Baruch-Rubin Summer Faculty Fellow
2014        Baruch-Rubin Faculty Fellow

UPDATED 02/25/2026

| | |
|---|---|
| 1992-1993 | University of Illinois Fellowship |
| 1990 | Phi Beta Kappa |
| 1991 | Smith College, Magna cum laude |
| 1988-1992 | Smith College International Student Grant |
| 1988-1992 | Smith College Dean's List |
| 1988-1992 | Smith College First Group Scholar |

# EXHIBIT B

UPDATED 03/31/2026

CHITRA RAGHAVAN, Ph.D.
Department of Psychology
John Jay College of Criminal Justice
524 West 59th Street
New York, N.Y. 10019
craghavan@jjay.cuny.edu

## LIST OF CASES TESTIFIED (2016-2026)

5-24-2016: Expert witness in sex trafficking and coercive control in *People v. Gayot*, Ind. Nos. 482/14, 462/15 (N.Y. County Ct., Suffolk County). Requested by the Suffolk County District Attorney's Office.

9-07-2016: Expert witness in coercive control and PTSD in *Rana vs. Islam*, 14-cv-1993 (S.D.N.Y.). Requested by the law firm of Dechert LLP.

11-29-2016: Expert witness in domestic violence, coercive control and trauma in *Ellis vs. Administration of Children's Services* (N.Y. Fam. Ct.). Requested by the Center for Family Representation.

12-08-2016: Expert witness in domestic violence, coercive control, and trauma in *People v. Pehlwan*, Ind. No. 9767/14 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

12-20 to 12-22-2017, 4-11-2018: Expert witness in domestic violence and trauma in a consolidated *Frye* hearing in *People v. Abdur-Razzaq*, Ind. No. 3154/13, and *People v. Skipper*, Ind. No. 2409/15 (N.Y. Sup. Ct., Bronx County). Requested by the Bronx County District Attorney's Office.

10-31-2018: Expert witness in coercive control, sex trafficking, trauma, and trauma bonding in *People v. Abdur-Razzaq*, Ind. No. 3154/13 (N.Y. Sup. Ct., Bronx County). Requested by the Bronx County District Attorney's Office.

1-08-2019: Expert witness in coercive control, sex trafficking, trauma, and trauma bonding in *People v. Skipper*, Ind. No. 2409/15 (N.Y. Sup. Ct., Bronx County). Requested by the Bronx County District Attorney's Office.

1-11-2019: Expert witness in sex trafficking and coercive control in *People v. Abiodun Abileke* (N.Y. County Ct., Suffolk County). Requested by the Suffolk County District Attorney's Office.

4-29-2019: Expert witness in psychology and coercive control in *Toro Bonilla v. Rivera Erazo*, 18-cv-4569 (E.D.N.Y.). Requested by Davis Polk & Wardwell LLP.

4-10-2019:  Expert witness in domestic violence and coercive control in *People v. Drucker* (N.Y. County Ct., Ulster County).  Requested by the Ulster County District Attorney's Office.

8-09-2019: Expert witness in sexual coercion and domestic violence in *People v. Farquharson*, Ind. No. 751/2018 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

3-10 to 03-11-2020:  Expert witness in sex trafficking and coercive control in *United States v. Randall*, 19-cr-131 (S.D.N.Y.).  Requested by the United States Attorney's Office for the Southern District of New York.

3-04 to 03-05-2020:  Expert witness in sex trafficking and coercive control in *United States v. Armstead*, 18-cr-357, 19-cr-369 (D.D.C.).  Requested by the United States Attorney's Office for the District of Columbia.

10-19-2020 to 10-20-2020:  Expert witness in psychology, coercive control, and multicultural issues in *Francis v. Culley*, No. 20-cv-3326 (E.D.N.Y.).  Requested by Davis Polk & Wardwell LLP.

2-2-2021: Expert witness in domestic violence, coercive control and PTSD in *People vs. Natasha Chopito*, Sentencing Hearing. (State of New Mexico). Requested by Law Offices of the Public Defender, New Mexico.

5-7-2021: Expert witness in forensic psychology in *United States v. Subhannah Wahaj*, (Federal District of New Mexico). Requested by Defendant's Attorney Ryan Villa, Federal District Court for the District of New Mexico.

6-7-2021 to 6-8-2021: Expert witness in coercive control, sex trafficking and trauma in *United States v. Rivera, (S.D.N.Y.).* Requested by the United States Attorney's Office for the Southern District of New York.

7-7-2021 to 7-8-2021: Expert witness in coercive control, domestic violence, and trauma bond in *United States v. Aquilino Torres*.  Requested by the United States Attorney's Office for the Southern District of New York.

7-28-2021: Expert witness in coercive control, domestic violence, and trauma bond in *United States v. Joey Green-Remache* (D.D.C.).  Requested by the United States Attorney's Office for the District of Columbia.

10-05-2021: Expert witness in coercive control, domestic violence, sex trafficking and trauma bond in *United States v. Darnell Deshawn*.  Requested by the United States Attorney's Office for the District of Minnesota.

2

10-20-2021: Expert witness in coercive control, domestic violence, and sexual coercion. *The People of the State of New York v. Andre Gilkes (245-2020)*. Requested by the Kings County District Attorney's Office.

3-15-2022: Expert witness in coercive control and domestic violence. *The People of the State of Michigan vs. Jessica Simpson*. (Michigan). Requested by Law Offices of the Federal Defender, Eastern District of Michigan.

4-14-2022: Expert witness in coercive control and battered person syndrome. *The People of the State of New Mexico vs. William Baca*. (Michigan). Sentencing Hearing Requested by Law Offices of the Public Defender, New Mexico.

9-24-2022: Expert witness in coercive control, domestic violence, sexual coercion cultural influence in *People v. Uddin Meftaah*, Ind. No. 73667-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

01-31-2023: Expert witness in intimate partner violence, coercive control, and trauma in *People v. Christopher Dantignac*, Ind. No. 73950-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

03-29-2023: Expert witness in intimate partner violence, coercive control, and sexual coercion in *People v. Joshua Nembhard* – Ind. 70686-21 (N.Y. Sup. Ct., Nassau County). Requested by the Nassau County District Attorney's Office.

06-07-2023: Expert witness in domestic violence, coercive control, and trauma bonds in *People v. Joshua Hemphill* – Ind. 2018CF1015654 (D.C. Sup. Ct., District of Columbia). Requested by the United States Attorney's Office for the District of Columbia.

10-02-23: Expert witness in domestic violence and coercive control in *United States v. Rosado (SDNY)* - 21 Cr. 516 (RMB) 2021R00680. Requested by the United States Attorney's Office for the Southern District of New York.

11-6-2023: Expert witness in intimate partner violence and coercive control in *US v. Marvin Lopez* 2016 - CF1 018780 (D.C. Sup. Ct., District of Columbia). Requested by the United States Attorney's Office for the District of Columbia. Requested by the United States Attorney's Office for the District of Columbia.

12-13-2023: Expert witness in domestic violence and coercive control in *People v. Ruslan Sadikhov* - IND-73067-21 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

12-13-2023: Expert witness in domestic violence, cultural issues, and coercive control in *People vs. Al-Sodani, Mohammed* IND-74570-22 (N.Y. Sup. Ct., Kings County). Requested by the Kings County District Attorney's Office.

3

02-28-2024: Expert witness in psychology, forensic psychology, sexual victimization, and sexual assault in *People vs. Clarke, Carlis,* IND-72441-21 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

03-14-2024: Expert witness in domestic violence, coercive control, and sexual assault in *People vs. Mustafa Aboulissan* IND-74236-22 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

03-26-2024: Expert witness in domestic violence and coercive control in People vs. Jonathan Wright IND- 70998-23 and 71033-22 (N.Y. Sup. Ct., Suffolk County).  Requested by the Suffolk County District Attorney's Office.

05-17-2024. Expert Deposition in *Minskoff v. Mendoza*, Case No. 1:23-CV-584 (E.D.N.Y.). Witness for the plaintiff, deposed by defendant counsel, Reed Smith LLP and Constangy Brookes Smith and Prophete, LLP.

05-22-2024: Expert witness in domestic violence, coercive control, and trauma bonding in *US vs. Quenton Jones* 2024 - DVM 167 (D.C. Sup. Ct., District of Columbia).  Requested by the United States Attorney's Office for the District of Columbia.

09-19-2024: Expert witness in domestic violence, coercive control, and sexual assault in *People vs. Ri Zheng* IND-70572-23 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

10-25-2024. Expert Deposition in Jane Doe 3 *v. Darren Indyke and Richard D. Kahn,* Case No. 1:24-CV-01204-AS (S.D.N.Y.). Witness for the plaintiff, deposed by defendant counsel, Hughes, Hubbard, & Reed LLP for Indyke and Patterson, Belknap, Webb, & Tyler, LLP for Kahn.

1-7-2025: Expert witness in domestic violence, coercive control and PTSD in *USA vs. Stacey Yellowhorse*, Sentencing Hearing. (State of New Mexico). Witness for the defense counsel Rothstein and Donatelli Law, LLP., New Mexico.

3-11-2025: Expert witness in domestic violence, coercive control, and trauma in *People vs. Juan Rosas Cordero* IND-70147-23 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

3-17-2025: Expert Deposition in *Dixon v. Reid*, No. Case No 1:2023cv09878 (S.D.N.Y.) Witness for the plaintiff, deposed by defendant counsel, Gregory Korn for Kinsella Holley Iser Kump Steinsapir LLP., Los Angeles, and Bobbi C. Sternheim for Law Offices of Bobbi C. Sternheim, New York.

5-6-2025: Expert witness in sexual assault, coercive control, and traumatic outcomes in *People vs. Fabio Abreu-Rojas* IND-73904-22 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

08-20-2025: Expert witness in coercive control and traumatic outcomes in People v. Michael Howell, IND-70589-24 (N.Y. Sup. Ct., Suffolk County).  Requested by the Suffolk County District Attorney's Office.

5-6-2025: Expert witness in sexual assault, coercive control, and traumatic outcomes in *People vs. Fabio Abreu-Rojas* IND-73904-22 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

5-21-25: Expert witness in coercive control, sex trafficking and traumatic outcomes in People v. Akeem Lee, et al., IND-71134-23  (N.Y. Sup. Ct., Bronx County).  Requested by the Bronx County District Attorney's Office.

01-29-2026: Expert witness in sexual assault, coercive control, and traumatic outcomes in *People vs. Ramiro-Hernandez* IND-72616-23 (N.Y. Sup. Ct., Kings County).  Requested by the Kings County District Attorney's Office.

02-13-2026: Expert Deposition in Roberts v. eXp Realty, LLC, et al. (Case No. 2:23-cv-10492-AB-AGR, C.D. Cal.). Witness for the plaintiff (retained by Cohen Hirsch, LP and Lenze Lawyers, PLC), deposed by counsel for defendants eXp Realty, David S. Golden, Brent Gove, and Michael L. Bjorkman.

03-24-2026: Expert witness in coercive control, sex trafficking and traumatic outcomes in People v. Mitchell Johnson, IND-73588-24 (N.Y. Sup. Ct., Suffolk County).  Requested by the Suffolk County District Attorney's Office.